UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV, an individual,
KERRI WEEMS, an individual,
and CELEBRATION
GLOBAL, INC., a Florida not for profit          Case No.:
corporation, HONEY LAKE FARMS,
INC., a Florida not for profit corporation,
NORTHSTREAM MANAGEMENT
GROUP, LLC, a Florida limited liability
company, and WEEMS GROUP, LLC,
a Florida limited liability company,

        Plaintiffs,

v.

ASSOCIATION OF RELATED CHURCHES,
a Texas not-for-profit corporation,
CHRIS HODGES, individually,
DINO RIZZO, individually, and
JOHN SEIBELING, individually,

        Defendants.

_____/

## **COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiffs, Charles Stovall Weems, IV ("Pastor Weems"), Kerri Weems ("K. Weems"), Celebration Global, Inc. ("Celebration Global"), Honey Lake Farms, Inc. ("Honey Lake Farms"), NorthStream Management Group, LLC ("NorthStream"), and Weems Group, LLC ("Weems Group"), sue Defendants, Association of Related Churches ("ARC"), Chris Hodges ("Hodges"), Dino Rizzo ("Rizzo"), and John Seibeling ("Seibeling"), and allege as follows:

## OVERVIEW OF THE CASE

1.      This case arises out of a continuing unlawful conspiracy masterminded by the Defendants to protect and expand their church growth business interests and endeavors and the substantial income they generate by destroying Plaintiffs and eliminating them as perceived threats and competitors, which included engineering a takeover at Celebration Church of Jacksonville, Inc. ("Celebration Church") to allow Defendants to effectively gain control over its operations and substantial assets, cover-up numerous criminal and tortious acts committed in the process, and frame the Weemses's for financial crimes they never committed.

2.      Defendants were consumed by greed and the desire to advance their own financial and business interests when they deliberately targeted Pastor Weems and those closest to him because he rejected their unbridled church growth model and was focused on missionary work and developing supporting businesses that Defendants perceived as a significant threat to their economic interests.

3.      Using ARC's significant influence and power as a vehicle to facilitate and conceal their nefarious scheme, Defendants intentionally caused substantial financial and other irreparable harm to the Plaintiffs through a pattern of unlawful and often criminal acts that included extortion, bribery, psychological abuse, wire fraud, and computer crimes which ultimately caused over $100 million in damages.

4.      This action seeks to hold Defendants accountable for their illegal and tortious misconduct and put a stop to the substantial harm their unlawful actions continue to cause.

## PARTIES, JURISDICTION, AND VENUE

5.      This is an action for damages well in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees, as well as equitable relief.

6.      Plaintiff, Pastor Weems, is a resident and citizen of Duval County, Florida.

7.      Plaintiff, K. Weems, is a resident and citizen of Duval County, Florida.

8.      Plaintiff, Celebration Global, is a Florida not for profit corporation with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216.

9.      Plaintiff, Honey Lake Farms, is a Florida not for profit corporation with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216.

10.     Plaintiff, NorthStream, is a Florida limited liability company with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216, whose sole members are Pastor Weems and K. Weems.

11.     Plaintiff, Weems Group, is a Florida limited liability company with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216, whose sole members are Pastor Weems and K. Weems.

12.     Defendant, ARC, is a Texas not-for-profit corporation with its principal place of business located at 1201 Lee Branch Lane, Birmingham, AL 35242.

13.     Defendant, Hodges, is a resident and citizen of Birmingham, Alabama.

14.     Defendant, Rizzo, is a resident and citizen of Birmingham, Alabama.

15.     Defendant, Seibeling, is a resident and citizen of Memphis, Tennessee.

16.     Non-party, Celebration Church, is a Florida not-for-profit corporation with its principal place of business at 9555 R.G. Skinner Parkway, Jacksonville, Florida 32256.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because it involves claims between citizens of different states with an amount in controversy that exceeds the sum of $75,000.00, exclusive of interest and costs.

18.     Pursuant to 28 U.S.C. §1391, venue is proper in this District because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

19.     Defendants, directly and/or through employees, agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, engaged in numerous contacts in, with, and/or directed at the state of Florida upon which this action is based.

20.     Defendants knowingly and intentionally entered into one or more contracts or agreements, pursuant to which they, directly and/or through employees, agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, committed and engaged in tortious and overt acts within and directed at the state of Florida.

21.     Based on the facts alleged throughout this Complaint, this Court has personal jurisdiction over each Defendant under Section 48.193, *Florida Statutes*, because they each personally, directly, in concert with one another, and/or through an employee, agent, co-conspirator, subsidiary, affiliate, and/or other person or entity acting under their management, supervision, direction, and/or control, engaged in one or more of the following acts:

   a.   committing tortious acts within the state of Florida;

   b.   committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

   c.   operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in Florida;

   d.   engaging in substantial and not isolated activity within the state of Florida; and/or

   e.   engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and engaging in overt acts in furtherance of that conspiracy within or directed at the state of Florida.

22.     Based on the facts alleged throughout this Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy Due Process under the United States Constitution because Defendants: (1) engaged in substantial and not isolated activity within and directed at the state of Florida; (2) conducted business through employees, agents, co-conspirators, and/or authorized representatives located in the state of Florida; and/or (3) committed and conspired to commit intentional torts expressly aimed at Florida, the effects and harms of which were calculated to and did cause injury within the state of Florida. Accordingly, each

of the Defendants could and should have reasonably anticipated being sued for the claims alleged herein in the state of Florida.

23.     At all times material to this action, Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them acted within the course and scope of an agency, license, partnership, employment, conspiracy, ownership, joint venture, or contractual relationship with one another.  At all times material to this action, each Defendant's acts, omissions, and misconduct alleged herein were known to, authorized, approved, and/or ratified by the other Defendants; and/or Defendants engaged in such acts, omissions, and misconduct in concert or active participation with one another or to aid or abet one another.

24.     Defendants conspired and agreed with each other and others to engage in unlawful and tortious conduct intended to harm and injure Plaintiffs, in furtherance of which Defendants and their agents and co-conspirators engaged in overt acts within and directed at the state of Florida and could and should have reasonably anticipated that the acts and omissions alleged herein connected them to Florida in a meaningful way.

25.     Defendants' actions and misconduct alleged herein produced and/or substantially contributed to producing the damages, injuries, and harms Plaintiffs suffered, and for which they seek recovery and redress through this action; which injuries and harms occurred in the state of Florida and the greatest effects of which were suffered within the state of Florida.

26.      All conditions precedent to the filing and maintenance of this action have occurred, have been performed, and/or have been waived.

