# EXHIBIT A



# REPORT OF INVESTIGATION
## *to*
# CELEBRATION CHURCH
# OF JACKSONVILLE, INC.

## *April 24, 2022*

Kristin Ahr
360 S. Rosemary Avenue
Suite 1410
West Palm Beach, FL 33401
T 561.366.8765
F 561.655.1109
kristin.ahr@nelsonmullins.com

Lee D. Wedekind, III
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
T 904.665.3652
F 904.665.3699
lee.wedekind@nelsonmullins.com

## <u>INDEX</u>

<u>Page</u>

I.  Introduction and Background ....................................................................................3

    A.  Celebration's Corporate Governance ...............................................4

    B.  The Authorization of this Investigation ...........................................5

II.  Findings of Fact ....................................................................................................6

    A.  Summary....................................................................................6

    B.  Overview of the Weemses' Leadership of Celebration.....................7

    C.  The Encounter.............................................................................9

    D.  Post-Encounter Leadership of the Church.....................................10

    E.  Lack of Oversight from December 2020 to June 2021 ...................13

    F.  Improper Financial Transactions .................................................13

        •  The Parsonage at 16073 Shellcracker Road ..........................13

        •  The Second PPP Loan ......................................................15

        •  TurnCoin Investment .......................................................17

        •  Fraudulent mischaracterization and cancellation of
           Honey Lake Farms debt.....................................................18

        •  Misappropriation of Designated Funds.................................19

        •  BBVA/PNC Bank Termination of access to credit lines........................19

III. Conclusions........................................................................................20

IV. Recommendations........................................................................................22

Do not admit a charge against an elder except on the evidence of two or three witnesses. As for those who persist in sin, rebuke them in the presence of all, so that the rest may stand in fear.

1 Timothy 5:19-20.

## I.  **INTRODUCTION AND BACKGROUND**

Nelson Mullins was contacted by attorney Steven Goodspeed from The Church Lawyers (Middlebrooks & Goodspeed) in Dallas, Texas.  Goodspeed had been engaged by Celebration Church of Jacksonville, Inc. ("Celebration" or the "Church") regarding the terms and structure of an agreement in which Pastor Stovall Weems ("Weems") would transition out of the Senior Pastor position at Celebration. During the course of the discussions about the transition, it was revealed by or to the Church's Board of Trustees (each a "Trustee" and collectively the "Board") that there had been certain questionable financial practices and other pastoral issues under the Weemses' leadership of the Church.  In light of these claimed improprieties, in January 2022 the Board voted to suspend Stovall and Kerri Weems ("Kerri Weems") from their positions with the Church, place them in "not good standing" under the Church's bylaws, and authorize an investigation to determine the veracity of the allegations. Nelson Mullins was retained to conduct the investigation.

Our investigation included an extensive analysis of thousands of pages of documents and more than 20 interviews with current and former senior leadership team members, staff members, former Trustees, and other advisors and consultants. Each interview was conducted with witnesses who had direct, first-hand knowledge of the events discussed. These interviews were, and remain, confidential and privileged under the attorney-client communication privilege and the work product doctrine. Each witness was first provided with an *Upjohn* warning and confirmed his or her willingness to answer questions. To preserve the privileged nature of these interviews, this report does not include direct quotes or attributions of statements to specific witnesses and uses general descriptions of testimony where specificity would have revealed the source. All testimony referenced in this report was corroborated by multiple witnesses or by documentation.

We requested that Stovall and Kerri Weems be interviewed in connection with this investigation, but they refused. They have also refused to recognize the authority of the Board to undertake these actions and the legitimacy of this investigation. Despite their refusal to participate in this investigation, the Weemses have made numerous public statements to media outlets and through their social media accounts deriding the Church, the Trustees, and this investigation. Perhaps worse, although the Church's bylaws require that all disputes be submitted to mediation and arbitration pursuant to the Christian Conciliation process, the Weemses filed a civil action in state court to prevent the investigation from continuing and unwind the Board's actions. At every stage in the process, the Weemses have actively opposed and attempted to undermine the investigation process and prevent its completion.

After the investigation was completed but before this report was finalized, Weems resigned all of his positions with the Church. While the Weemses no longer hold any positions of authority at Celebration, this report is being provided to assist the Board in fulfilling its biblical and legal obligations.

### A. Celebration's Corporate Governance

Celebration is governed by the following legal authorities: (1) the Florida Not for Profit Corporation Act, Fla. Stat. § 617.01011, *et seq.*; (2) the Amended and Restated Articles of Incorporation of Celebration Church of Jacksonville, Inc. adopted on December 1, 2013 (the "Articles"); (3) the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on January 13, 2022[1]; (4) the Celebration Church Employee Handbook revised on May 3, 2021 (the "Employee Handbook"); and (5) the policies approved by the Board of Trustees (the "Board Policies").

Celebration is a board-led church. Plenary power to manage and govern the affairs of the church is vested in the Board. Articles Art. 9; Bylaws Arts. 4-6. More specifically, the Board has the duties and responsibilities generally associated with and exercised by a corporate board and as such, is the only governing body within the Church. Bylaws § 8.01. Accordingly, all corporate power is to be exercised under the authority of the Board. *Id.* This specifically includes the management and oversight of all of the Church's financial resources, including the acquisition and disposition of Church property (both real and personal). *Id.* Even more specifically, this includes the power to buy, sell, mortgage, pledge or encumber property owned by the Church; to approve or disapprove the transfer of church assets to other tax-exempt organizations; and to approve or disapprove of any transaction unrelated to the purposes of the Church. *Id.*

The Church's executive functions and day-to-day operations are managed by the Senior Pastor. Bylaws Art. 7. The Senior Pastor serves as the President and Chief Executive Officer of the Church and is responsible to manage the Church's operations in accordance with biblical principles. Bylaws §§ 7.01-7.02. Specifically, the Senior Pastor's duties include: serving as the leader of the Church body, staff, organizations, ministries, and Trustees; defining and communicating the Church's purpose; administering and coordinating the day-to-day operations of the Church; nominating and removing Overseers; appointing, directing, and overseeing the senior leadership team; hiring, directing, and overseeing Church staff; and endeavoring to ensure that the directives and resolutions of the Trustees are carried out. *Id.* The Senior Pastor serves as the Chairman of the Board, but is not entitled to vote on board matters. Bylaws § 7.05.

