# Exhibit A

Filing # 144490070 E-Filed 02/23/2022 04:39:57 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO:

DIVISION:

CHARLES STOVALL WEEMS, IV, an
individual, and KERRI WEEMS, an
individual,

     Plaintiffs,

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., a Florida not for
profit corporation,

     Defendant.

_____/

## COMPLAINT FOR TEMPORARY INJUNCTION

Plaintiffs, CHARLES STOVALL WEEMS, IV, and KERRI WEEMS, individuals, by and

through their undersigned counsel, and in accordance with Section 19.05 of the Amended and

Restated Bylaws of Celebration Church of Jacksonville, Inc., hereby bring this lawsuit for

injunctive relief against Defendant, CELEBRATION CHURCH OF JACKSONVILLE, INC., a

Florida not for profit corporation, and in support thereof state as follows:

### I.    PARTIES AND JURISDICTION

1.    This is an action seeking injunctive relief pursuant to the express provisions of the

Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc.

2.    Plaintiff, Charles Stovall Weems, IV ("Pastor Stovall"), is an individual, residing

in Duval County, Florida.

3.      Plaintiff, Kerri Weems ("Kerri"), is an individual, residing in Duval County, Florida.

4.      Defendant, Celebration Church of Jacksonville, Inc. (the "Church"), is a Florida not for profit corporation with its principal place of business at 9555 R.G. Skinner Parkway, Jacksonville, Florida 32256.

5.      Venue is proper before this Court pursuant to Chapter 47, Florida Statutes, because the Church's principal place of business is in Duval County, Florida, and the cause of action alleged herein accrued in Duval County, Florida.  Section 47.011, Florida Statutes.

6.      All conditions precedent have occurred or otherwise been waived.

7.      Pastor Stovall and Kerri have retained the undersigned counsel to represent them in this matter and are obligated to pay such counsel a reasonable fee for the services rendered in connection herewith.

## II.    FACTS

### A.  The Church's Senior Pastor, Stovall, and His Wife, Kerri.

8.      Pastor Stovall and Kerri founded the Church in 1998 in Jacksonville.

9.      Between 1998 and the present, Pastor Stovall grew the Church into a global, multi-site, non-denominational church with nearly 12,000 members.

10.     Pastor Stovall has been the Senior Pastor and President of the Church since its inception.

11.     The Senior Pastor, under the terms of the Church's Bylaws, has triple, concurrent responsibilities: (1) complete plenary authority, control, and responsibility for directing missions and spiritual activities of the Church; (2) serving as President and Chief Executive Officer of the Church and having authority to direct all of the day-to-day operations of the Church, including

2

establishing budgets, raising funds, and directing monies; and (3) acting as Chairman of the Board. The Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. (the "Bylaws") are attached as "Exhibit A" and incorporated by reference herein.

### B. The Church's Board of Trustees.

12.     The Board of Trustees is responsible for management and oversight of Church corporate matters and financial resources. Ex. A at § 8.01. The Trustees "are to serve the Church by assuring compliance with the Church's management policies and procedures, [and] by approving the annual budget and other major financial commitments …." Ex. A at § 5(b).

13.     The Board of Trustees is required to be comprised of not less than five (5) and no more than nine (9) Trustees. Ex. A at §§ 8.03(a), 8.03(d). All Trustees are nominated exclusively by the Senior Pastor for one calendar year terms. Ex. A at § 8.03(c).

14.     Upon the conclusion of 2020, three of the existing five Trustees chose not to apply for re-nomination to renew their positions.

15.     Therefore, in January 2021, Pastor Stovall appointed two new trustees, Kevin Cormier and Marcus Rowe. In February 2021, Fitzhugh Powell was nominated. In Spring 2021, Pastor Stovall nominated two more new trustees, Angela Cannon and Jacob William.

16.     In June 2021, Kevin Cormier, Angela Cannon, and Jacob William were confirmed in accordance with the Church's Bylaws.

### C. The Church's Overseers.

17.     In addition to Trustees, the Church's Bylaws also contemplate and provide for Overseers, whose role it is to provide apostolic oversight to the Senior Pastor and who are charged with protecting the Church through counsel, prayer, and if required, the investigation and discipline of the Senior Pastor. Ex. A at § 10.02.

18.     The Church's Senior Pastor has the exclusive authority to nominate Overseers, who are required by the Bylaws to be ordained pastors.  After nomination, the Board of Trustees is required to confirm the nomination of each Overseer.  Ex. A at §§ 10.01, 10.03.

19.     The Church's Bylaws require that there shall be no less than three (3) Overseers. Ex. A at § 10.03.

### D.  Pastor Stovall's Planned Transition into the Founding Pastor Role.

20.     In early 2019, Pastor Stovall expressed an interest in transitioning out of the Senior Pastor role and into a Founding Pastor role at the Church so that he could focus on Church missions.

21.     As part of this transition, Pastor Stovall, the Senior Leadership Team, and the Trustees identified Pastor Tim Timberlake ("Pastor Tim") as Pastor Stovall's putative successor to lead the Church, depending on performance and acceptance by the congregation.

22.     Pastor Tim assumed responsibility in March 2021 for leadership of the Church in Jacksonville and its affiliate campuses in the USA, while Pastor Stovall retained his legal position and authority as the Senior Pastor, President, Chief Executive Officer of the Church, and Chairman of the Board.

23.     The Church hired lawyers at The Church Law Group to help develop a retirement package for Pastor Stovall and Kerri, in addition to other corporate work.

### E.  Pastor Stovall Discovers Internal Church Financial Misconduct by Trustee, Kevin Cormier, and Church CFO, Lisa Stewart.

24.     In 2018, before Kevin Cormier was nominated and confirmed as a Church Trustee, he and the Church entered into a collaboration whereby construction-type entities owned by him were hired by the Church to perform land and housing improvements and management services at Honey Lake Farms, Inc. and Honey Lake Clinic, Inc.

4

25.     Honey Lake Farms (formerly, Celebration Care Ministries) and Honey Lake Clinic are legally separate, 501(c)(3) non-profits that were founded and initially funded by the Church. They remain related to the Church through common mission. Honey Lake Farms remains in-part funded by the Church. The leadership of these organizations largely overlaps with the Church.

26.     Importantly, in her role as CFO of the Church, Lisa Stewart also served as CFO of the related entities from their inceptions.

27.     In 2020, Kevin Cormier announced to Pastor Stovall his intention to donate $1 million of in-kind construction-type services to the Church's mission at Honey Lake Farms.

28.     Throughout 2020 and 2021, construction work and land management services were performed at Honey Lake Farms by Kevin Cormier's companies.

29.     Pastor Stovall was lead to believe that Kevin Cormier's work was part of his $1 million pledge to the Church's mission at Honey Lake Farms.

30.     Pastor Stovall also believed that Lisa Stewart, the Church's CFO, was properly accounting for Kevin Cormier's pledged donation and was responsibly managing the Church's finances.

31.     Lisa Stewart left her position as Church CFO in January 2021 and transitioned to work solely for Honey Lake Clinic. A new Church CFO was installed.

32.     In early-2021, the Church began receiving an influx of billing invoices from Kevin Cormier's entities, eventually totaling approximately $700,000.

33.     The Church's new CFO, Tojy Thomas, became concerned with such large invoices coming in so frequently, and brought them to Pastor Stovall's attention.

34.     The invoices had vague descriptions of the work performed and included requests for significant payments for work performed on Kevin Cormier's personal property.

35.    Pastor Stovall discovered that Kevin Cormier was overbilling or improperly billing the Church for enormous sums of money for alleged services at Honey Lake Farms. For example, Kevin's for-profit company was charging the Church money to rent the Church's own lodge for a Church-related event.

36.    Pastor Stovall discovered that Kevin Cormier was charging the Church rent for its use of a residential house ("Monticello") and at the same time, inappropriately charging the Church $137,871 for renovation expenses to that same property. The Church should not have been funding renovations to a property that was owned by Kevin and not by the Church.

37.    Pastor Stovall further discovered that Kevin Cormier invoiced the Church $18,000 per month for the Church's use of another residence individually owned by him, Keaton Beach, for a time period when that property was still under renovation and therefore not inhabitable.

38.    Pastor Stovall learned that the Church's previous CFO, Lisa Stewart, knew that Kevin Cormier had not donated any of the $1 million in work that he pledged and that the work for which he was billing the Church was actually supposed to be "donated" i.e., free.

39.    Lisa Stewart and Tojy Thomas allowed payments to be issued to Kevin Cormier's entities knowing that no agreements were in place and that no authorization or approvals were obtained for the work allegedly performed.

40.    Moreover, Kevin stopped submitting any substantiations for his invoices, but continued to get payments for them. Importantly, when Pastor Stovall discovered Kevin's improper billing practices, he directed Tojy Thomas to stop the payments and require Kevin to submit purchase orders, agreements, and proof of services rendered to justify the requested payments. Kevin did not produce the substantiation requested but continued to bill.

41.    Lisa Stewart was giving false reports to Pastor Stovall and misrepresenting the balances in the Church's accounts.

42.    Lisa Stewart refused to separate AWKNG organization to be a separate 501(c)(3) from the Church.  Lisa concealed her insubordination to Pastor Stovall's and the Board's directives to separate the funds designated for the AWKNG organization into a separate account from that of the Church.  By doing this, she was able to hide her financial and operational mismanagement and retain control of funds to create inaccurate and misleading reports.

43.    This insubordination and intentional misrepresentation led Pastor Stovall to believe the Church's finances were materially different than they were in reality.

44.    Lisa Stewart provided Kevin Cormier with unrestricted access to Honey Lake Farms' bank accounts, even when the Senior Pastor himself had no access to view the bank accounts.

45.    Lisa Stewart's financial and operational mismanagement of Honey Lake Clinic and its agreements with the Church caused irreparable harm and hundreds of thousands of dollars in financial damages to both the Church and Honey Lake Farms.

**F.    Pastor Stovall Confronts Kevin Cormier About His Fraud on the Church.**

46.    In April 2021, Pastor Stovall confronted Kevin Cormier about the discovered misconduct.

47.    For the first time, Kevin Cormier told Pastor Stovall that he reneged on his pledge to donate $1 million of in-kind services to the Church and admitted that he never let Pastor Stovall know.

48.     When Pastor Stovall called out specific examples of inappropriate billing, Kevin Cormier announced that God spoke to him just then and inspired him to donate the $550,000 of fraudulently billed work.

49.     Kevin Cormier also committed to donating to the Church the Monticello house the Church had been renting from him.

50.     Pastor Stovall believed he had properly fulfilled his obligation according to *Matthew* 18:15 to go to his brother to privately resolve the issue.

51.     When Kevin Cormier repented, Pastor Stovall believed that the wrongdoings inflicted upon the Church by Kevin Cormier had been righted, and that Kevin was returning to a righteous path.

52.     But, behind the scenes and unbeknownst to Pastor Stovall, Kevin Cormier relentlessly continued his behavior.  He began feeding the other Trustees and senior Church members lies and misinformation, and less than two weeks later, Kevin Cormier contacted the Overseers then-serving, falsely claiming that Pastor Stovall was guilty of misconduct.  Pastor Stovall was not made aware of Kevin's contact with the Overseers until late-September 2021.

53.     Kevin Cormier falsely claimed that Pastor Stovall was improperly manipulating and misdirecting the Church's finances or was guilty of some unspecified and vague wrongful conduct.

54.     In reality, Pastor Stovall had the Honey Lake Farms' bank accounts transferred to another financial institution to stop Kevin Cormier's wrongful access to the accounts and to protect the Church and Honey Lake Farms from Kevin Cormier's financial abuse.

