# Exhibit B

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

CHARLES STOVALL WEEMS, IV
and KERRI WEEMS

        Plaintiffs,

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., KEVIN
CORMIER, MARCUS ROWE,
ANGELA CANNON,
JACOB WILLIAM, and
LEE WEDEKIND, III,

        Defendants.

_____/

Case No.: 2022-CA-1047

Division: CV-F

## SECOND AMENDED COMPLAINT

Plaintiffs, Charles Stovall Weems, IV ("Pastor Weems") and Kerri Weems ("K. Weems"), sue Defendants, Celebration Church of Jacksonville, Inc. ("Celebration Church"), Kevin Cormier ("Cormier"), Marcus Rowe ("Rowe"), Angela Cannon ("Cannon"), Jacob William ("William"), and Lee Wedekind, III ("Wedekind"), and allege as follows:

## INTRODUCTION

1.    This case presents an egregious example of what happens when a group of people decide to weaponize false information to inflict harm on others and advance their personal and economic agendas, demonize someone they target as an adversary, and deceive the public into believing salacious lies are true.

2.    Defendants were unsatisfied with the substantial and irreparable harm they had already inflicted on Plaintiffs during the nefarious coup they staged to banish Pastor Weems and K. Weems from the church they founded over two decades ago, so they created and published

online a bogus "Report of Investigation" advancing a scurrilous narrative and false and defamatory statements about Plaintiffs, along with surreptitiously obtained and irrelevant private information concerning K. Weems.

3.     Defendants' goal was to destroy Plaintiffs' livelihood and reputations, discredit them, publicly humiliate them, punish them, and try to prevent them from continuing their ministry anywhere else.

4.     Defendants launched their outrageous, libelous attack *after* Pastor Weems had already resigned and completely separated himself and his family from Celebration Church. Incredibly, Defendants engaged in this reprehensible conduct while citing scripture about "false prophets" and insidiously professing to be acting under the auspices of "biblical standards."

5.     Pastor Weems and K. Weems have brought this action to: clear their names; establish the falsity of the scandalous narrative and statements Defendants published about them; recover damages for the substantial injuries Defendants' lies and tortious conduct have caused; prevent Defendants' continued publication of defamatory falsehoods and private information about Plaintiffs; and expose how the seditionists now in control Celebration Church maliciously and unjustifiably ruined Plaintiffs' ability to work in their chosen profession.

## PARTIES, JURISDICTION, AND VENUE

6.     This is an action for equitable relief and damages in excess of $30,000.00, exclusive of interest, costs, and attorneys' fees.

7.     Plaintiff, Pastor Weems, is an individual who lives, works, and serves his community in Duval County, Florida.

8.     Plaintiff, K. Weems, is an individual who lives, works, and serves her community in Duval County, Florida.

9.     Defendant, Celebration Church, is a Florida not for profit corporation with its principal place of business at 9555 R.G. Skinner Parkway, Jacksonville, Florida 32256.

10.    Defendant, Cormier, is an individual residing in Duval County, Florida.

11.    Defendant, Rowe, is an individual residing in Duval County, Florida.

12.    Defendant, Cannon, is an individual residing in Orange County, Florida.

13.    Defendant, William, is an individual residing in Palm Beach County, Florida.

14.    Defendant, Wedekind, is an individual residing in Duval County, Florida.

15.    Defendants, directly and/or through employees, agents, authorized representatives, co-conspirators, and/or other persons, entities, and/or representatives acting under their management, direction, and/or control, engaged in numerous contacts in and with the state of Florida associated with the planning, creation, and publication of the false and defamatory statements and private information about Plaintiffs upon which this action is based, which were published to, accessible to, and accessed and viewed by residents in Duval County.

16.    Venue is proper in Duval County, Florida pursuant to Chapter 47, Florida Statutes, because Celebration Church's principal place of business is in Duval County, Florida, one or more individual Defendants reside in Duval County, Florida, and the causes of action alleged herein accrued in Duval County, Florida.

17.    Based on the facts alleged throughout this Amended Complaint, this Court has personal jurisdiction over each of the Defendants under Section 48.193, *Florida Statutes*, because they each personally or directly, in concert with one another, and/or through an employee, agent, co-conspirator, and/or other person or entity acting under their management, direction, and/or control, engaged in one or more of the following acts:

A.     committing tortious acts within the state of Florida;

B.    committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

C.    operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in Florida;

D.    engaging in substantial and not isolated activity within the state of Florida; and/or

E.    engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and engaging in overt acts in furtherance of that conspiracy within the state of Florida.

18.    Based on the facts alleged throughout this Amended Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy Due Process under the United States Constitution because Defendants:  (1) engaged in substantial and not isolated activity within and directed at the state of Florida; (2) reside, maintain an office, and/or conducted business through agents located in the state of Florida; and/or (3) committed or conspired to commit intentional torts expressly aimed at Florida, the effects and harms of which were calculated to and did cause injury within the state of Florida.  Accordingly, each of the Defendants could and should have reasonably anticipated being sued in the state of Florida for the claims alleged herein.

19.    At all times material to this action, Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them acted within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture relationship with one another.  At all times material to this action, each Defendant's acts, failures to act, and misconduct alleged herein were known to, authorized, approved, and/or ratified by the other Defendants; and such acts, omissions, and misconduct were engaged in by the Defendants in concert or active participation with one another or to aid or abet one another.

20.     Defendants' actions, failures to act, and misconduct alleged herein produced and/or substantially contributed to producing the damages, injuries and harms Plaintiffs suffered, for which they seek recovery and redress through this action; which injuries and harms occurred in the state of Florida and the greatest effects of which were suffered within the state of Florida.

21.     All conditions precedent to the filing and maintenance of this action have occurred, have been performed, and/or have been waived.

22.     The causes of action alleged herein accrued after Pastor Weems and K. Weems were no longer employed by or members of Celebration Church and are based on tortious misconduct that does not directly implicate matters of church governance or pastoral discipline. Accordingly, the Ecclesiastical Abstention Doctrine and Christian Alternative Dispute Resolution provision of Celebration Church's Bylaws do not apply to the claims alleged herein, and this Court has subject matter over this action.

## COMMON FACTUAL ALLEGATIONS TO ALL COUNTS

23.     Pastor Weems and K. Weems founded Celebration Church in 1998 and devoted the past 24 years of their lives to their church, its congregation, and its missions.

24.     Initially, Celebration Church was comprised of a single site in Jacksonville, Florida, but through years of dedication and sacrifice Pastor Weems and K. Weems grew that single site into a global, multi-site, non-denominational church with nearly 20,000 members.

25.     Pastor Weems served as Celebration Church's Senior Pastor and President from its inception until Defendants' actions forced him to resign and completely separate himself and his family from the church on April 15, 2022.

26.     As Senior Pastor, Pastor Weems's responsibilities included: (1) complete plenary authority, control, and responsibility for directing missions and spiritual activities of the church;

(2) serving as President and Chief Executive Officer of the church and having authority to direct all of its day-to-day operations, including establishing budgets, raising funds, and directing monies; and (3) acting as Chairman of the Board.

27.     Celebration Church's Board of Trustees was responsible for management and oversight of its corporate matters and financial resources.  The trustees were nominated exclusively by the Senior Pastor for one calendar year terms.

28.     In addition to the trustees, a group of individuals served as Celebration Church's "Overseers," who provided apostolic oversight to the Senior Pastor and were charged with protecting the Church through counsel, prayer, and if required, the investigation and discipline of the Senior Pastor.  The Overseers are nominated by the Senior Pastor and must be confirmed by the Board of Trustees.

29.     In the fall of 2018, after leading Celebration Church for two decades, Pastor Weems and K. Weems began working toward transitioning Pastor Weems from his Senior Pastor role to a Founding Pastor role, in which he would be able to spend much more of his time and energy on Celebration Church's missions and less on the church's day-to-day operations.

30.     As part of that process, The Church Lawyers (Middlebrook I Goodspeed) consulted on the transition and Pastor Weems's Founding Pastor role.  Among other things, the transition contemplated a Founding Pastor agreement, retirement package, and securing the continued and ongoing financial support for Celebration Church's missions.

31.     Celebration Church's Board of Trustees and Overseers were fully aware of, approved, and agreed to the terms, conditions, and agreements associated with Pastor Weems's transition to Founding Pastor, retirement package, and parsonage.

32.     Attendant to the transition, Pastor Weems identified Pastor Tim Timberlake
("Pastor Timberlake") as a potential successor to the Senior Pastor position.  In 2019, Pastor
Timberlake began speaking at Celebration Church.  In January 2020, he moved to Jacksonville.

33.     As part of the transition plan, Pastor Timberlake initially would serve in a
leadership role at Celebration Church's Jacksonville campus, and Pastor Weems would retain his
legal control and authority as the Senior Pastor, President, Chief Executive Officer, and Chairman
of the Board while he worked with the church to finalize the arrangements and formal contracts
memorializing and implementing his transition, retirement arrangement, Founding Pastor position,
and parsonage.

34.     During this time, Pastor Weems was also working on formalizing an agreement
with the church on K. Weems's retirement package.

35.     As a result of the COVID pandemic and lockdowns, Celebration Church was
limited to video services until September 2020.  During this difficult time, Pastor Weems and K.
Weems were instrumental in helping the church navigate through the financial difficulties caused
by COVID and lockdowns and other problems created by certain Executive Leadership under the
control of Lisa Stewart (Pastor Weems and K. Weems were "Senior Leadership," not "Executive
Leadership").

36.     When in-person services finally resumed, Pastor Timberlake started leading
Sunday morning services at Celebration Church's Jacksonville campus and Pastor Weems started
to focus on mission work, reaching more of the church's members across the country and world
through video, refining the organization of the church and its missions and related organizations,
and finalizing the arrangements surrounding his transition to Founding Pastor.

37.    Pastor Weems and K. Weems were also working with church leadership and consultants to address problems in the church's organizational structure, which had lagged behind the church's significant growth.

38.    At Pastor Weems's and K. Weems's request, the church contracted with a consulting firm (Network King) to conduct an organizational evaluation and identify needed areas of improvement.

39.    In November 2020, Network King issued a report identifying six areas the church needed to improve and concluded that the church's "*executive leadership*" was the root cause of most of these issues.

40.    At the end of their terms in 2020, three of the five trustees chose not to seek re-nomination to their positions.

41.    In January 2021, Pastor Weems appointed two new trustees, Cormier and Rowe.

42.    In February 2021, Fitzhugh Powell ("Powell") sought re-nomination to his trustee position.

43.    In the Spring of 2021, Pastor Weems nominated Cannon and William as trustees.

44.    By June 2021 and at all material times thereafter, Cormier, Rowe, Powell, Cannon, and William were acting or purporting to act as Celebration Church's trustees (collectively, the "Trustees," and each a "Trustee").

### The Trustees' Coup d'état

## PSALMS 41:9

"Yea, mine own familiar friend, in whom I trusted, which did eat of my bread, hath lifted up *his* heel against me."

45.     In 2018, long before Cormier was nominated and confirmed as a Trustee, he and Celebration Church entered into a collaboration whereby construction-type entities owned by him were hired by the church to perform land and housing improvements and management services at Honey Lake Farms, Inc. ("Honey Lake Farms") and Honey Lake Clinic, Inc. ("Honey Lake Clinic").

46.     Honey Lake Farms (formerly, Celebration Care Ministries) and Honey Lake Clinic are legally separate, 501(c)(3) non-profits that were founded and initially funded by the church. They remain related to Celebration Church through common mission.  Honey Lake Farms remains in-part funded by the church.  The leadership of these organizations largely overlaps with the church.

47.     Importantly, in her role as CFO of the church at the time, Lisa Stewart ("Stewart") also served as CFO of the related entities from their inception.

48.     In 2020, Cormier announced to Pastor Weems his intention to donate $1 million of in-kind construction-type services to the church's mission at Honey Lake Farms.

49.     Throughout 2020 and 2021, construction work and land management services were performed at Honey Lake Farms by Cormier's companies.

50.     Pastor Weems was led to believe that Cormier's work was part of his $1 million pledge to the church's mission at Honey Lake Farms.

51.     Pastor Weems also believed that Stewart was properly accounting for Cormier's pledged donation and responsibly managing the church's finances.

52.     Stewart left her position as Church CFO in January 2021 and transitioned to work solely for Honey Lake Clinic.  A new church CFO was installed.

53.     In early-2021, Celebration Church began receiving an influx of billing invoices from Cormier's entities, eventually totaling approximately $700,000.

54.     The church's new CFO, Tojy Thomas, became concerned with such large invoices coming in so frequently and brought them to Pastor Weems's attention.

55.     The invoices had vague descriptions of the work performed and included requests for significant payments for work on Cormier's personal property.

56.     Pastor Weems eventually discovered that Cormier was overbilling or improperly billing Celebration Church for enormous sums of money for alleged services at Honey Lake Farms. For example, Cormier's for-profit company was charging the church money to rent the church's own lodge for a church-related event.

57.     Pastor Weems also discovered that Cormier was charging the church rent for its use of a residential house ("Monticello") and simultaneously and inappropriately charging the church $137,871 for renovation expenses to that same property.  The church should not have been funding renovations to a property Cormier owned.

58.     Pastor Weems further discovered that Cormier invoiced the church $18,000 per month for the church's use of another residence individually owned by him ("Keaton Beach") for a time period when that property was still under renovation and therefore not inhabitable.

59.    Pastor Weems also learned that the church's previous CFO, Stewart, knew that Cormier had not donated any of the $1 million in work that he pledged and that the work for which he was billing the church was actually supposed to be "donated" (*i.e.*, free).

60.    Stewart and Tojy Thomas allowed payments to be issued to Cormier's entities knowing that no agreements were in place and that no authorization or approvals were obtained for the work allegedly performed.

61.    Moreover, Cormier stopped submitting any substantiations for his invoices, but continued to get payments for them. Importantly, when Pastor Weems discovered Cormier's improper billing practices, he directed Tojy Thomas to stop the payments and require Cormier to submit purchase orders, agreements, and proof of services rendered to justify the requested payments. Cormier did not produce the substantiation requested but continued to bill.

62.    Stewart was giving false reports to Pastor Weems and misrepresenting the balances in the church's accounts.

63.    Stewart also refused to separate the AWKNG organization to be a separate 501(c)(3) from the church and concealed her insubordination to Pastor Weems's and the Board of Trustees' directives to separate the funds designated for the AWKNG organization into a separate account from that of the church. By doing this, she was able to hide her financial and operational mismanagement and retain control of funds to create inaccurate and misleading reports.

64.    This insubordination and intentional misrepresentation led Pastor Weems to believe the church's finances were materially different than they actually were.

65.    Stewart was also providing Cormier with unrestricted access to Honey Lake Farms' bank accounts, even though the Senior Pastor had no access to view them.

66.     Stewart's financial and operational mismanagement of Honey Lake Clinic and its
agreements with the church caused substantial harm and hundreds of thousands of dollars in
financial damages to both the church and Honey Lake Farms.

67.     In April 2021, Pastor Weems confronted Cormier about his misconduct.

68.     Cormier admitted that he reneged on his pledge to donate $1 million of in-kind
services and sought to remedy the situation by "donating" the work he claimed to have performed
but for which he had not yet been paid, along with a house that the Church had been renting from
him.

69.     Although Cormier appeared contrite, behind the scenes he was taking steps to oust
Pastor Weems and K. Weems from the church they built.  He began feeding the other Trustees and
senior church members lies and misinformation, falsely claiming that Pastor Weems was
improperly manipulating and misdirecting Celebration Church's finances or was guilty of some
unspecified and vague wrongful conduct.

70.     Meanwhile, unaware of the festering plot against them, Pastor Weems and K.
Weems continued working tirelessly to bring stability, structure, consistency, and clarity to
Celebration Church's staff, congregation, and organization, and to greatly improve the church's
financial position.

71.     By June 2021, Celebration Church's organizational operations and finances had
significantly improved.

72.     In fact, after retaining and working with outside accountants to clean up the mess
former CFOs Stewart and Thomas left, Celebration Church's Executive Pastor and newly
appointed Treasurer, Wayland Wiseman ("Wiseman") prepared a *2021 Celebration Report*, which
was presented to the Board of Trustees at their June 3, 2021 meeting.  This *2021 Celebration*

*Report* details Celebration Church's organizational and missional developments and "financial wins," and repeatedly recognizes Pastor Weems and K. Weems for their efforts to improve the church:

## CELEBRATION ORGANIZATIONAL DEVELOPMENT

2020 was a challenging year for many, especially churches. Despite the challenges we faced, Celebration has made many strides as an organization to bring stability, structure, consistency, and clarity to our staff and congregation.