## COMMON FACTUAL ALLEGATIONS TO ALL COUNTS

### Overview of the Plaintiffs

27.      Pastor Weems and K. Weems founded Celebration Church in 1998 and devoted over 23 years of their lives to their church, its congregation, and its missions.

28.      Initially, Celebration Church was comprised of a single site in Jacksonville, Florida, but through years of dedication and sacrifice Pastor Weems and K. Weems grew that single site into a global, multi-site, non-denominational church with nearly 20,000 members.

29.      Pastor Weems served as Celebration Church's Senior Pastor, CEO, and President from its inception until he was forced to resign and separate himself and his family from the church on April 15, 2022.

30.      As Senior Pastor of Celebration Church, Pastor Weems had sole authority to set and shape the vision and direction of Celebration Church, and his responsibilities included: (1) complete plenary authority, control, and responsibility for directing missions and spiritual activities of the church; (2) serving as President and Chief Executive Officer of the church and having authority to direct all of its day-to-day operations, including establishing budgets, raising funds, and directing monies; and (3) acting as Chairman of the Board.

31.     Celebration Church's Board of Trustees were nominated exclusively by the Senior Pastor for one calendar-year terms and responsible for management and oversight of its corporate matters and financial resources.

32.     Celebration Church's "Overseers" were nominated by the Senior Pastor and confirmed by the Board of Trustees, provided apostolic oversight to the Senior Pastor, and were charged with protecting the Church through counsel, prayer, and if required, the investigation and discipline of the Senior Pastor.

### The Weemses's Anti-Growth Vision and Missionary Work

33.     In 2018, Pastor Weems came to the realization that Celebration Church had become too "corporate" and focused on generating attendance and revenue and needed to concentrate on helping the poor, missionary work, equality, and simplifying the church by creating alternative revenue streams that would make the church less donation dependent.

34.     Pastor Weems also came to recognize that the modern church growth system and its constant pressure to grow attendance and generate more and more revenue to keep the corporate "machine" running was having significant negative psychological and health impacts on pastors, who needed counseling, guidance, and treatment to recover from the adverse effects of the growth model that Defendants are at the forefront of promoting.

35.     To execute his new vision, Pastor Weems and K. Weems developed a plan that included establishing several corporate entities that collectively would house and fund Celebration Church's significant administrative and personnel operations,

quickly reduce expenses and Celebration Church's debt, and operate and fund the missionary work on which Pastor Weems wanted to focus.

36. The plan for this vision included the following:

A. a retreat and outpatient facility for pastoral care—Honey Lake Farms—and an adjoining medical clinic—Honey Lake Clinic, Inc.—that would provide Christian mental health treatment services, the revenue from which would be used to build out and support Honey Lake Farms' mission;

B. a for profit corporation—NorthStream—designed to provide centralized and shared management services to Celebration Church and numerous other churches that enabled church leadership to focus their attention on ministry and missions rather than operational aspects of their churches; that would also develop Restorative Community Developments (RCD's[1]), the first of which was Honey Lake Farms; and

C. a separate entity—AWKNG, Inc.—which would act as a hub for the restorative/ministry programing used at Honey Lake Farms, a theology school, missionary partnerships, media operations, and other similar endeavors.

37. Celebration Global was designed to be the umbrella organization under which Pastor Weemses's missionary work would be housed.

38. As they began implementing their anti-growth, missionary focused vision, Pastor Weems and K. Weems contributed their own personal money and invested in Weems Group for a combined total of approximately $1.2 million that was used to fund the operations of Honey Lake Farms, NorthStream, and AWKNG.

---

[1] Restorative Community Developments are self-contained investment portfolios ideal for venture philanthropists and impact investors, combining profitability with socially and environmentally conscious that directly impact human flourishing in both rural and urban areas.

**Overview of Defendants**

39.    ARC is a cooperative of independent churches from different denominations, networks, and backgrounds, the members of which consist of (a) churches "planted" or launched through ARC and (b) churches that invest in the mission of ARC financially.

40.    Although ARC started as a loosely connected group of people who wanted to help smaller churches, it eventually (under the leadership of Hodges) shifted its focus to generating large attendance growth and church "planting" to vastly expand Defendants' influence and revenue streams.

41.    ARC has become one of the largest church planting organizations in North America and has planted more than a thousand churches since 2000.

42.    ARC-planted churches enter into contractual agreements with ARC that, among other things, provide for initial loans to launch the church and require the church to pay 10% of tithes and offerings to ARC until this loan is repaid; following which the church is required to send ARC an ongoing amount of 2% of its monthly tithes/offerings.

43.    Celebration Church is not an ARC-planted church, and at all times material to this action had no legal, contractual, or financial obligations to ARC or any of the other Defendants.

44.    Historically, Celebration Church gratuitously donated approximately $150,000 to $200,000 per year to or for the benefit of ARC's church planting operations.   However, Defendants were constantly pressuring Pastor Weems to

10

commit to donating 2% of Celebration Church's income to ARC for church planting purposes.

45.    ARC is not a denomination and claims that it does not issue directives on what its member churches should promote doctrinally, philosophically, ministerially, or politically; and further claims that all of its member churches are completely and totally autonomous—operationally, financially, and governmentally.[2]

46.    ARC has attained a significant amount of power and influence through its church growth model and church-planting operations, and is able to maintain and expand such power and influence through affiliated entities and "partners" that it heavily encourages its members to use.

47.    Hodges is one of the co-founders of ARC and Founder and Senior Pastor of Church of the Highlands ("Highlands"), one of the largest churches in the United States with over 60,000 members and 23 campuses.

48.    Hodges fully embraces the modern church growth model and has vocally expressed his goal to help 1,000 churches break the 1,000-attendance barrier.

49.    Hodges founded and operates several entities closely affiliated with ARC and Highlands that are heavily promoted as ARC "partners," including GrowLeader, LLC ("GrowLeader") and Highlands College.

50.    GrowLeader is a for-profit company that is closely affiliated with and heavily promoted through ARC that generates significant revenue and resulting

---

[2] https://www.arcchurches.com/about/our-structure/

financial benefits to Defendants by providing fee-based mentoring, coaching, training, and consulting services and related resources focused on promoting and advancing the modern church growth system to churches and their leadership.

51.     Hodges derives significant power and financial benefits from the promotion and advancement of GrowLeader and Highlands through ARC.

52.     Rizzo is the Executive Director of ARC and an Associate Pastor at Church of the Highlands[3] who also served as an Overseer at Celebration Church until September 2021.