---

[1] Prior to January 13, 2022, the church was governed by the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on October 25, 2015. Collectively, this report will refer to these documents as the "Bylaws." To the extent there is a material difference in their terms, the report will reference the "2015 Bylaws" or the "2022 Bylaws."

Under Florida law, the Senior Pastor owes the Church fiduciary duties. FLA. STAT. § 617.0834(1) ("An officer ... of a nonprofit organization ... is not personally liable for monetary damages to any person for any statement, vote, decision, or failure to take an action, regarding organizational management or policy by an officer or director, *unless*: (a) The officer or director breached or failed to perform his or her duties as an officer or director; and (b) The officer's or director's breach of, or failure to perform, his or her duties constitutes ... [a] transaction from which the officer or director derived an improper personal benefit, directly or indirectly...") (emphasis added). Where an officer of a nonprofit corporation breaches a duty to the corporation and derives a personal benefit for doing so, he or she is personally liable for any resulting damages.

The Senior Pastor is subject to oversight and management by the Board in matters of corporate governance and the Overseers in spiritual and disciplinary matters. Bylaws § 7.07. An investigation may be initiated at the request of two Trustees or two senior leadership team members. Bylaws § 7.07(a). The subject matters appropriate for investigation include immoral conduct, improper financial practices, or espousing improper theological beliefs. *Id*. Investigations are conducted by or on behalf of the Overseers, or if there are fewer than three Overseers, by or on behalf of the Board. Bylaws § 7.07(b), 2022 Bylaws § 7.07(c). If the Overseers or the Board determines that discipline is warranted by a majority vote, they are empowered to: assume complete authority over the Senior Pastor's ministerial activities; discipline the Senior Pastor in any way deemed necessary; remove the Senior Pastor from his leadership position; and/or terminate the Senior Pastor's employment. *Id*.

The Bylaws also authorize the Trustees to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). In responding to a complaint, the Trustees are required to "determine whether an investigation is appropriate and the form that it should take." Bylaws § 17.02(d). The Trustees must promptly investigate, and then take appropriate corrective action if warranted by the investigation. Bylaws § 17.02(e).

### B. The Authorization of this Investigation

The 2015 Bylaws provide that the Overseers have sole authority to respond to a request for investigation and impose discipline on the Senior Pastor. 2015 Bylaws § 7.07(b). The Bylaws also require that the Church have at least three Overseers in place at all times. Bylaws § 10.03. It is the sole responsibility of the Senior Pastor to nominate Overseers to the Board. *Id*. As long as disciplinary action against the Senior Pastor is being considered, the composition of the Overseers cannot be changed. Bylaws § 10.04. Under the 2015 Bylaws if the Senior Pastor failed to nominate Overseers but an investigation had been requested, there was no mechanism to investigate or impose discipline on the Senior Pastor. Therefore, the Senior Pastor could avoid oversight or discipline by not nominating any Overseers. This was the predicament faced by the Church in January 2022.

In 2021, the Church had only two Overseers: Dino Rizzo and John Siebeling. When both resigned in September 2021, Weems did not nominate any replacements. Then, on January 4, 2022, Trustees Fitz Powell, Kevin Cormier, and Marcus Rowe requested that an investigation be conducted into potentially improper financial practices engaged in by Weems. In response, on January 4 Weems stated that only the Overseers could conduct an investigation. On January 5, Weems attempted to nominate three Overseers: Sean Yost, Scott Volk, and Bryan Schwartz. Of these, Mr. Volk and Mr. Schwartz were not ordained pastors at respected congregations and were therefore unqualified to serve as Overseers. Bylaws § 10.01. Even if they were qualified, though, the Board could not approve them because the composition of the Overseers could not be changed due to the pending request for an investigation. Bylaws § 10.04. Ultimately, the Board did not approve the nominated Overseers.

On January 13, 2022, the Board approved the 2022 Bylaws, which added Sections 7.07(c) and 7.08(e). Section 7.07(c) provides that if there are fewer than three Overseers, the Board shall assume the roles and responsibilities of the Overseers. This is consistent with the Board's historical authority to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). Thereby fully empowered to act by the Bylaws, on January 13 the Board voted to initiate an investigation and to retain Nelson Mullins to conduct it and to report its findings to the Board. This report comprises the findings of our investigation.

Our investigation was performed according to biblical principles. Pursuant to the Board's directive, this investigation was designed and intended to reveal and report the truth of what has transpired at Celebration under the Weemses' leadership.

## II. <u>FINDINGS OF FACT</u>

### A. Summary

Stovall Weems engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the Church. Weems failed to present these transactions to the Board for its review and approval, which he was required to do pursuant to Florida law and the Church's governing documents. When three Trustees sought to question these transactions, Weems retaliated by attempting to remove them. Although Weems has a duty to cooperate with this investigation, he has refused to do so.