55.     Little did Pastor Stovall know that Kevin Cormier was setting the scene to oust Pastor Stovall from the very Church that Pastor Stovall built.

**G. Kevin Cormier's Illegal, Usurious Contract.**

56.     In August 2021, Kevin Cormier and the Church signed a written agreement to document Kevin's donation of the Monticello house.

57.     In an attempt to recoup Kevin Cormier's investment in an unaffiliated entity, Honey Lake Resort, Kevin Cormier drafted the agreement so that Honey Lake Farms would be obligated to pay Kevin the $120,000 that he previously invested in Honey Lake Resort.

58.     Kevin Cormier's contract required an interest rate on the repayment of those funds at 10% per month – or 120% per year – far in excess of Florida's legal interest rate limit of 18% per year.

59.     When Pastor Stovall discovered the illegality of the contract, his independently-hired consultant confronted Kevin Cormier.  Kevin admitted padding his invoices, claimed that he did not know that he could not charge 10% monthly interest, and promised to discontinue pursuing payment of the usurious interest.

**H. Pastor Stovall Removes Kevin Cormier as a Church Trustee.**

60.     On January 3, 2022, to protect the Church from Kevin Cormier's continued inappropriate and fraudulent financial misconduct, Pastor Stovall exercised his authority to remove Kevin Cormier as a Trustee pursuant to Section 8.03(e) of the Bylaws.  Ex. A.

61.     In accordance with the Church's Bylaws, Pastor Stovall should have been protected as a whistleblower against any act of retaliation.  Ex. A at § 17.03(b).

62.     Instead, the Trustees unceremoniously, without cause or investigation, and in complete violation of the Church's procedural Bylaws, sought to unseat Pastor Stovall from his role as Senior Pastor.

## I. **Kevin Cormier Retaliates against Pastor Stovall.**

63.     In response to Pastor Stovall's confronting Kevin and in an effort hide his own misconduct, Kevin Cormier set out to misdirect the Trustees' suspicion onto Pastor Stovall.

64.     Kevin Cormier misleadingly convinced the other Trustees that it was actually Pastor Stovall who committed misconduct.

65.     The Trustees apparently believed the lies that they were told about Pastor Stovall.

66.     Pastor Stovall learned that as a result of Kevin Cormier's and Lisa Stewart's misrepresentations to the other Trustees, an effort had begun to wrongfully remove him as Senior Pastor.

67.     Because two of the three Overseers had resigned in Fall 2021, Pastor Stovall attempted to have confirmed two additional Overseers as required by the Bylaws to determine whether an investigation would occur.   The Trustees, however, refused to confirm any new Overseers.

68.     During December 2021 and early-January 2022, Pastor Stovall attempted to schedule meetings with the Trustees to handle pending matters, but the Trustees refused to respond at all.

69.     Pastor Stovall learned from Pastor Tim and ARC President, Gregg Surratt, that Kevin Cormier convinced others to participate in Pastor Stovall's wrongful ousting in blatant violation of the Church's procedural requirements regarding Overseers or an investigation.

70.     On January 7, 2022, Pastor Stovall was compelled to remove Trustees as a result of their intent, based upon false and inaccurate information, to undermine the Church's basic governance protocols.

71.     Less than one hour later, despite Pastor Stovall's protected whistleblower status, the same Trustees sent Pastor Stovall a letter notifying him that he was not in good standing and was suspended as the Church's Senior Pastor as a result of "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor."

72.     The letter claimed the Board has "called upon the Overseers, if any, to investigate …," but does not explain or offer any authority for how any suspension could be accomplished if no Overseer-investigation had been conducted let alone the fact that only one Overseer was in service.

73.     No specific claims of misconduct were disclosed in the letter.  In fact, as of the date of filing of this Complaint, none have been provided and no Church-representative has interviewed or even asked a single question of Pastor Stovall or Kerri.

74.     Upon information and belief, the subjects of the so-called investigation of Pastor Stovall include his election to take an advance on his 2021 pay, an investment of Church funds, and the last parsonage transaction.

75.     These allegations ignore the fact that the advance pay is entirely permissible under the compensation package that is prepared annually by the compensation committee, comprised of Trustees, Overseers, Church attorneys, and Lisa Stewart.

76.     Likewise, Pastor Stovall's investment was made as authorized by the Bylaws, from the funds budgeted and approved for this purpose, for the sole benefit of the Church employees' retirement plans.  Although this investment was incredibly successful, Pastor Stovall derived no personal benefit from this investment.

77.     Finally, any allegations relating to the parsonage transaction are baseless because this transaction was reviewed and approved by the compensation committee, comprised of

11

Trustees, Overseers, Church Attorneys, and Lisa Stewart, some of which are now the very individuals claiming it was improper.

78.     Upon information and belief, there has been no investigation initiated into the Kevin Cormier's or Lisa Stewart's misconduct.

79.     Pastor Stovall's alleged suspension was wholly outside and failed to meet the Church Bylaws' strict procedural requirements related to the investigation and discipline of a Senior Pastor.[1]

80.     Contrary to the procedure required by the Bylaws, the Trustees improperly suspended Pastor Stovall before any investigation occurred, wrongfully halting Pastor Stovall's and Kerri's compensation and banning all contact with the Church and its members and were threatened with arrest should they set foot on Church property.

81.     Because of the Trustee's complete failure to comply with the Bylaws, their attempt to suspend Pastor Stovall was entirely ineffective, and Pastor Stovall remains in good standing.

**J.   Improper and Ineffective Amendment of the Church's Bylaws.**

82.     Upon information and belief, the remaining Trustees realized that the procedures required under the Bylaws had not been followed.

---

[1] The Church Bylaws require that if two or more Trustees believe that the Senior Pastor has engaged in improper conduct, they must contact the Senior Pastor *and* the Overseers requesting that the Overseers undertake an investigation and evaluation of appropriate discipline. Ex. A at § 7.07(a). After the Overseers are called upon to investigate, they must first have an affirmative vote of a majority of Overseers to even initiate any such investigation. The Bylaws further provide that, following an investigation, another majority vote is required to take disciplinary action. Ex. A at § 7.07(b). The Bylaws clearly state that the Senior Pastor is deemed to remain in good standing until the Overseers affirmatively vote to initiate an investigation. Ex. A at § 7.08(b). Currently, meeting the requirements of these provisions is impossible because there is only one Overseer in place.

83.     On January 12, 2022, with only two hours' notice, the remaining Trustees scrambled to pass a purported amendment to the Church's Bylaws whereby they would allow themselves as Trustees to serve in the role as Overseers.  Exhibit B.

84.     This attempt to amend the Church's Bylaws, however, was invalid for failure to comply with the Bylaws' procedural requirements to do so because (1) the Bylaws are not permitted to be amended at a special meeting – only at regular meetings; (2) the notice requirement for amendment of Bylaws was not met; (3) there was no written consent of all Trustees to amend the Bylaws; and (4) there are fewer than five Trustees currently in service (Angela Cannon and Jacob William).

85.     Importantly, the attempted Bylaw amendment seeks to eliminate the critical qualification criteria set out in the Bylaws that an individual serving as an Overseer must be an ordained pastor.

86.     That same criteria is importantly *not* applicable to individuals serving as Trustees.

87.     Moreover, if disciplinary action of a Senior Pastor is being considered or an investigation is underway, the Bylaws require that no changes in the composition of the Overseers shall be made.  Ex. A § 10.04.

88.     Pastor Stovall and Kerri have filed this lawsuit to compel compliance with the Church's Bylaws, which require disputes among Church members to be submitted to non-court proceedings such as mediation and/or arbitration.

89.     The Bylaws specifically contemplate the issuance of an injunction whereby all parties are restored to their status quo pending resolution of the dispute in accordance with the Bylaws.

90.     Pastor Stovall and Kerri do not seek this Court's ruling on the ecclesiastical merits of this dispute, but rather seek this Court's enforcement of the specific provisions in the Bylaws that (i) require the Bylaws to be construed in accordance with Florida secular law, and (ii) allow for entry by a secular court of competent jurisdiction of a temporary injunction as requested here.

91.     Pastor Stovall and Kerri wish to follow the requirements of the Church's Bylaws and allow for a full and thorough investigation of any and all wrongdoing involving the Church's Board of Trustees, present and former officers, employees, and other parties and organizations that contributed to the dispute.

## COUNT I
## INJUNCTIVE RELIEF UNDER ARTICLE 19.05 OF THE BYLAWS

92.     This paragraph re-alleges and re-incorporates paragraphs 1 through 91 as if stated fully herein.

93.     This action is for injunctive relief under Article 19.05 of the Church's Bylaws to restore the parties to status quo while the dispute over Kevin Cormier's removal as Trustee and Pastor Stovall's alleged suspension is mediated and/or arbitrated.

94.     All disputes between Church officers, trustees, employees, leaders, etc., are to be submitted to mediation and arbitration governed by the Rules of Procedure for Christian Conciliation, Institute for Christian Conciliation. Ex. A at § 19.05.

95.     Any party may file a motion seeking temporary injunctive relief from a court of competent jurisdiction in order to maintain the status quo until the underlying dispute or claim can be submitted for mediation or arbitration. Ex. A at § 19.05.

96.     Pastor Stovall and Kerri request this Honorable Court to issue an injunction to maintain status quo until the underlying dispute can be submitted to mediation and/or arbitration.

97.    Pastor Stovall and Kerri have suffered and continue to suffer irreparable harm if they are not returned to the status quo.

98.    Pastor Stovall and Kerri have no adequate remedy at law.

99.    Because Pastor Stovall and Kerri's suspension was improper due to numerous procedural and substantive violations of the Bylaws, Pastor Stovall and Kerri have a substantial likelihood of success on the merits.

100.    To maintain the status quo, Pastor Stovall and Kerri request that the Court issue an Order restoring and maintaining the status and situation of the parties as it existed on January 7, 2022, prior to the unlawful actions of the Trustees, which shall include the following non-exclusive matters:

    i.    Restoring Pastor Stovall and Kerri to their pre-suspension positions at the Church including full access to Church-related accounts such as email, Zoom, etc.;

    ii.    Restoring their base salary and benefits arrangements and back pay;

    iii.    Requiring the Trustees to confirm or reject Pastor Stovall's nominated Overseers in accordance with the Bylaws;

    iv.    Determining that the purported January 2022 amendment to the Bylaws is invalid;

    v.    Requiring all parties to strictly comply with the Bylaws' procedural requirements for discipline and conflict resolution;

    vi.    Requiring the issuance of communication to the Church's missionary partners recalling the Church's previous statement relating to this dispute; and

    vii.    Prohibiting any further communication regarding this dispute.

101.    A temporary injunction will serve the public interest by providing relief as contemplated by the Bylaws while the parties resolve their dispute through mediation and/or arbitration.

15

WHEREFORE Plaintiffs, Charles Stovall Weems, IV, and Kerri Weems, respectfully request this Honorable Court enter an order for temporary injunctive relief directing that the Plaintiffs be restored to the status quo, as described in more detail above, and for any and all other relief that the Court deems fair and just.

Respectfully submitted,

PURCELL, FLANAGAN, HAY & GREENE, P.A.
*/s/ Christopher J. Greene*
Christopher J. Greene
Florida Bar No.: 516015
Devon S. Richards
Florida Bar No. 58211
Lyudmyla Kolyesnik
Florida Bar No. 1022343
1548 Lancaster Terrace
Jacksonville, Florida 32204
Telephone: (904) 355-0355
Facsimile: (904) 355-0820
Primary: litigation@pfhglaw.com
Secondary: service@pfhglaw.com
*Counsel for Plaintiffs*

16

## AMENDED AND RESTATED BYLAWS
## OF
## CELEBRATION CHURCH OF JACKSONVILLE, INC.

These Amended and Restated Bylaws (hereinafter referred to as "these Bylaws") govern the affairs of Celebration Church of Jacksonville, Inc., a Florida religious nonprofit corporation (the "Church" or "Corporation"). The Church is organized under the Florida Not For Profit Corporation Act (the "Act"). These Bylaws amend and restate, in its entirety, the previous Bylaws of the Church, as amended.