At the request of our Senior Pastors, we contracted a consultant firm to conduct a full organizational evaluation. They evaluated our operating model, our organizational structure, and our workplace environment. Through this process we identified 6 areas Celebration needed to change to go to the level God was calling it to.

# WHAT WE DID

As the Senior Pastors, the Weems took full responsibility for the results discovered by the evaluation. Under the direction of Ps. Kerri Weems a plan was put in place to immediately address these areas.

**1. Leadership Challenges:** We developed a new Org Chart and identified top and middle management as "Directors". We put a development plan together specifically for that group of leaders to teach them how to lead at a new level within our new structure.

**2. Poor Communication:** We developed a new Org Chart which makes the chain of command clear. We made it available to all staff 24/7/365. We developed a Communication Division within the new structure.

**3. Limited Planning and Forecasting –** We developed a new Org Chart that clearly shows who is responsible for what from central to city to a specific location. We put in place a decision-making team of the Executive Directors who are the highest leaders of each Division. We are currently building a process for strategy planning which includes but is not limited to the use of Project Management software. 4th qtr. planning for the upcoming year, quarterly strategy meetings to evaluate current year and adjust.

**4. Lack of Emphasis on Professional Development –** We created all new Job Descriptions and Role Responsibility based on the new Org Chart. We are implementing an Evaluation process based on performance and potential to help us identify and develop deficiency, identify leadership potential and reward performance.

**5. Ineffective Governance:** We developed a new Org Chart and divided the work of the Church into 5 Divisions and organized the work underneath. We created a Standard Operating Procedure or SOP Template, and we began to document all activities we intend to repeat with consistency. We reviewed and updated current policies and created a centralized staff intranet using Microsoft 365 where all critical staff content can be accessed.

**6. Lack of Performance Focus –** We developed a clear Org Chart organized around the work to be done. We put in place clear Job Descriptions and an employee evaluation process. We identified middle management and we were emphasizing accountability across the organization. We are making a conscious effort to tie the corporate work the staff does to the spiritual mission of the church.

# MISSIONAL DEVELOPMENTS

Under the direction of Pastor Stovall Weems and out of a desire to unburden the church, we isolated the enterprise activities as well as activities we have traditionally considered Missional work. We set up AWKNG as separate non-profit entity and placed within the programs and ministries that were previously operated by and funded by the church. Separation from Celebration Church has and will allow AWKNG to grow and partner with other churches and ministries. It has also allowed the Church to significantly cut payroll and expenses.

As a missional partner, Celebration Church now sends its missional dollars to AWKNG who then provide resources all over the world.

# FINANCIAL WINS

Combining Pastor Stovall Weems desire to unburden the church along with the effects of the Pandemic, we made several financial moves that resulted in reducing debt and expenses by $38.3 million. These included a reduction in operating costs, reduction in debt and turning down additional debt.



 

**OPRERATIONAL COSTS**

• $7.6 million reduction in payroll due to offboarding and re-assigning to AWKNG.

• $1 million budget cut to operations, ministry, and outreach.

  

**DEBT REDUCTION**

• $4 million Metro Church building loan paid off from sale of the building.
• $3.6 million WIF loan converted from Celebration Church to Honey Lake Farms.

  

**DEBT LIABILITY REDUCTION**

• $10.5m co-signed loan converted from Celebration Church to Honey Lake Clinic

• $1.6 million co-signed loan converted from Celebration Church to Honey Lake Farms.

  

**FUTURE DEBT LIABILITY REDUCTIONS**

• $10m co-signed loan cancelled. for real estate purchase.

**REPORT** 2021

9

15

73.    The *2021 Celebration Report* also included a section about the church's future:

# THE FUTURE

The Weems brought in Pastor Tim Timberlake in November of 2019 to serve as the Lead Pastor of Celebration Church and to start the process of transitioning out of the day-to-day operations of the church. In the last 18 months, several intentional steps have been taken in addition to those in this report all to strengthen the Spiritual and Corporate wellbeing of Celebration Church for the future.



Pastor Stovall Weems' goal of unburdening the church and making Celebration Church clean and simple is now a reality. Thanks to both Pastors Stovall and Kerri Weems, the right people and systems are now in place for Celebration Church to enjoy years of Spiritual and Corporate health and growth under the leadership of Pastor Tim Timberlake.

74.    Pastor Weems and K. Weems believed everything was moving forward as planned with the transition to Pastor Weems's role as Founding Pastor and the related agreements involving the Weems's retirement plans, funding for the missions, and parsonage.

75.    Pastor Weems engaged the Holland & Knight law firm to assist in reviewing and drafting documents and contracts to finalize the terms of the agreements Celebration Church's Board of Trustees had already approved and was implementing.

76.    The Board of Trustees even formed a "Founding Pastor Compensation Committee," on which several Trustees served.

77.    At a July 29, 2021 Board of Trustees meeting, Pastor Weems wanted to make sure

the church's CPA firm had accurate financials to present because the Trustees needed accurate

numbers to make decisions regarding the ongoing changes within the church.

78.    Celebration Church's finances and ministries, Pastor Weems's transition to the

Founding Pastor role, and his and K. Weems's retirement plans all were discussed at a

September 15, 2021 Board of Trustees meeting:

- PSW continues to explain that there are some other legal things involved in the <u>transition</u> that he will leave in the Board's hands.  It is very important to Ps Kerri (PK) and PSW that there be a role for the founding pastors and there are a lot of things regarding that they need to be worked out.  The church needs to get an attorney and figure out how things need to go.  Even after September 22, legally nothing changes and there has been no change of control from a legal standpoint.

- PK and PSW are off salary and have been off since May/June, right now they feel good about compensation plan and don't want to take a salary from the church ever again. All things were checked and approved by outside attorneys
- PSW suggests that there needs to be a really deep audit of the church. He wants the comfort of knowing that no stone was unturned and everything is squared away and to know that as there is a legal transition, that there is full clarity and everybody can feel confident.
- <u>Question</u>: What is the meaning of the 9/22 Celebration Service if nothing legally will be done at that time?  <u>Answer</u>: Yes, nothing will be done.  The board was asked to speak into all of this.  PSW is not planning on stepping back into the church, even if Ps Tim steps away.  PSW wants to ensure that the name of the church is not changed and that certain parameters are put around the transition.
- <u>Question</u>: Who was behind the decision to remove PK and PSW salaries from the church?  <u>Answer</u>: The decision to do the salary for the 2021Y in the spring was PSW's decision.  In addition the church is putting together a retirement package and compensation package.
- <u>Question</u>: What is the timeline for completing the transition?  <u>Answer</u>: PSW is leaving it to the Board and wants to be removed from the process.
  - There is a suggestion that the conversation should start with PWW and PTT and then bring other people in.
  - <u>Question</u>: Is this just for PSW and PK?  Is there anyone else that we need to be considered?  <u>Answer</u>: We have started putting together a package for PSW as the senior pastor.
    - PSW adds that he enjoys working deals to get the church out of debt and would love to be compensated with a management fee or finder's fee.
- PWW states that there needs to be a board committee for the transition, 3 out of 5 board members
  - A motion is made and seconded to form the committee.  PWW will communicate to pull it together and get started.

79.     Heading into a December 2021 Board of Trustees meeting, Pastor Weems believed his Founding Pastor agreement, retirement package, and the previously agreed upon financial and organizational plans for Celebration Church's missions and related organizations would be reviewed and revised for final approval.

80.     However, the Trustees abruptly changed course at the December 8, 2021 meeting, at which the Founding Pastor agreement and retirement packages for Pastor Weems and K. Weems were supposed to be approved.  The Trustees claimed they were not prepared to address those issues, did not take up Pastor Weems's pending Overseer nominations, and slashed the church's mission funding commitment of 10% of revenues in half, apparently due to a significant shortfall in revenue from tithes and offerings in 2021 under Pastor Timberlake's leadership and for which Pastor Weems was not responsible.  This drastic reduction in mission funding all but assured the failure of the mission organizations, AWKNG, Inc. and Honey Lake Farms.

81.     Still unaware of the clandestine plot to oust him, Pastor Weems also discovered another instance of Cormier attempting to defraud the church and eventually learned about Cormier's false claims to senior church members, other Trustees, and the Overseers about Pastor Weems.

82.     Pastor Weems decided the best course of action was to allow Cormier's one year term as a Trustee to expire and not re-new it and consulted with Wiseman and Rowe (among others) about the best way to sever the church's relationship with Cormier.

83.     On December 31, 2021, Pastor Weems emailed Cormier to inform him that his one-year term as a Trustee had concluded and that a new Trustee would be appointed to fill his vacated position.

84.     On January 4, 2022, Cormier responded by providing "notice" that he, Powell, and
Rowe were "bringing a full investigation" on unspecified allegations and "will be asking our board
to review the possibility of asking Stovall Weems to step down as our current Chairman and Senior
Pastor role." Cormier further claimed that "[b]ased on our bylaws the removal of board members
during this investigation must be put on hold…"

85.     Pastor Weems responded later that evening, informing Cormier that he could not
initiate such an investigation under Celebration Church's Bylaws and advising him of the proper
procedures to follow. Now aware of Cormier's continued inappropriate and fraudulent misconduct
directed at Celebration Church, Pastor Weems also dismissed Cormier from the Board of Trustees
and advised that he would ask the Board of Trustees to investigate Cormier's actions over the past
year.

86.     Unfortunately, by this point Cormier's plot and continued false statements about
Pastor Weems had already taken hold and the other Trustees ignored the church's Bylaws and
followed Cormier's lead as he took control over the decision-making process.

87.     Trustees Rowe, Cannon, and William were fully aware that Pastor Weems had not
engaged in any misconduct but had (as detailed in the *2021 Celebration Report*, numerous meeting
minutes, and other documentation) spearheaded efforts to fix the prior organizational and financial
problems the church experienced. Nevertheless, Rowe, Cannon, and William agreed with
Cormier's seditious plot to banish Pastor Weems.

88.     On January 7, 2022, also aware of Rowe's involvement in the plot to remove him
for unspecified reasons, Pastor Weems sent an email dismissing Rowe as a Trustee based on
Cormier's statements about Rowe's involvement and an admission made by Pastor Timberlake
about which Trustees were involved in the insurrection.

89.    On January 7, 2022, almost immediately after dismissing Rowe, Pastor Weems received a letter (dated January 6) from Rowe and Powell claiming that he was under discipline, was not in good standing, and was suspended as the church's Senior Pastor as a result of "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor."

90.    Pastor Weems's suspension was wholly improper and violative of multiple Celebration Church Bylaws. Nonetheless, he was banned from Celebration Church while he supposedly was "investigated," barred from church property under threat of criminal prosecution and instructed to cease all contact with everyone associated with Celebration Church.

91.    The Trustees began working closely with Wedekind and directing this supposed "investigation" toward a predetermined result.

92.    The Trustees had already decided that Pastor Weems would be ousted as Senior Pastor, President, CEO and Chairman, and would not receive any severance or retirement package well-before the supposed "investigation" commenced.

93.    Although K. Weems was not the subject of the investigation (nor could she be, because she had not been employed by the church since April 2021), the Trustees and Celebration Church gave her the same treatment as Pastor Weems, effectively banning her from Celebration Church.

94.    Worse, the church abruptly terminated K. Weems's access to her email and cloud storage without prior notice.  When she asked to retrieve her personal financial, medical, and intellectual property, the church ignored her requests.

95.    Then, on January 26, 2022, Wedekind, ostensibly with Trustee and Celebration Church approval, denied K. Weems's request for her personal property and instructed K. Weems (among other things) not to communicate directly with any church employees and to:

1. Preserve, protect, and maintain (and do not alter, amend, modify, delete, or destroy) all documents relating to church business, including all documents that relate in any way to any financial transactions or business relationships directly or indirectly related to Celebration Church. This includes any emails, text messages, or any other communications relating to church business. We will coordinate the collection of any electronic devices you used to carry out church business for forensic examination.
2. Do not contact or attempt to communicate in any way with any church executives, staff, employees, volunteers, or trustees. Please direct all communications to my attention. If you have retained a law firm to represent you, please forward this letter to your law firm with a request that the law firm contact me.
3. Do not attempt to access any church property or systems, except that you may continue residing in the parsonage during the pendency of the investigation.
4. Do not disclose the existence or nature of this investigation to any other person except your immediate family members and your attorneys or advisors. This investigation is intended to be confidential to minimize disruption and reputational harm to all involved parties.
5. Cooperate fully with the investigation.

96.     Notably, these instructions include the directive that: "***This investigation is intended to be confidential to minimize disruption and <u>reputational harm to all involved parties</u>.***"

97.     Apparently realizing the impropriety of their refusal to allow K. Weems access to her personal private financial and medical information and intellectual property, Kristin Ahr sent a follow-up email to K. Weems on January 26, 2022:

> Mrs. Weems:
>
> I have re-reviewed the emails and wanted to clarify some things, in case we were missing each other with meaning and messaging. First, I assure you that we are not looking into any of your medical records as a part of our investigation. Wanted to clear that up in case you were concerned about any personal health information being reviewed or shared. Also, if there is an urgent medical need for some record that you cannot obtain a copy of from your health care provider or through any other means, please call me anytime on my cell phone (561-603-3445) and I will do my very best to try to locate that for you if led in the right direction and would do so with the utmost discretion. I am sending you this email now so that you are comfortable with the fact that we are not digging through any of your medical information and that you can reach out to me if needed. That said, if you have an attorney who is representing you, I must have your attorney's permission to speak with you.
>
> Regards,
> Kristin Ahr

98.     Importantly, Ms. Ahr affirmatively represented that Wedekind's firm, Nelson Mullins, was "not looking into any of your medical records as a part of our investigation" and "not digging through any of your medical information," assuring K. Weems that her personal health information was not being reviewed or shared.

## The Sham Investigation

99.     Following the manufactured and wholly ultra vires "suspension" of Pastor Weems, the Trustees initiated and directed Wedekind's supposed "investigation" of Pastor Weems.

100.     From the outset, this sham "investigation" was nothing more than a mechanism to complete the Trustees' coup and permanently banish Pastor Weems and K. Weems from their church.

101.     Supposedly, the investigation included "an extensive analysis of thousands of pages of documents and more than 20 interviews with current and former senior leadership team members, staff members, former Trustees, and other advisors and consultants," and "[e]ach interview was conducted with witnesses who had direct, first-hand knowledge of the events discussed," but not a single interviewee has been identified.

102.     In reality, it is evident from the content of the "report" of this "investigation" that the primary sources of information are a handful of people known to be biased against Pastor Weems and K. Weems, including at least one former Church employee with a well-known history of animosity toward Plaintiffs, other individuals with axes to grind, and people who witnessed private situations and conversations inside the Weems's home who were subject to non-disclosure agreements.

103.     Supposedly, the "investigation" also included the review of "thousands of pages of documents," none of which are identified.

104.    In fact, this omission in the "report" about the "investigation" appears to be intentional because there are numerous readily available documents presumably reviewed by Wedekind and the Trustees that directly refute the false accusations made in the April 24, 2022 "Report of Investigation," as well as other documents which were intentionally omitted from the report because they contain information disproving the false and defamatory accusations about Plaintiffs.

105.    This is not surprising, because discovering the truth was never the real goal of the "investigation." Rather, the Trustees and Wedekind were pre-determined to make findings that aligned with the Trustees' goal of destroying Pastor Weems and K. Weems so they could seize control of the Church.

106.    Throughout the initial weeks of the supposed investigation, Pastor Weems and K. Weems, individually and through counsel, repeatedly asked to be interviewed.  By way of example:

From: Lee Wedekind, III<lee.wedekind@nelsonmullins.com>
Date: On Sun, Jan 9, 2022 at 3:17 PM
Subject: FW: RESPONSE TO: Letter-to-Celebration-Church-Trustees-re-status_w-attachmts
To: chasbo7@protonmail.ch <chasbo7@protonmail.ch>
CC: Kristin Ahr <kristin.ahr@nelsonmullins.com>,jason.havens@hklaw.com <jason.havens@hklaw.com>

Pastor:

Thank you for confirming Celebration's retention of our firm to conduct this investigation and your willingness to fully participate in it. As you know, to the extent that Holland & Knight has ever represented Celebration (of which we have seen no evidence), that representation has been terminated. Please let us know if you are being represented by counsel or if we should communicate with you directly.