53.     Seibeling is a Founder and Senior Pastor of The Life Church and founding board member of ARC who also served as an Overseer at Celebration Church until September 2021.

54.     Promoting the use of ARC attorneys by churches is one means through which Defendants furtively maintain control and oversight over ARC members.

55.     Attorneys David Middlebrook and Steven Goodspeed ("Middlebrook Goodspeed") specialize in the areas of church formation, governance, operations, and taxes.  At all times material to this action, Middlebrook Goodspeed were law partners whose firm was promoted as an ARC "partner," and they contemporaneously represented ARC and Celebration Church, as well as numerous other ARC member churches.

---

[3] https://jamesriver.church/author/drizzo

56.     Middlebrook's current law firm, The Church Lawyers Group, is a featured ARC "partner" that provides special resources for ARC members.

57.     Middlebrook Goodspeed prepared Celebration Church's governing Bylaws installed in 2015.

58.     Attorneys Lee Wedekind ("Wedekind") and Kristin Ahr ("Ahr") work for the Nelson Mullins Riley & Scarborough LLP law firm ("Nelson Mullins") and have served as litigation counsel for ARC and Rizzo.  At all times material to this action, Wedekind and Ahr, through Nelson Mullins, represented ARC; including when they purportedly represented Celebration Church during the events described below.

59.     At all times material to this action, Defendants acted as the principals of and directed and controlled the acts and conduct of Middlebrook Goodspeed and Wedekind and Ahr upon which the claims set forth herein are based; during the performance of which Middlebrook Goodspeed and Wedekind and Ahr were acting in the capacity as Defendants' undisclosed agents carrying out Defendants' directives under Defendants' control.

**The Implementation of Weemses's New Vision & Direction for Celebration**

60.     In 2019, Pastor Weems and K. Weems began working toward implementing Pastor Weems's new vision and direction for Celebration Church and transitioning Pastor Weems from Celebration Church's Senior Pastor to a Founding Pastor role in which he would be able to spend much more of his time and energy on

missions and less on the church's day-to-day operations, while also continuing to have an ongoing relationship with the congregation he founded and pastored.

61.    Pastor Weemses's vision to shift Celebration Church's focus away from growth and toward missionary work is antithetical to Defendants' church growth business and operational model and financial interests.

62.    As Pastor Weems began to implement his new shift in focus, he informed Defendants that Celebration Church would only be willing to donate funds to ARC if they were earmarked for missionary work and helping pastors get the counseling, guidance, and treatment they needed to shift their focus to ministry and missions, rather than church growth; while also expressing his concerns over the ARC system and its focus on planting churches to help expand ARC and GrowLeader and Defendants' own personal interests, causing stress and psychological harm for pastors.

63.    Middlebrook Goodspeed consulted Pastor Weems and Celebration Church on his transition to the Founding Pastor role and the memorialization of agreed upon terms and conditions of a Founding Pastor agreement, retirement package for Pastor Weems and K. Weems, parsonage, and continued and ongoing financial support for the missions in which Pastor Weems was involved.

64.    Celebration Church's Board of Trustees and Overseers were fully aware of, approved, and agreed on behalf of Celebration Church to the terms, conditions, and agreements associated with Pastor Weemses's transition to Founding Pastor, the Weemses's' retirement package, their parsonage, and the commitment to provide financial support for the missions with which Pastor Weems would be involved.

65.     Attendant to his transition to Founding Pastor, Pastor Weems was also working on identifying someone as a potential eventual successor to the Celebration Church Senior Pastor position.

66.     Defendants were aware of this and seized on it as an opportunity to oust Pastor Weems from Celebration Church and plant an ARC-affiliated pastor they knew they could control and who would continue to advance Defendants' church growth model.

67.     Defendants identified ARC agent Tim Timberlake ("Timberlake") as the perfect candidate to fill this role, and Rizzo subsequently vouched for Timberlake to Pastor Weems.

68.     At all times material to this action, Defendants acted as the principals of, directed, and controlled acts and conduct of Timberlake upon which the claims set forth herein are based; during the performance of which Timberlake acted in the capacity as Defendants' undisclosed agent carrying out Defendants' directives under Defendants' control.

69.     Unaware of the clandestine agency relationship between Defendants and Timberlake and Defendants' planting of Timberlake to advance their conspiracy against Plaintiffs, Pastor Weems moved forward with the Founding Pastor transition plan, pursuant to which Timberlake initially would serve as lead pastor at Celebration Church's Jacksonville campus while Pastor Weems retained legal control and authority as the Senior Pastor, President, CEO, and Chairman of the Board.  Pastor Weems would coach Timberlake through his development plan while observing his

performance and simultaneously working to memorialize the agreed upon terms of his transition to Founding Pastor.

70.     In December 2019, Celebration Church's Compensation Committee (including Seibeling and Rizzo) approved a compensation package that included (among other things) Celebration Church's acquisition of a parsonage for the Weemses's and the payment of $100,000 per year to Pastor Weems until age 65; the terms of which were memorialized in a *Compensation Resolution* fully executed and approved by the Board of Trustees.

71.     On December 20, 2019, Celebration Church entered into a *Parsonage Use License Agreement* with Pastor Weems and K. Weems, effective as of January 10, 2020.

72.     Based on the agreements memorialized in the *Compensation Resolution* and the rights that accrued to Pastor Weems and K. Weems by virtue of the benefits Celebration Church agreed to provide, the Weemses's sold their home and moved into a temporary parsonage.

73.     During the same time period, Timberlake abruptly moved to Jacksonville without prior notice to Pastor Weems, 11 months ahead of the agreed upon schedule, and immediately began exerting pressure on Pastor Weems to hand over control of Celebration Church.

74.     In early 2020, as a result of the COVID pandemic and lockdowns, Celebration Church was limited to video services until September 2020. During this difficult time, Pastor Weems and K. Weems were instrumental in helping the church navigate through the financial difficulties caused by COVID and lockdowns and other

operational problems created by certain executive leadership under the control of Lisa Stewart ("Stewart"), Celebration Church's CFO at that time.

75.     When in-person services finally resumed, Timberlake started leading Sunday morning services at Celebration Church's Jacksonville campus and Pastor Weems focused on mission work, reaching more of the church's members across the country and world through video, refining the organization of the church and its missions and related organizations, and working with Middlebrook Goodspeed to memorialize Celebration Church's agreements concerning Pastor Weems's transition to Founding Pastor.

76.     One of Pastor Weems's and K. Weems's primary focuses during this time was Honey Lake Farms.

77.     In her role as CFO of Celebration Church at that time, Stewart also served as CFO of Honey Lake Farms and Honey Lake Clinic.