Since at least 2019, the Weemses' leadership of the Church has been inconsistent and unbiblical. Stovall Weems failed to effectively define and communicate the Church's purpose, failed to properly administer the organization, nominate Overseers, oversee Church staff, and ensure the Board's directives were met effectively and efficiently. Instead, Weems has acted erratically, creating a culture of confusion and disarray that has hindered the Church from effectively carrying out its mission. Worse, Weems' leadership was marked by rampant spiritual and emotional abuse, including manipulation, a profound sense of self-importance and selfishness, superiority and entitlement,

overbearing and unreasonable demands on employees' time, a lack of accountability or humility, demands of absolute loyalty and compliance, public shaming and humiliation of employees, coercion, shunning, gaslighting, and the creation of a culture of fear and intimidation in which it was not safe to disagree with Weems.

Each of the above actions constitutes a separate and independent basis justifying the discipline of the Senior Pastor, up to and including ratifying the removal of his leadership position and termination of his employment.

### B. Overview of the Weemses' Leadership of Celebration

Stovall and Kerri Weems, among others, founded Celebration in 1998. Since then, the Church has experienced great success and growth. Celebration currently has 3,745 active members across five campuses. Celebration's early years were marked by the development of a small, tight-knit group of people who helped grow and lead the Church in the following years. Many of Celebration's current senior leadership team and employees have been with the Church since the early 2000s. Their knowledge and understanding of the Church, and their first-hand witness of its—and the Weemses'—transformation, provide a valuable resource that was extremely helpful in our investigation. The Church's deep bench of longtime volunteers, employees, leaders, and pastors is among its greatest assets and a key reason for the Church's growth and success.

Stovall Weems, as the Church's longtime Senior Pastor, was responsible for the management of the Church's day-to-day operations and the spiritual leadership of the Church. Witnesses described troubling details regarding the Weemses' dysfunctional leadership style. Many of these issues were detailed in a Baseline Report prepared in November 2020 by Network King, a firm hand-picked and commissioned by the Weemses.

The Network King report identified six key ways in which the Church required improvement: leadership challenges, poor communication, limited planning and forecasting, lack of professional development, ineffective governance, and lack of focus on performance. The Network King report found that the root cause of most of these issues was a failure of executive leadership. The report summarized its observations of the Church's executive leadership as including:

- Unclear vision, mission, and values
- Unclear leader intent
- Lack of developed strategy
- Inconsistent guidance
- Centralized decision-making
- Rampant hasty decision-making
- Lack of delegation
- Micromanagement
- General lack of order
- Poor expectation management

- Lack of accountability
- Lack of effective change management
- Lack of mentorship
- No leadership development program
- Personal activities impacting professional operations

The Network King report stands as a scathing indictment of the Weemses' failed leadership at Celebration. We understand that another, even more critical report specifically addresses the Weemses, but we have been unable to obtain a copy of it.

The single word used most frequently to describe Stovall Weems was: *narcissist*. When asked to describe Weems, nearly every witness we interviewed used that specific word. Many witnesses detailed, often through tears, instances when Weems personally belittled and humiliated them for minor mistakes or misunderstanding Weems' inconsistent and confusing directives. Worse, Weems created and fostered an environment in which he was not subject to accountability. Many witnesses explained that the first rule to survive at the Church was "We don't say no to Pastor." In this way, he was able to impose his will on others to force their compliance with his demands. Neither Stovall nor Kerri Weems served anyone at the Church. Instead, they demanded others to serve them – the antithesis of Christ-like personal sacrifice and service to others.

The Weemses' demands blurred the line between employees' personal and professional lives to such an extent there was no apparent difference between them. Total responsibility to serve the Weemses in all ways at all times was required to appease them. Witnesses described many examples of overbearing demands. One witness reported that she had to beg for one hour per day in which she was not required to immediately respond to text messages. Another reported that Weems instructed an employee to drive to a liquor store late at night and deliver a bottle of bourbon to his house because he did not want to be seen purchasing liquor. Another recounted that an employee was instructed to purchase a car for Weems and deliver it to his house. After the employee delivered the car as demanded, Weems told him to find his own ride home. Many witnesses described intense personal anguish and pain caused by working for the Weemses. One witness expressed an inability to return to church—any church—due to crippling anxiety and panic attacks.

Weems considered himself a visionary and frequently presented big ideas in conceptual form. These ideas were often simultaneously complex and unfinished, and Weems suffered an inability to fully explain his plans or how they should be implemented. Weems constantly wanted to execute on these plans during their conceptual phase without further analysis or refinement. When employees presented feasibility issues that would limit or prevent these ideas from being successful, they were ridiculed as "dreamkillers." Employees who raised questions or challenged ideas were quickly removed from the decision-making process. Many witnesses described knowing whether they were "in" or "out" of Weems' circle of trust by whether Weems would communicate—or not—with that person. Shunning, isolating, and discarding were common tactics used to punish anyone who expressed a disagreement or concern with an idea presented by Weems.

As the Church became more successful, the lavishness of the Weemses' lifestyle also increased. Private charter flights to exotic vacations, a full "house staff" to assist in maintaining their mansions, and personal assistants required to attend to the Weemses' every demand all became trappings of their life. The Weemses' compensation, staff, travel and expense accounts comprised approximately 10% of the Church's total revenue. Despite these privileges, the Weemses treated people who attended to them as inferior. In 2020, Weems drafted a document that instructed the Weemses' assistants on how they were to keep each of the three residences so the Weemses would not be bothered during their transitions between homes. This was so the Weemses could focus on their "spiritual acuity" at all times.

The Weemses also posted schedules of their required food and beverage service so that their employees would know how to serve them food and drinks. These instructions included specifications on the times of day the items were to be provided, exact requirements for each item, and a description of how the items were to be presented to the Weemses (on "real dishes" presented on a "serving tray"). These instructions—similar to over-the-top green room riders required by celebrities—reflected the Weemses' immense entitlement and self-importance.

Since Tim Timberlake was brought into Celebration in 2019, the Weemses were seldom seen at the church. Many witnesses could not remember the last time that the Weemses worshipped at Celebration.