## ARTICLE 1
## NAME AND REGISTERED OFFICE

The name of this religious nonprofit corporation is Celebration Church of Jacksonville, Inc. The principal office of the Church in the State of Florida shall be located at 9555 R·G Skinner Parkway, Jacksonville, FL 32256. The Board of Directors of the Church, hereinafter referred to as the "Trustees," shall have full power and authority to change any office from one location to another, either in Jacksonville, Florida or elsewhere. The Church shall comply with the requirements of the Act and maintain a registered office and registered agent in Florida. The registered office may be, but need not be, identical to the Church's principal office in Florida. The Trustees may change the registered office and the registered agent as provided in the Act.

## ARTICLE 2
## STATEMENT OF FAITH

**2.01    The Bible.**

We believe that the Bible is God's Word. It is accurate, authoritative and applicable to our everyday lives. 2 Timothy 3:15-16.

**2.02    God.**

We believe in one eternal God who is the Creator of all things. He exists in three Persons: God the Father, God the Son and God the Holy Spirit. He is totally loving and completely holy. Matthew 3:16-17; 28:19; 1 John 5:7-8; Isaiah 9:6.

**2.03    Salvation.**

We believe that sin has separated each of us from God and His purpose for our lives. We believe that in order to receive forgiveness and the 'new birth' we must repent of our sins, believe in the Lord Jesus Christ, and submit to His will for our lives. John 14:6; Colossians 1:13-18; Romans 5:1; Ephesians 2:8-9; 2 Peter 3:9; 1 Timothy 2:3-4.

EXHIBIT A

### 2.04    Jesus Christ.

We believe that the Lord Jesus Christ as both God and man is the only One who can reconcile us to God. He lived a sinless and exemplary life, died on the cross in our place, and rose again to prove His victory and empower us for life. We believe that the Lord Jesus Christ is coming back again as He promised. John 1:1-4; 1 Timothy 3:16; Matthew 1:18; 2 Corinthians 5:21; Mark 16:5-6; Acts 1:9-11; John 14:3.

### 2.05    The Holy Spirit.

We believe that the Holy Spirit empowers us to live the holy and fruitful lives that God intends for us to live and that through the Holy Spirit we have access to spiritual gifts for the purpose of building and edifying the local church. 2 Peter 1:2-3; 2 Corinthians 3:18; Acts 8:14-17; Acts 10:44-48; Romans 11:29.

### 2.06    The Local Church.

We believe in the power and significance of the Church and the necessity of believers to meet regularly together for fellowship, prayer and the 'breaking of bread'. We believe that God has individually equipped us so that we can successfully achieve His purpose for our lives which is to worship God, fulfill our role in the Church and serve the community in which we live. We believe that God wants to heal and transform us so that we can live healthy and blessed lives in order to help others more effectively. Ephesians 1:22, 2:19-22.

### 2.07    Heaven and Hell.

We believe that Heaven and Hell are real eternal places and that our eternal destination is determined by our response to the Lord Jesus Christ. Revelation 20:11-15; John 14:1-4; Romans 6:23; John 3:15-16.

### 2.08    Marriage and Sexuality.

Based upon the orthodox teaching of the church throughout history and the faithful witness of the scriptures, we believe in and affirm the meaning of the term "marriage" exclusively as follows: Marriage sanctioned by God joins one man and one woman in a faithful, exclusive, committed and lifelong union. We believe God intends sexual intimacy to be only for a man and woman who are married to each other and He has defined all intimate sexual activity outside of a heterosexual marriage as sexual immorality, sinful, and contrary to God's will as defined in Scripture. The standard and expectation for all Christ Followers regarding sexuality is celibacy in singleness and faithfulness in heterosexual marriage.

We believe that any form of sexual immorality as defined in scripture (Matt 15:18-20, 1 Cor. 6:9-10) is sinful and offensive to God. We believe in order to preserve the function and

integrity of the church as the local Body of Christ, and to provide a biblical role model to the church members and the community, it is imperative all persons employed by the church in any capacity, or who serve as volunteers, should abide by and agree to this Statement on Marriage and Sexuality and conduct themselves accordingly. *(Matt 5:16; Phil 2:14-16; 1 Thess. 5:22.)*

We believe that God offers redemption and restoration to all who confess and forsake their sin, seeking His mercy and forgiveness through Jesus Christ. We believe that every person must be afforded compassion, love, kindness, respect, and dignity. Hateful and harassing behavior or attitudes directed toward any individual are to be repudiated and are not in accord with scripture nor the doctrines of the Church. *(Acts 3:19-21; Rom 10:9-10; 1 Cor 6:9-11; Mark 12:28-31; Luke 6:31.)*

### 2.09 Statement on the Sanctity of Human Life.

We believe that all human life is scared and created by God in His image. Human Life is of inestimable worth in all its dimensions, including pre-born babies, the aged, the physically or mentally challenged, and every other stage or condition from conception through natural death. We are therefore called to defend, protect and value all human life. (Ps 130)

### 2.10 The Sacraments.

The sacraments of baptism and communion are permanent visible signs of our profession of Christian faith and God's gracious ministry toward us. By them we affirm our faith and give public witness to the sacred nature of what we believe. In fulfilling these spiritual duties, we are reminded an important work has taken place in our hearts as believers. They point to the gracious work of Christ - His sacrificial death and victorious resurrection for us. By them, He works within us to quicken, strengthen and deepen our faith. God's real presence and His grace are made available through them.

Baptism is a symbol of the new covenant of grace and signifies acceptance of the benefits of the atonement through the death, burial, and resurrection of Christ. All believers who repent and believe on Jesus as personal Savior and Lord are commanded by the Word of God to be baptized in water in the Name of the Father, the Son, and the Holy Spirit. Baptism is an act of obedience to God.

Baptism is an opportunity for every believer to publicly affirm and express their faith. The act symbolically declares to the world they now believe and trust in Jesus as Savior. Baptism affirms that Christ has radically changed your life; the old sinful lifestyle has died with Christ at salvation, and a new person has been raised to live a new life in Christ. It declares you are submitting to the process of lifelong spiritual growth and committed to serve Him as Lord by the power of the Holy Spirit.

In the New Testament, baptism is practiced publicly. We incorporate baptisms into worship gatherings on a regular basis and emphasize the public nature of the sacrament.

(Matt 3:1-7, 13-17; 10:32; 28:16-20; Mark 1:9-13; John 3:5; 22, 26; 4:1-2; Acts 2:38-39, 41; 8:12-17, 35-39; 9:18; 10:47-48; 16:29-34; 18:8; 19:1-6; 22:16; Rom 2:28-29; 4:11; 6:3-4; 1 Cor 12:13; Gal 3:27-29; Col 2:11-12; Titus 3:5; 1 John 1:9; 1 Pet 3:18-22)

Communion (the Lord's Supper) is symbolic of our redemption by Christ's death:  Each time we partake of communion we remember Jesus lived a sinless life, died on the Cross in our place, and rose again to prove His victory over death and sin. Eating and drinking the symbols of Christ's sacrifice express our awareness and affirmation that through the death of Jesus we have received salvation by faith and have eternal life through the Lord Jesus. The sacrament is also a sign of love believers have for each other and represents our hope looking forward to Christ's return and second coming, reminding us to proclaim the Lord's death until He comes!

To those who receive it humbly, with a proper spirit and by faith, communion is a means through which God communicates grace to the heart, nourishing the soul and spirit.

(Ex 12:1-14; Matt 26:26-29; Mark 14:22-24; Luke 22:14-20; John 6:28-58; 1 Cor.5:7-8; 10:3-4, 16-17; 11:23-32; 2 Peter 1:4)

### 2.11 Statement of Final Authority.

The statement of faith doesn't exhaust the extent of our beliefs. The Bible itself, as the inspired and infallible Word of God that speaks with final authority concerning Truth, Morality, and the proper conduct of mankind, is the sole and final of all that we believe. For purposes of Celebration Church's faith, doctrine, practice, policy and discipline, our Senior Pastor and Senior Leadership Team are the organization's final interpretive authority on the Bibles meaning and application.

## ARTICLE 3
## GENERAL PROVISIONS

### 3.01   Autonomy.

The Church is autonomous and maintains the right to govern its own affairs, independent of any denominational control.  Recognizing, however, the benefits of cooperation with other churches in world missions and otherwise, this Church may voluntarily affiliate with any churches of like precious faith.

### 3.02   Purposes.

The Church is formed for any lawful purpose or purposes not expressly prohibited under the Act.  The Church is organized and shall be operated exclusively for religious, charitable and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  Notwithstanding the foregoing, the Church's purposes also include the limited participation of the Church in any other activities, including taxable activities, but only to the extent the activities would be permitted by a tax-exempt organization.  More particularly, but without limitation, the purposes of this Church are to:

(a)    Minister the Word of God;

(b)    Conduct regular religious worship services through various forms of ministries;

(c)    Promote and encourage, through ministries of the Church, cooperation with other organizations ministering within the community;

(d)    Spread the Word of the Gospel by ministering to all through seminars, radio, television, and other forms of mass media;

(e)    Conduct a local and international Church by the direction of the Lord Jesus Christ and under the leadership of the Holy Spirit in accordance with all the provisions as set forth in the Bible;

(f)    Maintain local Church and missionary facilities to propagate the gospel of Jesus Christ both at home and in foreign lands and to support and send missionaries throughout the world;

(g)    Conduct a school for ministers and leaders;

(h)    License and ordain qualified individuals including graduates of ministerial schools;

(i)    Collect and disburse any and all necessary funds for the maintenance of the Church and the accomplishment its purpose within the State of Florida and elsewhere around the world; and

(j)    Make distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended.

The Church is also organized to promote, encourage, and foster any other similar religious, charitable and educational activities; to accept, hold, invest, reinvest and administer any gifts, legacies, bequests, devises, funds, and property of any sort or nature, and to use, expend, or donate the income or principal thereof for, and to devote the same to, the foregoing purposes of the Church; and to do any and all lawful acts and things which may be necessary, useful, suitable, or proper for the furtherance of accomplishment of the purposes of this Church; Provided, however, no act may be performed which would violate Section 501(c)(3) of the Internal Revenue Code of 1986, as it now exists or as it may hereafter be amended.

### 3.03   Powers and Restrictions.

Except as otherwise provided in these Bylaws and in order to carry out the above-stated purposes, the Church shall have all those powers set forth in the Act, as it now exists or as it may hereafter be amended.  Moreover, the Church shall have all implied powers necessary and proper

to carry out its express powers. The powers of the Church to promote the purposes set out above are limited and restricted in the following manner:

(a)    The Church shall not pay dividends and no part of the net earnings of the Church shall inure to the benefit of or be distributable to its organizers, trustees, officers or other private persons, except that the Church shall be authorized and empowered to make payments and distributions (including reasonable compensation for services rendered to or for the Church) in furtherance of its purposes as set forth in the Articles of Incorporation and these Bylaws. No substantial part of the activities of the Church shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Church shall not participate in, or intervene in (including the publication or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provisions of the Articles of Incorporation or these Bylaws, the Church shall not carry on any other activities not permitted to be carried on by (i) a Corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws, or (ii) a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws.