From: Charlie Weems <cweems@goldweems.com>
Date: On Wed, Jan 19, 2022 at 5:51 PM
Subject: Fwd: RE: Letter-to-Celebration-Church-Trustees-re-status
To: Lee Wedekind, III <lee.wedekind@nelsonmullins.com>
CC:

Lee –

I'm sorry you feel that way.  That is not the intention.  I called and texted you Sunday afternoon to let you know that something like this was coming to set up the ADR.  All this does is stake out our position, none of which is a surprise to you I'm sure.  It took quite a while for H&K to get it out.

I guess I sort of felt the same way about the late night letter sent out Saturday declaring that Stovall was suspended from participation as a Celebration representative on affiliate boards (specifically the Clinic) because he is under investigation for pastoral misconduct.  I'm not sure where that extension comes from, but we've tried to swallow it although we believe the entire process is unlawful.  With the time frame you have estimated for the "investigation," and the complete physical and electronic cutoff of Stovall from his base – his Church – y'all have put us into a very difficult and untenable position.  I am trying to hold the line but the continuous grind of this is unimaginably hard for Stovall and Kerri.

I would ask the following in the spirit of Christian reconciliation:

1.  The Church put Stovall back on the payroll as of January 1 during this "investigation," as was contemplated by Stovall and the Trustees while trying to put the founder's package together – to deny this simple maintenance to him and his family after his service and contributions is not right, especially given the circumstances of the obscure, unconfirmed and unestablished "misconduct" with which he is supposedly charged;

2.  You interview Stovall and Kerri ASAP about whatever it is he is charged with, and provide them access to their emails, videos and files at the Church to document and demonstrate the correctness of plans and actions taken.

Thank you for considering.

I am available to talk at any time.

107.    Although Wedekind repeatedly and falsely assured Plaintiffs that the "investigation" would be coming to an end in a matter of days or a couple of weeks, it dragged on much longer.  Meanwhile, Pastor Weems's and K. Weems's requests for interviews continued to be ignored, they remained banned from church property under threat of criminal prosecution and were barred from speaking to anyone affiliated with the church.

108.    During this time, they were essentially made pariahs, unable to defend themselves and isolated from church, friends, church members, and professional colleagues and contacts, most of whom they were prohibited from contacting and had been told Plaintiffs were suspended and "under investigation" for some unspecified reason.

109.    As time dragged on with no imminent resolution of this incredibly damaging situation in sight, Plaintiffs decided to take action and filed suit on February 23, 2022 to try to obtain temporary injunctive relief to protect their rights and force the resolution of the sham investigation.

110.     On March 3, 2022, the church responded by filing a Motion to Dismiss, signed by
Wedekind, which lobbed unsubstantiated, unnecessary personal attacks that were completely
irrelevant to the legal arguments it raised.  The motion also explained how the Trustees had, on
January 13, 2022, amended the church's Bylaws resulting in the Board "currently acting as the
highest ecclesiastical authority in the church…"

111.     Realizing the lengths to which the Trustees were willing to go to maintain control
over the church and their clear intentions (as communicated through the unsubstantiated,
unnecessary personal attacks in the motion to dismiss) to wage an all-out war, Pastor Weems came
to the difficult realization that he could no longer be a part of Celebration Church and needed to
try to protect his family from any further attacks by resigning and completely separating from
Celebration Church.

112.     Thus, on April 15, 2022, Pastor Weems tendered his resignation as Senior Pastor,
President, Chief Executive Officer, Chairman and member of the Board of Trustees, and registered
agent, and made it clear that he and his family were legally separating from the Church and would
continue their ministry elsewhere.

**The Defamatory Report**

113.     Unsatisfied with Pastor Weems's resignation, and likely fearful that members of
Celebration Church's congregation would follow Pastor Weems once he began ministering
elsewhere and working with other churches, the Trustees conspired with Wedekind to create and
publicly disseminate a false and defamatory narrative and statements about Pastor Weems and K.
Weems, along with private and confidential information about K. Weems, to try to destroy their
reputations, humiliate them, and prevent Pastor Weems from continuing his ministry anywhere.

114.    Defendants created and published the "Report of Investigation to Celebration Church of Jacksonville, Inc." dated April 24, 2022 (the "Defamatory Report"), attached hereto as **Exhibit A**, which was drafted by Wedekind in consultation with the Trustees with every intention of making the report public—even though Wedekind previously instructed K. Weems that: "***This investigation is intended to be confidential to minimize disruption and <u>reputational harm to all involved parties</u>.***"

115.    The intention to make the report public is evident from its Introduction, which refuses to disclose the identities of the supposed witnesses interviewed during the investigation—a precaution that would be completely unnecessary if the report was actually supposed to be confidential and only circulated internally to the Trustees.

116.    The Defamatory Report is not an objective summary of truthful facts gathered through a reasonable, legitimate, objective investigation. Rather, it is an inflammatory, biased narrative replete with false and defamatory statements and ad hominem attacks designed to destroy Pastor Weems's and K. Weems's reputations, humiliate them, and destroy their credibility.

117.    The Defamatory Report was prepared with the intention of publicly disseminating it to convict Pastor Weems and K. Weems in the court of public opinion.  It is filled with blatantly false statements, many of which are refuted by documents Wedekind analyzed during the investigation and of which the Trustees was fully aware.  It also makes a number of material omissions to create a false and defamatory narrative and implications about Pastor Weems and K. Weems.

118.    Overall, the Defamatory Report is a thinly disguised effort to discredit Pastor Weems and his wife in the most destructive and invasive way, using bold falsehoods and omitting relevant facts, combined with vicious unattributed gossip and gratuitous harmful allegations.  The

material omissions combined with false and misleading statements and reasonable implications drawn therefrom are presented in a way clearly intended to create maximum damage to Plaintiffs' reputations and to destroy any opportunity for Pastor Weems to lead a ministry in the future.

119.    The Defamatory Report is particularly and gratuitously damaging to K. Weems, who was not and had not been for some time an employee of Celebration Church.  She was not subject to church discipline and was never "placed under investigation" or "suspended." Nevertheless, the Trustees and Wedekind decided to include her in the allegations against Pastor Weems and needlessly and unnecessarily lumped her into the Defamatory Report and publicly disclosed her personal and private health care information on the Internet.

120.    The Defamatory Report was intentionally worded to falsely portray Pastor Weems and K. Weems as rich, living in mansions, and lining their pockets with the church's money while engaging in unauthorized acts they were concealing from the church.

121.    In reality, Pastor Weems is by no means wealthy—precisely because he did NOT do the things he has been falsely accused of doing.

122.    Rather, Pastor Weems spent over 20 years building and expanding a large church without even setting up a retirement plan for himself or his family.  His salary was set by others in accord with reasonable standards.  He eventually stopped drawing a salary and removed $6.5 million of payroll from the Church as part of a 2020-2021 reorganization that was designed with counsel and embraced by the Trustees to separate and put the ancillary church related entities (like Honey Lake Farms) on their own (but supported by an annual revenue pledge from the Church). He also personally gave back hundreds of thousands of dollars to the church each year; and invested hundreds of thousands of dollars, almost to the point of insolvency, in the church's

ancillary organizations believing the church was supporting him and operating in good faith with respect to their agreements, when in fact the Trustees and Lead Pastor were doing just the opposite.

123.    All of the foregoing was done without receiving a dime from any ancillary organization.

## The False and Defamatory Introduction and Background

124.    The Defamatory Report begins with an "Introduction and Background" section containing several blatantly false statements.

125.    Among other things, it falsely states that, "[d]uring the course of discussions about [Pastor Weems's] transition" out of the Senior Pastor position, "it was revealed by or to the Church's Board of Trustees…that there had been certain questionable financial practices and other pastoral issues under the Weemses' leadership of the church." As explained above, the first call to investigate Pastor Weems came from Cormier and was not raised during discussions about his transition. It was raised by email on January 4, 2022, and only after Pastor Weems notified Cormier that his Trustee appointment would be ending.

126.    Next, the Defamatory Report falsely states that, "in light of these claimed improprieties…the Board voted to suspend Stovall and Kerri Weems…" However, K. Weems held no position from which she could be "suspended" and was never the subject of any supposed "investigation."

127.    The Defamatory Report continues by falsely asserting that Pastor Weems and K. Weems "refused" to be interviewed in connection with the investigation. As set forth above, this is blatantly false. Plaintiffs repeatedly asked to be interviewed.

128.    Defendants' false narrative continues with a misleadingly false characterization of Plaintiff's original lawsuit for injunctive relief, and the untrue assertion that Plaintiffs "at every

stage of the process…attempted to undermine the investigation process and prevent its completion."

129.    The following section of the Defamatory Report includes a false and misleading summary of "Celebration's Corporate Governance," which does not form the basis of Plaintiffs' claims in this Amended Complaint.

130.    The next section purports to address the "Authorization of this Investigation," but falsely asserts that Pastor Weems "avoided oversight or discipline by not nominating any Overseers" and "did not nominate any replacements" after two overseers resigned in September 2021.

131.    Pastor Weems nominated several overseers whom the Trustees never approved.

132.    This section of the Defamatory Report also deceptively omits any reference to the fact that Pastor Weems dismissed Cormier on January 4, 2022 and asked for Cormier to be investigated for financial and other misconduct.

133.    This section also claims that "[p]ursuant to the Board's directive, this investigation was designed and intended to reveal and report the truth of what has transpired at Celebration under the Weemses' leadership."  This assertion could not be further from the truth.

### The False and Defamatory "FINDINGS OF FACT"

134.    The Defamatory Report attempts to strengthen the impact of its false assertions about Plaintiffs' supposed misconduct by labeling them **FINDINGS OF FACT.**"

135.    These professed "factual" findings are infested with false and defamatory statements and purposeful omissions necessary to convey Defendants' false narrative to readers, beginning with the following "Summary":

## II. FINDINGS OF FACT

### A. Summary

Stovall Weems engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the Church. Weems failed to present these transactions to the Board for its review and approval, which he was required to do pursuant to Florida law and the Church's governing documents. When three Trustees sought to question these transactions, Weems retaliated by attempting to remove them. Although Weems has a duty to cooperate with this investigation, he has refused to do so.

136.    The section titled "Overview of the Weemses' Leadership of Celebration" describes unidentified "witnesses" accounts of "troubling details" of the Weemses' "dysfunctional leadership style," which it asserts were also detailed in the Baseline Report prepared in November 2020 by Network King.

137.    The Defamatory Report also falsely describes the Baseline Report as a "scathing indictment of the Weemses' failed leadership at Celebration," but as explained above, the Baseline Report addresses failures of "executive leadership," not Pastor Weems or K. Weems.

138.    The Defamatory Report also intentionally omits any reference to the *June 2021 Celebration Report*, which outlines all of the efforts spearheaded by Plaintiffs to address the organizational and operational improvements suggested by Network King.

139.    This section of the Defamatory Report also contains numerous other false and defamatory personal attacks and unsubstantiated claims from "witnesses" known to be biased and uses incendiary labels to try to portray Plaintiffs as failed leaders.

140.    The following section of the Defamatory Report is needlessly devoted to rehashing the "Encounter," which occurred in 2018. This section appears to be nothing more than a pretext to invade K. Weems's privacy by discussing false assertions about her mental health.

141.    This next section of the Defamatory Report also includes false claims that Pastor Weems used the "Encounter" to justify his authority and maintain control of the church, and that Pastor Weems "gave away" the church to Pastor Timberlake—all of which is completely untrue.

142.    The following section purports to address the "Post-Encounter Leadership of the Church," and consists almost entirely of false and defamatory statements about Plaintiffs' leadership and mental state after the "Encounter."

143.    This section also misrepresents the discussions and exchanges concerning the reorganization and transition plan in 2020 and falsely describes the actions of Stewart and Thomas, the true nature of which are explained in detail above.

**The False and Defamatory Accusations of "Improper Financial Transactions"**

- **Defamatory Statements Regarding the Parsonage**

144.    The Defamatory Report claims that in February 2021 Pastor Weems, through his entity Weems Group, LLC ("Weems Group"), purchased a residential home for $855,000 and then sold the property to the Church for over $400,000 more than the purchase price—which is falsely labeled "embezzled profit."

145.    The Defamatory Report falsely claims that the purchase was financed by drawing on the Celebration Church's line of credit with Wesleyan Investment Foundation ("WIF"), and that Pastor Weems "represented to WIF that the Board had approved the purchase of the Shellcracker property when it hadn't."

146.    The Defamatory Report goes on to falsely accuse Pastor Weems of impropriety in executing the closing documents both on behalf of Weems Group and Celebration Church.

147.    Pastor Weems's parsonage arrangement was first considered and approved in 2019 by WIF, the Trustees, and the Church's attorneys.

148.     The church Board of Trustees ultimately approved a Parsonage and Compensation Agreement (the "Parsonage Agreement") for Pastor Weems by Resolution dated December 10, 2019, under which Pastor Weems was provided an allowance of $1,300,000 (not tied to a specific property) as well as deferred compensation.  This highly relevant and material information is intentionally omitted from the Defamatory Report.

149.     In February 2021, Weems Group purchased the Shellcracker property for $855,000 as a retirement home for Pastor Weems, and it was never intended to be a parsonage.

150.     Pastor Weems then spent over $458,763 on the property making necessary repairs and improvements ($221,228) and furnishing the home ($237,535). In total, Pastor Weems and the Weems Group spent over $1,313,000 on the Shellcracker property.

151.     Beginning in June 2021, Pastor Weems, the Trustees and church attorneys began in earnest putting together Pastor Weems Founding Pastor package with retirement.  As part of the package, the Shellcracker property was going to be given to Pastor Weems's missional non-profit, Celebration Global, as a gift.  This was very clear, in writing, and was agreed upon by all parties; and subsequently confirmed again in November 2021 in writing.

152.     All parties, including the Trustees, the church's lender, Wesleyan Foundation, and church officers knew and approved of this arrangement.

153.     Further, all documentation in connection with the parsonage transactions were prepared by Church personnel—not Pastor Weems.  Pastor Weems never handled the execution of compliance or documentation in the 24-year history of the church.  That was all handled by the church's CFO, financial directors, and HR personnel.  The implication that he was consummating a deal to defraud Celebration Church is categorically false.

154.     The Defamatory Report intentionally omits all the above information.

- **The False and Defamatory Statements Regarding
  the PPP Loan and TurnCoin Investments**

155.    In this section, the Defamatory Report falsely claims "[f]reed from the financial
and accounting professionals that ensured [Pastor Weems] complied with the law, the Church's
financial records indicate that *none* of the loan proceeds from the second PPP loan were used for
permitted expenditures" and that Pastor Stovall use the funds to purchase TurnCoin, a digital
security, without providing notice to or receiving authorization from the Trustees.  ["$500,000 of
PPP loan proceeds [of roughly $1,100,000] were used to purchase an investment in TurnCoin" by
Pastor Stovall "without notice to or authorization by the Board."]

156.    The Defamatory Report also falsely asserts that Pastor Weems received a direct
financial benefit as a result of the TurnCoin investment. This preposterous contention of
wrongdoing is based on numerous falsehoods and contradictory facts contained within the
Defamatory Report itself.

157.    Pastor Weems did not direct improper use of the second $1.1 Million in PPP loan
funds.  The monies were deposited in the church's operating account and used to partially
discharge the $8M annual payroll and other qualified expenses during the permitted period.  There
is no requirement or regulation that PPP funds must be placed into or accounted for from a
segregated account.  Dollars are fungible, and all that is required is that monies in the amount of
the loan were spent during the allowed period on qualified expenses, including payroll.  Also,
Celebration Church and its related mission organizations had other funds at all times that were
available to be used to make the investments.

158.    Moreover, once the budget was approved the Senior Paster had full authority to do
everything within the confines of the approved budget, including making investments and directing

support to domestic churches and foreign missions, which Pastor Weems had done for 20 years
with full knowledge of every Trustee that served.

159.    In April 2021, the church had over $2,200,000 in the bank, monthly revenues of
roughly $1,500,000, and had received the second PPP loan of $1,100,000 (which enabled retention
of employees and was applied to payroll).  The suggestion that a $100,000 Church investment
made during this time came from the PPP loan when dollars are fungible and the church had
millions of other dollars available is patently preposterous.