78.     Around this time, Celebration Church and Kevin Cormier ("Cormier") entered into a collaboration whereby construction-type entities owned by Cormier were hired by Celebration Church to perform land and housing improvements and management services at Honey Lake Farms.  Not long thereafter, Cormier promised to donate $1 million of in-kind construction-type services at Honey Lake Farms.

79.     Throughout 2020, construction work and land management services were performed at Honey Lake Farms by Cormier's companies, which Pastor Weems was led to believe was part of Cormier's $1 million pledge.  Pastor Weems expected

that Stewart was properly accounting for this donation and responsibly managing the church's finances in accordance with her fiduciary duties.

80.     In December of 2020, the Honey Lake Farms Lodge opened and started offering retreats and its outpatient facility for pastoral care.

81.     Honey Lake Clinic also began generating revenue providing Christian mental health treatment services.

82.     Pastor Weems soon appointed Cormier as a Celebration Church Trustee and Stewart left her position as Celebration Church CFO and transitioned to work solely for Honey Lake Clinic as its CEO.

83.     During her time working as CFO for Celebration Church and Honey Lake Clinic, Stewart gave false financial reports to Pastor Weems, which misrepresented balances in the church's accounts, and engaged in additional fraudulent misconduct.

84.     For example, in 2020 Stewart refused to separate the AWKNG mission organization as a separate 501(c)(3) entity distinct from the church and concealed her insubordination to Pastor Weemses's and the Board of Trustees' directives to separate the funds designated for the AWKNG organization into a separate account from that of the church.  By doing this, she was able to hide her financial and operational mismanagement and retain control of funds to create inaccurate and misleading reports in which Stewart materially misrepresented the church's unrestricted cash as $2.2 million more than it actually was.  This and other fraudulent acts were documented in Celebration Church's 2020 audit.

85.    Stewart also provided Cormier with unrestricted access to Honey Lake Farms' bank accounts and failed to supervise his activities.  Pastor Weems had no access to view these accounts, which Cormier used to reimburse his companies for expenses without any oversight or accountability.

86.    Pastor Weems eventually discovered and verified that Cormier had embezzled church funds, engaged in a fraudulent billing scheme, and attempted to commit usury.

87.    Stewart knew that Cormier had not donated any of the $1 million in work that he pledged and that the work for which he was billing the church was actually supposed to be "donated" (*i.e.*, free), but allowed payments to be issued to Cormier's entities knowing that no agreements were in place to support them and that no authorization or approvals were obtained for the work allegedly performed.  Cormier also stopped submitting any substantiation for his invoices but continued to get payments.

88.    In April of 2021, Pastor Weems confronted Cormier about his above-described misconduct and Cormier admitted that he reneged on his pledge to donate $1 million of in-kind services and sought to remedy the situation by "donating" the work he claimed to have performed but for which he had not yet been paid, along with a house that the church had been renting from him.

89.    Meanwhile, Pastor Weems and K. Weems continued working tirelessly to bring stability, structure, consistency, and clarity to Celebration Church's staff, congregation, and organization, and to greatly improve the church's financial position.

They believed everything was moving forward as planned with the transition to Pastor Weemses's role as Founding Pastor and the church's related agreements concerning the Weemses's' retirement packages, funding for Celebration Global, and the parsonage.

90.     In May of 2021, the Weemses's and Celebration Church agreed on the property that would be the Weemses's' permanent parsonage and it was sold to the Church for that purpose—following which Celebration Church agreed to and did treat that property as the Weemses's' parsonage under the *Parsonage Use License Agreement*.

91.     The Board of Trustees also represented that they were working with Middlebrook Goodspeed on finalizing written documents (such as a *Founding Pastor Emeritus Operating Agreement*) memorializing the terms that Celebration Church already verbally agreed upon and approved concerning Pastor Weems's transition to Founding Pastor, the Weemses's' retirement compensation, the parsonage, and the funding of the missions with which Pastor Weems is involved.

92.     Defendants all were aware of the agreements Celebration Church made and approved concerning Pastor Weems's transition to Founding Pastor, the Weemses's' retirement compensation, the parsonage, and the funding to be provided to Celebration Global for the missions with which Pastor Weems is involved.

93.     However, unbeknownst to Pastor Weems, Defendants and their agents were already working behind the scenes for quite some time on a plan to oust Pastor Weems from his leadership position and interfere with Plaintiffs' agreements with Celebration Church.

94.    Among other things, this included: the planting of Timberlake and direction and approval of his subversive acts described below; enlisting Timberlake and Cormier to help oust Pastor Weems; enlisting Stewart to manufacture evidence of supposed financial crimes and mismanagement to use against the Weemses's; and enlisting Gaby Sullivan (K. Weems's assistant and an employee of NorthStream) to illegally access and download K. Weemses's private data, emails, medical information, and therapy sessions and provide them to Defendants to use against the Weemses's.  Sullivan told multiple Celebration Church staff members that she was "protected" and that Celebration Church was going to be taken over.

95.    In September 2021, Hodge's Highlands church announced that it was spending $4.5 million to build its own "Lodge Retreat Center"—a center for pastoral counseling reported as being "the vision of" Hodges and Rizzo[4] that was virtually identical to the Honey Lake Farms' Lodge that had been up and running since December 2020.   Around the same time, Rizzo and Seibeling stepped down as Celebration Church Overseers.

96.    Honey Lake Farms' Lodge and The Lodge Retreat Center (once completed) would have been competitors.  However, Defendants knew Honey Lake Farms' Lodge had a significant advantage because it was already operational and had numerous retreats, counseling and restorative programs led by professional therapists

---

[4]      https://ministrywatch.com/church-of-the-highlands-quietly-advances-controversial-pastoral-retreat-center/

and able to provide outpatient clinical care through its association with Honey Lake Clinic, which  Defendants' "Lodge" was unable to provide.

97.     Defendants also perceived Honey Lake Farms as a threat because it was providing counseling services that included programs designed to improve pastoral mental health by moving away from the church growth model.

98.     During this same time period, Pastor Weems uncovered more evidence of Cormier embezzling money from Celebration Church.

99.     On September 22, 2021, Pastor Weems informed Rizzo and Seibeling about Cormier's embezzlement and fraud and resulting need to dismiss him from the Celebration Church board.  To Pastor Weems's surprise, they revealed that Cormier called them back in April of 2021 (10-days after Pastor Weems first confronted Cormier about his financial misconduct) and asked them to initiate an investigation against Pastor Weems.