### C. The Encounter

The Encounter was a pivotal moment in Celebration's history. At a Seder service on Passover in 2018, Stovall Weems claimed he had a personal encounter with Jesus Christ. Guest pastor Paul Wilbur, a messianic Jew, came to explain and reenact the ancient Hebrew/Judaic Passover Supper at Celebration. At the event, Weems became transfixed on a piece of bread he was holding. Weems stared blankly at the bread for a long time and then appeared bewildered, stunned, and speechless as his attention turned back to the events on the stage.

A video of the service at which the Encounter took place can be viewed here: https://youtu.be/swkJMbGuKa4?list=PLCIFIIMQrbfC1yXgmCMaZP0xMEbbwEHKv&t =6566

Afterward, Weems described that he had seen Jesus on the stage and been transported to the Last Supper the night before Jesus' crucifixion. Weems claims that he was physically with Jesus Christ and that Jesus spoke with him, directing his attention to the future and what Christ wanted for the Weemses to accomplish on Earth. Weems described Jesus as having dark hair, a white robe, and speaking in Hebrew.

This report takes no position on whether the Encounter was real. There is no way to confirm or deny—legally or factually—what was going on inside Weems' mind during that time. There is evidence that the Weemses were under a tremendous amount of personal stress during this time that may have impacted Weems' mindset that evening.

Regardless, after the Encounter things changed dramatically. Most witnesses recall that event was the catalyst for dramatically changed behaviors and actions by the Weemses in the following years.

Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed. People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

Over time, Weems used the Encounter and subsequent messages flowing from the Encounter to justify his authority and maintain control of the Church. If questioned, Weems would respond by saying that this direction was given to him by God through the Encounter. As a result, staff were not permitted to challenge Weems for fear of being accused of disobeying God's will. Because only Weems experienced the Encounter, only he had the ability to interpret its meaning and direction. When employees would ask questions or express confusion over Weems' directions, he would tell them that he had only disclosed part of the vision God deposited in him through the Encounter. In that way, Weems exercised control by claiming a secret divine revelation.[2]

One of the results of the Encounter was Weems' decision to "give away" the Church to Pastor Tim Timberlake – without first telling Kerri Weems, the board, senior leadership team, or the staff. The absence of any communication or coordination surrounding this handoff was the genesis for an extremely disorganized and disruptive transition, which ultimately culminated in this investigation.

### D. Post-Encounter Leadership of the Church

For months following the Encounter, Weems struggled to form words or communicate effectively. He was disengaged in business meetings with staff and cried frequently. The Encounter magnified his demand for control and his defiance to authority or accountability. Anyone—trustees, pastors, senior leaders, employees—who did not serve the needs of the Weemses was replaced. Anyone who challenged Weems' judgment or control of the Church was removed. He and Kerri Weems frequently repeated that the Board reported to them, not the other way around. Weems said that while he may have needed Overseers during his younger years, he no longer felt he did.

Most staff members described 2019 as a very confusing time. Weems struggled to process the Encounter and every decision was based on a disjointed understanding of its meaning. Weems would make decisions and demand they be carried out immediately, only to later reverse himself. Communications were sporadic and no clear chain of command was established. Weems often shuffled employees between positions

---

[2] The concept that a special knowledge of God is made available only to a select few is a tenet of Gnosticism condemned for centuries as heretical.

depending on who was in his inner circle. Because employees had poorly-described job functions and were constantly being reassigned, many employees did not know who was in charge of the Church's operations. Weems also began making strange comments about sweeping changes he intended for the Church's ministry. At one point he suggested the Church needed to learn how to function without any buildings.

During this time, Weems also appeared physically and mentally unwell. Members of the senior leadership team were so concerned that they convened a meeting to confront him about his mental health and the impact it was having on the Church's ability to function effectively. Although the meeting seemed to have gone well initially, it ultimately had no lasting impact and Weems continued to spiral.

In 2020, COVID-19 led to a complete disruption of the Church's operations. This disruption was further complicated by a plan developed by Weems to "separate the business from the Church" by spinning off several ministries as stand-alone corporate entities. In September 2020, the Board was comprised of Erik Sharpe, Jonathan MacArthur, Todd Gicalone, and Fitz Powell, all of whom were experienced Trustees who had served since at least 2014. At the September 2020 Board meeting, Weems presented his vision for a massive restructuring plan that included a request to seek a new $14 million credit line to fund proposed real estate transactions and capital improvements. The proposed reorganization was a confusing and poorly-conceived plan. Weems never fully grasped the complexities involved, continually changed direction, and failed to adequately explain his concepts to the board, senior leaders, and staff. Recognizing major issues with this reorganization, the board required that Weems provide it with business plans for each entity to be spun off. Some business plans were provided at the October 2020 Board meeting, but the Board later concluded they were of limited value.

Friction between Weems and the Board grew. At the December 2020 Board meeting, the Trustees came prepared to engage in an extensive conversation about Weems' reorganization plan. While the Church's revenues were 15% short of projections, Weems advocated for the Board to approve $14 million in new debt. When the Trustees questioned him about the details of his plan, and specifically how the Church would service the new debt, Weems responded with frustration and indignance. Instead of providing a business case to support his plan, Weems demanded that the Trustees either immediately approve the plan without further questions or end the meeting. When the Trustees asked for a 5-minute break to ease the tension, the Weemses walked out.[3]

---

[3] The debt proposal was approved in the Weemses' absence, but the property purchase ultimately fell through because of a title defect that Weems had failed to identify. This is another example of problems that arose as a result of Weems' rushed decision-making and failure to adequately analyze issues before demanding execution (and God's grace in saving the Church from critical mistakes).