(b)    In the event this Church is in any one year a "private foundation" as defined by Section 509(a) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws, it shall be required to distribute its income for such taxable year at such time and in such manner as not to subject the foundation to taxation under Section 4942 of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws; and further shall be prohibited from: (i) any act of "self-dealing" as defined in Section 4941(d) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws; (ii) retaining any "excess business holdings" as defined by Section 4943(c) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws; (iii) making any investments in such manner as to subject the foundation to taxation under Section 4944 of the Internal Revenue Code of 1986, as amended, or corresponding provisions any subsequent federal tax laws; or (iv) making a taxable expenditures as defined in Section 4945(d) of the internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws..

(c)    The Church shall not accept any gift or grant if the gift or grant contains major conditions that would restrict or violate any of the Church's religious, charitable or educational purposes or if the gift or grant would require serving a private as opposed to a public interest.

# ARTICLE 4
# GOVERNING BODY

The Church is operated as a religious nonprofit Corporation in accordance with Title 36, Chapter 617 of the Florida Not for Profit Corporation Act, and subject to the Act, its Articles of

Incorporation and these Bylaws. The Church is governed by its Board of Directors (hereinafter referred to as the "Trustees").

# ARTICLE 5
## CHURCH GOVERNMENT

The Church seeks to be led by the Holy Spirit in all things. The Senior Pastor, the Trustees, the Officers, the Overseers, the Senior Leadership Team and the Membership all have a certain role in the Church's government.

(a)     Role of the Senior Pastor. The Senior Pastor has executive and supervisory control over and is ultimately responsible for both the spiritual and the corporate health of the Church, including communicating the ministry vision for and overseeing the day-to-day operations of the Church (as described in Article 7).

(b)     Role of the Trustees. The Trustees shall have the duties and responsibilities generally associated with and exercised by a corporate board and are to serve the Church by assuring compliance with the Church's management policies and procedures, by approving the annual budget and other major financial commitments of the Church (as described in Articles 4 and 8).

(c)     Role of the Officers. The Officers are to serve the Church in accordance with those certain roles and responsibilities as may be determined from time to time by the Senior Pastor, the Trustees, or by such persons designated by the Trustees or Senior Pastor (as described in Article 9).

(d)     Role of the Overseers. The Overseers shall provide apostolic oversight to the Senior Pastor and are charged with protecting the Church through counsel, prayer, and if required, the discipline of the Senior Pastor (as described in Article 10).

(e)     Role of the Senior Leadership Team. The Senior Leadership Team serves in both a spiritual leadership capacity and in a staff leadership capacity, as the protectors and encouragers of a positive spiritual climate within the Church and as seasoned and experienced members of the pastoral team who work alongside the Senior Pastor in carrying out his directives (as described in Article 11).

(f)     Role of the Members. The Members of the Church support the Senior Pastor in fulfilling his calling; influence the spiritual tone, strength and the direction of the body of believers (as described in Article 6).

## ARTICLE 6
## CHURCH MEMBERSHIP

The Church's membership is open to all who profess their faith openly in our Lord Jesus Christ. There shall be one class of membership (hereinafter the "Members") and the Members shall all be people who faithfully contribute, through tithes and offerings, to the finances of the Church. Membership is granted and recognized once a person has attended the membership class, completed and returned the financial support commitment form and demonstrated regular financial giving through tithes and offerings to the Church. Should one (1) year pass without a record of financial contributions, membership shall be terminated by the Trustees. The Trustees may, from time to time, adopt and amend the application procedures and qualifications for membership in the Church.

As set forth in Article 4, the corporate governance of the Church is solely vested in the Trustees. As set forth in Article 7, plenary power to oversee the spiritual affairs and the day-to-day operations of the Church is vested with the Senior Pastor. As such, Members are not entitled to cast a vote in person, by proxy or otherwise that is binding upon the Church.

The Senior Pastor shall have the sole and exclusive authority to seek the membership's approval or disapproval of an action that Members would not otherwise not be entitled to vote (hereinafter a "vote of affirmation") upon. Should the Senior Pastor seek a vote of affirmation, the outcome of such vote carries no legal weight, is not binding on the Corporation and is only intended to gauge the opinion of or seek moral support from the membership.

## ARTICLE 7
## THE SENIOR PASTOR:
## PRESIDENT AND CHIEF EXECUTIVE OFFICER

### 7.01   The Office of the Senior Pastor: Dual and Concurrent Responsibilities.

The Church finds its headship under the Lord Jesus Christ and in its Senior Pastor. The Senior Pastor shall have plenary authority over and shall be responsible for directing all of the ministries and spiritual activities of the Church. Concurrently, the Senior Pastor shall serve as the President and Chief Executive Officer of the Corporation and shall have plenary authority over and shall be responsible for directing all of the day-to-day business activities and operations of the Church.

Because the Church has two simultaneous and complimentary expressions: (1) the spiritual life of a body of believers (the Church); and (2) the corporate entity that houses the Church's functions and activities (the Corporation), it is the Senior Pastor that bridges the gap between these dual and concurrent expressions. The Senior Pastor, is primarily responsible for the spiritual life of the Church, and at the same time, he must be in the position to insure the Church's corporate health and that its resources are directed toward the ministries he deems fit and in furtherance of the Church's best interests.

**7.02    Duties and Responsibilities.:**

The Senior Pastor is responsible to lead the Church in accordance with Biblical principles to accomplish the New Testament purposes of the Church and his duties require that he:

(a):    Provide Biblical vision and direction for the congregation;
(b)    Serve as the leader of the Church body of believers, the Church staff, all church organizations, all Church ministries, the Trustees, and all Church Advisory Committees, with the exception of the Independent Compensation Committee and the Confirmation Committee, to accomplish the New Testament purposes of the Church;.
(c)    Define and communicate the Church's purpose;
(d)    Administer and coordinate the day-to-day ministry to the congregation and administration and operations of the Church;
(e)    Nominate and remove Overseers;
(f)    Appoint, direct, oversee and remove Senior Leadership Team Members;
(g)    Recognize and enlist apostolic, prophetic, evangelistic, pastoral and teaching ministries, along with that of Senior Leadership Team Members and additional staff members as he deems Biblical and necessary for the healthy and balanced spiritual ministry of the body of believers;
(h)    Select individuals who will help to assist in the business operations of the Corporation;
(i)    Hire, direct, oversee, and terminate Church staff as he deems necessary to help administrate the affairs of the Church;
(j)    Endeavor to ensure that all official and duly authorized directives and corporate resolutions of the Trustees are properly carried out; and
(k)    Do all things necessary and proper to fulfill the above-described leadership position and to fulfill all duties incident to the office of President and Chief Executive Officer of a corporation.

**7.03    Senior Pastor's Spiritual Leadership.**

In his role as Senior Pastor, he may work with the Trustees, Officers, the Senior Leadership Team Members, Overseers or anyone else serving in any five-fold ministry offices (as outlined in Ephesians 4:11-13) in any way that he determines is Biblical and consistent with these Bylaws, the Articles of Incorporation and the Act. In addition, the Senior Pastor shall budget monies, hire staff, develop projects or ministry, and create small groups or other specialized ministries according to his convictions and Biblical understanding. He shall have the authority to appoint and approve anyone that can assist in what he deems necessary to properly carry on the work of the Church.

**7.04    Senior Pastor's Responsibility for Worship Services.**

The scheduling of worship times, the ordering of worship services, and the leadership of worship services, as well as all other uses of Church owned facilities are to be determined by the Senior Pastor, or his designee.  No person shall be invited to speak, teach or minister at a service held in Church-owned facilities, or in the name of the Church, without the specific approval of the Senior Pastor, or his designee.

**7.05    Senior Pastor's Role with Trustees.**

The Senior Pastor shall serve as the Chairman of the Trustees.  He shall call the meetings and determine the agenda for all Trustee meetings in consultation with the Trustees.  The Senior Pastor shall not (except under the circumstances described in Article 8) be entitled to cast a vote on matters before the Trustees.

The Senior Pastor shall have the exclusive right to make nominations of candidates from the Membership to serve as a Trustee and present his nominee to the Trustees (as described in Article 8.03).

**7.06    Senior Pastor's Role in Administration.**

The Senior Pastor, as the President and Chief Executive Officer of the Corporation, or his designee, shall have plenary authority over and shall be responsible for directing all of the day-to-day business activities and operations of the Church.

The Senior Pastor shall be responsible for hiring, directing, disciplining, and dismissing staff members.   The Senior Pastor shall, in accordance with applicable federal tax law and Internal Revenue Service guidelines for nonprofit organizations, determine and establish salaries and pay scales for all salaried employees (excluding his salary and those of his family members). The Senior Pastor's final determination of salaries and pay scales shall be reviewed and approved annually by the Independent Compensation Committee (as described in Article 12).

**7.07    Church Discipline regarding the Senior Pastor.**

(a)     Criteria for Discipline of Senior Pastor.  Should, in the opinion of two (2) or more Trustees or two (2) or more members of the Senior Leadership Team, the Senior Pastor engage in immoral conduct, improper financial practices, or espouse theological views or beliefs (hereinafter referred to as "pastoral misconduct") that may require discipline, then such Trustees or Senior Leadership Team Members shall contact the Senior Pastor and the Overseers and request that the Overseer's undertake an investigation of all alleged incidents of pastoral misconduct and the evaluation of appropriate discipline, if warranted.

(b)     Process for Investigation and Disciplinary Action. Should the Overseers be called upon to investigate pastoral misconduct, an affirmative vote of a majority of the total number of

Overseers is required to initiate an investigation. Following the conclusion of the Overseer's investigation and the making of findings, an affirmative vote of a majority of the total number of Overseers is required to take disciplinary action against the Senior Pastor. Following such majority vote, the Overseers shall assume complete authority over the Senior Pastor's on-going and future ministerial activities; the Overseers may undertake to discipline Senior Pastor in any way deemed necessary; the Overseers may vote to remove the Senior Pastor from his position of leadership or to terminate the Senior Pastor's employment with the Church. Otherwise, the Overseers shall have no authority in the normal life of the Church and then only as set forth in these Bylaws.

### 7.08   Installation of New Senior Pastor-President.

(a)     The Confirmation Committee.  The Confirmation Committee shall have an advisory role with regard to the confirmation of a new Senior Pastor-President (as described in Article 8).

(b)     Vacancy while the Senior Pastor-President is in Good Standing. The Senior Pastor is in "*Good Standing*" if: (1) he is not under investigation by the Overseers or (2) he is not under discipline by the Overseers.

If a vacancy in the position of Senior Pastor occurs due to death, disability, resignation or other absence while the Senior Pastor is in Good Standing (as defined herein), then the outgoing Senior Pastor shall nominate a candidate to serve as the new Senior Pastor by way of a signed writing (or in a previously signed writing in the event of death) submitted to the Confirmation Committee for its review and consideration. The Confirmation Committee shall then submit the outgoing Senior Pastor's nominee for a vote by the Confirmation Committee.  An affirmative vote of two-thirds of the representatives then serving on the Confirmation Committee shall be required to confirm the selection of a new Senior Pastor of the Church.  In the event that the Confirmation Committee does not confirm such nominee, the process shall be repeated until a nominee is confirmed as the new Senior Pastor.  If the outgoing Senior Pastor is unable or unwilling to nominate a candidate for the position of new Senior Pastor, then the Overseers shall nominate a candidate under the same process described herein.

(c)     Vacancy while the Senior Pastor is Not in Good Standing.  The Senior Pastor is "*Not in Good Standing*" if: (1) he is under investigation by the Overseers; or (2) he is undergoing discipline by the Overseers.