160.    The $856,033 transferred to Honey Lake Farms Missions account referenced in this
section of the Defamatory Report was a regularly scheduled trimester transfer for the benefit of
the church's mission organizations (set at 10% of revenues by approval of the Trustees in the
budget, with such transfers accomplished as they had been for 20 years) ($1.7M in 2021) and
included specific mission offerings (such as Heart for the House) (projected at $1.5M-$2M in
2021).

161.    In the spring of 2021, Pastor Weems was also taking steps to correct Stewart's
failure to move $2,000,000 to AWKNG on its books or to place that money in the AWKNG bank
account. This was money the Trustees directed to be moved to AWKNG when it was separated as
a stand-alone 501(c)(3) in July 2020.  To avoid distress on the church accounts, Pastor Weems
directed that this mistake be corrected by transfers to the mission accounts over the first half of
2021.

162.    The TurnCoin investments by Honey Lake Farms and AWKNG (both separate
501(c)(3) organizations, formerly part of and related in mission to the church) were independently
made by those organizations.  Both had substantially more money in the bank than the amount of

their TurnCoin investments, and it is false and disingenuous to suggest that the church's PPP loan was used to fund those investments.

163.    The Defamatory Report also falsely asserts when commenting on the resignation of CFO Thomas in the spring of 2021 that Pastor Weems was "[f]reed from the financial and accounting professionals that ensured Weems complied with the law [and that] the Church's financial records indicate that none of the loan proceeds from the second PPP loan were used for permitted expenditures." In fact, there is no such showing by the records.

164.    As for Thomas, he resigned as of May 7, 2021 rather than attend a meeting called by Pastor Weems for him to explain why none of the accounts of the church balanced or could be explained to or reconciled.

165.    Contrary to supposedly being "freed from accounting professionals," Pastor Weems immediately thereafter engaged top tier accounting firms BDO and Dunn & Chamberlain to straighten out the mess Thomas (and Stewart before him) left with the church's accounting.

166.    Finally, Pastor Weems did not direct or handle disbursements himself. He relied on staff to handle such matters from the inception of his ministry.

167.    The investments in TurnCoin were proper and within the authority of the investing party or entity. Multiple Trustees and staff of the church were and remain TurnCoin investors.

168.    In 2021, with the advice and assistance of counsel, Pastor Weems, with the full participation and approval of the Trustees, moved further into the significant reorganization begun in 2020 with three objectives:  (a) to move the church away from a wholly donation-dependent church, which is an unsustainable model; (b) to move its missions organizations into separate 501(c)(3) entities supporting each other and supported by but not a part of the church; and (c) to protect the church from exposure for liability from its broader related activities.

169.     TurnCoin was brought to the attention of the church by Cannon, who is an investor and a member of the advisory board for TheExchange, Inc. (the USA member of TurnCoin Global).  Investigation of this SEC regulated digital security disclosed solid management and a platform in which it is anticipated that celebrities participating would donate part of their revenues back to charities with missions similar to the church's missions outreach – Heart of Compassion Foundation, the Heart of Sport Foundation and the Chen Foundation.

170.     This investment also offered an opportunity for significant return, with commensurate risk.  Pastor Weems believed that this investment was worth the risk, invested his own money in it, and directed relatively small investments for Celebration Church and its mission organizations in hopes of generating long-term returns for them.

171.     Pastor Weems believed that TurnCoin's company mission, values, and non-profit foundations were nearly in complete alignment with so much of the Celebration Church's mission to the underserved, poor, and oppressed.  He also believed the leadership team at TurnCoin is outstanding and the investment has the potential to significantly help the ministries to not be so donation dependent to do missional work.  The church's $100,000 investment is valued at approximately $1.5M and will be liquid per regulations in the fall of 2022.

172.     At least half the Celebration Trustees are believed to have also invested in TurnCoin (including Cannon and Cormier), along with multiple church leadership team members and associates.

173.     The investment was discussed by Pastor Weems and Trustees on Zoom calls, as was use of the investment as a hoped-for seed to provide retirement benefits for employees agreed upon.  Trustees Rowe and William also addressed how to manage the returns from the investment.

174.     The investments were bundled together to allow each of the investors, including Celebration Church, Honey Lake Farms and AWKNG, to qualify as initial legacy investors; a status that could carry earlier returns and hopefully, a return of the initial investment plus 10% interest.

175.     In addition to completely mischaracterizing the investment motivation and decision, the Defamatory Report falsely states that "$500,000 in Church debt was invested in TurnCoin." None of the money came from church debt.

176.     The Defamatory Report also falsely asserts that "[none] of the transactions were presented to or authorized by the Board, as required by the Church's articles of incorporation, bylaws, and Board policies regarding expenditures." This is also blatantly false. Within the approved budget, Pastor Weems had total authority over investments and spending.

177.     The Defamatory Report also states that "[i]n 2020, the Board imposed a limit of $5,000 on expenditures that did not require Board authorization. Any expenses over this amount were required to be approved by the Board."

178.     This is also false. There is no such policy. In 2020, there was a Trustee letter recommending such a practice, but it was summarily rejected and never even brought to a board meeting for discussion, let alone adopted. The Senior Pastor had complete authority to made expenditures that were within the budget as approved by the Trustees.

179.     Moreover, the Defamatory Report intentionally omits all of the foregoing exculpatory information because it disproves Defendants' false narrative.

- **The False and Defamatory Statements About
the "Fraudulent Mischaracterization and Cancellation of Honey Lake Farms Debt"**

180.     This section of the Defamatory Report accuses Pastor Weems of improperly seeking (with disclosure) to modify financial statements in connection with a loan application.

181.    However, no loan application was even made by Honey Lake Farms and no loan was obtained.  Moreover, the described restructure of the Honey Lakes Farms balance sheet was to correctly reflect the intent of the parties when Honey Lake Farms was made a separate 501(c)(3) organization and to recognize that Honey Lake Clinic was obligated to pay off the debt incurred to improve the property before Honey Lake Farms was separated from the church, not to enhance a loan application.   None of this was improperly motivated or "fraudulent."

- **The False and Defamatory Statements about "Misappropriation of Designated Funds"**

182.    This deceptively titled section of the Defamatory Report falsely accuses Pastor Weems of "misappropriation" because mission organization AWKNG Inc. was unable to fund mission trips for which it solicited donations.  However, as explained above, this default was caused when the church and its Trustees abruptly cancelled, with no warning, all of its support and refused to honor (and fund) its agreement of sending 10% of church revenues to the missional non-profits, that still needed partial support at the time but were close to being self-sufficient.  During this time, Celebration Church leadership also made false statements to financial partners, pastors and donors that caused $3.2 million in committed 2022 revenue to be cancelled.

183.    The section is obviously an intentional attempt to cast aspersions on Pastor Weems that are unfounded and the result of decisions the Trustees made.  Moreover, AWKNG is a separate 501(c)(3) with its own board not controlled by Pastor Weems.

184.    AWKNG was shut down in January 2022 only because the church cut off <u>all</u> mission funding, reneging on its specific pledge to provide 10% of annual revenues to missions each year, as it had done for the past 20 years.  If the church had honored its promise or even a small portion of it, the $29,486 needed to cover mission trips easily could have been covered.

185.    Pastor Weems obtained permission from all the intended mission donation recipients to redirect the funds to provide a last payroll check for employees AWKNG was forced to lay off when the church reneged on its 20-year-old 10% funding commitment.

186.    Earlier, the Defamatory Report describes the hardship on these AWKNG employees when they were terminated in early 2022—which was the same time as the Trustees' coup and refusal to fund Celebration Church's mission pledge as it had for the last 20 years.

187.    The Defamatory Report purposefully omits any reference to these facts so that it can falsely lay complete blame on Pastor Weems and misleadingly accuse him of "misappropriation."

188.    Pastor Weems did not realize or "misappropriate" a single dollar from the AWKNG monies.

- **Celebration's Loss of Access to Credit Lines**

189.    This section of the Defamatory Report accuses Pastor Weems of changing banks in early 2021, allegedly causing Celebration Church to lose credit card privileges 10 months later.

190.    This change was properly motivated and required to protect the church's bank accounts.  Pastor Weems directed the moving of the church's primary banking relationship in January 2021 because he had no access or e-credentials to view church bank accounts, had been unable to get any reconciliation or proper accounting from then-CFO Stewart, and reasonably believed that Stewart and Cormier were improperly controlling and using the accounts.

191.    This change was implemented by then-CFO Thomas, who apparently was unaware of the balance requirements.  If similar arrangements could not be made with First Citizens Bank, Thomas should have notified Pastor Weems (or Thomas's superior at Celebration Church), who could have addressed the issue.

39

192.     However, the church's current financial situation is the result of gross overstaffing

and failure to follow Pastor Weems's suggestions for revenue enhancement since Pastor

Timberlake took over complete responsibility for the church's donation and congregational giving

programs at the beginning of 2021.

### The False and Defamatory "CONCLUSIONS"

193.     The entirety of the "CONCLUSIONS" section of the Defamatory Report is false

and defamatory, filled with inflammatory terms and bogus criminal accusations that are clearly

intended to destroy Plaintiffs' reputations, livelihood, and ability to engage in pastoral leadership:

---

### III.     CONCLUSIONS

Through the actions described above, Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office. He has brought Celebration to the brink of insolvency. The current amount of Accounts Receivable that remain outstanding and unpaid is $3,389,835 (excluding the embezzled profit from the Shellcracker sale). But for the steadying leadership of Pastor Tim Timberlake and the actions of Celebration's Board, Celebration would have likely already failed as an institution.

---

194.     The defamatory nature of these false statements was exponentially increased by the

included references to scriptures and assertion that "Stovall and Kerri Weems have disqualified

themselves from pastoral leadership."

195.     These effects are further enhanced by the report's "RECOMMEDNATIONS,"

which include an accounting of "all funds misappropriated by" Plaintiffs and reporting "these

findings to the appropriate authorities to determine whether criminal charges should be brought."

**<u>The Widespread Publication and Dissemination of the Defamatory Report</u>**

196.    On or before April 24, 2022, the Trustees authorized and approved the widespread

public dissemination of Wedekind's Defamatory Report, including on Celebration Church's

website.

197.    In fact, the church updated its homepage to include a conspicuous new menu option

titled "Report" alongside the existing, common menu items such as "About," "Locations," and

"Watch":



198.    The "Report" menu option leads to a page titled "Weems Investigation":



199.    This page contains a "Statement" that, among other things, falsely asserts: "Pastoral misconduct was found to be present based on facts and corresponding documentation.   The Church's attorneys conducted a months-long investigation, interviewing more than 20 witnesses and reviewing thousands of documents. Stovall and Kerri Weems were asked multiple times to participate in the Investigation, but they refused."

200.    The "Statement" continues by listing the 7 "action steps" included within the Defamatory Report, among them requiring Pastor Weems and K. Weems "to account for and

return to the Church all funds misappropriated by them" and "report these findings to the appropriate authorities to determine whether criminal charges should be brought." As set forth above, Pastor Weems and K. Weems did not engage in any criminal conduct or misappropriate any funds from the church.

201.    The bottom of the church's "Weems Investigation" page contains a hyperlink[1] that leads to a pdf of the Defamatory Report, which visitors are free to view and download:



---

202.    Defendants knew and intended when they conspired to create and post the Defamatory Report and accompanying statement on Celebration Church's website that the Defamatory Report and Defendants' false and defamatory statements would be widely viewed, disseminated publicly, and reported on in the press.

203.    Upon information and belief, one or more Defendants may also have alerted members of the press to the posting of the Defamatory Report on Celebration Church's website and/or provided them a copy of the report.

### The Defamatory Presentation

204.    On or before April 25, 2022, the Trustees also participated in, authorized, and approved the creation and publication a pre-recorded video of Wedekind regurgitating the same false and defamatory narrative and statements in the Defamatory Report (which are described above).  This video was played at a staff meeting attended by numerous lower-level church employees and volunteers.

205.    Wedekind pre-recorded this video at the request of the Trustees and knew that it was intended for public dissemination and would be published to third-parties.

### Violations of K Weems's Privacy

206.    The gratuitous inclusion of false and humiliating accusations about K. Weems in the Defamatory Report also included disclosure of her private, personal medical information and private interactions and conversations that occurred within the privacy of K. Weems's home.

207.    This vile, reprehensible attack on K. Weems included the following:

> Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed. People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

208.    The assertion that K. Weems has a "history of clinical depression" could only have been based on medical records. Specifically, even though K. Weems has discussed "struggles with depression" in very specific environments and situations in which she had an expectation of privacy, she never publicly stated she has a "history of clinical depression."

209.    Notably, these supposed "facts" about K. Weems involve events that transpired in **2018**—four years ago—which have absolutely no bearing on any supposed financial impropriety by Pastor Weems. Moreover, K. Weems was not even the subject of any supposed "investigation."

210.    The assertions that K. Weems was "distraught and overwhelmed by her husband's behavior" and "suicidal as a result of the Encounter and Weems's behavior following it" are also blatantly false and yet another clear violation of privacy because they disclose information based on statements from supposed witnesses with non-disclosure agreements who only could have observed K. Weems having private interactions and conversations in a private setting (*i.e.*, her home).

### Actual Malice

211.    Defendants published the above-described false and defamatory statements and narrative about Plaintiffs in the Defamatory Report and Defamatory Presentation with actual knowledge of their falsity or reckless disregard for their truth or falsity.

212.    Defendants had actual knowledge that the false and defamatory narrative and statements they published about Plaintiffs were untrue and deliberately published the statements knowing they were false and defamatory.

213.    At the very least, Defendants recklessly disregarded the truth of the defamatory narrative and statements they published, caused to be published, and/or encouraged to be published about Plaintiffs, or purposefully avoided the truth about the false and defamatory narrative and statements about Plaintiffs.

214.    Defendants had a predetermined narrative about Plaintiffs.

215.    As part of that preconceived narrative, Defendants deliberately used incendiary labels and biblical references in conjunction with false accusations about Plaintiffs to emphasize the seriousness and criminal nature of the false charges against them and to evoke hatred and contempt for Plaintiffs.

216.    Defendants intentionally omitted exculpatory facts of which they were aware because those facts disproved the false narrative and criminal accusations Defendants were already determined to and did publish.

217.    Defendants' personal and economic motivations, as well as their bias against and ill-will toward Plaintiffs, led them to ignore facts of which they were aware and facts which were easily and readily available that refuted and disproved the false narrative and statements about Plaintiffs.

218.    Defendants knew the true facts undermined their predetermined narrative about Plaintiffs, so they consciously avoided, disregarded, and deliberately engaged in efforts to conceal and omit evidence that contradicted their preconceived narrative.

219.    Defendants even went so far as to publish and to direct and encourage others to publish false and baseless accusations to discredit Plaintiffs.

220.    The false and defamatory narrative and statements about Plaintiffs were published in the context of an official attorney "investigation," which by its very nature and under the circumstances was not urgent and which Defendants were under no legitimate time pressure to publish before fact-checking.

221.    Despite the seriousness of the false charges they leveled against Plaintiffs, Defendants failed to take basic steps to investigate and test the accuracy of their false and defamatory narrative and statements, while consciously ignoring and purposefully omitting facts of which they were aware that disproved the false accusations Defendants leveled against Plaintiffs.

222.    Defendants also falsely claimed Plaintiffs refused to comment on the false accusations, while knowing that Plaintiffs were asking and offering to be interviewed.

223.    Defendants engaged in highly unreasonable conduct constituting an extreme departure from the professional standards ordinarily adhered to by responsible people in their fields.

224.    Defendants' failure to investigate, purposeful avoidance of, and deliberate distortion of the truth was compounded by the inherent improbability of and obvious reasons to doubt the veracity of the false claims made against Plaintiffs, as well as the obvious lack of credibility and known biases of the supposed "witnesses" and the claims they made about Plaintiffs.  Defendants all were aware of facts refuting the claims published in the Defamatory Report and Defamatory Presentation.

225. Moreover, the nature and severity of the false and defamatory narrative and statements about Plaintiffs and the facts and information of which Defendants were aware at the time of publication were such that Defendants did, in fact, entertain serious doubts as to the truth of the narrative and statements, leading to the publication of the narrative and statements with a high degree of awareness of their probable falsity.