100.     In October of 2021, the Weemses's continued to move forward with their transition plan and missionary work, meeting and developing an advantageous business relationship with Historical Concepts, a highly respected architecture and development firm in Atlanta, and commissioned (at a cost over $14,000) the rendering of a master site plan for Honey Lake Farms so that they could begin recruiting investors for the RCD portion of the project.

101.     The Weemses's immediately drove from their meeting with Historical Concepts to the 2021 ARC conference at Seacoast Church in South Carolina to

demonstrate their goodwill toward their friends at ARC and put forth the idea of working together around missions.

102.    As a result, Pastor Weems and Greg Surratt agreed to partner to expand the availability of pastoral health retreats by hosting them at Honey Lake Farms and Surratt's lodge, which would have generated an estimated $1.5 million in income for Honey Lake Farms and AWKNG over the next 24 months.

103.    Not long thereafter, AWKNG and Honey Lake Farms held a fundraiser to raise money for scholarships for pastors and ministers to attend wellness retreats, which raised approximately $250,000 and connected Plaintiffs with Willie Robertson (well known for the "Duck Dynasty" reality show).  Robertson  expressed interest in partnering with Honey Lake Farms and even shot some episodes of his series, "Buck Commander," at the farm.  During the fundraising event, discussions were had with Robertson around potential future filming and other types of partnerships around youth programs and community evangelism at Honey Lake Farms.

104.    In addition to Robertson, Honey Lake Farms was poised to partner with Wildwood Ranch, Hand of Hope, and Convoy of Hope on very profitable and beneficial endeavors for Honey Lake farm's mission.

105.    NorthStream had also secured an advantageous business relationship with the city of Greenville, FL related to its first RCD and was launching its first RCD in Africa through Project Africa in Zimbabwe.

106.    Plaintiffs had also developed an advantageous business relationship with David Maura through which they were poised to secure significant investments in their operations at Honey Lake Farms and NorthStream.

### The Implementation of the Plan to Destroy Plaintiffs and Frame Pastor Weems and K. Weems for Financial Crimes

107.    In November of 2021, Pastor Weems approached the Honey Lake Clinic board about releasing disbursements to Honey Lake Farms in compliance with the clinic's bylaws. Although strongly opposed by Stewart and Honey Lake Clinic CFO, Devan Schandig, the board voted unanimously in favor of the disbursement.

108.    Soon thereafter, Defendants began to execute the final phase of their plan to destroy Plaintiffs.

109.    Unbeknownst to Pastor Weems, Rizzo and Timberlake contacted Surratt and informed him that Pastor Weems was about to be put under investigation by Cormier, Powell, and Rowe and that Surratt should cut all ties with Pastor Weems and Honey Lake Farms, which led to Surratt to immediately call Pastor Weems and cancel the projects they had planned to partner in together.

110.    Heading into a December 2021 Celebration Church Board of Trustees meeting, the Weemses's were completely in the dark about the plot against them and believed the Board of Trustees was set to give final approval the written documents memorializing the existing agreements with Celebration Church.

111.    Instead, acting under the influence and control of Defendants and their agents, the Trustees abruptly changed course at the December 8, 2021 meeting;

producing a draft *Founding Pastor Emeritus Agreement* with substantially different terms than those that had already been agreed upon by Celebration Church (most notably, termination provisions that would allow the Trustees to deny the Weemses's the rights and benefits Celebration Church had already agreed to provide), and slashing the already agreed upon funding promised by Celebration Church to Celebration Global by fifty percent (approximately $24 million over 15 years).

112.   This drastic reduction in missions funding combined with the campaign targeting Plaintiffs' strategic partnerships all but assured the failure of the mission organizations and operations in which the Weemses's had already personally invested.

113.   Defendants continued to secure Timberlake's allegiance to their cause, curate his image, and promote him as a capable leader for Celebration Church by orchestrating hundreds of thousands of dollars in monetary payments to him directly and indirectly through his ministry for book sales and promotion, in exchange for which and at Defendants' direction, Timberlake relentlessly contacted pastors, missional partners, strategic partners, leaders of church networks, and donors; telling them that Pastor Weems was about to be investigated for financial misconduct and would be removed as Senior Pastor, leaving Timberlake in control of the church, and that they should deal solely with him since Pastor Weems would be ousted with no possibility of return.  Timberlake even directed Celebration Church youth pastors to begin telling the youth that Pastor Weems was under investigation for financial

misconduct—leading several of them, some as young as 12, to be confused and talk to their parents about this.

114.    Timberlake also made it clear that he would take Pastor Weems's place at ARC and return Celebration Church's vision and direction to ARC's and GrowLeader's church growth model.

115.    Defendants also committed to ruining the Plaintiffs' reputations, specifically in the ministry world, so they could never be in ministry or make a living and have no possible way of ever being part of Celebration Church again.

116.    Pastor Weems was planning on dismissing Cormier at the end of the year and had enlisted the help of Trustees Rowe and Wiseman to attend the meeting with Cormier, during which he would be confronted, permanently removed from the board and the church, and the authorities would be notified, if necessary, pending the financial audit Pastor Weems had already ordered.  On December 31, 2021, Pastor Weems emailed Cormier to inform him that his one-year term as a Trustee had concluded and that a new Trustee would be appointed to fill his vacated position, which would lead to this planned meeting.

117.    On January 4, 2022, Cormier responded by providing "notice" that he and two other trustees, Powell and Rowe, were "bringing a full investigation" on unspecified allegations and "will be asking our board to review the possibility of asking Stovall Weems to step down as our current Chairman and Senior Pastor role." Cormier further claimed that "[b]ased on our bylaws the removal of board members during this investigation must be put on hold…"

118.   Pastor Weems responded later that evening, informing Cormier that he could not initiate such an investigation under Celebration Church's Bylaws and advising him of the proper procedures to follow.   Pastor Weems also dismissed Cormier from the Board of Trustees and advised that he would ask the Board of Trustees to investigate Cormier's actions over the past year, listing the instances of fraud for which Cormier would be investigated.

119.   On January 7, 2022, now aware of Rowe's involvement in the plot to remove him for unspecified reasons, Pastor Weems sent an email dismissing Rowe as a Trustee based on Cormier's statements about Rowe's involvement and an admission made by Timberlake about which Trustees were involved.

120.    On January 7, 2022, almost immediately after dismissing Rowe, Pastor Weems received a letter (dated January 6) from Rowe and Powell claiming that he was under discipline, was not in good standing, and was suspended as the church's Senior Pastor as a result of "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor."