At the end of 2020, the Church's longstanding CFO Lisa Stewart left to become the CEO of Honey Lake Clinic. In the interim, Devan Schanding served as interim CFO. Stewart's permanent replacement, Tojy Thomas, joined in January 2021 but left by May because of extremely poor treatment by Weems. Thomas came from an accounting background with substantial nonprofit experience at the University of Chicago and Woodman Valley Chapel in Colorado Springs. One of Thomas's primary tasks was to implement the separation of these ministries (AWKNG, Honey Lake Farms) from the Church. To accomplish this, Thomas needed to understand what these entities were designed to do, what purpose they historically served, what assets and liabilities "belonged" to each entity, and who each entity would employ going forward.

Thomas learned that Weems had a poor understanding of the Church's organizational structure and financial position, including its revenues and expenses. As things progressed, Thomas became increasingly concerned about the Church's cash burn rate and how it was depleting the Church's cash balance. The Church's financial statements reflect that its cash balance dropped from $9 million in October 2020 to $6 million in December 2020, then to $2 million in March/April 2021. Weems never had a grasp of where the money went and would oscillate between negligent attention to financial details and aggressive demands for voluminous information. He could never keep all of the parts straight in his head, and he blamed this confusion on the providers of the information (Stewart, Thomas, Cormier).

After Thomas left, Weems did not fill the position of CFO but instead relied on the HR director to assume some of the responsibilities of that position. The turmoil of the reorganization combined with the turnover of accounting and financial professionals resulted in a highly disorganized and dysfunctional enterprise in early-to-mid 2021.

Part of this confusion was caused by Weems' failure to recognize and treat the different entities as distinct. Although Weems was a full-time employee of the Church, paid by the Church and responsible for raising funds on behalf of the Church, he would obtain donations and then direct them to be deposited into other entities' accounts. This was problematic because it was never clear that any entity was capable of financial success independent of the Church. This has been proven out by AWKNG's demise. When AWKNG was spun off and Weems was responsible for its management outside of the Church's control, it immediately failed. In January 2022, AWKNG fired all but a handful of its staff – 40 employees were let go. Demonstrating a lack of empathy and obliviousness to the workers who had just lost their jobs, Weems asked the fired employees to pray for Kerri Weems because of how hard it had been on her. Kerri Weems did not attend the meeting at which the employees were laid off.

### E. Lack of Oversight from December 2020 to June 2021

In the aftermath of the December 2020 board meeting, Trustees Sharpe, MacArthur, and Gicalone determined that they could no longer continue to serve on the Board if the Senior Pastor refused to accept any accountability or governance. In February 2021, Mr. Sharpe, Mr. MacArthur, and Mr. Gicalone resigned as Trustees. In their resignation letter, they outlined a series of concerns they had with the direction of the Church, including its over-accumulation of debt, financial commitments made without board authorization, conflicts of interest between organizations, the absence of the minimum number of required Overseers, an organizational complexity that made transparency and oversight difficult, and poor staff reviews and accountability. These concerns mirrored those set forth in the Network King report issued a few months prior. The letter restated the Board's policy requiring Board approval of any expenditure over $5,000 not previously included in an approved budget. Their resignation left Mr. Powell and Mr. Rowe as the Trustees.

The Church's annual report filed in March 2021 lists the current Trustees as directors, but despite the near-complete turnover of the Board and the serious management concerns raised by Network King and the outgoing Trustees, Weems did not call a meeting of the Board from December 10, 2020 to June 3, 2021—nearly six months. During this period, Weems acted without any accountability or oversight by the Board or the Overseers. This was also the period during which the CFO role transitioned three times, from Stewart to Schanding to Thomas. Uncoincidentally, it was during this period when all of the improper financial transactions occurred. Weems eliminated or ignored all oversight, accountability, and compliance mechanisms that acted to limit his discretion and acted unilaterally.

### F. Improper Financial Transactions

#### 1. The Parsonage at 16073 Shellcracker Road

In January 2020, at the request of the Weemses, the Church agreed to purchase a parsonage for the Weemses to use as their personal residence. The property, located at 4504 Hunterston Lane in Glen Kernan Golf and Country Club, was purchased on January 14, 2020 for $1,295,000. The Board approved the purchase and executed a resolution authorizing Lisa Stewart to execute the necessary documents to close on the purchase. In connection with the Church's purchase, Celebration and the Weemses entered into a Parsonage Use License Agreement setting forth the rights of the parties with respect to the use of the parsonage. The Agreement related only to the Hunterston property, and would terminate on the date the Weemses abandoned the parsonage as their primary residence.

At some point thereafter, the Weemses decided they wanted to relocate. In connection with the Church's sale of the Hunterston parsonage, Weems asked if he could keep the proceeds from the sale. He was told by Tojy Thomas that because the Church owned the property, he was not entitled to the sale proceeds. The Hunterston parsonage

was sold on June 4, 2021 for $1,475,000. Weems never presented the potential sale of the Hunterston parsonage to the Board. Celebration kept the sale proceeds.

Meanwhile, on February 9, 2021 Weems Group, LLC—of which Weems is the sole member and its manager—purchased a single-family residence at 16073 Shellcracker Road on the Nassau River. The property was listed for sale at $875,000 but Weems Group bought it for $855,000. The appraisal obtained by Weems Group in connection with financing its purchase of the property valued it at $890,000 as of December 23, 2020.

Four months after Weems Group purchased the Shellcracker property, Weems Group sold it to the Church for $1,286,863.30—an increase of $431,386, more than 50% more than Weems Group had just paid. The Church's purchase of the Shellcracker property was not disclosed to or approved by the Board. The closing documents were signed by Weems on behalf of both Weems Group and the Church. The Church financed the purchase of the property by drawing on its line of credit from its primary lender, Wesleyan Investment Foundation ("WIF"). Weems executed a Mortgage Modification and Spreading Agreement encumbering the Shellcracker parsonage and increasing the Church's debt by $1,300,000.