If a vacancy in the position of Senior Pastor occurs due to death, disability, resignation or other absence while the Senior Pastor is in Not in Good Standing (as defined herein), then the Overseers shall nominate a candidate for the position of new Senior Pastor by an affirmative vote of one less than the total number of Overseers. The Overseer's shall submit to the Confirmation Committee its nominee for new Senior Pastor by way of a writing signed by the required number of Overseers. An affirmative vote of two-thirds of the representatives serving on the Confirmation Committee shall act to confirm the new Senior Pastor of the Church.  In the event

that the Confirmation Committee does not confirm such nominee the process described herein shall be repeated until a nominee is confirmed as the new Senior Pastor..

(d)     Appointment of Interim Senior Pastor.  If a vacancy in the position of Senior Pastor occurs due to death, disability, resignation or other absence while the Senior Pastor is in Not in Good Standing (as defined herein), then the Overseers may appoint, by a vote of one less than the total number of Overseers then serving, an acting Interim Senior Pastor who shall serve until such time as a new Senior Pastor is nominated and confirmed by way of the process set forth herein.  The acting Interim Senior Pastor shall be eligible for nomination and confirmation as Senior Pastor as set forth herein.   The Interim Senior Pastor shall not, during his service as Interim Senior Pastor, concurrently serve as an Officer, Trustee, or Overseer of the Church and shall not have any corporate rights, duties, or responsibilities to the Corporation.

## ARTICLE 8
## TRUSTEES

### 8.01    General Powers and Authority of the Trustees.

The term "Trustees" as used herein shall mean the Board of Directors as described in accordance with Title 36, Chapter 617.0801 of the Florida Not For Profit Corporation Act.  The Trustees shall have the duties and the responsibilities generally associated with and exercised by a corporate board and as such, are the only governing body within the Church.  All corporate powers shall be exercised by or under the authority of the Trustees and in accordance with the Act and these Bylaws.  Accordingly, the Trustees shall have the final authority solely over affairs pertaining to corporate matters of the Church.

The Trustees shall be responsible for the management and oversight of all of the Church's financial resources, including the acquisition and disposition of Church property (both real and personal).  Further, the Trustees shall have the power:

(a)     To buy, sell, mortgage, pledge or encumber such real or personal property owned by the Church;

(b)     To approve or disapprove of the Church merging or transferring some or all of its assets to another qualified tax-exempt organization;

(c)     To approve or disapprove of the Church dissolving or otherwise liquidating its assets;.

(d)     To approve or disapprove of the engaging in any transaction, contract, agreement, or arrangement that is unrelated to the purposes of the Church;

(e)     To approve or disapprove of the Church entering into any financial commitment that violates the financial guidelines in 8.02; and

(f)     To do all things necessary and proper to carry out the above-described general corporate powers and to fulfill all the duties incident to the role of Trustees of the Corporation.

**8.02    Financial Guidelines.**

(a)     Debt Restrictions. Before the Trustees can authorize the church to borrow money or incur lease obligations, the following conditions must be met:

(1)     Maximum 35% Payment Ceiling. The combined totals of all monthly debt and real estate lease payments, following the incurring of the indebtedness or lease obligation under consideration, will not exceed 35% of the average monthly total income. The percentage shall be based on, but not limited to tithes, offerings, investment income and unrestricted gifts to the church.

(2)     Lease to purchase allowance. If indebtedness is being secured to build a structure that will relieve the church of its need for a leased facility that will be vacated when the new building is completed, then the current lease commitment need not be calculated into the 35% expenditure limitation for eighteen (18) months. Thus, the church is allowed eighteen (18) months for both construction and lease payments that combined, exceed the 35% limit, only if there is compelling assurance that by the end of the eighteen (18) month period it is reasonable to expect relief from the burden of the lease payment.

(3)     Church Plant Exception. If a church plant has less than twelve (12) months financial history and wishes to borrow less than $250,000, that decision may be based on the most current three (3) months of financial history provided by the church Secretary or Treasurer.

**8.03    Number, Qualifications, Appointment, Term, and Resignation or Removal of Trustees.**

(a)     Number. There shall be not less than five (5) and no more than nine (9) Trustees.

(b)     Qualifications. Except for the Senior Pastor, Trustees shall not be employees of the Church. Nor shall they be related by blood or marriage to any other Trustee, the Senior Pastor, an Officer any or member of the Senior Leadership Team of the Church.

(c)     Election. The Senior Pastor shall have the exclusive right to nominate individuals whom he deems qualified to serve as a Trustee. A candidate for Trustee shall be elected by the affirmative vote of all remaining Trustees.

In the event of a Trustee vacancy, whether due to resignation or removal, the Senior Pastor shall be given a reasonable amount of time to nominate an individual he deems qualified to serve as a Trustee in accordance with these Bylaws.

(d)      Term.  The term of office for all Trustees other than Senior Pastor shall be one (1) year; however, such Trustees may serve consecutive terms without limitation.  The Senior Pastor shall serve as a Trustee until he resigns, dies or is otherwise removed pursuant to Article 7.07.

(e)      Resignation or Removal.  Any Trustee may resign at any time by giving written notice to the Church.  Such resignation shall take effect on the date of the receipt of such notice and, acceptance of such resignation shall not be necessary to make it effective.

The Senior Pastor may, upon written notice, remove Trustees with or without cause, but at a rate that does not exceed two (2) removals every nine (9) months.  If a vacancy in the position of Senior Pastor occurs, for any reason, then the individual(s) duly elected as the Corporation's Vice President(s); and/or Secretary and Treasurer acting together, may nominate or remove Trustees, subject to the same limitations that would otherwise apply to nominations and removal of Trustees by the Senior Pastor.  If a vacancy in the Senior Pastor, Vice President(s), the Secretary or Treasurer positions occur, then the Trustees shall nominate and elect new Trustees until one or more of the vacant positions are filled.

### 8.04    Chairman of the Trustees.

The Senior Pastor shall serve and preside as the non-voting (except in circumstances described in Article 8.12) Chairman of the Trustees. Pursuant to Article 8.04, the Senior Pastor shall call regular and special meetings of the Trustees and shall determine the agenda for all meetings.  If the Senior Pastor's attendance is impossible, then the one of the Vice Presidents shall serve as non-voting Chairman.  If none of the Vice President's attendance is possible, then the Church's Secretary and Treasurer acting together, shall serve as non-voting Chairman;  If neither the Senior Pastor, the Vice President(s) nor the Secretary or Treasurer is able to attend the meeting, then the Trustees shall elect a Chairman and proceed in order, keeping minutes of their actions for the corporate record.  Any resolutions passed during a Trustee meeting without the official Church Officers shall not take effect until the next properly called Trustee's meeting when the appropriate representation of official church officers is present and the minutes of the prior meeting are put forward for approval by the Trustees and included in the corporate record book.

### 8.05    Meetings.

(a)      Regular or Special meetings.  A regular meeting of Trustees shall occur at least annually.  The Senior Pastor or any two (2) Trustees may call a special meeting of the Trustees.

Regular or Special meetings of the Trustees may be held either within or outside the State of Florida, but shall be held at the Church's registered office in Florida if the notice thereof does

not specify the location of the meeting. A regular or special meeting may be held at any place consented to in writing by all of the Trustees, either before or after the meeting. If such consents are given, they shall be filed with the minutes of the meeting.

(b)    Telephonic Meetings. Any meeting, regular or special, may be held by conference telephone or similar communication equipment, so long as all Trustees participating in the meeting can simultaneously hear one another and participate. All Trustees shall be deemed to be present in person at a meeting conducted in accordance with the foregoing sentence.

(c)    Notice Requirements for Regular or Special Meetings. Regular meetings of the Trustees may be held without notice if the time and place of such meetings are fixed by a resolution of the Trustees.

The Notice of Special Meetings shall include::

(1)    Manner of Giving Notice. Notice of the date, time and place of special meetings shall be given to each Trustee by one of the following methods: (a) by personal delivery of written notice; (b) by first class mail, postage paid; (c) by telephone communication, either directly to the Trustee or to a person at the Trustee's office or home who the person giving the notice has reason to believe will promptly communicate the notice to the Trustee; (d) by faxed telecopy to the Trustee's office or home; or (e) by electronic mail ("e-mail").

(2)    Time Requirements. Notice sent by first class mail shall be deposited in the United States mail at least four (4) days before the time set for the meeting. Notices given by personal delivery, telephone, telecopier or e-mail shall be delivered, telephoned, faxed or e-mailed to the Trustee or given at least twenty-four (24) hours before the time set for the meeting.

(3)    Notice Contents. The notice shall state the date, time and place for the meeting. However, the notice does not need to specify the place of the meeting if the special meeting is to be held at the Church's principal office. Unless otherwise expressly stated herein, the notice does not need to specify the purpose or the business to be transacted at the special meeting.

(4)    Waiver. Attendance of a Trustee at a meeting shall constitute waiver of notice of such meeting, except where the Trustee attends a meeting for the express purpose of objecting that the meeting is not properly called.

**8.06    Action of Trustees Without a Meeting.**

Any action required or permitted to be taken by the Trustees may be taken without a meeting, if all of the Trustees, individually, or collectively, consent in writing to the action.

Such action by written consent or consents shall be filed with the minutes of the proceedings of the Church.

**8.07    Quorum.**

Unless otherwise provided for in these Bylaws, a majority of the number of Trustees then in office shall constitute a quorum for the transaction of business at any meeting of the Trustees. The Trustees present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough Trustees leave the meeting so that less than a quorum remains.  However, no action may be approved without the vote of at least a majority of the number of Trustees in attendance required to constitute a quorum.  If a quorum is present at no time during a meeting, a majority of the Trustees present may adjourn and reconvene the meeting one time without further notice.

**8.08    Proxies.**    Voting by proxy is prohibited.

**8.09    Duties of Trustees of the Corporation.**

The Trustees of the Corporation shall discharge their duties, in good faith, with ordinary care, and in a manner they reasonably believe to be in the best interest of the Church.  The Trustees of the Corporation may in good faith rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Church or another person that were prepared or presented by a variety of persons, including Officers, employees of the Church, professional advisors or experts such as accountants or legal counsel. A Trustee of the Corporation is not relying in good faith if the individual has knowledge concerning a matter in question that renders such reliance unwarranted.

The Trustees, despite the use of the word, shall not have the powers and/or duties of a "Trustee of a trust" (as that term is generally understood in the law of Trusts), with respect to the Church or with respect to any property held or administered by the Church, including property that may be subject to restrictions imposed by the donor or transferor of the property.

**8.10    Delegation of Duties.**

The Trustees, in consultation with the Senior Pastor, are entitled to select advisors and delegate duties and responsibilities to them, such as the full power and authority to purchase or otherwise acquire stocks, bonds, securities, and other investments on behalf of the Church; and to sell, transfer, or otherwise dispose of the Church's assets and properties at a time and for a consideration that the advisor deems appropriate.  Trustees shall have no personal liability for actions taken or omitted by the advisor if the Trustees act in good faith and with ordinary care in selecting the advisor.  The Trustees may, in consultation with the Senior Pastor, remove or replace the advisor at any time, with or without cause.

**8.11    Interested Parties.**

Pursuant to the Act and the provisions of Article 18 below, a contract or transaction between the Church and a Trustee of the Church is not automatically void or voidable simply because the Trustee, an employee or other control party, has a financial interest in the contract or transaction.