226. Even a cursory review of the facts surrounding the events described in the Defamatory Report revealed the falsity of the charges made against Plaintiffs. Defendants conducted, were aware of, and had available to them research, information, and documents which showed or easily would have showed that the claims being made about Plaintiffs were untrue.

227. However, Defendants deliberately or recklessly turned a blind eye to the truth and did not ensure that what they were representing as fact about Plaintiffs was correct.

228. Defendants knew about and had easily available to them information and documents establishing that their false narrative and all of the false and defamatory statements published about Plaintiffs were untrue.

229. Each of the Defendants entertained serious doubts as to the truth of the false and defamatory narrative and statements about Plaintiffs, but nevertheless fabricated, directed or encouraged others to make, collaborated with each other to publish, published, and proliferated these false and defamatory statements and the false and defamatory narrative about Plaintiffs.

## COUNT I
## (DEFAMATION--PASTOR WEEMS v. CELEBRATION)

230. Pastor Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

231. Celebration Church published, caused to be published, and/or directed or encouraged others to publish the false and defamatory narrative and statements described in

paragraphs 114, 120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace.

232.    Celebration Church's false and defamatory narrative and statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

233.    Celebration Church's defamatory narrative and statements about Pastor Weems are false.  Pastor Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

234.    As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, Celebration Church published, caused to be published, and/or directed or encouraged others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

235.    Celebration Church's defamatory narrative and statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

236.    In light of Pastor Weems's standing in the community, the nature of the statements and narrative about him, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as Pastor Weems, Celebration Church directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements and narrative.

237.    Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Celebration Church's false and defamatory narrative and statements.

238.    Re-publication of Celebration Church's false and defamatory statements and narrative in other publications, online, and through social media, caused Pastor Weems to suffer additional damages; all of which were foreseeable.

239.    Celebration Church had actual knowledge that the false and defamatory narrative and statements about Pastor Weems would garner significant public and media attention, which it could use (and did use) to advance and promote its own interests and reputation.

240.    Celebration Church acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

241.    As a direct and proximate result of Celebration Church's tortious conduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

242.    As a direct and proximate result of Celebration Church's tortious conduct, and in addition to the quantifiable monetary damages Pastor Weems suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

243.    Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting Celebration Church from publishing and republishing the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

244.    The public interest would be served by the entry of an injunction prohibiting Celebration Church's tortious conduct.

WHEREFORE, Pastor Weems demands judgment against Celebration Church awarding:

a. Compensatory and special damages in appropriate amounts to be established at trial;

b. Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c. Costs associated with this action; and

d. Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT II
### (DEFAMATION—PASTOR WEEMS v. TRUSTEES)

245. Pastor Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

246. The Trustees published, caused to be published, and/or encouraged or directed others to publish the false and defamatory narrative and statements described in paragraphs 114, 120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace.

247. The Trustees' false and defamatory narrative and statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

248. The Trustee's defamatory narrative and statements about Pastor Weems are false. Pastor Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

249. As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, the Trustees published, caused to be published, and/or encouraged or directed others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

250.    The Trustees' defamatory narrative and statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

251.    In light of Pastor Weems's standing in the community, the nature of the statements and narrative about him, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as Pastor Weems, the Trustees directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future. Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements and narrative.

252.    Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Trustees' defamatory statements and narrative.

253.    Re-publication of the Trustees' false and defamatory narrative and statements by other publications, online, and through social media caused Pastor Weems to suffer additional damages; all of which were foreseeable.

254.    The Trustees had actual knowledge that their false and defamatory narrative and statements about Pastor Weems would garner significant public and media attention, which they could use (and did use) to advance and promote their own interests and reputations.

255.    The Trustees' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

256.    As a direct and proximate result of the Trustees' misconduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

257.    As a direct and proximate result of the Trustees' tortious conduct, and in addition to the quantifiable monetary damages he suffered, Pastor Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

258.    Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting the Trustees from publishing and republishing the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

259.    The public interest would be served by the entry of an injunction prohibiting the Trustees' tortious conduct.

WHEREFORE, Pastor Weems demands judgment against the Trustees awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT III
### (DEFAMATION—PASTOR WEEMS v. WEDEKIND)

260.    Pastor Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

261.    Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the false and defamatory narrative and statements described in

paragraphs 114, 120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace.

262.    Wedekind's defamatory narrative and statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

263.    Wedekind's defamatory narrative and statements about Pastor Weems are false. Pastor Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

264.    As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

265.    Wedekind's defamatory narrative and statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

266.    In light of Pastor Weems's standing in the community, the nature of the statements and narrative about him, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as Pastor Weems, Wedekind directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements and narrative.

267.    Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Wedekind's defamatory statements and narrative.

268.    Re-publication of Wedekind's false and defamatory narrative and statements by Celebration Church, other publications, online, and through social media caused Pastor Weems to suffer additional damages; all of which were foreseeable.

269.    Wedekind had actual knowledge that the false and defamatory narrative and statements about Pastor Weems would garner significant public and media attention.

270.    Wedekind's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

271.    As a direct and proximate result of Wedekind's misconduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

272.    As a direct and proximate result of Wedekind's tortious conduct, and in addition to the quantifiable monetary damages Pastor Weems suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

273.    Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting Wedekind from publishing and republishing the defamatory narrative and statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

274.    The public interest would be served by the entry of an injunction prohibiting Wedekind's tortious conduct.

WHEREFORE, Pastor Weems demands judgment against Wedekind awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT IV
## (DEFAMATION--K. WEEMS v. CELEBRATION)

275.    K. Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

276.    Celebration Church published, caused to be published, and/or directed or encouraged others to publish the false and defamatory narrative and statements described in paragraphs 114, 120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose and had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace.

277.    Celebration Church's false and defamatory narrative and statements are of and concerning K. Weems and reasonably understood to be about her.

278.    Celebration Church's defamatory narrative and statements about K. Weems are false.  K. Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

279.    As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, Celebration Church published, caused to be published, and/or directed or encouraged others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

280.    Celebration Church's defamatory narrative and statements are defamatory *per se* because they charged that K. Weems committed crimes and tended to injure her in her trade, business or profession.

281.    In light of K. Weems's standing in the community, the nature of the statements and narrative about her, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as K. Weems, Celebration Church directly and proximately caused K. Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  K. Weems is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements and narrative.

282.    K. Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Celebration Church's false and defamatory narrative and statements.

283.    Re-publication of Celebration Church's false and defamatory statements and narrative in other publications, online, and through social media, caused K. Weems to suffer additional damages; all of which were foreseeable.

284.    Celebration Church had actual knowledge that the false and defamatory narrative and statements about K. Weems would garner significant public and media attention, which it could use (and did use) to advance and promote its own interests and reputation.

285.    Celebration Church acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

286.    As a direct and proximate result of Celebration Church's tortious conduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

287.    As a direct and proximate result of Celebration Church's tortious conduct, and in addition to the quantifiable monetary damages K. Weems suffered, she has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

288.    Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting Celebration Church from publishing and republishing the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

289.    The public interest would be served by the entry of an injunction prohibiting Celebration Church's tortious conduct.

WHEREFORE, K. Weems demands judgment against Celebration Church awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT V
## (DEFAMATION—K. WEEMS v. TRUSTEES)

290.    K. Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

291.    The Trustees published, caused to be published, and/or encouraged or directed others to publish the false and defamatory narrative and statements described in paragraphs 114,

120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose sand had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace.

292.     The Trustees' false and defamatory narrative and statements are of and concerning K. Weems and reasonably understood to be about her.

293.     The Trustee's defamatory narrative and statements about K. Weems are false.  K. Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

294.     As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, the Trustees published, caused to be published, and/or encouraged or directed others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

295.     The Trustees' defamatory narrative and statements are defamatory *per se* because they charged that K. Weems committed crimes and tended to injure her in her trade, business or profession.

296.     In light of K. Weems's standing in the community, the nature of the statements and narrative about her, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as K. Weems, the Trustees directly and proximately caused K. Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  K. Weems is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements and narrative.

297.    K. Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Trustees' defamatory statements and narrative.

298.    Re-publication of the Trustees' false and defamatory narrative and statements by other publications, online, and through social media caused K. Weems to suffer additional damages; all of which were foreseeable.

299.    The Trustees had actual knowledge that their false and defamatory narrative and statements about K. Weems would garner significant public and media attention, which they could use (and did use) to advance and promote their own interest and reputations.

300.    The Trustees' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

301.    As a direct and proximate result of the Trustees' tortious conduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

302.    As a direct and proximate result of the Trustees' tortious conduct, and in addition to the quantifiable monetary damages she suffered, K. Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

303.    Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting the Trustees from publishing and republishing the defamatory narrative and statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

304.    The public interest would be served by the entry of an injunction prohibiting the Trustees' tortious conduct.

WHEREFORE, K. Weems demands judgment against the Trustees, awarding:

a. Compensatory and special damages in appropriate amounts to be established at trial;

b. Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c. Costs associated with this action; and

d. Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT VI
### (DEFAMATION—K. WEEMS v. WEDEKIND)

305.    K. Weems re-alleges and incorporates Paragraphs 1 through 229, as if fully stated herein.

306.    Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the false and defamatory narrative and statements described in paragraphs 114, 120, 125-128, 130-132, 134-138, 144-193, and 195, above; which did expose and had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace.

307.    Wedekind's defamatory narrative and statements are of and concerning K. Weems and reasonably understood to be about her.

308.    Wedekind's defamatory narrative and statements about K. Weems are false.  K. Weems did not engage in any of the misconduct described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

309.    As alleged in paragraphs 1-4, 26-27, 29-31, 34, 37-44, 45-92, 100-108, 113-120, and 211-229, Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

310.     Wedekind's defamatory narrative and statements are defamatory *per se* because they charged that K. Weems committed crimes and tended to injure her in her trade, business or profession.

311.     In light of K. Weems's standing in the community, the nature of the statements and narrative about her, the extent to which the narrative and statements were circulated, and the tendency of the narrative and statements to injure someone such as K. Weems, Wedekind directly and proximately caused K. Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  K. Weems is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements and narrative.

312.     K. Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Wedekind's defamatory statements and narrative.

313.     Re-publication of Wedekind's false and defamatory narrative and statements by Celebration Church, other publications, online, and through social media caused K. Weems to suffer additional damages; all of which were foreseeable.

314.     Wedekind had actual knowledge that the false and defamatory narrative and statements about K. Weems would garner significant public and media attention.

315.     Wedekind's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

316.     As a direct and proximate result of Wedekind's misconduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

317.     As a direct and proximate result of Wedekind's tortious conduct, and in addition to the quantifiable monetary damages she suffered, K. Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

318.     Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting Wedekind from publishing and republishing the defamatory narrative and statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

319.     The public interest would be served by the entry of an injunction prohibiting Wedekind's tortious conduct.

WHEREFORE, K. Weems, demands judgment against Wedekind awarding:

a.  Compensatory and special damages in appropriate amounts to be established at trial;

b.  Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c.  Costs associated with this action; and

d.  Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT VII
## (CONSPIRACY TO DEFAME—PASTOR WEEMS v. ALL DEFENDANTS)

320.     Pastor Weems re-alleges paragraphs 1 through 274, as if fully set forth herein.

321.     Defendants agreed and conspired with one another to defame Pastor Weems.

322.     In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

323.     Defendants committed overt acts in pursuance and furtherance of their conspiracy.

324.     As a direct and proximate result, Pastor Weems suffered damages, including compensatory and special damages in amounts to be proven at trial.

325.    Pastor Weems is also entitled to an injunction prohibiting the publication or republication of the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

WHEREFORE, Pastor Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT VIII
### (CONSPIRACY TO DEFAME—K. WEEMS v. ALL DEFENDANTS)

326.    K. Weems re-alleges paragraphs 1 through 229 and 275 through 319, as if fully set forth herein.

327.    Defendants agreed and conspired with one another to defame K. Weems.

328.    In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

329.    Defendants committed overt acts in pursuance and furtherance of their conspiracy.

330.    As a direct and proximate result, K. Weems suffered damages, including compensatory and special damages in amounts to be proven at trial.

331.    K. Weems is also entitled to an injunction prohibiting the publication or republication of the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and on the church's website.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a. Compensatory and special damages in appropriate amounts to be established at trial;

b. Injunctive relief prohibiting the publication or republication of the defamatory narrative and statements;

c. Costs associated with this action; and

d. Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT IX
## (INVASION OF PRIVACY AND/OR AIDING AND ABETTING INVASION OF PRIVACY—K. WEEMS v. ALL DEFENDANTS)

332. K. Weems realleges Paragraphs 1 through 229, as though fully set forth herein.

333. Defendants, in engaging in the conduct alleged in paragraphs 93-98, 113-119, 140, and 196-210, grossly invaded K. Weems' protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and Florida common law.

334. Among other things, Defendants used, exploited and publicly disclosed intimate details of K. Weems' personal life by actively participating in, providing substantial assistance to and/or ratifying or approving the public disclosure and dissemination of K. Weems' private, personal information in the Defamatory Report and Defamatory Presentation, as described in paragraphs 206-210, and/or acting in concert with and/or aiding and abetting one another to accomplish such public disclosure and dissemination, for their own economic gain and self-interests, and to harm K. Weems.

335. The unauthorized use, exploitation, disclosure and dissemination of K. Weems's private information in the Defamatory Report and Defamatory Presentation was highly offensive and objectionable to any reasonable person of ordinary sensibilities and was not of legitimate public concern.

336.    Defendants knew or should have known that the information they disclosed included private and confidential information, in which K. Weems had a reasonable expectation of privacy, and that disclosure of this information in the Defamatory Report and Defamatory Presentation would reveal private and personal things which Defendants had no right or authorization to use, disseminate, disclose or exploit and would be offensive and objectionable to a reasonable person of ordinary sensibilities.  The publication of these private facts constitutes a substantial violation of K. Weems' right of privacy.

337.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting K. Weems' private information, and/or for acting in concert with, aiding and abetting other Defendants to accomplish the same.  K. Weems had a reasonable expectation of privacy and had no knowledge of, and did not consent to, the recording or public disclosure of any such private activities.

338.    The intimate details of K. Weems' private life that were unlawfully obtained and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published and would not have been published but for the Defendants' actions of procuring, actively participating in, providing substantial assistance for, and/or ratifying or approving the use, distribution, dissemination, disclosure, and/or exploitation of such private facts, or Defendants acting in concert with, aiding and abetting such misconduct.

339.    Defendants violated K. Weems' fundamental privacy rights by the conduct alleged herein, including the intrusion into her privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the information, and/or acting in concert with, providing substantial assistance for, ratifying, approving, aiding, and/or abetting of the same, in an

unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to K. Weems and others, in conscious disregard of K. Weems' rights.

340.    Defendants acted with actual malice and reckless disregard of K. Weems' rights.

341.    As a direct and proximate result of the aforementioned acts by each of the Defendants, K. Weems has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

342.    K. Weems also is entitled to permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of her private information, and any portions thereof; as well as mandating the delivery of the same and all content derived therefrom to K. Weems.

343.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of K. Weems' rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of her private information;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

### COUNT X
### (PUBLIC DISCLOSURE OF PRIVATE FACTS AND/OR AIDING AND ABETTING PUBLIC DISCLOSURE OF PRIVATE FACTS—K. WEEMS v. ALL DEFENDANTS)

344.    K. Weems realleges Paragraphs 1 through 229, as if fully set forth herein.

345.    Defendants actively participated in, provided substantial assistance to and/or ratified, approved, aided and/or abetted the disclosure and dissemination of private facts about K. Weems, and/or Defendants acted in concert with, aided and abetted one another in connection with such public disclosure, as described in paragraphs 93-98, 113-119, 140, and 196-210, for their own economic gain and self-interests and to harm K. Weems.

346.    Defendants knew or should have known that they disclosed private and confidential information about K. Weems in which she had a reasonable expectation of privacy and were reveling private and personal things about K. Weems which said Defendants had no right or authorization to use, disseminate, disclose or exploit that would be offensive and objectionable to a reasonable person of ordinary sensibilities.  The publication of these private facts constitutes a substantial violation of K. Weems' right of privacy.

347.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the private information and/or for acting in concert with, aiding, and abetting other Defendants in committing these acts.  K. Weems had a reasonable expectation of privacy and had no knowledge of, and did not consent to, the disclosure of any such private information.

348.    Private facts about K. Weems were unlawfully obtained, and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published, and would not have been published but for Defendants' actions of procuring, actively participating in, providing substantial assistance for and/or ratifying or approving the use, distribution, dissemination, disclosure and/or exploitation of such private facts, or Defendants' actions in concert with, or acts of aiding and abetting such misconduct.