121.   As these events unfolded, Defendants ensured that they would maintain ultimate oversight and control over the Weemses's ouster from Celebration Church through Middlebrook Goodspeed and the enlistment of ARC attorneys Wedekind and Ahr to lead the supposed "investigation" of Pastor Weems and K. Weems.

122.   On January 8, 2022, Wedekind and Ahr informed Pastor Weems that he was banned from Celebration Church while he supposedly was "investigated," barred

him from church property under threat of criminal prosecution, and instructed him to cease all contact with everyone associated with Celebration Church.

123.   These acts were wholly improper and violative of multiple Celebration Church Bylaws.

124.   Aware of this, Defendants used Middlebrook Goodspeed and Wedekind and Ahr to amend the Celebration Church Bylaws to give the Trustees the absolute, unchecked power they needed to unlawfully oust Pastor Weems from the church.

125.   Wedekind and Ahr also proceeded with conducting the sham "investigation" of Pastor Weems; during which Defendants and Middlebrook Goodspeed worked closely with Wedekind and Ahr to ensure that the supposed "investigation" would end in the predetermined outcome Defendants wanted.

126.   Well-before the supposed "investigation" commenced, Defendants knew Cormier and Stewart were involved in embezzling money from Celebration Church and that the "investigation" could be used to frame Pastor Weems for the embezzlement and justify ousting him from Celebration Church and thereafter install leadership Defendants could control (Cormier and Timberlake), avoid paying Plaintiffs the benefits Celebration Church had already agreed to provide, and use Pastor Weems as the scapegoat for Cormier and Stewart's illegal activities while simultaneously eliminating Honey Lake Farms as competition for Highlands' Lodge and stomping-out Pastor Weemses's anti-church growth message.

127.   All the while, Defendants believed that their nefarious plot would never be exposed because it would be protected by the secrecy of ecclesiastical abstention.

128.    During the sham "investigation," the Weemses's were essentially made pariahs, unable to defend themselves and isolated from the church, friends, church members, and professional colleagues and contacts, most of whom they were prohibited from contacting and had been told the Weemses's were suspended and "under investigation" for unspecified reasons.

129.    At the same time, Defendants knew the actions they orchestrated had placed Plaintiffs in significant financial distress.

130.    Then, on January 17, 2022, Defendants sent an extortionate email to Pastor Weems through their agent, Larry Stockstill, an Overseer and Apostolic Elder of Highlands and Hodges' personal pastor.

131.    In this January 17, 2022 email, Stockstill acting at Defendants' direction openly acknowledged Cormier's embezzlement but insisted that he remain on Celebration Church's Board of Trustees:

> Several notable leaders have challenged the idea you had that the trustees are leading a "coup d'etat." They have said they are good, solid men who love both of you but are trying to save the church. I am aware of your concern about the embezzlement you caught one of the Trustees in but that must be dealt with separately from their actions as a body right now and not the source of their corporate actions.  Their actions have centered around your leadership and actions in the recent time.

132.    In this January 17, 2022 email, Stockstill acting at Defendants' direction also openly challenged Pastor Weemses's "new direction in ministry" before summarizing that Pastor Weems was "under investigation financially…banned from

the church and it's property… and no longer [has] a 'founder's seat' and that will probably not happen," before laying out in detail the actions Pastor Weems had to take to "CLEAR [his] NAME," which included repenting to ARC, Rizzo, and Seibeling in particular:

1. Express to the trustees your repentance and sorrow for the erratic leadership  What began, perhaps, with a desire to please the Lord and enter revival has developed into something that is not a part of the solid, stable foundation and values of Celebration Church.  Your financial dealings must be totally simplified so that the most unassuming member can understand.

2. Return to a broken, repentant, reconciling relationship to the Board of ARC (of which you have continued to be a part). Repent to them concerning not walking under their covering, blessing, and oversight. Repent specifically to John and Dino for ignoring their advice and counsel as overseers.

3. Pull back from following the directions and advice of other outside leaders who have reshaped Celebration church since your vision.

4. Restore your relationship to Tim Timberlake. He is not seeking to take your church and dishonor you. He could easily return to North Carolina. Whether you feel you erred in appointing him or not, it is an irreversible action you have publicly taken and you must return to the role of an encouraging father in his life (something he no longer has with his wonderful father already in heaven).

5. When all of the above is done, the last piece to clear your reputation is the financial investigation. If it comes back with nothing significant, there should be, in my opinion, no barrier to the Trustees giving you a severance package as the Founder. In my opinion, there will be no "Founder's seat" because of the confusion that has ensued around your leadership. I believe the Trustees will help you begin your worldwide missions ministry as completely separate from Celebration. You have huge potential as a leader, a preacher of righteousness, and a voice to this generation worldwide…IF YOU CLEAR YOUR NAME.

133.   At the time of this January 17, 2022 email, Pastor Weems and Celebration Church had no formal relationship with ARC, and ARC had no legal control over Pastor Weems or Celebration Church.  There was no legitimate reason for ARC or any of the Defendants to be making any demands on Pastor Weems.

134.    At the time of this January 17, 2022 email, Middlebrook Goodspeed were also, at Defendants' direction, refusing to do anything to assist Pastor Weems in preventing the coup unfolding at Celebration Church and instead insisted that Pastor Weems "not get an attorney or go to the court."

135.    As time dragged on with no imminent resolution of this incredibly damaging situation in sight, the Weemses's decided to take action and filed suit on February 23, 2022 to try to obtain temporary injunctive relief to protect their rights and force the resolution of the sham investigation.

136.    On March 3, 2022, Wedekind filed a Motion to Dismiss in that lawsuit which lobbed unsubstantiated, unnecessary personal attacks against the Weemses's that were completely irrelevant to the legal arguments it raised and further explained how Celebration Church's Bylaws were amended on January 13, 2022, to make its Board "the highest ecclesiastical authority in the church…"

137.    Upon reading this, Pastor Weems came to the difficult realization that he could no longer be a part of Celebration Church and needed to try to protect his family from any further attacks by resigning and completely separating from Celebration Church.

138.    Thus, on April 15, 2022, Pastor Weems tendered his resignation as Senior Pastor, President, Chief Executive Officer, Chairman and member of the Board of Trustees, and registered agent.

139.    However, Defendants were not satisfied with Pastor Weemses's resignation, were upset over the lawsuit and the publicity it drew, and were likely

fearful that members of Celebration Church's congregation would follow Pastor Weems once he began ministering elsewhere and working with other churches. Accordingly, Defendants continued to work closely behind the scenes with their attorneys, Wedekind and Ahr, to create and publicly disseminate a false and defamatory narrative and statements about Pastor Weems and K. Weems, along with private and confidential information about K. Weems they had unlawfully gathered, to try to destroy their reputations, humiliate them, and prevent Plaintiffs from continuing their ministry and missions.