To induce WIF to advance funds to the Church under its line of credit, Weems represented to WIF that the Board had approved the purchase of the Shellcracker property when it hadn't. What Weems claimed as authorization was the Board's prior approval of the purchase of the Hunterston parsonage, not the Shellcracker property. The failure to provide that important information was a material misrepresentation, an Event of Default under the Church's Promissory Note to WIF, and a breach of the Church's Business Loan Agreement with WIF.

Weems did not commission an appraisal of the property on behalf of Celebration when his company sold it to the Church, and the Duval County Property Appraiser has determined that the sale is not a "qualified" sale under the Florida Administrative Code (meaning it was determined not to be an arm's length transaction). An email sent by Sarah Mannion, the attorney that closed the sale, indicates that the Weems Group kept the $430,000 profit it made on the sale of the property.

The purchase of the Hunterston parsonage and the purchase of the Shellcracker property were fundamentally different in several ways:

- The Board was presented with the purchase of the Hunterston property and authorized the transaction via formal board action evidenced by a written resolution but was never presented with or authorized the purchase of the Shellcracker property.
- Lisa Stewart was authorized to execute the documents necessary to close on the Hunterston property purchase, but Weems was never similarly authorized to purchase the Shellcracker property.
- The Church and the Weemses entered into a license agreement for the use of the Hunterston property, but not the Shellcracker property.

- The Hunterston property was brought from and sold to unrelated third parties, while the Shellcracker property was bought from a company owned by Weems (and through which he obtained a huge financial windfall).

The Weemses have claimed that the Shellcracker purchase was merely a "transfer" of the parsonage from one location to another. But the resolution authorizing the Hunterston acquisition and the license use agreement both make clear that they specifically related only to that particular property and were not a blank check for the Weemses to buy and sell properties as they saw fit.

The Weemses have attempted to justify keeping the profit the Weems Group realized by flipping the Shellcracker property because the money was needed for "improvements." The Weemses' claim that these funds were used to improve the property appears to be entirely false. There is no evidence that any improvements have been made to the property, and certainly not improvements worth $430,000. First, the Building Department's records do not show that any permit applications have been filed for work to be performed at the Shellcracker property, and no notices of commencement have been recorded in the Duval County official records. Second, and more damning, when asked by the Weemses' realtor whether any renovations would be made to the property after closing for the purpose of obtaining homeowner's insurance, Weems sent an email stating: "No renovations after closing."

But even if that justification were true, it ignores the Weemses' direct and undisclosed conflict of interest in the transaction, the material misrepresentation made by Weems to WIF, and the absence of authority to purchase and mortgage property on behalf of the Church without notice to or approval by the Board. Standing alone, the improprieties and misrepresentations surrounding this transaction are sufficient grounds to disqualify the Weemses from serving as pastors and constitute a valid basis for their immediate termination.

2. The Second PPP Loan

In 2020, the Church applied for and was granted a loan under the federal Paycheck Protection Program ("PPP"). The first PPP loan was in the amount of $2.2 million and was used by the Church to pay staff salaries. Weems at different times asked if the Church could use the loan proceeds for general operating expenses or for other ministries. In response, it was explained that the loan could only be used for specific purposes, because the loan rules required that the funds be used only for very specific purposes. Ultimately, the loan was used for its required purposes, each expenditure was documented, and the Church sought, and was granted, forgiveness of the loan. Lisa Stewart, the Church's then-CFO, managed the process.

In April 2021, the Church applied for a second PPP Loan. Tojy Thomas was the Church's CFO when the second PPP loan application was submitted, which included the following certification:

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; *I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*

Thomas had resigned by the time the loan was approved and $1,106,400 in loan proceeds were received by the Church. Freed from the financial and accounting professionals that ensured Weems complied with the law, the Church's financial records indicate that *none* of the loan proceeds from the second PPP loan were used for permitted expenditures. Instead, Weems directed that the funds be spent on the following:

- $100,000 to invest in TurnCoin on behalf of the Church,[4] a digital security with which fans can "invest" in "talented people in all passions of life; sport, esports, music, art, entertainment and more."

- $856,033.33 was transferred to Honey Lake Farms's First Citizens Missions Account,[5] of which $150,000 was used to buy TurnCoin on behalf of Honey Lake Farms and $150,000 was used to buy TurnCoin on behalf of AWKNG.

- $100,000 was transferred to the Church's Missions account to cover a transfer of $100,000 to an unrelated church ministry in Nevada.[6]

In total, $500,000 of PPP loan proceeds were used to purchase TurnCoin. All of these transactions were directed by Weems without notice to or authorization by the Board, which has sole authority to "to approve or disapprove the transfer of church assets to other tax-exempt organizations" pursuant to Bylaws § 8.01. Weems knew, based on his experience with the first PPP loan, that these expenses were not permitted under the PPP loan program and would result in the Church's inability to seek forgiveness of the loan. The result of these transfers was an increase of the Church's debt by more than $1 million.

---

[4] TurnCoin is discussed in greater detail in Section II(B)(3).

[5] Weems is the President of Honey Lake Farms, Inc. and therefore transferred these funds as an "advance" on giving based on inflated revenue projections that would not be hit, resulting in a significant overpayment.

[6] The transferred funds were used to purchase TurnCoin at Weems' direction, as discussed in Section II(B)(3) below.

Weems also derived a direct financial benefit from these transactions. As discussed in greater detail below, Weems bundled these funds with others so that he could qualify as a "legacy investor" in TurnCoin. Legacy investors were entitled to be paid back before other investors and were entitled to 10% interest on their investment.