**8.12    Actions of Trustees.**

The Trustees shall try to act by consensus. However, if action by consent is impossible or unless the act of a greater number is required by the Act or these Bylaws, then the vote of a majority of the Trustees present and voting at a meeting at which a quorum is present shall be sufficient to constitute the act of the Trustees. A Trustee who is present at a meeting and abstains from a vote is considered to be present and voting for the purpose of determining the decision of the Trustees. The burden is on each individual Trustee to ensure their votes are properly recorded in the minutes as either a "yes," "no," or "abstain."

In the event of a vote of the Trustees resulting in a deadlock, the Senior Pastor shall be entitled to cast a "majority ballot" breaking the deadlock so that an official act or decision may be undertaken by the Trustees.

**8.13    No Compensation.**

The Trustees shall not receive any compensation in exchange for services rendered as a Trustee. The Trustees may however, adopt a resolution providing for reimbursement to Trustees for reasonable expenses incurred as a result of attendance at a meeting of the Trustees.

# ARTICLE 9
# OFFICERS

**9.01    Number, Appointment, Term, and Resignation or Removal of Officers.**

(a)    Number. The Officers of the Corporation shall be a President (as described in Article 7), Vice President(s), a Secretary and a Treasurer and any other Officers chosen at the discretion of the Senior Pastor.

(b)    Appointment to and Creation of New Offices. The President shall be appointed in accordance with requirements set forth under Article 7.

The Secretary and Treasurer are to be appointed by the President. In the event that the President is unwilling or unable to nominate a Secretary or Treasurer, then the Trustees shall nominate a Secretary or Treasurer and approve such nominee by a majority vote of the Trustees.

The President shall appoint all other Officers of the Church. In the event that the President is unwilling or unable to nominate an Officer, then the Trustees shall nominate an Officer and approve such nominee by a majority vote of the Trustees.

(c)    Term. The Senior Pastor shall be the President until he resigns or is removed in accordance with Article 7 and a new Senior Pastor is installed in accordance with Article 7. The term of office for all officers other than Senior Pastor shall be one (1) year; however, such Officers may serve consecutive terms without limitation. In the event of a vacancy in the office of Senior Pastor, the Trustees shall, by majority vote, elect a Trustee to serve as the acting President.

An Officer may resign at any time by giving written notice to the Church. Such resignation shall take effect on the date of the receipt of such notice, or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

All other Church Officers may be removed with or without notice, and with or without cause, by the unilateral action of the Senior Pastor or by a majority vote of the Trustees.

### 9.02    Powers of Officers.

(a)    President. The duties and responsibilities of the President are listed in Article 7 herein.

(b)    Vice President. When the President is absent, is unable to act, or refuses to act, the Vice President may perform the duties of the President. When the Vice President acts in place of the President, the Vice President shall have all the powers of and be subject to all the restrictions upon the President. If there is more than one Vice President, the Vice Presidents shall act in place of the President in the order that is established by the President when the Vice Presidents were appointed. A Vice President shall perform other duties as assigned by the President.

(c)    Treasurer. The Senior Pastor shall appoint the Treasurer of the Church. The Treasurer of the Church shall: (a) have charge and custody of and be responsible for all funds and securities of the Church; (b) receive and give receipts for monies due and payable to the Church from any source; (c) deposit all monies in the name of the Church in banks, trust companies, or other depositories as provided in the Bylaws or as directed by the Trustees; (d) write checks and disburse funds to discharge obligations of the Church; (e) maintain the financial books and records of the Church; (f) prepare financial reports at least annually; (g) perform other duties as assigned by the Senior Pastor or by the Trustees; (h) if required by the Trustees, give a bond for the faithful discharge of his or her duties in a sum and with a surety as determined by the Trustees; and (i) perform all of the duties incident to the office of treasurer. An individual serving as Treasurer shall not be authorized to serve in a dual capacity as both President and Treasurer.

(d)    Secretary: The Senior Pastor shall appoint the Secretary of the Church. The Secretary of the Church shall: (a) give all notices as provided in the Bylaws or as required by law; (b) take minutes of the meetings of the members and of the Trustees and keep the minutes as part of the corporate records; (c) maintain custody of the corporate records and of the seal of the Church; (d) affix the seal of the Church to all documents as authorized; (e) keep a register of the mailing address of each Trustee, Officer, Overseer, Senior Leadership Team Member, church member and employee of the Church; (f) perform duties as assigned by the Senior Pastor or by the Trustees; and (g) perform all duties incident to the office of Secretary. An individual serving as Secretary shall not be authorized to serve in a dual capacity as both President and Secretary.

### 9.03    Duties of Officers of the Corporation.

The Officers of the Corporation shall discharge their duties, in good faith, with ordinary care, and in a manner they reasonably believe to be in the best interest of the Church. The Officers of the Corporation may in good faith rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Church or another person that were prepared or presented by a variety of persons, including Trustees, Officers, employees of the Church, professional advisors or experts such as accountants or legal counsel. An Officer of the Corporation is not relying in good faith if the individual has knowledge concerning a matter in question that renders such reliance unwarranted.

## ARTICLE 10
## OVERSEERS

### 10.01    Requirements and Biblical Qualifications to Be an Overseer.

The members of the Overseers shall be ordained pastors at respected congregations who know and love the Church and its Senior Pastor. They must agree to make themselves available, at their own expense, to serve the Church when requested.

Biblical qualifications for Overseers shall be: "Now the overseer must be above reproach, the husband of but one wife, temperate, self-controlled, respectable, hospitable, able to teach; not given to drunkenness, not violent but gentle, not quarrelsome, not a lover of money. He must manage his own family well and see that his children obey him with proper respect. (If anyone does not know how to manage his own family, how can he take care of God's Church?) He must not be a recent convert, or he may become conceited and fall under the same judgment as the devil. He must also have a good reputation with outsiders, so that he will not fall into disgrace and into the devil's trap." (1 Timothy 3: 2-7).

### 10.02    Responsibilities of Overseers.

The Overseers shall provide apostolic oversight to the Senior Pastor and are charged with protecting the Church through counsel, prayer, and when required, the investigation of alleged

pastoral misconduct, as defined herein in Article 7.07(a), and if any, the resulting discipline of the Senior Pastor, up to and including his removal as set forth in Article 7.

### 10.03  Number, Appointment, and Term of Overseers.

There shall be no less than three (3) Overseers. So long as the Senior Pastor is in Good Standing (as defined in Article 7 herein), Overseers shall be nominated by the Senior Pastor, in consultation with the Senior Leadership Team Members, and confirmed by a majority vote of the Trustees. The term of office for all Overseers shall be one (1) year; however, such Overseers may serve consecutive terms without limitation.

### 10.04  Resignation, Removal and/or Nomination of New Overseers.

An Overseer may resign at any time by giving written notice to the Church. Such resignation shall take effect on the date of the receipt of such notice; and, the acceptance of resignation shall not be necessary to be effective.

The Senior Pastor may remove Overseers, with or without notice and with or without cause.

In the event of a vacancy by an Overseer that causes the total number of Overseers to be less than five (5), the Senior Pastor shall be given a reasonable amount of time to nominate a new Overseer, in consultation with the Senior Leadership Team Members and such nominee shall be confirmed by a majority vote of the Trustees. In the event that the office of Senior Pastor is vacant, the individual who was duly elected as the Corporation's Secretary and Treasurer acting together, may nominate or remove Overseers, subject to the same limitations that would otherwise apply to nominations and removals by the Senior Pastor.

If disciplinary action is being considered or an investigation of the Senior Pastor is underway, no changes in the composition of the Overseers shall be made until the Overseer's work is completed and such findings are reported to the Trustees and Senior Leadership Team.

## ARTICLE 11
## SENIOR LEADERSHIP TEAM

### 11.01  Requirements and Biblical Qualifications to Be a Member of the Senior Leadership Team.

The Senior Leadership Team is comprised of men and women who function within the local Church and are viewed by the congregation as spiritual leaders of the Church. The Senior Leadership Team Members are seasoned members of the pastoral team of the Church who serve the Church in a spiritual capacity. Senior Leadership Team Members shall not be Trustees. They meet the Biblical qualifications for Senior Leadership Team Members and, in addition their role as staff members, function in that calling. In addition to fulfilling the job duties, the Senior Leadership Team Members are to covenant together with the Senior Pastor for the development

of the spiritual life of the Church and are to serve as the primary protectors and encouragers of a positive spiritual climate within the Church body.

Biblical qualifications for Senior Leadership Team Members shall be: "An Elder must be blameless, the husband of but one wife, a man whose children believes and is not open to the charge of being wild and disobedient. Since an Elder is entrusted with God's work, they must be blameless – not overbearing, not quick tempered, not given to drunkenness, not violent, not pursuing dishonest gain. Rather he must be hospitable, one who loves what is good, and who is self- controlled, upright, holy and disciplined. They must hold firmly to the trustworthy message as it has been taught, so that they can encourage others by sound doctrine and refute those who oppose it.".(Titus 1:6-9 NIV);

**11:02  Responsibilities of Senior Leadership Team.**

The functions of the Senior Leadership Team are to:

(a)     Maintain and teach by living a godly, Christian lifestyle;
(b)     Serve the Church by helping the Senior Pastor to establish the vision and direction of the Church;
(c)     Provide leadership as a member of the Senior Pastoral Leadership Team;
(d)     Demonstrate leadership to the Members of the local Church;
(e)     Provide a prayer shield for the Church staff and the local Church;
(f)     Defend, protect and support the integrity of the Church staff and the local Church;
(g)     Pray for the sick;
(h)     Organize, implement and execute licensing and ordination requirements and procedures;
(i)     Mediate disputes among the brethren;
(j)     Counsel with church members and staff; and
(k)     Contact the Overseers to initiate investigation and potential discipline of the Senior Pastor if a situation involving pastoral misconduct occurs.

**11.03  Number, Appointment, and Term of Senior Leadership Team.**

There shall be no less than three (3) Senior Leadership Team Members. So long as the Senior Pastor is in Good Standing (as defined in Article 7 herein), the Senior Pastor shall appoint persons to serve on the Senior Leadership Team. The term of service for each Member of the Senior Leadership Team shall continue until he resigns, is deceased, or is removed in accordance with these Bylaws..

### 11.04  Resignation and Removal of Senior Leadership Team Members.

A Member of the Senior Leadership Team may resign at any time by giving written notice to the Senior Pastor. Such resignation shall take effect on the date of the receipt of such notice; and, the acceptance of resignation shall not be necessary to be effective.

Generally, the Senior Pastor may remove Senior Leadership Team Members, with or without notice and with or without cause.

In the event of a vacancy by a Member of the Senior Leadership Team which causes the total number of Members of the Senior Leadership Team to be less than three (3), the Senior Pastor shall be given a reasonable amount of time to appoint a new person(s) to serve on the Senior Leadership Team. In the event that the office of Senior Pastor is vacant, the individual who was duly elected as the Corporation's Secretary and Treasurer acting together, may nominate or remove Senior Leadership Team Members, subject to the same limitations that would otherwise apply to nominations and removals by the Senior Pastor.

## ARTICLE 12
## COMMITTEES AND ADVISORY TEAMS

### 12.01  Establishment of Committees and Advisory Teams.

The Board of Trustees may, at its discretion, adopt a resolution establishing one or more Committees or Advisory Committees. Any and all Advisory Committees shall conform to rules established by the Trustees.

### 12.02  Audit Review Committee.

The Trustees shall appoint the Secretary and Treasurer acting together, and two (2) Trustees to serve on the Audit Review Committee of the Church. The Audit Review Committee shall select and engage the Church's Independent Auditors to perform the annual audit of the Church as required herein. After reviewing the annual audit, the Audit Review Committee shall report its findings to the Trustees at a regular or special meeting of the Trustees.