349.    The actions of the Defendants as alleged herein are highly offensive and objectionable to any reasonable person of ordinary sensibilities and are not of legitimate public concern.   K. Weems did not consent to nor authorize any use, distribution, dissemination, disclosure or exploitation of the private information, whatsoever, or of the publication of same by anyone.

350.    Defendants violated K. Weems' fundamental privacy rights by the conduct alleged herein, including the intrusion into her privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the private facts, and/or acting in concert, providing substantial assistance for, ratifying, approving, aiding and/or abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to K. Weems and others, in conscious disregard of her rights.

351.    Defendants acted with actual malice and reckless disregard for K. Weems' rights.

352.    As a direct and proximate result of the aforementioned acts by each of the Defendants, K. Weems has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety, embarrassment, humiliation, shame and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

353.    K. Weems also is entitled to permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the private information, and any portions thereof; and mandating the delivery of all originals, reproductions, copies, and portions of the same and all content derived therefrom to K. Weems.

354.     The aforementioned acts of Defendants were done intentionally or with a conscious and/or reckless disregard of K. Weems' rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.     Compensatory and special damages in appropriate amounts to be established at trial;

b.     Injunctive relief prohibiting the publication or republication of her private information;

c.     Costs associated with this action; and

d.     Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT XI
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS—K. WEEMS v. ALL DEFENDANTS)

355.     K. Weems realleges paragraphs 1 through 229, as if fully set forth herein.

356.     Defendants acted intentionally, maliciously and without justification, actively participated in, provided substantial assistance to, and/or ratified or approved misconduct that caused K. Weems' private information to be publicly disseminated and disclosed to third parties, and/or by acting in concert with, aiding and abetting in such activities, as described in paragraphs 93-98, 113-119, 140, and 196-210, when Defendants knew or should have known that K. Weems would suffer severe emotional distress as a result.

357.     The conduct by the Defendants was intentional and malicious and done for the purpose of causing or was known by Defendants to be likely to cause K. Weems to suffer humiliation, mental anguish and severe emotional distress, and was done with the wanton and reckless disregard of the consequences to K. Weems.

358.    In committing these acts, Defendants acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon K. Weems, to her detriment.

359.    Defendants acted with actual malice and reckless disregard of K. Weems' rights.

360.    As a direct and proximate result of the aforementioned acts by each of the Defendants, K. Weems has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

361.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of K. Weems' rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of her private information;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT XII
## (CONSPIRACY TO INVADE PRIVACY—K. WEEMS v. ALL DEFENDANTS)

362.    K. Weems realleges Paragraphs 1 through 229 and 332-354, as if fully set forth herein.

363.    Defendants entered into an agreement or agreements with one another as part of an ongoing scheme to commit an unlawful act or acts and/or perform lawful act(s) by unlawful means.

364.     Defendants, as more specifically set forth above, each performed overt acts in pursuance of their conspiracy.

365.     As a direct and proximate result of Defendants' acts, K. Weems suffered substantial economic and emotional injury, damage, loss and harm, anxiety, embarrassment, humiliation, shame, damage to reputation, severe emotional distress, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.     Compensatory and special damages in appropriate amounts to be established at trial;

b.     Injunctive relief prohibiting the publication or republication of her personal information;

c.     Costs associated with this action; and

d.     Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Shane B. Vogt*
Shane B. Vogt – FBN 257620
E-mail:  svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2022, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Lee D. Wedekind, III
Nelson Mullins Riley & Scarborough LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
lee.wedekind@nelsonmullins.com
allison.abbott@nelsonmullins.com

Kristin M. Ahr
Nelson Mullins Riley & Scarborough LLP
360 S. Rosemary Avenue, Suite 1410
West Palm Beach, FL 33401
kristin.ahr@nelsonmullins.com
brooke.werner@nelsonmullins.com
*Attorneys for Defendant*

/s/ Shane B. Vogt
Attorney

# EXHIBIT A



# REPORT OF INVESTIGATION
## *to*
# CELEBRATION CHURCH
# OF JACKSONVILLE, INC.

## *April 24, 2022*

Kristin Ahr
360 S. Rosemary Avenue
Suite 1410
West Palm Beach, FL 33401
T 561.366.8765
F 561.655.1109
kristin.ahr@nelsonmullins.com

Lee D. Wedekind, III
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
T 904.665.3652
F 904.665.3699
lee.wedekind@nelsonmullins.com

# **INDEX**

Page

I.   Introduction and Background ..................................................................3

    A.  Celebration's Corporate Governance ................................................4

    B.  The Authorization of this Investigation ...........................................5

II.  Findings of Fact .................................................................................6

    A.  Summary.........................................................................................6

    B.  Overview of the Weemses' Leadership of Celebration......................7

    C.  The Encounter..................................................................................9

    D.  Post-Encounter Leadership of the Church........................................10

    E.  Lack of Oversight from December 2020 to June 2021 ....................13

    F.  Improper Financial Transactions .....................................................13

        •  The Parsonage at 16073 Shellcracker Road ..........................13

        •  The Second PPP Loan ...........................................................15

        •  TurnCoin Investment ............................................................17

        •  Fraudulent mischaracterization and cancellation of
           Honey Lake Farms debt..........................................................18

        •  Misappropriation of Designated Funds..................................19

        •  BBVA/PNC Bank Termination of access to credit lines.........................19

III. Conclusions.........................................................................................20

IV. Recommendations................................................................................22

Do not admit a charge against an elder except on the evidence of two or three witnesses. As for those who persist in sin, rebuke them in the presence of all, so that the rest may stand in fear.

1 Timothy 5:19-20.

## I. INTRODUCTION AND BACKGROUND

Nelson Mullins was contacted by attorney Steven Goodspeed from The Church Lawyers (Middlebrooks & Goodspeed) in Dallas, Texas. Goodspeed had been engaged by Celebration Church of Jacksonville, Inc. ("Celebration" or the "Church") regarding the terms and structure of an agreement in which Pastor Stovall Weems ("Weems") would transition out of the Senior Pastor position at Celebration. During the course of the discussions about the transition, it was revealed by or to the Church's Board of Trustees (each a "Trustee" and collectively the "Board") that there had been certain questionable financial practices and other pastoral issues under the Weemses' leadership of the Church. In light of these claimed improprieties, in January 2022 the Board voted to suspend Stovall and Kerri Weems ("Kerri Weems") from their positions with the Church, place them in "not good standing" under the Church's bylaws, and authorize an investigation to determine the veracity of the allegations. Nelson Mullins was retained to conduct the investigation.

Our investigation included an extensive analysis of thousands of pages of documents and more than 20 interviews with current and former senior leadership team members, staff members, former Trustees, and other advisors and consultants. Each interview was conducted with witnesses who had direct, first-hand knowledge of the events discussed. These interviews were, and remain, confidential and privileged under the attorney-client communication privilege and the work product doctrine. Each witness was first provided with an *Upjohn* warning and confirmed his or her willingness to answer questions. To preserve the privileged nature of these interviews, this report does not include direct quotes or attributions of statements to specific witnesses and uses general descriptions of testimony where specificity would have revealed the source. All testimony referenced in this report was corroborated by multiple witnesses or by documentation.

We requested that Stovall and Kerri Weems be interviewed in connection with this investigation, but they refused. They have also refused to recognize the authority of the Board to undertake these actions and the legitimacy of this investigation. Despite their refusal to participate in this investigation, the Weemses have made numerous public statements to media outlets and through their social media accounts deriding the Church, the Trustees, and this investigation. Perhaps worse, although the Church's bylaws require that all disputes be submitted to mediation and arbitration pursuant to the Christian Conciliation process, the Weemses filed a civil action in state court to prevent the investigation from continuing and unwind the Board's actions. At every stage in the process, the Weemses have actively opposed and attempted to undermine the investigation process and prevent its completion.

After the investigation was completed but before this report was finalized, Weems resigned all of his positions with the Church. While the Weemses no longer hold any positions of authority at Celebration, this report is being provided to assist the Board in fulfilling its biblical and legal obligations.

## A. Celebration's Corporate Governance

Celebration is governed by the following legal authorities: (1) the Florida Not for Profit Corporation Act, FLA. STAT. § 617.01011, *et seq.*; (2) the Amended and Restated Articles of Incorporation of Celebration Church of Jacksonville, Inc. adopted on December 1, 2013 (the "Articles"); (3) the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on January 13, 2022[1]; (4) the Celebration Church Employee Handbook revised on May 3, 2021 (the "Employee Handbook"); and (5) the policies approved by the Board of Trustees (the "Board Policies").

Celebration is a board-led church. Plenary power to manage and govern the affairs of the church is vested in the Board. Articles Art. 9; Bylaws Arts. 4-6.  More specifically, the Board has the duties and responsibilities generally associated with and exercised by a corporate board and as such, is the only governing body within the Church. Bylaws § 8.01. Accordingly, all corporate power is to be exercised under the authority of the Board. *Id.* This specifically includes the management and oversight of all of the Church's financial resources, including the acquisition and disposition of Church property (both real and personal). *Id.* Even more specifically, this includes the power to buy, sell, mortgage, pledge or encumber property owned by the Church; to approve or disapprove the transfer of church assets to other tax-exempt organizations; and to approve or disapprove of any transaction unrelated to the purposes of the Church. *Id.*

The Church's executive functions and day-to-day operations are managed by the Senior Pastor. Bylaws Art. 7. The Senior Pastor serves as the President and Chief Executive Officer of the Church and is responsible to manage the Church's operations in accordance with biblical principles. Bylaws §§ 7.01-7.02. Specifically, the Senior Pastor's duties include: serving as the leader of the Church body, staff, organizations, ministries, and Trustees; defining and communicating the Church's purpose; administering and coordinating the day-to-day operations of the Church; nominating and removing Overseers; appointing, directing, and overseeing the senior leadership team; hiring, directing, and overseeing Church staff; and endeavoring to ensure that the directives and resolutions of the Trustees are carried out. *Id.* The Senior Pastor serves as the Chairman of the Board, but is not entitled to vote on board matters. Bylaws § 7.05.

---

[1] Prior to January 13, 2022, the church was governed by the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on October 25, 2015. Collectively, this report will refer to these documents as the "Bylaws." To the extent there is a material difference in their terms, the report will reference the "2015 Bylaws" or the "2022 Bylaws."

Under Florida law, the Senior Pastor owes the Church fiduciary duties. FLA. STAT. § 617.0834(1) ("An officer ... of a nonprofit organization ... is not personally liable for monetary damages to any person for any statement, vote, decision, or failure to take an action, regarding organizational management or policy by an officer or director, *unless*: (a) The officer or director breached or failed to perform his or her duties as an officer or director; and (b) The officer's or director's breach of, or failure to perform, his or her duties constitutes ... [a] transaction from which the officer or director derived an improper personal benefit, directly or indirectly...") (emphasis added). Where an officer of a nonprofit corporation breaches a duty to the corporation and derives a personal benefit for doing so, he or she is personally liable for any resulting damages.

The Senior Pastor is subject to oversight and management by the Board in matters of corporate governance and the Overseers in spiritual and disciplinary matters. Bylaws § 7.07. An investigation may be initiated at the request of two Trustees or two senior leadership team members. Bylaws § 7.07(a). The subject matters appropriate for investigation include immoral conduct, improper financial practices, or espousing improper theological beliefs. *Id*. Investigations are conducted by or on behalf of the Overseers, or if there are fewer than three Overseers, by or on behalf of the Board. Bylaws § 7.07(b), 2022 Bylaws § 7.07(c). If the Overseers or the Board determines that discipline is warranted by a majority vote, they are empowered to: assume complete authority over the Senior Pastor's ministerial activities; discipline the Senior Pastor in any way deemed necessary; remove the Senior Pastor from his leadership position; and/or terminate the Senior Pastor's employment. *Id*.

The Bylaws also authorize the Trustees to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). In responding to a complaint, the Trustees are required to "determine whether an investigation is appropriate and the form that it should take." Bylaws § 17.02(d). The Trustees must promptly investigate, and then take appropriate corrective action if warranted by the investigation. Bylaws § 17.02(e).

## B. The Authorization of this Investigation

The 2015 Bylaws provide that the Overseers have sole authority to respond to a request for investigation and impose discipline on the Senior Pastor. 2015 Bylaws § 7.07(b). The Bylaws also require that the Church have at least three Overseers in place at all times. Bylaws § 10.03. It is the sole responsibility of the Senior Pastor to nominate Overseers to the Board. *Id*. As long as disciplinary action against the Senior Pastor is being considered, the composition of the Overseers cannot be changed. Bylaws § 10.04. Under the 2015 Bylaws if the Senior Pastor failed to nominate Overseers but an investigation had been requested, there was no mechanism to investigate or impose discipline on the Senior Pastor. Therefore, the Senior Pastor could avoid oversight or discipline by not nominating any Overseers. This was the predicament faced by the Church in January 2022.

In 2021, the Church had only two Overseers: Dino Rizzo and John Siebeling. When both resigned in September 2021, Weems did not nominate any replacements. Then, on January 4, 2022, Trustees Fitz Powell, Kevin Cormier, and Marcus Rowe requested that an investigation be conducted into potentially improper financial practices engaged in by Weems. In response, on January 4 Weems stated that only the Overseers could conduct an investigation. On January 5, Weems attempted to nominate three Overseers: Sean Yost, Scott Volk, and Bryan Schwartz. Of these, Mr. Volk and Mr. Schwartz were not ordained pastors at respected congregations and were therefore unqualified to serve as Overseers. Bylaws § 10.01. Even if they were qualified, though, the Board could not approve them because the composition of the Overseers could not be changed due to the pending request for an investigation. Bylaws § 10.04. Ultimately, the Board did not approve the nominated Overseers.

On January 13, 2022, the Board approved the 2022 Bylaws, which added Sections 7.07(c) and 7.08(e). Section 7.07(c) provides that if there are fewer than three Overseers, the Board shall assume the roles and responsibilities of the Overseers. This is consistent with the Board's historical authority to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). Thereby fully empowered to act by the Bylaws, on January 13 the Board voted to initiate an investigation and to retain Nelson Mullins to conduct it and to report its findings to the Board. This report comprises the findings of our investigation.

Our investigation was performed according to biblical principles. Pursuant to the Board's directive, this investigation was designed and intended to reveal and report the truth of what has transpired at Celebration under the Weemses' leadership.

## II. <u>FINDINGS OF FACT</u>

### A. Summary

Stovall Weems engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the Church. Weems failed to present these transactions to the Board for its review and approval, which he was required to do pursuant to Florida law and the Church's governing documents. When three Trustees sought to question these transactions, Weems retaliated by attempting to remove them. Although Weems has a duty to cooperate with this investigation, he has refused to do so.

Since at least 2019, the Weemses' leadership of the Church has been inconsistent and unbiblical. Stovall Weems failed to effectively define and communicate the Church's purpose, failed to properly administer the organization, nominate Overseers, oversee Church staff, and ensure the Board's directives were met effectively and efficiently. Instead, Weems has acted erratically, creating a culture of confusion and disarray that has hindered the Church from effectively carrying out its mission. Worse, Weems' leadership was marked by rampant spiritual and emotional abuse, including manipulation, a profound sense of self-importance and selfishness, superiority and entitlement,

overbearing and unreasonable demands on employees' time, a lack of accountability or humility, demands of absolute loyalty and compliance, public shaming and humiliation of employees, coercion, shunning, gaslighting, and the creation of a culture of fear and intimidation in which it was not safe to disagree with Weems.

Each of the above actions constitutes a separate and independent basis justifying the discipline of the Senior Pastor, up to and including ratifying the removal of his leadership position and termination of his employment.

## B. Overview of the Weemses' Leadership of Celebration

Stovall and Kerri Weems, among others, founded Celebration in 1998. Since then, the Church has experienced great success and growth. Celebration currently has 3,745 active members across five campuses. Celebration's early years were marked by the development of a small, tight-knit group of people who helped grow and lead the Church in the following years. Many of Celebration's current senior leadership team and employees have been with the Church since the early 2000s. Their knowledge and understanding of the Church, and their first-hand witness of its—and the Weemses'—transformation, provide a valuable resource that was extremely helpful in our investigation. The Church's deep bench of longtime volunteers, employees, leaders, and pastors is among its greatest assets and a key reason for the Church's growth and success.