140.    This culminated in an April 24, 2022, "Report of Investigation to Celebration Church of Jacksonville, Inc.", a copy of which is attached hereto as **Exhibit A** (the "Report"), which Defendants ensured was leaked to the press so that it would be publicly available before ARC's Conference in South Carolina on April 25-27, 2022—at which Hodges was planning to discuss the progress of the Highlands Lodge and plans for GrowLeader.

141.    The ultimate purpose of the public dissemination of the Report was to frame Pastor Weems and K. Weems for embezzling the money Defendants' knew Cormier and Stewart had taken and covered up, which could be used to legitimize the takeover of Celebration Church and ensure the failure of Plaintiffs' anti-growth vision and missionary work while simultaneously using Pastor Weems to publicly demonstrate what would happen to others if they entertained the idea of opposing Defendants' modern church growth philosophy.

142.     Notably, the Report falsely tried to blame Pastor Weems for (among other things) embezzlement based on a *supposed* $3 million cash shortfall between October and December 2020:

> Thomas learned that Weems had a poor understanding of the Church's organizational structure and financial position, including its revenues and expenses. As things progressed, Thomas became increasingly concerned about the Church's cash burn rate and how it was depleting the Church's cash balance. The Church's financial statements reflect that its cash balance dropped from $9 million in October 2020 to $6 million in December 2020, then to $2 million in March/April 2021. Weems never had a grasp of where the money went and would oscillate between negligent attention to financial details and aggressive demands for voluminous information. He could never keep all of the parts straight in his head, and he blamed this confusion on the providers of the information (Stewart, Thomas, Cormier).

143.     However, Celebration Church's own financial statements (prepared by Stewart) demonstrate that it had a $6 million cash balance in October 2020, not $9 million:

## CELEBRATION CHURCH, INC.

### STATEMENT OF FINANCIAL POSITION
#### FOR THE PERIOD ENDED SEPTEMBER 30, 2020 (unaudited)

| ASSETS | | |
|---|---|---|
| **CURRENT ASSETS** | | |
| CASH AND CASH EQUIVALENTS | $ | 6,335,876 |
| ACCOUNTS RECEIVABLE | | 2,357,758 |
| INVENTORY | | 29,481 |
| OTHER CURRENT ASSETS | | 275,816 |
| TOTAL CURRENT ASSETS | | 8,998,931 |
| PROPERTY AND EQUIPMENT, NET | | 38,538,400 |
| OTHER ASSETS | | 684,340 |
| TOTAL ASSETS | $ | 48,221,671 |

144.     Cormier and Stewart were in fact the ones responsible for over $3 million embezzled from Celebration Church, which Timberlake knew about and, at Defendants' direction, helped cover up to frame Pastor Weems and help support his installation as Pastor Weems's replacement at Celebration Church.

145.     Defendants' knew the Report, which was engineered to make it falsely appear as if it was the product of a legitimate investigation conducted by a reputable law firm, could be used to sway the opinions of Celebration Church's members, the public, and people and businesses affiliated with Plaintiffs to convince them that Pastor Weems and K. Weems were criminals—even though the reality was that Defendants were intimately involved in preparing the Report and its conclusions and the lawyers who authored the Report it were in fact working for and loyal to Defendants.

146.     Although Defendants knew the embezzlement and other criminal accusations the Report leveled against Pastor Weems were demonstrably false, they continued to ensure that these accusations were advanced publicly and disseminated to ensure Defendants' ultimate objective of destroying Plaintiffs was achieved.

147.     Thus, on April 27, 2022, acting at Defendants' direction, Wedekind prepared and transmitted a letter via email to TurnCoin, Ltd.'s chief legal officer, Arno Visser, (the "TurnCoin Letter"), which falsely asserted that Pastor Weems "embezzled and fraudulently transferred [Celebration Church] funds that were used to purchase TurnCoin" and engaged in "money laundering…in violation of 18 U.S.C. §§ 1956(a) and 1957":



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Lee D. Wedekind, III
T: 904.665.3652
lee.wedekind@nelsonmullins.com

50 N. Laura Street, 41st Floor
Jacksonville, FL 32202
T 904.665.3600  F 904.665.3699
nelsonmullins.com

April 27, 2022

**By email**

Arno Visser
Chief Legal Officer
TurnCoin, Ltd.
Madison Building Midtown
Queensway
GX11 1AA
arno@turncoin.com

      Re:    Demand to freeze TurnCoin purchased with embezzled and fraudulently transferred assets

Mr. Visser:

We represent Celebration Church of Jacksonville, Inc. Celebration's former pastor, Stovall Weems, embezzled and fraudulently transferred church funds that were used to purchase TurnCoin on behalf of the following: Charles S. ("Stovall") Weems IV, AWKNG, Inc., Honey Lake Farms, Inc., and Benny Perez Ministries. The purchase of TurnCoin under these circumstances may constitute money laundering by Weems in violation of 18 U.S.C. §§ 1956(a) and 1957.

On April 24, we released a report of our investigation into Weems's illegal activities. A copy of the report can be viewed at www.celebration.org/weemsinvestigation. Following the release of our report, we have been advised that Weems is planning to liquidate all or part of these TurnCoin holdings.

This letter is to notify TurnCoin of these potentially criminal actions and to request TurnCoin's assistance by freezing the holdings of Charles S. Weems IV, AWKNG, Inc., Honey Lake Farms, Inc., and Benny Perez Ministries until the dispute between these parties has been resolved. We would be pleased to provide you with additional information or to discuss this matter further at your earliest convenience.

Thank you for your cooperation.

Very truly yours,

Lee D. Wedekind, III

LDW/aa

148.    The TurnCoin Letter specifically directed TurnCoin to view the Report to read about "Weemses's illegal activities" and included a hyperlink to the Report for that purpose.

149.    This TurnCoin Letter used the Report and false criminal accusations about Pastor Weems to try to convince TurnCoin to freeze Pastor Weemses's investments in hopes of further financially crippling Plaintiffs.

150.    Despite knowledge of the actual perpetrators of the embezzlement and the efforts to conceal it, Defendants ensured that Pastor Weems would be publicly blamed for it, which not only protected Cormier for his criminal acts but also rewarded him by ensuring that he would be placed in charge of Celebration Church's Board of Trustees.