3. TurnCoin

TurnCoin is a digital security designed by TheXchange Pte. Ltd, a Singapore private company. TurnCoin would be used by fans to buy or sell "non-fungible cryptographic tokens" known as VirtualStax Cards that depict public figures such as athletes, movie stars, musicians, and other celebrities. By selling VirtualStax Cards, celebrities would be able "to monetize their social media following."

A private placement memorandum issued by the company in March 2021 includes the following disclaimer:

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS WHO CAN BEAR THE ECONOMIC RISK FOR AN INDEFINITE PERIOD OF TIME AND WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. FURTHERMORE, INVESTORS MUST UNDERSTAND THAT THIS INVESTMENT IS ILLIQUID AND IS EXPECTED TO CONTINUE TO BE ILLIQUID FOR AN INDEFINITE PERIOD OF TIME. NO PUBLIC MARKET EXISTS FOR THE SECURITIES, AND NO PUBLIC MARKET IS EXPECTED TO DEVELOP FOLLOWING THIS OFFERING. SEE "RISK FACTORS."

Celebration's cash reserves in mid-2021, when Weems decided to invest in TurnCoin, were substantially diminished and the Church could not afford to bear such a high risk for an indefinite period. Moreover, as mentioned above, the Board—not Weems—had authority to approve these decisions. Nevertheless, Weems acted unilaterally without presenting these proposed expenditures to the Board for its review and approval. As stated in the private placement memorandum, these funds are illiquid and cannot currently be accessed or utilized by the Church or entities.

Weems was also deceptive about the TurnCoin investments. When he first approached another pastor and friend about investing in TurnCoin, The pastor declined. Needing to bundle investors to qualify as a legacy investor, Weems decided to fund the pastor's investment through Celebration. Weems directed the Church's accounting staff to transfer $100,000 to the pastor's ministry account from the Church's Heart for the House Pentecost Offering. Heart for the House is a giving campaign in which Celebration's members are encouraged to make sacrificial, meaningful offerings to fund initiatives to transform lives through Jesus Christ. Weems told Celebration staff that the funds were to be used for a revival. Later, the pastor told the Church that Weems had directed him to invest the funds in TurnCoin as part of Weems' legacy investment group, which he did. To date, the funds have not been used for a revival.

Weems was also deceptive in how he showed these investments on Celebration's financial statements. In an email dated May 5, 2021, Weems instructed the Church's Human Resources Director that the TurnCoin investment be shown "as a cash currency on the books just like Bitcoin would.". But TurnCoin is a digital security, <u>not</u> a cryptocurrency. TurnCoin is currently illiquid and cannot be sold on a market – it is not a "cash currency." Identifying TurnCoin as a currency on Celebration's balance sheets is a fundamental mischaracterization of the asset.

In total, $500,000 in Church debt was invested in TurnCoin, but only $100,000 was invested in the Church's name. The remaining $400,000 was given away to other entities that Weems controlled (Honey Lake Farms, AWKNG) or people with whom he had a personal relationship.

None of these transactions were presented to or authorized by the Board, as required by the Church's articles of incorporation, bylaws, and Board policies regarding expenditures.[7] Furthermore, high-risk investments such as these are inconsistent with the Church's investment risk profile and its duty to serve as a faithful steward of sacrificially-donated funds.

### 4. Fraudulent mischaracterization and cancellation of Honey Lake Farms debt

Over the years, the Church made intercompany loans for the development and operation of Honey Lake Farms. These loans included a loan of $1,366,471.43 for the construction of a lodge building at the Farms. For years, this amount had been reflected as an asset of the Church (Accounts Receivable) and a liability of the Farms (Accounts Payable).

In January 2021, Weems inquired as to whether this loan should be forgiven by the Church. When it was explained to him that a consequence of the loan's forgiveness would be a negative impact to the Church's financial position, he determined that was not in the Church's best interest and dropped the matter.

In August 2021, Weems applied for a loan from First Citizens Bank on behalf of Honey Lake Farms, Inc. In connection with the application, HLF submitted financial statements to support its loan application. These statements, consistent with their historical characterizations, showed this as a liability of HLF. However, in order to improve HLF's financial statement to increase the likelihood of the loan's approval, Weems unilaterally determined to recharacterize this as an asset of the Farms, not a liability. He first told First Citizens that Honey Lake Clinic actually owed this money to the Farms. When the bank attempted to clarify this with the Clinic, the Clinic declined to recognize it as a legitimate receivable (because it wasn't).

---

[7] In 2020, the Board imposed a limit of $5,000 on expenditures that did not require Board authorization. Any expenses over this amount were required to be approved by the Board. The Board imposed this policy to prevent situations like this.

When the bank officer questioned the legitimacy of this entry (describing it as improper accounting), Weems expressed exasperation that the bank would attempt to confirm the information on the financial statements submitted by HLF ("I can't believe she asked [redacted] to do that."). The officer and Celebration's bookkeeping staff had a call in which the officer informed Celebration that the manipulation of financial statements in connection with a loan application was extremely serious and improper. To "resolve" the issue, Weems directed the Church's accountants to write off the $1.3 million debt on the Church's books so that it could be deleted as a liability on HLF's books. At Weems' direction, HLF's financial statements were revised to reflect this $1.3 million improvement in its financial position. All of this was done without board authorization at a time when the Church's financial position had eroded significantly.

The fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application violates Florida and federal law.

### 5. Misappropriation of Designated Funds

At Weems' direction, AWKNG solicited members of the Church to donate funds that AWKNG was to use for missions trips. Ultimately, AWKNG received donations in the amount of $29,486.75 that were solicited and designated for missions trips. After AWKNG was shut down in January 2021, Celebration was required to assume responsibility for conducting those mission trips. Despite Celebration's repeated requests, AWKNG has refused to transfer these designated funds to the Church or to account for their whereabouts. It therefore appears that AWKNG used these designated funds for an improper and unauthorized purpose.