### 12.03  Independent Compensation Committee.

An Independent Compensation Committee shall be established annually by the Board of Trustees, and shall consist of a minimum of two (2) independent Trustees and a minimum of three (3) independent Overseers. Under no circumstances shall the number of independent members of the Compensation Committee be decreased to less than five (5). An individual is considered to be "Independent" if the individual does not have a conflict of interest that would otherwise disqualify them from serving on this Committee. A conflict of interest arises when a person in a position of authority over the Church (such as an Officer, Director, Trustee, Senior Leadership Team Member, Overseer or employee) and can benefit financially from a decision

made in such a capacity, including indirect benefits such as to family members or businesses with which the person is closely associated.

The Independent Compensation Committee shall determine and approve, by a majority vote, the Senior Pastor's, any family members, and executive staff member's total compensation amounts.. The Independent Compensation Committee may consider duties, performance evaluations, compensation comparability data, and other relevant information to assist it in ensuring the amount of total compensation paid to each individual is reasonable and in compliance with current IRS guidelines for nonprofit organizations. The Senior Pastor shall not participate in the Independent Compensation Committee's discussion and formulation of or vote regarding his salary and benefits, or any family member's salary or benefits..

**12.04    Confirmation Committee.**

The Confirmation Committee shall be made up of a minimum of five (5) Trustees and a minimum of five (5) members of the Senior Leadership Team. In the event that there are more than five (5) Trustees or more than five (5) Senior Leadership Team Members in each respective group, then each group shall vote to select, by a majority vote of such group, five (5) of representatives to serve on the Confirmation Committee. If there is less than five (5) members on either Trustees or Senior Leadership Team at time of forming Confirmation Committee, there is to be equal representation from each respective group. An Overseer, elected by the Senior Pastor, has authority to issue the deadlock vote should there be a deadlock.

**12.05    Delegation of Authority.**

Each Committee shall consist of two or more persons and must have a minimum of two (2) Trustees serving on each committee. If, in addition to the Independent Compensation Committee, the Trustees establish or delegate any of its authority to a Committee, it shall not relieve the Trustees, or Trustee, of any responsibility imposed by these Bylaws or otherwise imposed by law. The Trustees shall define by resolution the activities and scope of authority and the qualifications, in addition to those set forth herein, for membership on all Committees.

No Committee shall have the authority to: (a) amend the Articles of Incorporation; (b) adopt a plan of merger or a plan of consolidation with another Church; (c) authorize the sale, lease, exchange, or mortgage of all or substantially all of the property and assets of the Church; (d) authorize the voluntary dissolution of the Church; (e) revoke proceedings for the voluntary dissolution of the Church; (f) adopt a plan for the distribution of the assets of the Church; (g) amend, alter, or repeal the Bylaws; (h) elect, appoint, or remove a member of a Committee or a Trustee or officer of the Church; (i) approve any transaction to which the Church is a party and that involves a potential conflict of interest as defined in Article 18 below; or (j) take any action outside the scope of authority delegated to it by the Trustees or in contravention of the Act.

The Trustees may designate various Advisory Teams not having or exercising the authority of the Trustees. Such Advisory Teams shall only function in an advisory capacity to the Trustees.

The Senior Pastor shall have the power to appoint and remove members of all Advisory Teams. With the exception of the Independent Compensation Committee and Confirmation Committee, the Senior Pastor shall serve as an ex officio member of all Advisory Teams. The Trustees shall define, by resolution, the scope of activities and the qualifications for membership on all Advisory Teams.

### 12.06   Term of Office.

Each member of a Committee or Advisory Team shall serve until the next annual meeting of the Trustees, or until a successor is appointed. However, the term of any Committee or Advisory Team member may terminate earlier if the Committee or Advisory Team is terminated by the Trustees, or if the member dies, ceases to qualify, resigns, or is removed as a member of the Church. A vacancy on a Committee or Advisory Team may be filled by an appointment made in the same manner as an original appointment. A person appointed to fill a vacancy on a Committee or Advisory Team shall serve for the unexpired portion of the terminated Committee member's term.

### 12.07   Chair and Vice-Chair.

Unless otherwise expressly stated herein, one member of each Committee or Advisory Team shall be designated as the chair, and another member shall be designated as the vice-chair. The chair and vice-chair of each Committee and Advisory Team shall be appointed by the Senior Pastor with consultation from the outgoing chairman. The chair shall call and preside at all meetings. When the chair is absent, is unable to act, or refuses to act, the vice-chair shall perform the duties of the chair. When a vice-chair acts in place of the chair, the vice-chair shall have all the powers of and be subject to all the restrictions upon the chair.

### 12.08   Quorum.

One half the number of members of a Committee or Advisory Team shall constitute a quorum for the transaction of business at any meeting. The members present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough members leave the meeting so that less than a quorum remains. However, no action may be approved without the vote of at least a majority of the number of members required to constitute a quorum. If a quorum is present at no time during a meeting, the chair may adjourn and reconvene the meeting one time without further notice.

### 12.09   Actions.

Committees and Advisory Teams shall try to take action by consensus. However, the vote of a majority of members present and voting at a meeting at which a quorum is present shall be sufficient to constitute the act of the Committee or Advisory Team unless the act of a greater number is required by law or the Bylaws. A member who is present at a meeting and abstains from a vote is considered to be present and voting for the purpose of determining the act of the Committee or Advisory Team.

# ARTICLE 13
# BUSINESS PRACTICES

### 13.01   Fiscal Year.

The fiscal year of the Corporation shall be the calendar year.

### 13.02   Contracts.

The Trustees may authorize any officer or officers, agent or agents of the Corporation, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation. Such authority may be general or may be confined to specific instances.

### 13.03   Checks, Drafts, or Orders.

All checks, drafts, orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation, and in such manner, as shall from time to time be determined by resolution of the Trustees. In the absence of such determination by the Trustees, either the Secretary and Treasurer acting together, or the President of the Corporation in accordance with their duties outlined in these Bylaws may sign such instruments.

### 13.04   Deposits.

All funds of the Corporation shall be deposited to the credit of the Corporation in such banks, trust companies, or other depositories as the Trustees may select in accordance with these Bylaws.

### 13.05   Gifts.

The President may accept on behalf of the Corporation any contribution, gift, bequest or device for any purpose of the Corporation.

### 13.06   Books and Records.

The Corporation shall keep correct and complete books and records and shall also keep minutes of the proceedings of its members, Trustees, committees having and exercising any of the authority of the Trustees, and any other committee, and shall keep at the principle office a record giving the names and addresses of all Trustees members entitled to vote. Any Church member may request to inspect books and records of the Corporation for any proper purpose at any reasonable time but only as approved by a majority of the Trustees on a case-by-case basis.

### 13.07  Annual Budgeting Process.

The President shall prepare and put forward a proposed annual budget of the Church for the Trustees consideration and approval.

## ARTICLE 14
## INDEMNIFICATION

### 14.01  Indemnification.

To the full extent permitted by the Act, as amended from time to time, the Church shall indemnify any Trustee, Pastor, Officer, Overseer, Senior Leadership Team Member, committee member, employee, or agent of the Church who was, is, or may be named a defendant or respondent in any proceeding as a result of his or her actions or omissions within the scope of his or her official capacity in the Church. The Church in defending such actions may advance reasonable expenses.

### 14.02  Determination of Right.

Legal counsel selected by the majority vote of the Trustees shall make a determination of the right to indemnification under the Act.

## ARTICLE 15
## MINISTERIAL ORDINATION

### 15.01  Ordination, Licensing, and Commissioning of Ministers of the Gospel.

(a)    Role of the Senior Pastor.  By majority vote of the Senior Pastor and Senior Leadership Team, the Senior Pastor may ordain, license or commission a person as a minister of the Gospel after first examining the applicant's background, moral and religious character, and previous Bible courses and/or independent studies completed.  Final determination shall be within the absolute discretion of the Senior Pastor and the Senior Leadership Team.

(b)    Application.  Application for ordination, licensing, or commissioning a person as a minister of the Gospel shall be on the form provided by the Church.  An application shall be either approved or denied by the Senior Pastor and the Senior Leadership Team within ninety (90) days of completing the process set forth by the Church as defined herein. Those applicants who are approved shall receive a certificate evidencing the approval.

(c)    Ability to Limit Ministry.  The Senior Pastor may, at his own discretion, limit ordained, licensed, and commissioned ministers to a specific area of special ministry emphasis.

**15.02  Ministry Training.**

The Senior Pastor and his staff may establish a School of Ministry, setting forth a prescribed curriculum and course of study leading to ordination and licensing of ministers. The School of Ministry shall prepare students in the knowledge of the Word of God and in ministering to people's needs through the Gospel of Jesus Christ.

## ARTICLE 16
## DISSOLUTION

**16.01  Dissolution and Distribution of Property.**

(a)      The Church shall hold, own, and enjoy its own personal and real property, without any right of reversion to another entity, except as provided in these Bylaws.

(b)      "Dissolution" means the complete disbanding of the Church so that it no longer functions as a congregation or as a corporate entity. Upon the dissolution of the Church, its property shall be applied and distributed as follows: (1) all liabilities and obligations of the Church shall be paid and discharged, or adequate provision shall be made therefore; (2) assets held by the Church upon condition requiring return, transfer, or conveyance, which condition occurs by reason of the dissolution, shall be returned, transferred, or conveyed in accordance with such requirements; (3) assets received and not held upon a condition requiring return, transfer, or conveyance by reason of the dissolution, shall be transferred or conveyed to one or more domestic or foreign corporations, societies, or organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law or the corresponding provision of any foreign jurisdiction in the case of a foreign corporation), and are engaged in activities substantially similar to those of the Church; this distribution shall be done pursuant to a plan adopted by the Trustees; and (4) any assets not otherwise disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Church is then located, for such purposes and to such organizations as said court shall determine, provided such organizations are in agreement with the Church's Statement of Faith and basic form of government.

## ARTICLE 17
## WHISTLEBLOWER POLICY

**17.01  Purpose.**

The Church requires all of its Trustees, Officers, Senior Leadership Team Members, employees, and volunteers to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. As employees and representatives of the Church, individuals must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations. Therefore, if a Trustee, Officer, Senior Leadership Team

Member, employee, or volunteer of the Church reasonably believes that the Church, by and through its Trustees, Officers, Senior Leadership Team Member s; employees, or volunteers, or entities with whom the Church has a business relationship, is in violation of applicable law or regulation, or any policy or procedure of the Church, then that individual shall file a written complaint with either his or her supervisor or the Trustees of the Church. This Policy is intended to encourage and enable employees and others to raise serious concerns within the Church prior to seeking resolution outside the Church.

**17.02  Procedure.**

(a)     Reporting Responsibility.  It is the responsibility of all of the Church's Trustees, Officers, Senior Leadership Team Member, employees, and volunteers to comply with all applicable laws and regulations, as well as all policies and procedures of the Church and to report violations or suspected violations in accordance with the Policy.

If a Trustee, Officer, Senior Leadership Team Member, employee, or volunteer of the Church reasonably believes that any policy, practice, or activity of the Church is in violation of any applicable law, regulation, policy, or procedure of the Church, then the Trustee, Officer, Senior Leadership Team Member, employee, or volunteer should share their questions, concerns, or complaints with someone who may be able to address them properly.  If the concerns are not addressed, the reporting individual should make a formal complaint as outlined herein.