Stovall Weems, as the Church's longtime Senior Pastor, was responsible for the management of the Church's day-to-day operations and the spiritual leadership of the Church. Witnesses described troubling details regarding the Weemses' dysfunctional leadership style. Many of these issues were detailed in a Baseline Report prepared in November 2020 by Network King, a firm hand-picked and commissioned by the Weemses.

The Network King report identified six key ways in which the Church required improvement: leadership challenges, poor communication, limited planning and forecasting, lack of professional development, ineffective governance, and lack of focus on performance. The Network King report found that the root cause of most of these issues was a failure of executive leadership. The report summarized its observations of the Church's executive leadership as including:

- Unclear vision, mission, and values
- Unclear leader intent
- Lack of developed strategy
- Inconsistent guidance
- Centralized decision-making
- Rampant hasty decision-making
- Lack of delegation
- Micromanagement
- General lack of order
- Poor expectation management

- Lack of accountability
- Lack of effective change management
- Lack of mentorship
- No leadership development program
- Personal activities impacting professional operations

The Network King report stands as a scathing indictment of the Weemses' failed leadership at Celebration. We understand that another, even more critical report specifically addresses the Weemses, but we have been unable to obtain a copy of it.

The single word used most frequently to describe Stovall Weems was: *narcissist*. When asked to describe Weems, nearly every witness we interviewed used that specific word. Many witnesses detailed, often through tears, instances when Weems personally belittled and humiliated them for minor mistakes or misunderstanding Weems' inconsistent and confusing directives. Worse, Weems created and fostered an environment in which he was not subject to accountability. Many witnesses explained that the first rule to survive at the Church was "We don't say no to Pastor." In this way, he was able to impose his will on others to force their compliance with his demands. Neither Stovall nor Kerri Weems served anyone at the Church. Instead, they demanded others to serve them – the antithesis of Christ-like personal sacrifice and service to others.

The Weemses' demands blurred the line between employees' personal and professional lives to such an extent there was no apparent difference between them. Total responsibility to serve the Weemses in all ways at all times was required to appease them. Witnesses described many examples of overbearing demands. One witness reported that she had to beg for one hour per day in which she was not required to immediately respond to text messages. Another reported that Weems instructed an employee to drive to a liquor store late at night and deliver a bottle of bourbon to his house because he did not want to be seen purchasing liquor. Another recounted that an employee was instructed to purchase a car for Weems and deliver it to his house. After the employee delivered the car as demanded, Weems told him to find his own ride home. Many witnesses described intense personal anguish and pain caused by working for the Weemses. One witness expressed an inability to return to church—any church—due to crippling anxiety and panic attacks.

Weems considered himself a visionary and frequently presented big ideas in conceptual form. These ideas were often simultaneously complex and unfinished, and Weems suffered an inability to fully explain his plans or how they should be implemented. Weems constantly wanted to execute on these plans during their conceptual phase without further analysis or refinement. When employees presented feasibility issues that would limit or prevent these ideas from being successful, they were ridiculed as "dreamkillers." Employees who raised questions or challenged ideas were quickly removed from the decision-making process. Many witnesses described knowing whether they were "in" or "out" of Weems' circle of trust by whether Weems would communicate—or not—with that person. Shunning, isolating, and discarding were common tactics used to punish anyone who expressed a disagreement or concern with an idea presented by Weems.

As the Church became more successful, the lavishness of the Weemses' lifestyle also increased. Private charter flights to exotic vacations, a full "house staff" to assist in maintaining their mansions, and personal assistants required to attend to the Weemses' every demand all became trappings of their life. The Weemses' compensation, staff, travel and expense accounts comprised approximately 10% of the Church's total revenue. Despite these privileges, the Weemses treated people who attended to them as inferior. In 2020, Weems drafted a document that instructed the Weemses' assistants on how they were to keep each of the three residences so the Weemses would not be bothered during their transitions between homes. This was so the Weemses could focus on their "spiritual acuity" at all times.

The Weemses also posted schedules of their required food and beverage service so that their employees would know how to serve them food and drinks. These instructions included specifications on the times of day the items were to be provided, exact requirements for each item, and a description of how the items were to be presented to the Weemses (on "real dishes" presented on a "serving tray"). These instructions—similar to over-the-top green room riders required by celebrities—reflected the Weemses' immense entitlement and self-importance.

Since Tim Timberlake was brought into Celebration in 2019, the Weemses were seldom seen at the church. Many witnesses could not remember the last time that the Weemses worshiped at Celebration.

### C. The Encounter

The Encounter was a pivotal moment in Celebration's history. At a Seder service on Passover in 2018, Stovall Weems claimed he had a personal encounter with Jesus Christ. Guest pastor Paul Wilbur, a messianic Jew, came to explain and reenact the ancient Hebrew/Judaic Passover Supper at Celebration. At the event, Weems became transfixed on a piece of bread he was holding. Weems stared blankly at the bread for a long time and then appeared bewildered, stunned, and speechless as his attention turned back to the events on the stage.

A video of the service at which the Encounter took place can be viewed here: https://youtu.be/swkJMbGuKa4?list=PLCIFIIMQrbfC1yXgmCMaZP0xMEbbwEHKv&t=6566

Afterward, Weems described that he had seen Jesus on the stage and been transported to the Last Supper the night before Jesus' crucifixion. Weems claims that he was physically with Jesus Christ and that Jesus spoke with him, directing his attention to the future and what Christ wanted for the Weemses to accomplish on Earth. Weems described Jesus as having dark hair, a white robe, and speaking in Hebrew.

This report takes no position on whether the Encounter was real. There is no way to confirm or deny—legally or factually—what was going on inside Weems' mind during that time. There is evidence that the Weemses were under a tremendous amount of personal stress during this time that may have impacted Weems' mindset that evening.

Regardless, after the Encounter things changed dramatically. Most witnesses recall that event was the catalyst for dramatically changed behaviors and actions by the Weemses in the following years.

Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed. People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

Over time, Weems used the Encounter and subsequent messages flowing from the Encounter to justify his authority and maintain control of the Church. If questioned, Weems would respond by saying that this direction was given to him by God through the Encounter. As a result, staff were not permitted to challenge Weems for fear of being accused of disobeying God's will. Because only Weems experienced the Encounter, only he had the ability to interpret its meaning and direction. When employees would ask questions or express confusion over Weems' directions, he would tell them that he had only disclosed part of the vision God deposited in him through the Encounter. In that way, Weems exercised control by claiming a secret divine revelation.[2]

One of the results of the Encounter was Weems' decision to "give away" the Church to Pastor Tim Timberlake – without first telling Kerri Weems, the board, senior leadership team, or the staff. The absence of any communication or coordination surrounding this handoff was the genesis for an extremely disorganized and disruptive transition, which ultimately culminated in this investigation.

## D. Post-Encounter Leadership of the Church

For months following the Encounter, Weems struggled to form words or communicate effectively. He was disengaged in business meetings with staff and cried frequently. The Encounter magnified his demand for control and his defiance to authority or accountability. Anyone—trustees, pastors, senior leaders, employees—who did not serve the needs of the Weemses was replaced. Anyone who challenged Weems' judgment or control of the Church was removed. He and Kerri Weems frequently repeated that the Board reported to them, not the other way around. Weems said that while he may have needed Overseers during his younger years, he no longer felt he did.

Most staff members described 2019 as a very confusing time. Weems struggled to process the Encounter and every decision was based on a disjointed understanding of its meaning. Weems would make decisions and demand they be carried out immediately, only to later reverse himself. Communications were sporadic and no clear chain of command was established. Weems often shuffled employees between positions

---

[2] The concept that a special knowledge of God is made available only to a select few is a tenet of Gnosticism condemned for centuries as heretical.

depending on who was in his inner circle. Because employees had poorly-described job functions and were constantly being reassigned, many employees did not know who was in charge of the Church's operations. Weems also began making strange comments about sweeping changes he intended for the Church's ministry. At one point he suggested the Church needed to learn how to function without any buildings.

During this time, Weems also appeared physically and mentally unwell. Members of the senior leadership team were so concerned that they convened a meeting to confront him about his mental health and the impact it was having on the Church's ability to function effectively. Although the meeting seemed to have gone well initially, it ultimately had no lasting impact and Weems continued to spiral.

In 2020, COVID-19 led to a complete disruption of the Church's operations. This disruption was further complicated by a plan developed by Weems to "separate the business from the Church" by spinning off several ministries as stand-alone corporate entities. In September 2020, the Board was comprised of Erik Sharpe, Jonathan MacArthur, Todd Gicalone, and Fitz Powell, all of whom were experienced Trustees who had served since at least 2014. At the September 2020 Board meeting, Weems presented his vision for a massive restructuring plan that included a request to seek a new $14 million credit line to fund proposed real estate transactions and capital improvements. The proposed reorganization was a confusing and poorly-conceived plan. Weems never fully grasped the complexities involved, continually changed direction, and failed to adequately explain his concepts to the board, senior leaders, and staff. Recognizing major issues with this reorganization, the board required that Weems provide it with business plans for each entity to be spun off. Some business plans were provided at the October 2020 Board meeting, but the Board later concluded they were of limited value.

Friction between Weems and the Board grew. At the December 2020 Board meeting, the Trustees came prepared to engage in an extensive conversation about Weems' reorganization plan. While the Church's revenues were 15% short of projections, Weems advocated for the Board to approve $14 million in new debt. When the Trustees questioned him about the details of his plan, and specifically how the Church would service the new debt, Weems responded with frustration and indignance. Instead of providing a business case to support his plan, Weems demanded that the Trustees either immediately approve the plan without further questions or end the meeting. When the Trustees asked for a 5-minute break to ease the tension, the Weemses walked out.[3]

---

[3] The debt proposal was approved in the Weemses' absence, but the property purchase ultimately fell through because of a title defect that Weems had failed to identify. This is another example of problems that arose as a result of Weems' rushed decision-making and failure to adequately analyze issues before demanding execution (and God's grace in saving the Church from critical mistakes).

At the end of 2020, the Church's longstanding CFO Lisa Stewart left to become the CEO of Honey Lake Clinic. In the interim, Devan Schanding served as interim CFO. Stewart's permanent replacement, Tojy Thomas, joined in January 2021 but left by May because of extremely poor treatment by Weems. Thomas came from an accounting background with substantial nonprofit experience at the University of Chicago and Woodman Valley Chapel in Colorado Springs. One of Thomas's primary tasks was to implement the separation of these ministries (AWKNG, Honey Lake Farms) from the Church. To accomplish this, Thomas needed to understand what these entities were designed to do, what purpose they historically served, what assets and liabilities "belonged" to each entity, and who each entity would employ going forward.

Thomas learned that Weems had a poor understanding of the Church's organizational structure and financial position, including its revenues and expenses. As things progressed, Thomas became increasingly concerned about the Church's cash burn rate and how it was depleting the Church's cash balance. The Church's financial statements reflect that its cash balance dropped from $9 million in October 2020 to $6 million in December 2020, then to $2 million in March/April 2021.  Weems never had a grasp of where the money went and would oscillate between negligent attention to financial details and aggressive demands for voluminous information. He could never keep all of the parts straight in his head, and he blamed this confusion on the providers of the information (Stewart, Thomas, Cormier).

After Thomas left, Weems did not fill the position of CFO but instead relied on the HR director to assume some of the responsibilities of that position. The turmoil of the reorganization combined with the turnover of accounting and financial professionals resulted in a highly disorganized and dysfunctional enterprise in early-to-mid 2021.

Part of this confusion was caused by Weems' failure to recognize and treat the different entities as distinct. Although Weems was a full-time employee of the Church, paid by the Church and responsible for raising funds on behalf of the Church, he would obtain donations and then direct them to be deposited into other entities' accounts. This was problematic because it was never clear that any entity was capable of financial success independent of the Church. This has been proven out by AWKNG's demise. When AWKNG was spun off and Weems was responsible for its management outside of the Church's control, it immediately failed. In January 2022, AWKNG fired all but a handful of its staff – 40 employees were let go. Demonstrating a lack of empathy and obliviousness to the workers who had just lost their jobs, Weems asked the fired employees to pray for Kerri Weems because of how hard it had been on her. Kerri Weems did not attend the meeting at which the employees were laid off.

### E.  Lack of Oversight from December 2020 to June 2021

In the aftermath of the December 2020 board meeting, Trustees Sharpe, MacArthur, and Gicalone determined that they could no longer continue to serve on the Board if the Senior Pastor refused to accept any accountability or governance. In February 2021, Mr. Sharpe, Mr. MacArthur, and Mr. Gicalone resigned as Trustees. In their resignation letter, they outlined a series of concerns they had with the direction of the Church, including its over-accumulation of debt, financial commitments made without board authorization, conflicts of interest between organizations, the absence of the minimum number of required Overseers, an organizational complexity that made transparency and oversight difficult, and poor staff reviews and accountability. These concerns mirrored those set forth in the Network King report issued a few months prior. The letter restated the Board's policy requiring Board approval of any expenditure over $5,000 not previously included in an approved budget. Their resignation left Mr. Powell and Mr. Rowe as the Trustees.

The Church's annual report filed in March 2021 lists the current Trustees as directors, but despite the near-complete turnover of the Board and the serious management concerns raised by Network King and the outgoing Trustees, Weems did not call a meeting of the Board from December 10, 2020 to June 3, 2021—nearly six months. During this period, Weems acted without any accountability or oversight by the Board or the Overseers. This was also the period during which the CFO role transitioned three times, from Stewart to Schanding to Thomas. Uncoincidentally, it was during this period when all of the improper financial transactions occurred. Weems eliminated or ignored all oversight, accountability, and compliance mechanisms that acted to limit his discretion and acted unilaterally.

### F.  Improper Financial Transactions

#### 1.  The Parsonage at 16073 Shellcracker Road

In January 2020, at the request of the Weemses, the Church agreed to purchase a parsonage for the Weemses to use as their personal residence. The property, located at 4504 Hunterston Lane in Glen Kernan Golf and Country Club, was purchased on January 14, 2020 for $1,295,000. The Board approved the purchase and executed a resolution authorizing Lisa Stewart to execute the necessary documents to close on the purchase. In connection with the Church's purchase, Celebration and the Weemses entered into a Parsonage Use License Agreement setting forth the rights of the parties with respect to the use of the parsonage. The Agreement related only to the Hunterston property, and would terminate on the date the Weemses abandoned the parsonage as their primary residence.

At some point thereafter, the Weemses decided they wanted to relocate. In connection with the Church's sale of the Hunterston parsonage, Weems asked if he could keep the proceeds from the sale. He was told by Tojy Thomas that because the Church owned the property, he was not entitled to the sale proceeds. The Hunterston parsonage

was sold on June 4, 2021 for $1,475,000.  Weems never presented the potential sale of the Hunterston parsonage to the Board. Celebration kept the sale proceeds.

Meanwhile, on February 9, 2021 Weems Group, LLC—of which Weems is the sole member and its manager—purchased a single-family residence at 16073 Shellcracker Road on the Nassau River.  The property was listed for sale at $875,000 but Weems Group bought it for $855,000. The appraisal obtained by Weems Group in connection with financing its purchase of the property valued it at $890,000 as of December 23, 2020.

Four months after Weems Group purchased the Shellcracker property, Weems Group sold it to the Church for $1,286,863.30—an increase of $431,386, more than 50% more than Weems Group had just paid. The Church's purchase of the Shellcracker property was not disclosed to or approved by the Board. The closing documents were signed by Weems on behalf of both Weems Group and the Church. The Church financed the purchase of the property by drawing on its line of credit from its primary lender, Wesleyan Investment Foundation ("WIF"). Weems executed a Mortgage Modification and Spreading Agreement encumbering the Shellcracker parsonage and increasing the Church's debt by $1,300,000.

To induce WIF to advance funds to the Church under its line of credit, Weems represented to WIF that the Board had approved the purchase of the Shellcracker property when it hadn't. What Weems claimed as authorization was the Board's prior approval of the purchase of the Hunterston parsonage, not the Shellcracker property. The failure to provide that important information was a material misrepresentation, an Event of Default under the Church's Promissory Note to WIF, and a breach of the Church's Business Loan Agreement with WIF.

Weems did not commission an appraisal of the property on behalf of Celebration when his company sold it to the Church, and the Duval County Property Appraiser has determined that the sale is not a "qualified" sale under the Florida Administrative Code (meaning it was determined not to be an arm's length transaction).  An email sent by Sarah Mannion, the attorney that closed the sale, indicates that the Weems Group kept the $430,000 profit it made on the sale of the property.