151.    Defendants also further rewarded Timberlake for his role in advancing Defendants' conspiracy by partnering with Servolution to promote and generate sales of Timberlake's book (*The Power of 1440*), while simultaneously using the book to encourage church planting and growth.

152.    Based on the agreements and promises made by Celebration Church as outlined above, the Weemses's not only stopped drawing a salary from the church but also invested and gave hundreds of thousands of dollars (almost to the point of insolvency) to fund the missions Celebration Church had already agreed to fund; all of which they lost as a result of Defendants' actions.

153.    Defendants' actions also caused losses of committed funding and agreements to Celebration Global totaling approximately $30 million dollars over a 15-year period.

154.    Honey Lake Farms was far down the road to being self-sustaining when Defendants' actions caused its committed investors and partners to back out, resulting in millions of dollars of additional losses.

## The Unlawful Means Defendants Used to Tortiously Interfere

155.    By engaging in the above-alleged conduct, Defendants conducted, engaged in, and/or participated in a pattern of unlawful and criminal activity deliberately intended to harm Plaintiffs and carry out defendants' conspiracy against them.

156.    Defendants' conduct alleged in paragraphs 126-134, above, constitutes racketeering and extortion in violation of 18 U.S.C. § 1961(1)(A) and § 836.05, *Fla. Stat.*

157.    Defendants' conduct alleged in paragraph 94, above, constitutes racketeering and an offense against users of computer systems, networks, and electronic devices in violation of  18 U.S.C. § 1961(1)(A) and § 815.06, *Fla. Stat.*,

158.    Defendants' conduct alleged in paragraphs 55-59, 63, 65-68, 92, 94, 113, 121, 126, and 150-151, above, constitutes racketeering and bribery in violation of 18 U.S.C. § 1961(1)(A) and § 838.16, *Fla. Stat.*.

159.    Defendants' conduct alleged in paragraphs 139-140, above, constitutes the communication of libelous matter to newspapers in violation of violated § 836.09, *Fla. Stat*.

160.    Defendants' conduct alleged in paragraphs 139-149, above, constitutes racketeering and wire fraud in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §1343.

161.    Defendants' overall course of conduct and conspiracy alleged above also constitutes a scheme to defraud in violation of the Florida Communications Fraud Act, § 817.034, *Fla. Stat*.

162.    Defendants aided, abetted, counseled, hired, or otherwise procured others to commit the criminal acts described above and are therefore principals in the first degree under § 777.011, *Florida Statutes*.

163.    Defendants soliciting others to commit the criminal acts described above, and in the course of such solicitation commanded, encouraged, hired, or requested another person to engage in specific conduct which would constitute such offense or an attempt to commit such an offense, thereby constituting criminal solicitation in violation of  § 777.04(2), *Florida Statutes*.

164.    Defendants agreed, conspired, combined and/or confederated with another person or persons to commit the criminal acts described above, thereby committing criminal conspiracy in violation of  § 777.04(3), *Florida Statutes*.

165.    Defendants also explicitly or tacitly agreed to participate in a common scheme and unlawful ongoing conspiracy, in furtherance of which they recommended,

agreed to, and participated in committing the criminal acts described above, which caused significant harm and damages to Plaintiffs as a result.

<u>COUNT I</u>
**(TORTIOUS INTERFERENCE)**

166.    Plaintiffs re-allege and incorporate Paragraphs 1 through 165, as if fully stated herein.

167.    As more specifically alleged in paragraphs 62-64, 70-71, 89-91, and 100-106, above, Plaintiffs had advantageous contractual and business relationships of which Defendants were aware.

168.    Defendants intentionally and unjustifiably interfered with Plaintiffs' advantageous contractual and business relationships.

169.    As a direct and proximate result of Defendants' unlawful and tortious interference with Plaintiffs' advantageous contractual and business relationships, Plaintiffs suffered substantial economic damages in amounts to be proven at trial.

170.    Defendants' actions alleged herein were unjustified, unlawful and committed maliciously and deliberately with an intent to injure Plaintiffs and cause them substantial harm; were committed with actual knowledge of the wrongfulness of the conduct and the high probability that injury and damage to Plaintiffs would result, and despite that knowledge, Defendants intentionally pursued their course of conduct, resulting in injury and damages to Plaintiffs; and/or were committed in conscious disregard of the Plaintiffs' rights.

171.   As a direct and proximate result of Defendants' tortious conduct, and in addition to the quantifiable monetary damages Defendants' conduct caused, Plaintiffs also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from engaging in such conduct in the future.

172.   Based on the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of an injunction prohibiting Defendants' tortious misconduct.

173.   The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful and tortious misconduct.

WHEREFORE, Plaintiffs demand judgment against Defendants awarding:

a.   Compensatory damages in appropriate amounts to be established at trial;

b.   Punitive damages in appropriate amounts to be established at trial;

c.   Injunctive relief prohibiting Defendants from engaging in the tortious and unlawful misconduct alleged herein;

d.   Costs associated with this action; and

e.   Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT II
## (CONSPIRACY)

174.   Plaintiffs re-allege and incorporate Paragraphs 1 through 173, as if fully stated herein.

175.     Defendants agreed and conspired with one another to tortiously interfere with Counter-Plaintiffs' advantageous contractual and business relationships.

176.     In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

177.     Defendants each committed overt acts in pursuance and furtherance of their conspiracy.

178.     As a direct and proximate result, Plaintiffs suffered damages in amounts to be proven at trial.

179.     Defendants' actions alleged herein were unjustified, unlawful and committed maliciously and deliberately with an intent to injure Plaintiffs and cause them substantial harm; were committed with actual knowledge of the wrongfulness of the conduct and the high probability that injury and damage to Plaintiffs would result, and despite that knowledge, Defendants intentionally pursued their course of conduct, resulting in injury and damages to Plaintiffs; and/or were committed in conscious disregard of the Plaintiffs' rights.

180.     As a direct and proximate result of Defendants' tortious conduct, and in addition to the quantifiable monetary damages Defendants' conduct caused, Plaintiffs also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from engaging in such conduct in the future.

181.    Based on the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of an injunction prohibiting Defendants' tortious misconduct.

182.    The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful and tortious misconduct.

WHEREFORE, Plaintiffs demand judgment against Defendants, awarding:

a.    Compensatory damages in appropriate amounts to be established at trial;

b.    Punitive damages in appropriate amounts to be established at trial;

c.    Injunctive relief prohibiting Defendants from engaging in the tortious and unlawful misconduct alleged herein;

d.    Costs associated with this action; and

e.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Shane B. Vogt*
Shane B. Vogt – FBN 257620
E-mail:  svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*