### 6. BBVA/PNC Bank Termination of access to credit lines

For years, the Church used BBVA Compass (now PNC Bank) as its primary bank and lender. In 2019, BBVA issued Celebration a credit line of $2 million that was linked to 75 credit cards that church staff used for operational expenses across the Church's many locations. This credit line was contingent on Celebration maintaining a balance of $2 million in deposits at the bank. Credit cards were also issued to AWKNG and Honey Lake Farms, Inc. Those entities' cards were not linked to the Church's operating accounts.

In January 2021, Weems directed new CFO Tojy Thomas to switch banks from BBVA to First Citizens Bank. This decision was unilaterally made without regard to the impact that this move could have on the Church's credit line. After the banking change, a minimal amount of money remained with BBVA but the church still depended on the credit cards to fund operational expenses and manage its cash balance.

On November 8, 2021, PNC notified the church that AWKNG (operated by Weems) had missed a payment. This default triggered the bank to evaluate all related accounts. PNC's evaluation led to a reduction in Celebration's commercial credit card limit from $2 million to $200,000 because Celebration had moved its operating account. Because the Church averaged $400,000 per month in credit card expenses, the reduction in this credit line significantly limited the Church's ability to fund operations and almost wiped out all

its cash reserves. The Church attempted to acquire new commercial credit cards with First Citizens but they were only willing to offer a $70,000 limit given the significant financial losses the church had suffered to date. On April 8, 2022, PNC announced that it was revoking Celebration's credit line in its entirety, leaving the Church in a cash-only position.

The loss of the Church's access to short-term credit has resulted in a significant impact to its operations. This was caused by Weems' depletion of the Church's cash reserves through the above unauthorized transactions and his hasty and poor decision-making.

### III.    <u>CONCLUSIONS</u>

Through the actions described above, Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office. He has brought Celebration to the brink of insolvency. The current amount of Accounts Receivable that remain outstanding and unpaid is $3,389,835 (excluding the embezzled profit from the Shellcracker sale). But for the steadying leadership of Pastor Tim Timberlake and the actions of Celebration's Board, Celebration would have likely already failed as an institution.

Spiritually, the Weemses have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture:

> Watch out for false prophets. They come to you in sheep's clothing, but inwardly they are ferocious wolves. By their fruit you will recognize them. Do people pick grapes from thornbushes, or figs from thistles? Likewise, every good tree bears good fruit, but a bad tree bears bad fruit. A good tree cannot bear bad fruit, and a bad tree cannot bear good fruit. Every tree that does not bear good fruit is cut down and thrown into the fire.  Thus, by their fruit you will recognize them.
>
> Matthew 7:15-20.

> To the elders among you, I appeal as a fellow elder and a witness of Christ's sufferings who also will share in the glory to be revealed: Be shepherds of God's flock that is under your care, watching over them—not because you must, but because you are willing, as God wants you to be; not pursuing dishonest gain, but eager to serve; not lording it over those entrusted to you, but being examples to the flock.
>
> 1 Peter 5:1-3.

Whoever aspires to be an overseer desires a noble task. Now the overseer is to be above reproach, faithful to his wife, temperate, self-controlled, respectable, hospitable, able to teach, not given to drunkenness, not violent but gentle, not quarrelsome, not a lover of money. He must manage his own family well and see that his children obey him, and he must do so in a manner worthy of full[a] respect. (If anyone does not know how to manage his own family, how can he take care of God's church?)

1 Timothy 3:1-5.

An elder must be blameless, faithful to his wife, a man whose children believe and are not open to the charge of being wild and disobedient. Since an overseer manages God's household, he must be blameless—not overbearing, not quick-tempered, not given to drunkenness, not violent, not pursuing dishonest gain. Rather, he must be hospitable, one who loves what is good, who is self-controlled, upright, holy and disciplined. He must hold firmly to the trustworthy message as it has been taught, so that he can encourage others by sound doctrine and refute those who oppose it.

Titus 1:6-9.

The biblical standards for leadership in the church are high, and Stovall and Kerri Weems have demonstrated a longstanding pattern of falling short of this measure. Pastors, employees, trustees, friends, co-workers, and independent consultants have attempted to address these failings without success. Worse, the Weemses are completely unrepentant. Instead of accepting this investigation with humility, they have sought to attack and undermine it, by making statements to the news media and on their social media accounts and by attempting to seize control of the Church through the court system. Stovall Weems has repeatedly disparaged the Church's leaders and has refused to accept any responsibility for the trauma and profound hurt that he and Kerri Weems have caused to many. Through their actions, Stovall and Kerri Weems have disqualified themselves from pastoral leadership.

1 Timothy 5:19-20 lays out a process by which the Weemses are to be rebuked, and the Church's bylaws provide for a process of conciliation that Celebration should follow. Additionally, the Church should consider taking the following recommended actions.

## IV.    <u>RECOMMENDATIONS</u>

1.      Accept the resignation of Stovall Weems and Kerri Weems as employees of Celebration effective April 15, 2022 without further compensation or benefits.

2.      Pursue the permanent removal of Stovall Weems and Kerri Weems from any positions of authority relating to the Church, Honey Lake Farms, Honey Lake Clinic, and AWKNG.

3.      Require Stovall Weems and Kerri Weems to account for and return to the Church all funds misappropriated by them.

4.      Remove Stovall Weems and Kerri Weems from the parsonage and sell the property.

5.      Require Northstream Management, Habitat for Wholeness, Honey Lake Farms and AWKNG to repay all receivables and loans made by the Church to those entities.

6.      Report these findings to the appropriate authorities to determine whether criminal charges should be brought.

7.      Engage in the Christian Conciliation Process outlined in Celebration's bylaws.