(b)     Acting in Good Faith.  Anyone filing a complaint concerning a violation or suspected violation of any applicable law, regulation, policy, or procedure of the Church must be acting in good faith and have reasonable grounds for believing the information disclosed indicates a violation of the applicable law, regulation, policy, or procedure of the Church.  Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

(c)     Reporting Violations.  In most cases, an employee or volunteer's supervisor is in the best position to address an area of concern.  However, if the reporting individual is not comfortable speaking with his or her supervisor, or the reporting individual is not satisfied with his or her supervisor's response, the reporting individual is encouraged to speak with a member of the Trustees.  Trustees are required to report suspected violations directly to the entire Trustees.

(d)     Accounting and Auditing Matters.  The Trustees shall address all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing.  The Trustees shall work until the matter is resolved.

(e)     Evidence.  Although the reporting individual is not expected to prove the truth of an allegation, the reporting individual needs to demonstrate that there are reasonable grounds for concern on his or her part and that these concerns are most appropriately handled through this procedure.

(f)     Investigation of Complaint.  After receipt of the complaint, the Trustee to whom the complaint was made shall provide the complaint to the entire Trustees.  The Trustees shall then determine whether an investigation is appropriate and the form that it should take.  Concerns may be resolved through the initial inquiry by agreed action without the need for further investigation.  The entire Trustees shall receive a report on each complaint and a follow-up report on action taken.

(g)     Handling of Reported Violations.  The Trustee to whom the complaint was made shall notify the reporting individual and acknowledge receipt of the reported violation within five (5) business days.  All reports will be promptly investigated and appropriate corrective action will be taken if warranted by the investigation.

A reporting individual who reasonably believes that s/he has been retaliated against in violation of this Policy shall follow the same procedures as s/he did when s/he filed the original complaint.

**17.03  Safeguards.**

(a)     Confidentiality.  Reported or suspected violations may be submitted on a confidential basis by the reporting individual or may be submitted anonymously.  Reports of violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation.

However, the reporting individual is encouraged to put his or her name to the allegation because appropriate follow-up questions and investigations may not be possible unless the source of the information is identified.  Concerns expressed anonymously will be investigated, but consideration will be given to:

(1)     The seriousness of the issue raised;
(2)     The credibility of the concern; and
(3)     The likelihood of confirming the allegation from documentation and/or other sources.

Every effort will be made to protect the reporting individual's identity; though all individuals considering such a report should be advised that anonymity cannot be assured if an external investigation or criminal proceedings relating to the report occur:

(b)     No Retaliation.  No reporting individual who, in good faith, reports a violation shall suffer harassment, retaliation, or adverse employment consequence.  An employee or representative of the Church who retaliates against a reporting individual who has reported a violation in good faith is subject to discipline up to, and including, termination of employment or dismissal from Church representation.

(c)     Harassment or Victimization.   Harassment or victimization of the reporting individual for providing information in accordance with this policy by anyone affiliated with the Church will not be tolerated.  In addition, the provision of such information shall not in any way influence, positively or negatively, the carrying out of routine disciplinary procedures by management as stated in the Church's Employment Policy.

(d)     Malicious Allegations.    The Trustees recognize that intentionally untruthful, malicious, erroneous, or harassing allegations would be damaging to the mission, integrity, and moral of the Church or the reputation of the accused individual.  The safeguards stated in this Policy do not apply to individuals who make such complaints.  Such allegations may result in disciplinary action, including but not limited to termination of employment and/or dismissal of membership.

## ARTICLE 18
## CONFLICT OF INTEREST POLICY

### 18.01  Purpose.

The purpose of the conflict of interest policy is to protect the Church's interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of a Trustee or officer of the Church, or might result in a possible excess benefit transaction.  This policy is intended to supplement, but not replace, any applicable state and federal laws governing conflicts of interest applicable to nonprofit and charitable organizations and is not intended as an exclusive statement of responsibilities.

### 18.02  Definitions.

(a)     Interested Person.  Any Trustee, principal officer, or member of a committee with powers delegated by the Trustees, who has a direct or indirect financial interest, as defined below, is an interested person.

(b)     Financial Interest.  A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:
(1)     An ownership or investment interest in any entity with which the Church has a transaction or arrangement;

(2)     A compensation arrangement with the Church or with any entity or individual with which the Church has a transaction or arrangement; or

(3)     A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Church is negotiating a transaction or arrangement.

Compensation includes direct or indirect remuneration, as well as gifts or favors that are not insubstantial. A financial interest is not necessarily a conflict of interest.

**18.03  Procedures.**

(a)    Duty to Disclose. In connection with any actual or possible conflict of interest, an interested person must disclose the existence of the financial interest and be given opportunity to disclose all material facts to the Trustees.

(b)    Determining Whether a Conflict of Interest Exists. After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he or she shall leave the Trustees' meeting while the determination of a conflict of interest is discussed and voted upon. The remaining Trustees shall decide if a conflict of interest exists.

(c)    Procedures for Addressing the Conflict of Interest.

(1)    An interested person may make a presentation at the Trustees' meeting, but after the presentation, he or she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

(2)    The chairman of the Trustees may, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

(3)    After exercising due diligence, the Trustees shall determine whether the Church can obtain, with reasonable efforts, a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

(4)    If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the Trustees shall determine by a majority vote of the disinterested Trustees whether the transaction or arrangement is in the Church's best interests, for its own benefit, and whether it is fair and reasonable. In conformity with the above determination, it shall make its decision whether to enter into the transaction or arrangement.

(d)    Violations of the Conflicts of Interest Policy.

(1)    If the Trustees have reasonable cause to believe a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

(2)    If, after hearing the member's response and after making further investigation as warranted by the circumstances, the Trustees determine the member has

failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

**18.04  Records of Proceedings.**

The minutes of the Trustees shall contain:

(a)  The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the Trustee's decision as to whether a conflict of interest in fact existed.

(b)  The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection with the proceedings.

**18.05  Compensation.**

(a)  A Trustee who receives compensation, directly or indirectly, from the Church for services is precluded from voting on matters pertaining to that member's compensation.

(b)  A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Church for services is precluded from voting on matters pertaining to that member's compensation.

(c)  No Trustee or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Church, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

## ARTICLE 19
## MISCELLANEOUS PROVISIONS

**19.01  Construction of Bylaws.**

These Bylaws shall be construed in accordance with the laws of the State of Florida. All references in the Bylaws to statutes, regulations, or other sources of legal authority shall refer to the authorities cited, or their successors, as they may be amended from time to time. If any Bylaw provision is held to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision and the Bylaws shall be construed as if the invalid, illegal, or unenforceable provision had not been included in the Bylaws. The headings used in the Bylaws are used for convenience and shall not be considered in construing the terms of the Bylaws. Wherever the context requires, all words in the Bylaws in

AMENDED AND RESTATED BYLAWS OF
CELEBRATION CHURCH OF JACKSONVILLE, INC.

Page 32 of 34

the male, female or neuter genders shall be deemed to include the other genders, all singular words shall include the plural, and all plural words shall include the singular.

**19.02  Seal.**

The Trustees may provide for a corporate seal.

**19.03  Power of Attorney.**

A person may execute any instrument related to the Church by means of a power of attorney if an original executed copy of the power of attorney is provided to the Secretary of the Church to be kept with the Church records.

**19.04  Parties Bound.**

The Bylaws shall be binding upon and inure to the benefit of the Church Members, Pastors, Trustees, Officers, Overseers, Senior Leadership Team, employees, and agents of the Church and their respective heirs, executors, administrators, legal representatives, successors, and assigns except as otherwise provided in the Bylaws.

**19.05  Christian Alternative Dispute Resolution.**

In keeping with 1 Corinthians 6:1-8, all disputes which may arise between any member of the Church and the Church itself, or between any member of the Church and any Pastor, Trustee, Overseer, Elder, Director, officer, employee, volunteer, agent, or other member of this Church, shall be resolved by mediation, and if not resolved by mediation, then by binding arbitration under the procedures and supervision of the Rules of Procedure for Christian Conciliation, Institute for Christian Conciliation. In the event that this group ceases to exist during the course of this Agreement, arbitration under this section shall be conducted according to the rules of the American Arbitration Association. Judgment upon an arbitration award may be entered in any court otherwise having jurisdiction. The parties each agree to bear their own costs related to any mediation or arbitration proceeding including payment of their own attorneys' fees. Either party may file a motion seeking temporary injunctive relief from a court of competent jurisdiction in order to maintain the status quo until the underlying dispute or claim can be submitted for mediation or arbitration.

If a dispute may result in an award of monetary damages that could be paid under a Church insurance policy, then use of the conciliation, mediation, and arbitration procedure is conditioned on acceptance of the procedure by the liability insurer of the Church and the insurer's agreement to honor any mediation, conciliation or arbitration award up to any applicable policy limits. The mediation, conciliation, and arbitration process is not a substitute for any disciplinary process set forth in the Bylaws of the Church, and shall in no way affect the authority of the Church to investigate reports of misconduct, to conduct hearings, or to administer discipline of members.

## ARTICLE 20
## AMENDMENT OF BYLAWS

Bylaws may be altered, amended, or repealed, and new Bylaws may be adopted at any regular meeting of the Trustees by the affirmative vote of two-thirds (2/3) of the Trustees. At least five (5) days written advance notice of said meeting shall be given to each Trustee. In the written notice, proposed changes must be explained. These Bylaws may also be altered, amended, or repealed and new Bylaws may be adopted by consent in writing signed by all of the Trustees.

## CERTIFICATE OF SECRETARY

I certify that I am the duly elected and acting Secretary of Celebration Church and that the foregoing Amended and Restated Bylaws constitute the Bylaws of the Church. These Amended and Restated Bylaws were duly adopted by the consent of a majority vote of the Board of Trustees of the Church present and voting at a duly called meeting of the Board members on the _25th_ day of _October_, 2015.


By: _____

Name: Lisa Stewart
Title:  Secretary

BOT-011222

**CELEBRATION CHURCH OF JACKSONVILLE, INC.**
Board of Trustees Special Meeting Agenda
January 12, 2022

**Location:** Zoom Call, 7:00PM
**Officers:** Ps. Stovall Weems, Ps. Tim Timberlake, Ps. Wayland Wiseman, Ashley Hawk
**Trustees:** Angela Cannon, Kevin Cormier, Fitz Powell, Marcus Rowe, Jacob William
**Invitee:** Lee Wedekind III, Attorney
**Minutes:** Ashley Hawk
**Facilitator:** Ps. Wayland Wiseman

ROLL CALL: Confirm a Quorum is present
PRAYER: Trustee, Marcus Rowe
INTRODUCTORY STATEMENT: Lee Wedekind III, Attorney

I.    **CONSENT AGENDA**
  a. APPROVAL OF AGENDA
  b. APPROVAL OF MEETING MINUTES
  c. APPROVAL OF NEW TRUSTEE NOMINATIONS
  d. APPROVE RESOLUTIONS
  e. SIGNATURES

II.   **MEETING AGENDA**
  a. REPORTS OF OFFICERS
  b. REPORTS OF COMMITTEES
  c. UNFINISHED BUSINESS
  d. NEW BUSINESS
    i. Commencement of Investigation
      1. Approve commencement of investigation into credible allegations of improper financial practices.
        a. Funds from transactions regarding parsonage
        b. Pre-payment of salaries
        c. Transactions between other entities
    ii. Amendment of Bylaws
      1. Propose addition of two provisions to account for circumstances where investigation has been requested but the church has fewer than 3 Overseers.
    iii. Ratification of Investigation Counsel
      1. Ratify church's engagement of Nelson Mullins as investigation counsel
    iv. Ratification of Termination of Other Outside Counsel
      1. Ratify termination of Holland & Knight as counsel for the church
  e. ANNOUNCEMENTS

III.  **ADJOURNMENT**

EXHIBIT B