The purchase of the Hunterston parsonage and the purchase of the Shellcracker property were fundamentally different in several ways:

- The Board was presented with the purchase of the Hunterston property and authorized the transaction via formal board action evidenced by a written resolution but was never presented with or authorized the purchase of the Shellcracker property.
- Lisa Stewart was authorized to execute the documents necessary to close on the Hunterston property purchase, but Weems was never similarly authorized to purchase the Shellcracker property.
- The Church and the Weemses entered into a license agreement for the use of the Hunterston property, but not the Shellcracker property.

- The Hunterston property was brought from and sold to unrelated third parties, while the Shellcracker property was bought from a company owned by Weems (and through which he obtained a huge financial windfall).

The Weemses have claimed that the Shellcracker purchase was merely a "transfer" of the parsonage from one location to another. But the resolution authorizing the Hunterston acquisition and the license use agreement both make clear that they specifically related only to that particular property and were not a blank check for the Weemses to buy and sell properties as they saw fit.

The Weemses have attempted to justify keeping the profit the Weems Group realized by flipping the Shellcracker property because the money was needed for "improvements." The Weemses' claim that these funds were used to improve the property appears to be entirely false. There is no evidence that any improvements have been made to the property, and certainly not improvements worth $430,000. First, the Building Department's records do not show that any permit applications have been filed for work to be performed at the Shellcracker property, and no notices of commencement have been recorded in the Duval County official records. Second, and more damning, when asked by the Weemses' realtor whether any renovations would be made to the property after closing for the purpose of obtaining homeowner's insurance, Weems sent an email stating: "No renovations after closing."

But even if that justification were true, it ignores the Weemses' direct and undisclosed conflict of interest in the transaction, the material misrepresentation made by Weems to WIF, and the absence of authority to purchase and mortgage property on behalf of the Church without notice to or approval by the Board. Standing alone, the improprieties and misrepresentations surrounding this transaction are sufficient grounds to disqualify the Weemses from serving as pastors and constitute a valid basis for their immediate termination.

### 2.  The Second PPP Loan

In 2020, the Church applied for and was granted a loan under the federal Paycheck Protection Program ("PPP"). The first PPP loan was in the amount of $2.2 million and was used by the Church to pay staff salaries. Weems at different times asked if the Church could use the loan proceeds for general operating expenses or for other ministries. In response, it was explained that the loan could only be used for specific purposes, because the loan rules required that the funds be used only for very specific purposes. Ultimately, the loan was used for its required purposes, each expenditure was documented, and the Church sought, and was granted, forgiveness of the loan. Lisa Stewart, the Church's then-CFO, managed the process.

In April 2021, the Church applied for a second PPP Loan. Tojy Thomas was the Church's CFO when the second PPP loan application was submitted, which included the following certification:

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; *I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*

Thomas had resigned by the time the loan was approved and $1,106,400 in loan proceeds were received by the Church. Freed from the financial and accounting professionals that ensured Weems complied with the law, the Church's financial records indicate that *none* of the loan proceeds from the second PPP loan were used for permitted expenditures. Instead, Weems directed that the funds be spent on the following:

- $100,000 to invest in TurnCoin on behalf of the Church,[4] a digital security with which fans can "invest" in "talented people in all passions of life; sport, esports, music, art, entertainment and more."

- $856,033.33 was transferred to Honey Lake Farms's First Citizens Missions Account,[5] of which $150,000 was used to buy TurnCoin on behalf of Honey Lake Farms and $150,000 was used to buy TurnCoin on behalf of AWKNG.

- $100,000 was transferred to the Church's Missions account to cover a transfer of $100,000 to an unrelated church ministry in Nevada.[6]

In total, $500,000 of PPP loan proceeds were used to purchase TurnCoin. All of these transactions were directed by Weems without notice to or authorization by the Board, which has sole authority to "to approve or disapprove the transfer of church assets to other tax-exempt organizations" pursuant to Bylaws § 8.01. Weems knew, based on his experience with the first PPP loan, that these expenses were not permitted under the PPP loan program and would result in the Church's inability to seek forgiveness of the loan. The result of these transfers was an increase of the Church's debt by more than $1 million.

---

[4] TurnCoin is discussed in greater detail in Section II(B)(3).

[5] Weems is the President of Honey Lake Farms, Inc. and therefore transferred these funds as an "advance" on giving based on inflated revenue projections that would not be hit, resulting in a significant overpayment.

[6] The transferred funds were used to purchase TurnCoin at Weems' direction, as discussed in Section II(B)(3) below.

Weems also derived a direct financial benefit from these transactions. As discussed
in greater detail below, Weems bundled these funds with others so that he could qualify
as a "legacy investor" in TurnCoin. Legacy investors were entitled to be paid back before
other investors and were entitled to 10% interest on their investment.

3.  TurnCoin

TurnCoin is a digital security designed by TheXchange Pte. Ltd, a Singapore
private company. TurnCoin would be used by fans to buy or sell "non-fungible
cryptographic tokens" known as VirtualStax Cards that depict public figures such as
athletes, movie stars, musicians, and other celebrities. By selling VirtualStax Cards,
celebrities would be able "to monetize their social media following."

A private placement memorandum issued by the company in March 2021 includes
the following disclaimer:

> THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK AND IS
> SUITABLE ONLY FOR PERSONS WHO CAN BEAR THE ECONOMIC
> RISK FOR AN INDEFINITE PERIOD OF TIME AND WHO CAN AFFORD
> TO LOSE THEIR ENTIRE INVESTMENT. FURTHERMORE, INVESTORS
> MUST UNDERSTAND THAT THIS INVESTMENT IS ILLIQUID AND IS
> EXPECTED TO CONTINUE TO BE ILLIQUID FOR AN INDEFINITE
> PERIOD OF TIME. NO PUBLIC MARKET EXISTS FOR THE SECURITIES,
> AND NO PUBLIC MARKET IS EXPECTED TO DEVELOP FOLLOWING
> THIS OFFERING. SEE "RISK FACTORS."

Celebration's cash reserves in mid-2021, when Weems decided to invest in
TurnCoin, were substantially diminished and the Church could not afford to bear such a
high risk for an indefinite period. Moreover, as mentioned above, the Board—not
Weems—had authority to approve these decisions. Nevertheless, Weems acted
unilaterally without presenting these proposed expenditures to the Board for its review
and approval. As stated in the private placement memorandum, these funds are illiquid
and cannot currently be accessed or utilized by the Church or entities.

Weems was also deceptive about the TurnCoin investments. When he first
approached another pastor and friend about investing in TurnCoin, The pastor declined.
Needing to bundle investors to qualify as a legacy investor, Weems decided to fund the
pastor's investment through Celebration. Weems directed the Church's accounting staff
to transfer $100,000 to the pastor's ministry account from the Church's Heart for the
House Pentecost Offering. Heart for the House is a giving campaign in which
Celebration's members are encouraged to make sacrificial, meaningful offerings to fund
initiatives to transform lives through Jesus Christ. Weems told Celebration staff that the
funds were to be used for a revival. Later, the pastor told the Church that Weems had
directed him to invest the funds in TurnCoin as part of Weems' legacy investment group,
which he did. To date, the funds have not been used for a revival.

Weems was also deceptive in how he showed these investments on Celebration's financial statements. In an email dated May 5, 2021, Weems instructed the Church's Human Resources Director that the TurnCoin investment be shown "as a cash currency on the books just like Bitcoin would.". But TurnCoin is a digital security, <u>not</u> a cryptocurrency. TurnCoin is currently illiquid and cannot be sold on a market – it is not a "cash currency." Identifying TurnCoin as a currency on Celebration's balance sheets is a fundamental mischaracterization of the asset.

In total, $500,000 in Church debt was invested in TurnCoin, but only $100,000 was invested in the Church's name. The remaining $400,000 was given away to other entities that Weems controlled (Honey Lake Farms, AWKNG) or people with whom he had a personal relationship.

None of these transactions were presented to or authorized by the Board, as required by the Church's articles of incorporation, bylaws, and Board policies regarding expenditures.[7] Furthermore, high-risk investments such as these are inconsistent with the Church's investment risk profile and its duty to serve as a faithful steward of sacrificially-donated funds.

4. Fraudulent mischaracterization and cancellation of Honey Lake Farms debt

Over the years, the Church made intercompany loans for the development and operation of Honey Lake Farms. These loans included a loan of $1,366,471.43 for the construction of a lodge building at the Farms. For years, this amount had been reflected as an asset of the Church (Accounts Receivable) and a liability of the Farms (Accounts Payable).

In January 2021, Weems inquired as to whether this loan should be forgiven by the Church. When it was explained to him that a consequence of the loan's forgiveness would be a negative impact to the Church's financial position, he determined that was not in the Church's best interest and dropped the matter.

In August 2021, Weems applied for a loan from First Citizens Bank on behalf of Honey Lake Farms, Inc. In connection with the application, HLF submitted financial statements to support its loan application. These statements, consistent with their historical characterizations, showed this as a liability of HLF. However, in order to improve HLF's financial statement to increase the likelihood of the loan's approval, Weems unilaterally determined to recharacterize this as an asset of the Farms, not a liability. He first told First Citizens that Honey Lake Clinic actually owed this money to the Farms. When the bank attempted to clarify this with the Clinic, the Clinic declined to recognize it as a legitimate receivable (because it wasn't).

---

[7] In 2020, the Board imposed a limit of $5,000 on expenditures that did not require Board authorization. Any expenses over this amount were required to be approved by the Board. The Board imposed this policy to prevent situations like this.

When the bank officer questioned the legitimacy of this entry (describing it as improper accounting), Weems expressed exasperation that the bank would attempt to confirm the information on the financial statements submitted by HLF ("I can't believe she asked [redacted] to do that."). The officer and Celebration's bookkeeping staff had a call in which the officer informed Celebration that the manipulation of financial statements in connection with a loan application was extremely serious and improper. To "resolve" the issue, Weems directed the Church's accountants to write off the $1.3 million debt on the Church's books so that it could be deleted as a liability on HLF's books. At Weems' direction, HLF's financial statements were revised to reflect this $1.3 million improvement in its financial position. All of this was done without board authorization at a time when the Church's financial position had eroded significantly.

The fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application violates Florida and federal law.

### 5.  Misappropriation of Designated Funds

At Weems' direction, AWKNG solicited members of the Church to donate funds that AWKNG was to use for missions trips. Ultimately, AWKNG received donations in the amount of $29,486.75 that were solicited and designated for missions trips. After AWKNG was shut down in January 2021, Celebration was required to assume responsibility for conducting those mission trips. Despite Celebration's repeated requests, AWKNG has refused to transfer these designated funds to the Church or to account for their whereabouts. It therefore appears that AWKNG used these designated funds for an improper and unauthorized purpose.

### 6.  BBVA/PNC Bank Termination of access to credit lines

For years, the Church used BBVA Compass (now PNC Bank) as its primary bank and lender. In 2019, BBVA issued Celebration a credit line of $2 million that was linked to 75 credit cards that church staff used for operational expenses across the Church's many locations. This credit line was contingent on Celebration maintaining a balance of $2 million in deposits at the bank. Credit cards were also issued to AWKNG and Honey Lake Farms, Inc. Those entities' cards were not linked to the Church's operating accounts.

In January 2021, Weems directed new CFO Tojy Thomas to switch banks from BBVA to First Citizens Bank. This decision was unilaterally made without regard to the impact that this move could have on the Church's credit line. After the banking change, a minimal amount of money remained with BBVA but the church still depended on the credit cards to fund operational expenses and manage its cash balance.

On November 8, 2021, PNC notified the church that AWKNG (operated by Weems) had missed a payment. This default triggered the bank to evaluate all related accounts. PNC's evaluation led to a reduction in Celebration's commercial credit card limit from $2 million to $200,000 because Celebration had moved its operating account. Because the Church averaged $400,000 per month in credit card expenses, the reduction in this credit line significantly limited the Church's ability to fund operations and almost wiped out all

its cash reserves. The Church attempted to acquire new commercial credit cards with First Citizens but they were only willing to offer a $70,000 limit given the significant financial losses the church had suffered to date. On April 8, 2022, PNC announced that it was revoking Celebration's credit line in its entirety, leaving the Church in a cash-only position.

The loss of the Church's access to short-term credit has resulted in a significant impact to its operations. This was caused by Weems' depletion of the Church's cash reserves through the above unauthorized transactions and his hasty and poor decision-making.

## III.  CONCLUSIONS

Through the actions described above, Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office. He has brought Celebration to the brink of insolvency. The current amount of Accounts Receivable that remain outstanding and unpaid is $3,389,835 (excluding the embezzled profit from the Shellcracker sale). But for the steadying leadership of Pastor Tim Timberlake and the actions of Celebration's Board, Celebration would have likely already failed as an institution.

Spiritually, the Weemses have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture:

> Watch out for false prophets. They come to you in sheep's clothing, but inwardly they are ferocious wolves. By their fruit you will recognize them. Do people pick grapes from thornbushes, or figs from thistles? Likewise, every good tree bears good fruit, but a bad tree bears bad fruit. A good tree cannot bear bad fruit, and a bad tree cannot bear good fruit. Every tree that does not bear good fruit is cut down and thrown into the fire. Thus, by their fruit you will recognize them.

> Matthew 7:15-20.

> To the elders among you, I appeal as a fellow elder and a witness of Christ's sufferings who also will share in the glory to be revealed: Be shepherds of God's flock that is under your care, watching over them—not because you must, but because you are willing, as God wants you to be; not pursuing dishonest gain, but eager to serve; not lording it over those entrusted to you, but being examples to the flock.

> 1 Peter 5:1-3.

Whoever aspires to be an overseer desires a noble task. Now the overseer is to be above reproach, faithful to his wife, temperate, self-controlled, respectable, hospitable, able to teach, not given to drunkenness, not violent but gentle, not quarrelsome, not a lover of money. He must manage his own family well and see that his children obey him, and he must do so in a manner worthy of full[a] respect. (If anyone does not know how to manage his own family, how can he take care of God's church?)

1 Timothy 3:1-5.

An elder must be blameless, faithful to his wife, a man whose children believe and are not open to the charge of being wild and disobedient. Since an overseer manages God's household, he must be blameless—not overbearing, not quick-tempered, not given to drunkenness, not violent, not pursuing dishonest gain. Rather, he must be hospitable, one who loves what is good, who is self-controlled, upright, holy and disciplined. He must hold firmly to the trustworthy message as it has been taught, so that he can encourage others by sound doctrine and refute those who oppose it.

Titus 1:6-9.

The biblical standards for leadership in the church are high, and Stovall and Kerri Weems have demonstrated a longstanding pattern of falling short of this measure. Pastors, employees, trustees, friends, co-workers, and independent consultants have attempted to address these failings without success. Worse, the Weemses are completely unrepentant. Instead of accepting this investigation with humility, they have sought to attack and undermine it, by making statements to the news media and on their social media accounts and by attempting to seize control of the Church through the court system. Stovall Weems has repeatedly disparaged the Church's leaders and has refused to accept any responsibility for the trauma and profound hurt that he and Kerri Weems have caused to many. Through their actions, Stovall and Kerri Weems have disqualified themselves from pastoral leadership.

1 Timothy 5:19-20 lays out a process by which the Weemses are to be rebuked, and the Church's bylaws provide for a process of conciliation that Celebration should follow. Additionally, the Church should consider taking the following recommended actions.

## IV.    <u>RECOMMENDATIONS</u>

1.    Accept the resignation of Stovall Weems and Kerri Weems as employees of Celebration effective April 15, 2022 without further compensation or benefits.

2.    Pursue the permanent removal of Stovall Weems and Kerri Weems from any positions of authority relating to the Church, Honey Lake Farms, Honey Lake Clinic, and AWKNG.

3.    Require Stovall Weems and Kerri Weems to account for and return to the Church all funds misappropriated by them.

4.    Remove Stovall Weems and Kerri Weems from the parsonage and sell the property.

5.    Require Northstream Management, Habitat for Wholeness, Honey Lake Farms and AWKNG to repay all receivables and loans made by the Church to those entities.

6.    Report these findings to the appropriate authorities to determine whether criminal charges should be brought.

7.    Engage in the Christian Conciliation Process outlined in Celebration's bylaws.