# Exhibit D

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

CHARLES STOVALL WEEMS, IV
and KERRI WEEMS

      Plaintiffs,

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., KEVIN
CORMIER, MARCUS ROWE,
ANGELA CANNON,
JACOB WILLIAM, and
LEE WEDEKIND, III,

      Defendants.

_____/

Case No.: 2022-CA-1047

Division: CV-F

## THIRD AMENDED COMPLAINT[1]

Plaintiffs, Charles Stovall Weems, IV ("Pastor Weems") and Kerri Weems ("K. Weems"),

sue Defendants, Celebration Church of Jacksonville, Inc. ("Celebration Church"), Kevin Cormier

("Cormier"), Marcus Rowe ("Rowe"), Angela Cannon ("Cannon"), Jacob William ("William"),

and Lee Wedekind, III ("Wedekind"), and allege as follows:

## INTRODUCTION

1.    This case presents an egregious example of what happens when a group of people

decide to weaponize false information to inflict harm on others and advance their personal and

---

[1] Plaintiffs file this Third Amended Complaint with full reservation of rights and as directed and pursuant to the rulings set forth in the Court's September 28, 2022 *Order Granting Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction and Dismissing Plaintiffs' Claims*. By filing this Third Amended Complaint, Plaintiffs do not intend to waive or abandon their rights to argue in any subsequent appeal that the claims as alleged in their Second Amended Complaint were proper and not barred by the Ecclesiastical Abstention Doctrine, nor waive or abandon any of the positions asserted in their filings and arguments opposing Defendants' Motions to Dismiss the Second Amended Complaint.

economic agendas, demonize someone they target as an adversary, and deceive the public into believing salacious lies are true.

2.      Defendants created, leaked to the press, and published on Celebration Church's public website a "Report of Investigation" containing knowingly false and defamatory statements accusing Plaintiffs of committing crimes and violating secular laws, as well as disclosing surreptitiously obtained private mental health information concerning K. Weems.

3.      Defendants launched their outrageous, libelous attack *after* Pastor Weems had already resigned and completely separated himself and his family from Celebration Church.

4.      Pastor Weems and K. Weems bring this action to clear their names; establish the falsity of the scandalous narrative and statements Defendants published about them; recover damages for the substantial injuries Defendants' lies and tortious conduct have caused; and prevent Defendants' continued publication of defamatory falsehoods and private information about Plaintiffs.

## PARTIES, JURISDICTION, AND VENUE

5.      This is an action for equitable relief and damages in excess of $30,000.00, exclusive of interest, costs, and attorneys' fees.

6.      Plaintiff, Pastor Weems, is an individual who lives, works, and serves his community in Duval County, Florida.

7.      Plaintiff, K. Weems, is an individual who lives, works, and serves her community in Duval County, Florida.

8.      Defendant, Celebration Church, is a Florida not for profit corporation with its principal place of business at 9555 R.G. Skinner Parkway, Jacksonville, Florida 32256.

9.      Defendant, Cormier, is an individual residing in Duval County, Florida.

10.     Defendant, Rowe, is an individual residing in Duval County, Florida.

11.     Defendant, Cannon, is an individual residing in Orange County, Florida.

12.     Defendant, William, is an individual residing in Palm Beach County, Florida.

13.     Defendant, Wedekind, is an individual residing in Duval County, Florida.

14.     Defendants, directly and/or through employees, agents, authorized representatives, co-conspirators, and/or other persons, entities, and/or representatives acting under their management, direction, and/or control, engaged in numerous contacts in and with the state of Florida associated with the planning, creation, and publication of the false and defamatory statements and private information about Plaintiffs upon which this action is based, which were published to, accessible to, and accessed and viewed by residents in Duval County.

15.     Venue is proper in Duval County, Florida pursuant to Chapter 47, Florida Statutes, because Celebration Church's principal place of business is in Duval County, Florida, one or more individual Defendants reside in Duval County, Florida, and the causes of action alleged herein accrued in Duval County, Florida.

16.     Based on the facts alleged throughout this Amended Complaint, this Court has personal jurisdiction over each of the Defendants under Section 48.193, *Florida Statutes*, because they each personally or directly, in concert with one another, and/or through an employee, agent, co-conspirator, and/or other person or entity acting under their management, direction, and/or control, engaged in one or more of the following acts:

      A.     committing tortious acts within the state of Florida;

      B.     committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

      C.     operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in Florida;

    D.    engaging in substantial and not isolated activity within the state of Florida; and/or

    E.    engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and engaging in overt acts in furtherance of that conspiracy within the state of Florida.

17.    Based on the facts alleged throughout this Amended Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy Due Process under the United States Constitution because Defendants:  (1) engaged in substantial and not isolated activity within and directed at the state of Florida; (2) reside, maintain an office, and/or conducted business through agents located in the state of Florida; and/or (3) committed or conspired to commit intentional torts expressly aimed at Florida, the effects and harms of which were calculated to and did cause injury within the state of Florida.  Accordingly, each of the Defendants could and should have reasonably anticipated being sued in the state of Florida for the claims alleged herein.

18.    At all times material to this action, Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them acted within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture relationship with one another.  At all times material to this action, each Defendant's acts, failures to act, and misconduct alleged herein were known to, authorized, approved, and/or ratified by the other Defendants; and such acts, omissions, and misconduct were engaged in by the Defendants in concert or active participation with one another or to aid or abet one another.

19.    Defendants' actions, failures to act, and misconduct alleged herein produced and/or substantially contributed to producing the damages, injuries and harms Plaintiffs suffered, for

which they seek recovery and redress through this action; which injuries and harms occurred in the state of Florida and the greatest effects of which were suffered within the state of Florida.

20.    All conditions precedent to the filing and maintenance of this action have occurred, have been performed, and/or have been waived.

21.    The causes of action alleged herein accrued after Pastor Weems and K. Weems were no longer employed by or members of Celebration Church and are based on tortious misconduct that does not directly implicate matters of church governance or pastoral discipline. Accordingly, the Ecclesiastical Abstention Doctrine and Christian Alternative Dispute Resolution provision of Celebration Church's Bylaws do not apply to the claims alleged herein, and this Court has subject matter over this action.

**COMMON FACTUAL ALLEGATIONS TO ALL COUNTS**

22.    On April 15, 2022, Pastor Weems tendered his resignation as Senior Pastor, President, Chief Executive Officer, Chairman and member of the Board of Trustees, and registered agent of Celebration Church, terminated Plaintiffs' church membership, and legally separated them from the Church.

23.    On or about April 24, 2022, Defendants created, leaked to the press, and published their "Report of Investigation to Celebration Church of Jacksonville, Inc." (the "Defamatory Report"), attached hereto as **Exhibit A**, which was drafted by Wedekind and finalized in consultation with Cormier, Cannon, Rowe, and William (the "Trustees"), with every intention of making the report public.

24.    The Defamatory Report was prepared to convict Pastor Weems and K. Weems in the court of public opinion and is accordingly filled with blatantly false statements accusing Plaintiffs of committing crimes and violating secular laws, despite the fact that Defendants were

fully aware the statements are false and are refuted by documents and information that Defendants deliberately omitted from the defamatory Report.

<strong><u>The False and Defamatory Statements[2]</u></strong>

25.     The Defamatory Report contains the following false and defamatory statements:

(a)     The "Summary" section of the "Findings of Fact" [Defamatory Report at p. 6] falsely states that Stovall Weems "engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the church";

(b)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses made "material misrepresentations" to Wesleyan Investment Foundation ("WIF") and "embezzled profit" from the sale of the 16073 Shellcracker Road;

(c)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not use any of the proceeds from Celebration Church's "Second PPP Loan" for permitted expenditures, but rather to purchase TurnCoin[3] and that "these expenses were not permitted under the PPP loan program and would result in the church's inability to seek forgiveness of the loan," as well as that Weems "was also deceptive about the TurnCoin investments…[and]…how he showed these investments on Celebration's financial statements" and "derived a direct financial benefit from these transactions";

(d)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 18-19] falsely states that the Weemses engaged in

---

[2] Pursuant to the Court's September 28, 2022 Order and rulings therein, and subject to the reservation of rights set forth in Footnote 1 above, the false and defamatory statements identified herein are limited to those portions of the Defamatory Report that falsely accuse Plaintiffs of violating secular laws and/or engaging in misconduct that do not require consideration of discipline, faith, internal church organization, or ecclesiastical rule, custom, or law. This should not, however, be construed as an admission that any other portions of the Defamatory Report are true. Plaintiffs explicitly deny all accusations against them in the Defamatory Report.

[3] TurnCoin is a digital security that was brought to the attention of the Celebration Church by Cannon, who is an investor and a member of the advisory board for TheExchange, Inc. (the USA member of TurnCoin Global). Investigation of this SEC regulated digital security disclosed solid management and a platform in which it is anticipated that celebrities participating would donate part of their revenues back to charities with missions similar to the church's missions outreach – Heart of Compassion Foundation, the Heart of Sport Foundation and the Chen Foundation.

the "Fraudulent Mischaracterization and Cancellation of Honey
Lake Farms Debt" and falsely accuses them of "manipulation of
financial statements in connection with a loan application" and the
"fraudulent manipulation of HLF's financial statements and
unauthorized debt forgiveness in connection with a loan application
[which] violates Florida and federal law";

(e)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p. 19] falsely states that the Weemses engaged in the
"Misappropriation of Designated Funds" donated to AWKNG for
an "improper and unauthorized purpose";.

(f)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p.p. 19-20] falsely states that Pastor Weems
"unilaterally" changed banks in early 2021, causing the revocation
of the church's credit line and that Weems "deplet[ed] the church's
cash reserves";.

(g)     The "CONCLUSIONS" section of the Defamatory Report [Id. at p.
20] falsely states that "Stovall Weems violated the law by breaching
his fiduciary duties to Celebration, committing fraud, unjustly
enriching himself at the expense of the Church, and failing to meet
the fiduciary duties and standards of care required by his office" and
"brought Celebration to the brink of insolvency";

(h)     The "RECOMMENDATIONS" section of the Defamatory Report
[Id. at p. 22] falsely states that Plaintiffs should be "require[d] to
account for and return to the Church all funds misappropriated" and
that that Plaintiffs should be reported "to the appropriate
authorities'" to determine whether "criminal charges should be
brought."

**<u>The Widespread Publication and Dissemination of the Defamatory Report</u>**

26.     On or shortly before April 24, 2022, the Trustees authorized and approved the

widespread public dissemination of the Defamatory Report prepared by Wedekind, including by

leaking it to the press and posting it on Celebration Church's public website (NOT through internal

Celebration Church communication channels with its Members).

27.     In fact, Celebration Church updated its homepage on its website for the general

public to include a conspicuous new menu option titled "Report" alongside the existing, common

menu items such as "About," "Locations," and "Watch":



28.    The "Report" menu option leads to a page titled "Weems Investigation":



29.    This page contains a "Statement" that, among other things, falsely reiterates many of the same false and defamatory statements outlined in paragraph 25, above, and lists the same 7 "action steps" included within the "RECOMMENDATIONS" section of the Defamatory Report, among them requiring Pastor Weems and K. Weems "to account for and return to the Church all

funds misappropriated by them" and "report these findings to the appropriate authorities to determine whether criminal charges should be brought" even though Pastor Weems and K. Weems never engaged in any criminal conduct or misappropriated any funds from the Church.

30.    The bottom of Celebration Church's "Weems Investigation" page contains a hyperlink[4] that leads to a pdf of the Defamatory Report, which visitors are free to view and download:



---

[4]https://celebrationchurch.sharepoint.com/sites/CelebrationPublicsite/Shared%20Documents/Forms/AllItems.aspx?id=%2Fsites%2FCelebrationPublicsite%2FShared%20Documents%2FWeems%20investigation%20report%20%284%2D26%2D2022%29%2Epdf&parent=%2Fsites%2FCelebrationPublicsite%2FShared%20Documents&p=true&ga=1

31.    Defendants knew and intended when they conspired to create and post the Defamatory Report and accompanying Statement on Celebration Church's website page that the Defamatory Report and Defendants' false and defamatory statements would be widely viewed, disseminated publicly, and reported on in the press.

32.    Defendants also alerted members of the press to the posting of the Defamatory Report on Celebration Church's website and/or provided them a copy of the Defamatory Report so that it would be widely reported on in the media.

### The Defamatory Presentation

33.    On or before April 25, 2022, the Trustees also participated in, authorized, and approved the creation and publication a pre-recorded video of Wedekind (the "Defamatory Presentation") making the same false and defamatory statements that are in the Defamatory Report (which are described in Paragraph 25, above).  This video was played at a staff meeting attended by numerous church employees and volunteers.

34.    Wedekind pre-recorded this video at the request of the Trustees and knew that it was intended for public dissemination and would be published to third-parties.

### Violations of K Weems's Privacy

35.    The Defamatory Report also disclosed K. Weems's private, personal medical information and the substance of her private interactions and conversations occurring within the privacy of K. Weems's home.

36.    Some of the information disclosed in the Defamatory Report about K. Weems was obtained by Gabriele Sullivan who, at the direction and/or with the approval of the Defendants, surreptitiously and illegally accessed K. Weems's private communications and marriage

counseling sessions, thereafter disclosing this private information to the Trustees and/or Wedekind

so that it could be published in the Defamatory Report.

37.    This reprehensible, outrageous attack on K. Weems in the Defamatory Report

included disclosing the following:

> Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed. People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

38.    The assertion that K. Weems has a "history of clinical depression" could only have

been based on medical records and other private mental health information surreptitiously and

illegally obtained by Defendants.

39.    The assertions that K. Weems was "distraught and overwhelmed by her husband's

behavior" and "suicidal as a result of the Encounter and Weems's behavior following it" are not

only false, but yet another clear violation of her privacy because they disclose information based

on statements from supposed witnesses with non-disclosure agreements who only could have

obtained this information from K. Weems's private interactions and conversations in a private

setting (*i.e.*, her home).

40.    At the time the Defamatory Report was created, leaked to the press, and published

to the general public and others, Defendants were aware that K. Weems is especially sensitive,

susceptible, and/or vulnerable to injury caused by mental distress.  Thus, their tortious acts were

undertaken despite knowledge of K. Weems's emotional vulnerability and are particularly

heartless, flagrant, and outrageous.

41.     Defendants' acts were also committed with a heightened degree of outrageousness because Defendants asserted and abused a position of power, apparent or actual, to damage K. Weems.

## Actual Malice

42.     Defendants published the above-described false and defamatory statements with actual knowledge of their falsity or reckless disregard for their truth or falsity.

43.     Defendants had actual knowledge that the statements they published about Plaintiffs were untrue and deliberately published the statements knowing they were false and defamatory.

44.     At the very least, Defendants recklessly disregarded the truth of the defamatory statements they published, caused to be published, and/or encouraged to be published about Plaintiffs, or purposefully avoided the truth about the false and defamatory statements about Plaintiffs.

45.     Defendants had a predetermined narrative about Plaintiffs and, as part of that preconceived narrative, Defendants deliberately accused Plaintiffs of committing crimes and emphasized the criminal nature of the false charges against Plaintiffs to evoke hatred and contempt toward them.

46.     Defendants also intentionally omitted exculpatory facts of which they were aware because those facts disproved the false criminal accusations Defendants were already determined to and did publish.

47.     Defendants' personal and economic motivations, as well as their bias against and ill-will toward Plaintiffs, led them to ignore facts of which they were aware and facts which were

easily and readily available that refuted and disproved the false criminal accusations about Plaintiffs.

48.     Defendants knew the true facts undermined their predetermined narrative about Plaintiffs, so they consciously avoided, disregarded, and deliberately engaged in efforts to conceal and omit evidence that contradicted their preconceived narrative.

49.     The false and defamatory statements about Plaintiffs were published in the context of an official attorney "investigation," which by its very nature and under the circumstances was not urgent and which Defendants were under no legitimate obligation or time pressure to publish before fact-checking.

50.     Despite the seriousness of the false charges they leveled against Plaintiffs, Defendants failed to take basic steps to investigate and test the accuracy of their false and defamatory narrative and statements, while consciously ignoring and purposefully omitting facts of which they were aware that disproved the false accusations Defendants leveled against Plaintiffs.

51.     Defendants engaged in highly unreasonable conduct constituting an extreme departure from the professional standards ordinarily adhered to by responsible people in their fields.

52.     Defendants' failure to investigate, purposeful avoidance of, and deliberate distortion of the truth was compounded by the inherent improbability of and obvious reasons to doubt the veracity of the false claims made against Plaintiffs, as well as the obvious lack of credibility and known biases of the supposed "witnesses" and the claims they made about Plaintiffs. Defendants all were aware of facts refuting the claims published in the Defamatory Report and Defamatory Presentation.

53.     Moreover, the nature and severity of the false and defamatory statements about Plaintiffs and the facts and information of which Defendants were aware at the time of publication were such that Defendants did, in fact, entertain serious doubts as to the truth of the statements, leading to the publication of the statements with a high degree of awareness of their probable falsity.

54.     Even a cursory review of the facts surrounding the events described in the Defamatory Report revealed the falsity of the charges made against Plaintiffs.  Defendants conducted, were aware of, and had available to them research, information, and documents which showed or easily would have showed that the claims being made about Plaintiffs were untrue.

55.     However, Defendants deliberately or recklessly turned a blind eye to the truth and did not ensure that what they were representing as fact about Plaintiffs was correct.

56.     Each of the Defendants entertained serious doubts as to the truth of the false and defamatory statements about Plaintiffs, but nevertheless fabricated, directed, and/or encouraged others to make, collaborated with each other to publish, published, and proliferated these false and defamatory statements about Plaintiffs.

## <u>COUNT I</u>
### (DEFAMATION--PASTOR WEEMS v. CELEBRATION)

57.     Pastor Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated herein.

58.     Celebration Church published, caused to be published, and/or directed or encouraged others to publish the following false and defamatory statements, which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace:

> (a)     The "Summary" section of the "Findings of Fact" [Defamatory Report at p. 6] falsely states that Stovall Weems "engaged in a series of improper and unauthorized financial transactions through which

15

he personally benefitted, either directly or indirectly, at the expense of the church";

(b)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses made "material misrepresentations" to Wesleyan Investment Foundation ("WIF") and "embezzled profit" from the sale of the 16073 Shellcracker Road;

(c)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not use any of the proceeds from Celebration Church's "Second PPP Loan" for permitted expenditures, but rather to purchase TurnCoin and that "these expenses were not permitted under the PPP loan program and would result in the church's inability to seek forgiveness of the loan," as well as that Weems "was also deceptive about the TurnCoin investments…[and]…how he showed these investments on Celebration's financial statements" and "derived a direct financial benefit from these transactions";

(d)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 18-19] falsely states that the Weemses engaged in the "Fraudulent Mischaracterization and Cancellation of Honey Lake Farms Debt" and falsely accuses them of "manipulation of financial statements in connection with a loan application" and the "fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application [which] violates Florida and federal law";

(e)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 19] falsely states that the Weemses engaged in the "Misappropriation of Designated Funds" donated to AWKNG for an "improper and unauthorized purpose";.

(f)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at p.p. 19-20] falsely states that Pastor Weems "unilaterally" changed banks in early 2021, causing the revocation of the church's credit line and that Weems "deplet[ed] the church's cash reserves";.

(g)     The "CONCLUSIONS" section of the Defamatory Report [Id. at p. 20] falsely states that "Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office" and "brought Celebration to the brink of insolvency";

16

(h)    The "RECOMMENDATIONS" section of the Defamatory Report
[Id. at p. 22] falsely states that Plaintiffs should be "require[d] to
account for and return to the Church all funds misappropriated" and
that that Plaintiffs should be reported "to the appropriate
authorities'" to determine whether "criminal charges should be
brought."

59.    Celebration Church's false and defamatory narrative and statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

60.    Celebration Church's defamatory statements about Pastor Weems are false. Pastor Weems did not engage in any of the misconduct described in paragraph 58, above.

61.    As alleged in paragraphs 42-56, Celebration Church published, caused to be published, and/or directed or encouraged others to publish the defamatory narrative and statements knowing that they were false or with reckless disregard for their truth or falsity.

62.    Celebration Church's defamatory statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

63.    In light of Pastor Weems's standing in the community, the nature of the statements about him, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Pastor Weems, Celebration Church directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future. Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements.

64.    Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Celebration Church's false and defamatory statements.

65.    Re-publication of Celebration Church's false and defamatory statements in other publications, online, and through social media, caused Pastor Weems to suffer additional damages; all of which were foreseeable.

66.    Celebration Church had actual knowledge that the false and defamatory statements about Pastor Weems would garner significant public and media attention, which it could use (and did use) to advance and promote its own interests and reputation.

67.    Celebration Church acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

68.    As a direct and proximate result of Celebration Church's tortious conduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

69.    As a direct and proximate result of Celebration Church's tortious conduct, and in addition to the quantifiable monetary damages Pastor Weems suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

70.    Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting Celebration Church from publishing and republishing the defamatory statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

71.    The public interest would be served by the entry of an injunction prohibiting Celebration Church's tortious conduct.

WHEREFORE, Pastor Weems demands judgment against Celebration Church awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT II

### (DEFAMATION—PASTOR WEEMS v. TRUSTEES)

72.    Pastor Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated herein.

73.    The Trustees published, caused to be published, and/or encouraged or directed others to publish the following false and defamatory statements, which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace:

(a)    The "Summary" section of the "Findings of Fact" [Defamatory Report at p. 6] falsely states that Stovall Weems "engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the church";

(b)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses made "material misrepresentations" to Wesleyan Investment Foundation ("WIF") and "embezzled profit" from the sale of the 16073 Shellcracker Road;

(c)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not use any of the proceeds from Celebration Church's "Second PPP Loan" for permitted expenditures, but rather to purchase TurnCoin and that "these expenses were not permitted under the PPP loan program and would result in the church's inability to seek forgiveness of the loan," as well as that Weems "was also deceptive about the TurnCoin investments…[and]…how he showed these investments on Celebration's financial statements" and "derived a direct financial benefit from these transactions";

(d)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 18-19] falsely states that the Weemses engaged in the "Fraudulent Mischaracterization and Cancellation of Honey Lake Farms Debt" and falsely accuses them of "manipulation of financial statements in connection with a loan application" and the "fraudulent manipulation of HLF's financial statements and

19

unauthorized debt forgiveness in connection with a loan application [which] violates Florida and federal law";

(e)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 19] falsely states that the Weemses engaged in the "Misappropriation of Designated Funds" donated to AWKNG for an "improper and unauthorized purpose";.

(f)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p.p. 19-20] falsely states that Pastor Weems "unilaterally" changed banks in early 2021, causing the revocation of the church's credit line and that Weems "deplet[ed] the church's cash reserves";.

(g)    The "CONCLUSIONS" section of the Defamatory Report [Id. at p. 20] falsely states that "Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office" and "brought Celebration to the brink of insolvency";

(h)    The "RECOMMENDATIONS" section of the Defamatory Report [Id. at p. 22] falsely states that Plaintiffs should be "require[d] to account for and return to the Church all funds misappropriated" and that that Plaintiffs should be reported "to the appropriate authorities'" to determine whether "criminal charges should be brought."

74.    The Trustees' false and defamatory statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

75.    The Trustee's defamatory statements about Pastor Weems are false.  Pastor Weems did not engage in any of the misconduct described in paragraph 73, above.

76.    As alleged in paragraphs 42-56, the Trustees published, caused to be published, and/or encouraged or directed others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

77.    The Trustees' defamatory statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

78.     In light of Pastor Weems's standing in the community, the nature of the statements about him, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Pastor Weems, the Trustees directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future. Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements.

79.     Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Trustees' defamatory statements.

80.     Re-publication of the Trustees' false and defamatory statements by other publications, online, and through social media caused Pastor Weems to suffer additional damages; all of which were foreseeable.

81.     The Trustees had actual knowledge that their false and defamatory statements about Pastor Weems would garner significant public and media attention, which they could use (and did use) to advance and promote their own interests and reputations.

82.     The Trustees' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

83.     As a direct and proximate result of the Trustees' misconduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

84.     As a direct and proximate result of the Trustees' tortious conduct, and in addition to the quantifiable monetary damages he suffered, Pastor Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

85.     Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting the Trustees from publishing and republishing the defamatory statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

86.     The public interest would be served by the entry of an injunction prohibiting the Trustees' tortious conduct.

WHEREFORE, Pastor Weems demands judgment against the Trustees awarding:

a.     Compensatory and special damages in appropriate amounts to be established at trial;

b.     Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.     Costs associated with this action; and

d.     Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT III
### (DEFAMATION—PASTOR WEEMS v. WEDEKIND)

87.     Pastor Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated herein.

88.     Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the following false and defamatory statements, which did expose and had the tendency to expose Pastor Weems to hatred, contempt, ridicule and disgrace:

(a)     The "Summary" section of the "Findings of Fact" [Defamatory Report at p. 6] falsely states that Stovall Weems "engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the church";

(b)     The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses made "material misrepresentations" to Wesleyan Investment

22

Foundation ("WIF") and "embezzled profit" from the sale of the
16073 Shellcracker Road;

(c)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not
use any of the proceeds from Celebration Church's "Second PPP
Loan" for permitted expenditures, but rather to purchase TurnCoin
and that "these expenses were not permitted under the PPP loan
program and would result in the church's inability to seek
forgiveness of the loan," as well as that Weems "was also deceptive
about the TurnCoin investments…[and]…how he showed these
investments on Celebration's financial statements" and "derived a
direct financial benefit from these transactions";

(d)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at pp. 18-19] falsely states that the Weemses engaged in
the "Fraudulent Mischaracterization and Cancellation of Honey
Lake Farms Debt" and falsely accuses them of "manipulation of
financial statements in connection with a loan application" and the
"fraudulent manipulation of HLF's financial statements and
unauthorized debt forgiveness in connection with a loan application
[which] violates Florida and federal law";

(e)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p. 19] falsely states that the Weemses engaged in the
"Misappropriation of Designated Funds" donated to AWKNG for
an "improper and unauthorized purpose";.

(f)     The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p.p. 19-20] falsely states that Pastor Weems
"unilaterally" changed banks in early 2021, causing the revocation
of the church's credit line and that Weems "deplet[ed] the church's
cash reserves";.

(g)     The "CONCLUSIONS" section of the Defamatory Report [Id. at p.
20] falsely states that "Stovall Weems violated the law by breaching
his fiduciary duties to Celebration, committing fraud, unjustly
enriching himself at the expense of the Church, and failing to meet
the fiduciary duties and standards of care required by his office" and
"brought Celebration to the brink of insolvency";

(h)     The "RECOMMENDATIONS" section of the Defamatory Report
[Id. at p. 22] falsely states that Plaintiffs should be "require[d] to
account for and return to the Church all funds misappropriated" and
that that Plaintiffs should be reported "to the appropriate
authorities'" to determine whether "criminal charges should be
brought."

89.     Wedekind's defamatory statements are of and concerning Pastor Weems and reasonably understood to be about Pastor Weems.

90.     Wedekind's defamatory statements about Pastor Weems are false.  Pastor Weems did not engage in any of the misconduct described in paragraph 88, above.

91.     As alleged in paragraphs 42-56, Wedekind created, authored, published, caused to be published, and/or encouraged or directed others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

92.     Wedekind's defamatory statements are defamatory *per se* because they charged that Pastor Weems committed crimes and tended to injure him in his trade, business or profession.

93.     In light of Pastor Weems's standing in the community, the nature of the statements about him, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as Pastor Weems, Wedekind directly and proximately caused Pastor Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  Pastor Weems is also entitled to recover damages for the costs associated with repairing his reputation and/or correcting the defamatory statements.

94.     Pastor Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Wedekind's defamatory statements.

95.     Re-publication of Wedekind's false and defamatory statements by Celebration Church, other publications, online, and through social media caused Pastor Weems to suffer additional damages; all of which were foreseeable.

96.     Wedekind had actual knowledge that the false and defamatory statements about Pastor Weems would garner significant public and media attention.

97.     Wedekind's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Pastor Weems, or in blatant disregard of the substantial likelihood of causing him harm.

98.     As a direct and proximate result of Wedekind's misconduct, Pastor Weems is entitled to compensatory and special damages in amounts to be proven at trial.

99.     As a direct and proximate result of Wedekind's tortious conduct, and in addition to the quantifiable monetary damages Pastor Weems suffered, he has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

100.     Based upon the facts alleged herein, Pastor Weems has the clear legal right to the entry of an injunction prohibiting Wedekind from publishing and republishing the defamatory statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

101.     The public interest would be served by the entry of an injunction prohibiting Wedekind's tortious conduct.

WHEREFORE, Pastor Weems demands judgment against Wedekind awarding:

a.     Compensatory and special damages in appropriate amounts to be established at trial;

b.     Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.     Costs associated with this action; and

d.     Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

<u>**COUNT IV**</u>

**(DEFAMATION--K. WEEMS v. CELEBRATION)**

102.    K. Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated
herein.

103.    Celebration Church published, caused to be published, and/or directed or
encouraged others to publish the following false and defamatory statements, which did expose and
had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace:

(a)    The "Summary" section of the "Findings of Fact" [Defamatory
Report at p. 6] falsely states that Stovall Weems "engaged in a series
of improper and unauthorized financial transactions through which
he personally benefitted, either directly or indirectly, at the expense
of the church";

(b)    The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses
made "material misrepresentations" to Wesleyan Investment
Foundation ("WIF") and "embezzled profit" from the sale of the
16073 Shellcracker Road;

(c)    The "Improper Financial Transactions" section of the Defamatory
Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not
use any of the proceeds from Celebration Church's "Second PPP
Loan" for permitted expenditures, but rather to purchase TurnCoin
and that "these expenses were not permitted under the PPP loan
program and would result in the church's inability to seek
forgiveness of the loan," as well as that Weems "was also deceptive
about the TurnCoin investments…[and]…how he showed these
investments on Celebration's financial statements" and "derived a
direct financial benefit from these transactions";

(d)    The "Improper Financial Transactions" section of the Defamatory
Report [Id. at pp. 18-19] falsely states that the Weemses engaged in
the "Fraudulent Mischaracterization and Cancellation of Honey
Lake Farms Debt" and falsely accuses them of "manipulation of
financial statements in connection with a loan application" and the
"fraudulent manipulation of HLF's financial statements and
unauthorized debt forgiveness in connection with a loan application
[which] violates Florida and federal law";

(e)    The "Improper Financial Transactions" section of the Defamatory
Report [Id. at p. 19] falsely states that the Weemses engaged in the

"Misappropriation of Designated Funds" donated to AWKNG for an "improper and unauthorized purpose";.

(f)  The "Improper Financial Transactions" section of the Defamatory Report [Id. at p.p. 19-20] falsely states that Pastor Weems "unilaterally" changed banks in early 2021, causing the revocation of the church's credit line and that Weems "deplet[ed] the church's cash reserves";.

(g)  The "CONCLUSIONS" section of the Defamatory Report [Id. at p. 20] falsely states that "Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office" and "brought Celebration to the brink of insolvency";

(h)  The "RECOMMENDATIONS" section of the Defamatory Report [Id. at p. 22] falsely states that Plaintiffs should be "require[d] to account for and return to the Church all funds misappropriated" and that that Plaintiffs should be reported "to the appropriate authorities'" to determine whether "criminal charges should be brought."

(a)  The assertions that K. Weems was "distraught and overwhelmed by her husband's behavior" and "suicidal as a result of the Encounter and Weems's behavior following it."

104.  Celebration Church's false and defamatory statements are of and concerning K. Weems and reasonably understood to be about her, particularly given the "Recommendations" section of the Defamatory Report, which states that K. Weems should be "require[d] to account for and return to the Church all funds misappropriated" and that K. Weems should be "reported to the appropriate authorities" to determine whether "criminal charges should be brought."

105.  Celebration Church's defamatory statements about K. Weems are false.  K. Weems did not engage in any of the misconduct described in paragraph 103, above.

106.  As alleged in paragraphs 42-56, Celebration Church published, caused to be published, and/or directed or encouraged others to publish the defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

107.    Celebration Church's defamatory statements are defamatory *per se* because they charged that K. Weems committed crimes and tended to injure her in her trade, business or profession.

108.    In light of K. Weems's standing in the community, the nature of the statements about her, the extent to which the statements were circulated, and the tendency of the statements to injure someone such as K. Weems, Celebration Church directly and proximately caused K. Weems to suffer significant damages, including substantial reputational harm which is ongoing in nature and will be suffered in the future.  K. Weems is also entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statements.

109.    K. Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of Celebration Church's false and defamatory statements.

110.    Re-publication of Celebration Church's false and defamatory statements in other publications, online, and through social media, caused K. Weems to suffer additional damages; all of which were foreseeable.

111.    Celebration Church had actual knowledge that the false and defamatory statements about K. Weems would garner significant public and media attention, which it could use (and did use) to advance and promote its own interests and reputation.

112.    Celebration Church acted knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

113.    As a direct and proximate result of Celebration Church's tortious conduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

114.    As a direct and proximate result of Celebration Church's tortious conduct, and in addition to the quantifiable monetary damages K. Weems suffered, she has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

115.    Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting Celebration Church from publishing and republishing the defamatory statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

116.    The public interest would be served by the entry of an injunction prohibiting Celebration Church's tortious conduct.

WHEREFORE, K. Weems demands judgment against Celebration Church awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT V
### (DEFAMATION—K. WEEMS v. TRUSTEES)

117.    K. Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated herein.

118.    The Trustees published, caused to be published, and/or encouraged or directed others to publish the following false and defamatory statements, which did expose sand had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace:

(a)    The "Summary" section of the "Findings of Fact" [Defamatory Report at p. 6] falsely states that Stovall Weems "engaged in a series of improper and unauthorized financial transactions through which

he personally benefitted, either directly or indirectly, at the expense of the church";

(b)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses made "material misrepresentations" to Wesleyan Investment Foundation ("WIF") and "embezzled profit" from the sale of the 16073 Shellcracker Road;

(c)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not use any of the proceeds from Celebration Church's "Second PPP Loan" for permitted expenditures, but rather to purchase TurnCoin and that "these expenses were not permitted under the PPP loan program and would result in the church's inability to seek forgiveness of the loan," as well as that Weems "was also deceptive about the TurnCoin investments…[and]…how he showed these investments on Celebration's financial statements" and "derived a direct financial benefit from these transactions";

(d)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 18-19] falsely states that the Weemses engaged in the "Fraudulent Mischaracterization and Cancellation of Honey Lake Farms Debt" and falsely accuses them of "manipulation of financial statements in connection with a loan application" and the "fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application [which] violates Florida and federal law";

(e)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 19] falsely states that the Weemses engaged in the "Misappropriation of Designated Funds" donated to AWKNG for an "improper and unauthorized purpose";.

(f)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p.p. 19-20] falsely states that Pastor Weems "unilaterally" changed banks in early 2021, causing the revocation of the church's credit line and that Weems "deplet[ed] the church's cash reserves";.

(g)    The "CONCLUSIONS" section of the Defamatory Report [Id. at p. 20] falsely states that "Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office" and "brought Celebration to the brink of insolvency";

30

(h)     The "RECOMMENDATIONS" section of the Defamatory Report
[Id. at p. 22] falsely states that Plaintiffs should be "require[d] to
account for and return to the Church all funds misappropriated" and
that that Plaintiffs should be reported "to the appropriate
authorities'" to determine whether "criminal charges should be
brought."

(i)     The assertions that K. Weems was "distraught and overwhelmed by
her husband's behavior" and "suicidal as a result of the Encounter
and Weems's behavior following it."

119.    The Trustees' false and defamatory narrative and statements are of and concerning
K. Weems and reasonably understood to be about her, particularly given the "Recommendations"
section of the Defamatory Report, which states that K. Weems should be "require[d] to account
for and return to the Church all funds misappropriated" and that K. Weems should be "reported to
the appropriate authorities" to determine whether "criminal charges should be brought."

120.    The Trustees' defamatory statements about K. Weems are false.  K. Weems did not
engage in any of the misconduct described in paragraph 118, above.

121.    As alleged in paragraphs 42-56 the Trustees published, caused to be published,
and/or encouraged or directed others to publish the defamatory statements knowing that they were
false or with reckless disregard for their truth or falsity.

122.    The Trustees' defamatory statements are defamatory *per se* because they charged
that K. Weems committed crimes and tended to injure her in her trade, business or profession.

123.    In light of K. Weems's standing in the community, the nature of the statements and
narrative about her, the extent to which the statements were circulated, and the tendency of the
statements to injure someone such as K. Weems, the Trustees directly and proximately caused K.
Weems to suffer significant damages, including substantial reputational harm which is ongoing in
nature and will be suffered in the future.  K. Weems is also entitled to recover damages for the
costs associated with repairing her reputation and/or correcting the defamatory statements.

124. K. Weems also suffered humiliation, mental anguish, emotional distress, and embarrassment as a direct and proximate result of the Trustees' defamatory statements.

125. Re-publication of the Trustees' false and defamatory statements by other publications, online, and through social media caused K. Weems to suffer additional damages; all of which were foreseeable.

126. The Trustees had actual knowledge that their false and defamatory statements about K. Weems would garner significant public and media attention, which they could use (and did use) to advance and promote their own interest and reputations.

127. The Trustees' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

128. As a direct and proximate result of the Trustees' tortious conduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

129. As a direct and proximate result of the Trustees' tortious conduct, and in addition to the quantifiable monetary damages she suffered, K. Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

130. Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting the Trustees from publishing and republishing the defamatory statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

131. The public interest would be served by the entry of an injunction prohibiting the Trustees' tortious conduct.

WHEREFORE, K. Weems demands judgment against the Trustees, awarding:

a.  Compensatory and special damages in appropriate amounts to be
    established at trial;

b.  Injunctive relief prohibiting the publication or republication of the
    defamatory statements;

c.  Costs associated with this action; and

d.  Such other and further relief as the Court deems just and appropriate to
    protect Plaintiffs' rights and interests.

## COUNT VI
### (DEFAMATION—K. WEEMS v. WEDEKIND)

132.    K. Weems re-alleges and incorporates Paragraphs 1 through 56, as if fully stated
herein.

133.    Wedekind created, authored, published, caused to be published, and/or encouraged
or directed others to publish the following false and defamatory statements, which did expose and
had the tendency to expose K. Weems to hatred, contempt, ridicule and disgrace:

(a)  The "Summary" section of the "Findings of Fact" [Defamatory
     Report at p. 6] falsely states that Stovall Weems "engaged in a series
     of improper and unauthorized financial transactions through which
     he personally benefitted, either directly or indirectly, at the expense
     of the church";

(b)  The "Improper Financial Transactions" section of the Defamatory
     Report [Id. at p. 13-14 and p. 20] falsely states that the Weemses
     made "material misrepresentations" to Wesleyan Investment
     Foundation ("WIF") and "embezzled profit" from the sale of the
     16073 Shellcracker Road;

(c)  The "Improper Financial Transactions" section of the Defamatory
     Report [Id. at pp. 15-18] falsely asserts that Pastor Weems did not
     use any of the proceeds from Celebration Church's "Second PPP
     Loan" for permitted expenditures, but rather to purchase TurnCoin
     and that "these expenses were not permitted under the PPP loan
     program and would result in the church's inability to seek
     forgiveness of the loan," as well as that Weems "was also deceptive
     about the TurnCoin investments…[and]…how he showed these

investments on Celebration's financial statements" and "derived a direct financial benefit from these transactions";

(d)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at pp. 18-19] falsely states that the Weemses engaged in the "Fraudulent Mischaracterization and Cancellation of Honey Lake Farms Debt" and falsely accuses them of "manipulation of financial statements in connection with a loan application" and the "fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application [which] violates Florida and federal law";

(e)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p. 19] falsely states that the Weemses engaged in the "Misappropriation of Designated Funds" donated to AWKNG for an "improper and unauthorized purpose";.

(f)    The "Improper Financial Transactions" section of the Defamatory Report [Id. at p.p. 19-20] falsely states that Pastor Weems "unilaterally" changed banks in early 2021, causing the revocation of the church's credit line and that Weems "deplet[ed] the church's cash reserves";.

(g)    The "CONCLUSIONS" section of the Defamatory Report [Id. at p. 20] falsely states that "Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office" and "brought Celebration to the brink of insolvency";

(h)    The "RECOMMENDATIONS" section of the Defamatory Report [Id. at p. 22] falsely states that Plaintiffs should be "require[d] to account for and return to the Church all funds misappropriated" and that that Plaintiffs should be reported "to the appropriate authorities'" to determine whether "criminal charges should be brought."

(i)    The assertions that K. Weems was "distraught and overwhelmed by her husband's behavior" and "suicidal as a result of the Encounter and Weems's behavior following it."

134.    Wedekind's defamatory statements are of and concerning K. Weems and reasonably understood to be about her, particularly given the "Recommendations" section of the Defamatory Report, which states that K. Weems should be "require[d] to account for and return to

the Church all funds misappropriated" and that K. Weems should be "reported to the appropriate
authorities" to determine whether "criminal charges should be brought."

135.    Wedekind's defamatory statements about K. Weems are false.  K. Weems did not
engage in any of the misconduct described in paragraph 133, above.

136.    As alleged in paragraphs 42-56, Wedekind created, authored, published, caused to
be published, and/or encouraged or directed others to publish the defamatory statements knowing
that they were false or with reckless disregard for their truth or falsity.

137.    Wedekind's defamatory statements are defamatory *per se* because they charged that
K. Weems committed crimes and tended to injure her in her trade, business or profession.

138.    In light of K. Weems's standing in the community, the nature of the statements
about her, the extent to which the statements were circulated, and the tendency of the statements
to injure someone such as K. Weems, Wedekind directly and proximately caused K. Weems to
suffer significant damages, including substantial reputational harm which is ongoing in nature and
will be suffered in the future.  K. Weems is also entitled to recover damages for the costs associated
with repairing her reputation and/or correcting the defamatory statements.

139.    K. Weems also suffered humiliation, mental anguish, emotional distress, and
embarrassment as a direct and proximate result of Wedekind's defamatory statements.

140.    Re-publication of Wedekind's false and defamatory statements by Celebration
Church, other publications, online, and through social media caused K. Weems to suffer additional
damages; all of which were foreseeable.

141.    Wedekind had actual knowledge that the false and defamatory statements about K.
Weems would garner significant public and media attention.

142.    Wedekind's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm K. Weems, or in blatant disregard of the substantial likelihood of causing her harm.

143.    As a direct and proximate result of Wedekind's misconduct, K. Weems is entitled to compensatory and special damages in amounts to be proven at trial.

144.    As a direct and proximate result of Wedekind's tortious conduct, and in addition to the quantifiable monetary damages she suffered, K. Weems has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

145.    Based upon the facts alleged herein, K. Weems has the clear legal right to the entry of an injunction prohibiting Wedekind from publishing and republishing the defamatory statements described in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

146.    The public interest would be served by the entry of an injunction prohibiting Wedekind's tortious conduct.

WHEREFORE, K. Weems, demands judgment against Wedekind awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT VII
### (CONSPIRACY TO DEFAME—PASTOR WEEMS v. ALL DEFENDANTS)

147.    Pastor Weems re-alleges paragraphs 1 through 101, as if fully set forth herein.

148.     Defendants agreed and conspired with one another to defame Pastor Weems.

149.     In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

150.     Defendants committed overt acts in pursuance and furtherance of their conspiracy.

151.     As a direct and proximate result, Pastor Weems suffered damages, including compensatory and special damages in amounts to be proven at trial.

152.     Pastor Weems is also entitled to an injunction prohibiting the publication or republication of the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and statement on the church's website.

WHEREFORE, Pastor Weems demands judgment against Defendants awarding:

a.     Compensatory and special damages in appropriate amounts to be established at trial;

b.     Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.     Costs associated with this action; and

d.     Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## <u>COUNT VIII</u>

## **(CONSPIRACY TO DEFAME—K. WEEMS v. ALL DEFENDANTS)**

153.     K. Weems re-alleges paragraphs 1 through 56 and 102-146, as if fully set forth herein.

154.     Defendants agreed and conspired with one another to defame K. Weems.

155.     In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

156.     Defendants committed overt acts in pursuance and furtherance of their conspiracy.

157.    As a direct and proximate result, K. Weems suffered damages, including compensatory and special damages in amounts to be proven at trial.

158.    K. Weems is also entitled to an injunction prohibiting the publication or republication of the defamatory narrative and statements in the Defamatory Report, Defamatory Presentation, and on the church's website.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.      Compensatory and special damages in appropriate amounts to be established at trial;

b.      Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.      Costs associated with this action; and

d.      Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT IX

### (INVASION OF PRIVACY AND/OR AIDING AND ABETTING INVASION OF PRIVACY—K. WEEMS v. ALL DEFENDANTS)

159.    K. Weems realleges Paragraphs 1 through 56, as though fully set forth herein.

160.    Defendants, grossly invaded K. Weems's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and Florida common law by actively participating in, providing substantial assistance to and/or ratifying or approving the public disclosure and dissemination of K. Weems's private, personal information in the Defamatory Report and Defamatory Presentation, and/or acting in concert with and/or aiding and abetting one another to accomplish such public disclosure and dissemination, for their own economic gain and self-interests, and to harm K. Weems, including the use and disclosure of K. Weems's private, personal medical information and the substance of her private interactions and conversations occurring within the privacy of K. Weems's home.

161.    Some of the information disclosed in the Defamatory Report about K. Weems was obtained by Gabriele Sullivan who, at the direction and/or with the approval of the Defendants, surreptitiously and illegally accessed K. Weems's private communications and marriage counseling sessions, thereafter disclosing this private information to the Trustees and/or Wedekind so that it could be published in the Defamatory Report.  This reprehensible, outrageous attack on K. Weems in the Defamatory Report included disclosing the following:

> Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed.  People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

162.    The unauthorized use, exploitation, disclosure and dissemination of K. Weems's private information in the Defamatory Report and Defamatory Presentation was highly offensive and objectionable to any reasonable person of ordinary sensibilities and was not of legitimate public concern.

163.    Defendants knew or should have known that the information they disclosed included private and confidential information, in which K. Weems had a reasonable expectation of privacy, and that disclosure of this information in the Defamatory Report and Defamatory Presentation would reveal private and personal things which Defendants had no right or authorization to use, disseminate, disclose or exploit and would be offensive and objectionable to a reasonable person of ordinary sensibilities.  The publication of these private facts constitutes a substantial violation of K. Weems's right of privacy.

164.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting

39

K. Weems's private information, and/or for acting in concert with, aiding and abetting other Defendants to accomplish the same. K. Weems had a reasonable expectation of privacy and had no knowledge of, and did not consent to, the recording or public disclosure of any such private activities.

165. The intimate details of K. Weems's private life that were unlawfully obtained and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published and would not have been published but for the Defendants' actions of procuring, actively participating in, providing substantial assistance for, and/or ratifying or approving the use, distribution, dissemination, disclosure, and/or exploitation of such private facts, or Defendants acting in concert with, aiding and abetting such misconduct.

166. Defendants violated K. Weems's fundamental privacy rights by the conduct alleged herein, including the intrusion into her privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the information, and/or acting in concert with, providing substantial assistance for, ratifying, approving, aiding, and/or abetting of the same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to K. Weems and others, in conscious disregard of K. Weems's rights.

167. Defendants acted with actual malice and reckless disregard of K. Weems's rights.

168. As a direct and proximate result of the aforementioned acts by each of the Defendants, K. Weems has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

169.    K. Weems also is entitled to permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of her private information, and any portions thereof; as well as mandating the delivery of the same and all content derived therefrom to K. Weems.

170.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of K. Weems's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of her private information;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT X
### (PUBLIC DISCLOSURE OF PRIVATE FACTS AND/OR AIDING AND ABETTING PUBLIC DISCLOSURE OF PRIVATE FACTS—K. WEEMS v. ALL DEFENDANTS)

171.    K. Weems realleges Paragraphs 1 through 56, as if fully set forth herein.

172.    Defendants actively participated in, provided substantial assistance to and/or ratified, approved, aided and/or abetted the disclosure and dissemination of private facts about K. Weems, and/or Defendants acted in concert with, aided and abetted one another in connection with such public disclosure, for their own economic gain and self-interests and to harm K. Weems, including the public disclosure and dissemination of K. Weems's private, personal information in the Defamatory Report and Defamatory Presentation, and/or acting in concert with and/or aiding and abetting one another to accomplish such public disclosure and dissemination, for their own economic gain and self-interests, and to harm K. Weems.

41

173.    The information Defendants disclosed included K. Weems's private, personal medical information and the substance of her private interactions and conversations occurring within the privacy of K. Weems's home, some of which was obtained by Gabriele Sullivan who, at the direction and/or with the approval of the Defendants, surreptitiously and illegally accessed K. Weems's private communications and marriage counseling sessions, thereafter disclosing this private information to the Trustees and/or Wedekind so that it could be published in the Defamatory Report.  This reprehensible, outrageous attack on K. Weems in the Defamatory Report included disclosing the following:

> Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed.  People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

174.    The unauthorized use, exploitation, disclosure and dissemination of K. Weems's private information in the Defamatory Report and Defamatory Presentation was highly offensive and objectionable to any reasonable person of ordinary sensibilities and was not of legitimate public concern.

175.    Defendants knew or should have known that they disclosed private and confidential information about K. Weems in which she had a reasonable expectation of privacy and were reveling private and personal things about K. Weems which said Defendants had no right or authorization to use, disseminate, disclose or exploit that would be offensive and objectionable to a reasonable person of ordinary sensibilities.  The publication of these private facts constitutes a substantial violation of K. Weems's right of privacy.

176.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the private information and/or for acting in concert with, aiding, and abetting other Defendants in committing these acts.  K. Weems had a reasonable expectation of privacy and had no knowledge of, and did not consent to, the disclosure of any such private information.

177.    Private facts about K. Weems were unlawfully obtained, and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published, and would not have been published but for Defendants' actions of procuring, actively participating in, providing substantial assistance for and/or ratifying or approving the use, distribution, dissemination, disclosure and/or exploitation of such private facts, or Defendants' actions in concert with, or acts of aiding and abetting such misconduct.

178.    The actions of the Defendants as alleged herein are highly offensive and objectionable to any reasonable person of ordinary sensibilities and are not of legitimate public concern.   K. Weems did not consent to nor authorize any use, distribution, dissemination, disclosure or exploitation of the private information, whatsoever, or of the publication of same by anyone.

179.    Defendants violated K. Weems's fundamental privacy rights by the conduct alleged herein, including the intrusion into her privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the private facts, and/or acting in concert, providing substantial assistance for, ratifying, approving, aiding and/or abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to K. Weems and others, in conscious disregard of her rights.

180.    Defendants acted with actual malice and reckless disregard for K. Weems's rights.

43

181.    As a direct and proximate result of the aforementioned acts by each of the

Defendants, K. Weems has suffered economic and emotional injury, damage, loss and harm,

damage to reputation, anxiety, embarrassment, humiliation, shame and severe emotional distress

in an amount subject to proof; which damages are continuing in nature and will be suffered in the

future.

182.    K. Weems also is entitled to permanent injunctive relief enjoining the use,

distribution, dissemination and disclosure of the private information, and any portions thereof; and

mandating the delivery of all originals, reproductions, copies, and portions of the same and all

content derived therefrom to K. Weems.

183.    The aforementioned acts of Defendants were done intentionally or with a conscious

and/or reckless disregard of K. Weems's rights, and with the intent to vex, injure or annoy, such

as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be
established at trial;

b.    Injunctive relief prohibiting the publication or republication of her private
information;

c.    Costs associated with this action; and

d.    Such other and further relief as the Court deems just and appropriate to
protect Plaintiffs' rights and interests.

## COUNT XI

### (INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS—K. WEEMS v. ALL DEFENDANTS)

184.    K. Weems realleges paragraphs 1 through 56, as if fully set forth herein.

185.    Defendants acted intentionally, maliciously and without justification, actively

participated in, provided substantial assistance to, and/or ratified or approved misconduct that

caused K. Weems's private information to be publicly disseminated and disclosed to third parties, and/or by acting in concert with, aiding and abetting in such activities, when Defendants knew or should have known that K. Weems would suffer severe emotional distress as a result.

186.     Defendants' disclosure of K. Weems's private, personal medical information and the substance of her private interactions and conversations occurring within the privacy of K. Weems's home and procurement of such information by surreptitiously and illegally accessing K. Weems's private communications and marriage counseling sessions and thereafter disclosing this private information is reprehensible and outrageous

187.     The assertions that K. Weems was "distraught and overwhelmed by her husband's behavior" and "suicidal as a result of the Encounter and Weems's behavior following it" are not only false, but a clear violation of her privacy because they disclose information based on statements from supposed witnesses with non-disclosure agreements who only could have obtained this information from K. Weems's private interactions and conversations in a private setting (*i.e.*, her home).

188.     Moreover, the disclosures of such information within the context of a "report" falsely accusing K. Weems of crimes and referring her for criminal prosecution, at a time when Defendants knew K. Weems was particularly emotionally vulnerable goes beyond all bounds of decency in a civilized society.

189.     At the time the Defamatory Report was created, leaked to the press, and published to the general public and others, Defendants were aware that K. Weems is especially sensitive, susceptible, and/or vulnerable to injury caused by mental distress.  Thus, their tortious acts were undertaken despite knowledge of K. Weems's emotional vulnerability and are particularly heartless, flagrant, and outrageous.

190.    Defendants acts were also committed with a heightened degree of outrageousness because Defendants asserted and abused a position of power, apparent or actual, to damage K. Weems.

191.    Defendants' conduct was intentional and malicious and done for the purpose of causing or was known by Defendants to be likely to cause K. Weems to suffer humiliation, mental anguish and severe emotional distress, and was done with the wanton and reckless disregard of the consequences to K. Weems.

192.    In committing these acts, Defendants acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon K. Weems, to her detriment.

193.    Defendants acted with actual malice and reckless disregard of K. Weems's rights.

194.    As a direct and proximate result of the aforementioned acts by each of the Defendants, K. Weems has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

195.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of K. Weems's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.    Compensatory and special damages in appropriate amounts to be established at trial;

b.    Injunctive relief prohibiting the publication or republication of her private information;

c.    Costs associated with this action; and

d.      Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT XII

### (CONSPIRACY TO INVADE PRIVACY—K. WEEMS v. ALL DEFENDANTS)

196.    K. Weems realleges Paragraphs 1 through 56 and 159 through 183, as if fully set forth herein.

197.    Defendants entered into an agreement or agreements with one another as part of an ongoing scheme to commit an unlawful act or acts and/or perform lawful act(s) by unlawful means.

198.    Defendants, as more specifically set forth above, each performed overt acts in pursuance of their conspiracy.

199.    As a direct and proximate result of Defendants' acts, K. Weems suffered substantial economic and emotional injury, damage, loss and harm, anxiety, embarrassment, humiliation, shame, damage to reputation, severe emotional distress, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

WHEREFORE, K. Weems demands judgment against Defendants awarding:

a.      Compensatory and special damages in appropriate amounts to be established at trial;

b.      Injunctive relief prohibiting the publication or republication of her personal information;

c.      Costs associated with this action; and

d.      Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Shane B. Vogt*
Shane B. Vogt – FBN 257620
E-mail: svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail: dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of October, 2022, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Lee D. Wedekind, III
Nelson Mullins Riley & Scarborough LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL  32202
lee.wedekind@nelsonmullins.com
allison.abbott@nelsonmullins.com

Kristin M. Ahr
Nelson Mullins Riley & Scarborough LLP
360 S. Rosemary Avenue, Suite 1410
West Palm Beach, FL 33401
kristin.ahr@nelsonmullins.com
brooke.werner@nelsonmullins.com

David M. Wells
Timothy J. McGinn
Gunster, Yoakley & Stewart, P.A.
Brickell World Plaza
600 Brickell Avenue, Suite 3500
Miami, FL 33131
dwells@gunster.com
tmcginn@gunster.com
dculmer@gunster.com
pholness@gunster.com
eservice@gunster.com

*/s/ Shane B. Vogt*
Attorney

# EXHIBIT A



# REPORT OF INVESTIGATION
## *to*
# CELEBRATION CHURCH
# OF JACKSONVILLE, INC.

## *April 24, 2022*

Kristin Ahr
360 S. Rosemary Avenue
Suite 1410
West Palm Beach, FL 33401
T 561.366.8765
F 561.655.1109
kristin.ahr@nelsonmullins.com

Lee D. Wedekind, III
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
T 904.665.3652
F 904.665.3699
lee.wedekind@nelsonmullins.com

## INDEX

Page

I.  Introduction and Background ...........................................................................3

    A.  Celebration's Corporate Governance ............................................4

    B.  The Authorization of this Investigation .......................................5

II.  Findings of Fact ............................................................................................6

    A.  Summary...........................................................................................6

    B.  Overview of the Weemses' Leadership of Celebration.......................7

    C.  The Encounter...................................................................................9

    D.  Post-Encounter Leadership of the Church......................................10

    E.  Lack of Oversight from December 2020 to June 2021 ....................13

    F.  Improper Financial Transactions .................................................13

        •  The Parsonage at 16073 Shellcracker Road ..........................13

        •  The Second PPP Loan ............................................................15

        •  TurnCoin Investment ............................................................17

        •  Fraudulent mischaracterization and cancellation of Honey Lake Farms debt...........................................................18

        •  Misappropriation of Designated Funds.................................19

        •  BBVA/PNC Bank Termination of access to credit lines........................19

III. Conclusions........................................................................................20

IV. Recommendations................................................................................22

Do not admit a charge against an elder except on the evidence of two or three witnesses. As for those who persist in sin, rebuke them in the presence of all, so that the rest may stand in fear.

1 Timothy 5:19-20.

# I. <u>INTRODUCTION AND BACKGROUND</u>

Nelson Mullins was contacted by attorney Steven Goodspeed from The Church Lawyers (Middlebrooks & Goodspeed) in Dallas, Texas. Goodspeed had been engaged by Celebration Church of Jacksonville, Inc. ("Celebration" or the "Church") regarding the terms and structure of an agreement in which Pastor Stovall Weems ("Weems") would transition out of the Senior Pastor position at Celebration. During the course of the discussions about the transition, it was revealed by or to the Church's Board of Trustees (each a "Trustee" and collectively the "Board") that there had been certain questionable financial practices and other pastoral issues under the Weemses' leadership of the Church.  In light of these claimed improprieties, in January 2022 the Board voted to suspend Stovall and Kerri Weems ("Kerri Weems") from their positions with the Church, place them in "not good standing" under the Church's bylaws, and authorize an investigation to determine the veracity of the allegations. Nelson Mullins was retained to conduct the investigation.

Our investigation included an extensive analysis of thousands of pages of documents and more than 20 interviews with current and former senior leadership team members, staff members, former Trustees, and other advisors and consultants. Each interview was conducted with witnesses who had direct, first-hand knowledge of the events discussed. These interviews were, and remain, confidential and privileged under the attorney-client communication privilege and the work product doctrine. Each witness was first provided with an *Upjohn* warning and confirmed his or her willingness to answer questions. To preserve the privileged nature of these interviews, this report does not include direct quotes or attributions of statements to specific witnesses and uses general descriptions of testimony where specificity would have revealed the source. All testimony referenced in this report was corroborated by multiple witnesses or by documentation.

We requested that Stovall and Kerri Weems be interviewed in connection with this investigation, but they refused. They have also refused to recognize the authority of the Board to undertake these actions and the legitimacy of this investigation. Despite their refusal to participate in this investigation, the Weemses have made numerous public statements to media outlets and through their social media accounts deriding the Church, the Trustees, and this investigation. Perhaps worse, although the Church's bylaws require that all disputes be submitted to mediation and arbitration pursuant to the Christian Conciliation process, the Weemses filed a civil action in state court to prevent the investigation from continuing and unwind the Board's actions. At every stage in the process, the Weemses have actively opposed and attempted to undermine the investigation process and prevent its completion.

After the investigation was completed but before this report was finalized, Weems resigned all of his positions with the Church. While the Weemses no longer hold any positions of authority at Celebration, this report is being provided to assist the Board in fulfilling its biblical and legal obligations.

## A. Celebration's Corporate Governance

Celebration is governed by the following legal authorities: (1) the Florida Not for Profit Corporation Act, FLA. STAT. § 617.01011, *et seq.*; (2) the Amended and Restated Articles of Incorporation of Celebration Church of Jacksonville, Inc. adopted on December 1, 2013 (the "Articles"); (3) the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on January 13, 2022[1]; (4) the Celebration Church Employee Handbook revised on May 3, 2021 (the "Employee Handbook"); and (5) the policies approved by the Board of Trustees (the "Board Policies").

Celebration is a board-led church. Plenary power to manage and govern the affairs of the church is vested in the Board. Articles Art. 9; Bylaws Arts. 4-6.  More specifically, the Board has the duties and responsibilities generally associated with and exercised by a corporate board and as such, is the only governing body within the Church. Bylaws § 8.01. Accordingly, all corporate power is to be exercised under the authority of the Board. *Id.* This specifically includes the management and oversight of all of the Church's financial resources, including the acquisition and disposition of Church property (both real and personal). *Id.* Even more specifically, this includes the power to buy, sell, mortgage, pledge or encumber property owned by the Church; to approve or disapprove the transfer of church assets to other tax-exempt organizations; and to approve or disapprove of any transaction unrelated to the purposes of the Church. *Id.*

The Church's executive functions and day-to-day operations are managed by the Senior Pastor. Bylaws Art. 7. The Senior Pastor serves as the President and Chief Executive Officer of the Church and is responsible to manage the Church's operations in accordance with biblical principles. Bylaws §§ 7.01-7.02. Specifically, the Senior Pastor's duties include: serving as the leader of the Church body, staff, organizations, ministries, and Trustees; defining and communicating the Church's purpose; administering and coordinating the day-to-day operations of the Church; nominating and removing Overseers; appointing, directing, and overseeing the senior leadership team; hiring, directing, and overseeing Church staff; and endeavoring to ensure that the directives and resolutions of the Trustees are carried out. *Id.* The Senior Pastor serves as the Chairman of the Board, but is not entitled to vote on board matters. Bylaws § 7.05.

---

[1] Prior to January 13, 2022, the church was governed by the Amended and Restated Bylaws of Celebration Church of Jacksonville, Inc. adopted on October 25, 2015. Collectively, this report will refer to these documents as the "Bylaws." To the extent there is a material difference in their terms, the report will reference the "2015 Bylaws" or the "2022 Bylaws."

Under Florida law, the Senior Pastor owes the Church fiduciary duties. FLA. STAT. § 617.0834(1) ("An officer ... of a nonprofit organization ... is not personally liable for monetary damages to any person for any statement, vote, decision, or failure to take an action, regarding organizational management or policy by an officer or director, *unless*: (a) The officer or director breached or failed to perform his or her duties as an officer or director; and (b) The officer's or director's breach of, or failure to perform, his or her duties constitutes ... [a] transaction from which the officer or director derived an improper personal benefit, directly or indirectly...") (emphasis added). Where an officer of a nonprofit corporation breaches a duty to the corporation and derives a personal benefit for doing so, he or she is personally liable for any resulting damages.

The Senior Pastor is subject to oversight and management by the Board in matters of corporate governance and the Overseers in spiritual and disciplinary matters. Bylaws § 7.07. An investigation may be initiated at the request of two Trustees or two senior leadership team members. Bylaws § 7.07(a). The subject matters appropriate for investigation include immoral conduct, improper financial practices, or espousing improper theological beliefs. *Id.* Investigations are conducted by or on behalf of the Overseers, or if there are fewer than three Overseers, by or on behalf of the Board. Bylaws § 7.07(b), 2022 Bylaws § 7.07(c). If the Overseers or the Board determines that discipline is warranted by a majority vote, they are empowered to: assume complete authority over the Senior Pastor's ministerial activities; discipline the Senior Pastor in any way deemed necessary; remove the Senior Pastor from his leadership position; and/or terminate the Senior Pastor's employment. *Id.*

The Bylaws also authorize the Trustees to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). In responding to a complaint, the Trustees are required to "determine whether an investigation is appropriate and the form that it should take." Bylaws § 17.02(d). The Trustees must promptly investigate, and then take appropriate corrective action if warranted by the investigation. Bylaws § 17.02(e).

## B. The Authorization of this Investigation

The 2015 Bylaws provide that the Overseers have sole authority to respond to a request for investigation and impose discipline on the Senior Pastor. 2015 Bylaws § 7.07(b). The Bylaws also require that the Church have at least three Overseers in place at all times. Bylaws § 10.03. It is the sole responsibility of the Senior Pastor to nominate Overseers to the Board. *Id.* As long as disciplinary action against the Senior Pastor is being considered, the composition of the Overseers cannot be changed. Bylaws § 10.04. Under the 2015 Bylaws if the Senior Pastor failed to nominate Overseers but an investigation had been requested, there was no mechanism to investigate or impose discipline on the Senior Pastor. Therefore, the Senior Pastor could avoid oversight or discipline by not nominating any Overseers. This was the predicament faced by the Church in January 2022.

In 2021, the Church had only two Overseers: Dino Rizzo and John Siebeling. When both resigned in September 2021, Weems did not nominate any replacements. Then, on January 4, 2022, Trustees Fitz Powell, Kevin Cormier, and Marcus Rowe requested that an investigation be conducted into potentially improper financial practices engaged in by Weems. In response, on January 4 Weems stated that only the Overseers could conduct an investigation. On January 5, Weems attempted to nominate three Overseers: Sean Yost, Scott Volk, and Bryan Schwartz. Of these, Mr. Volk and Mr. Schwartz were not ordained pastors at respected congregations and were therefore unqualified to serve as Overseers. Bylaws § 10.01. Even if they were qualified, though, the Board could not approve them because the composition of the Overseers could not be changed due to the pending request for an investigation. Bylaws § 10.04. Ultimately, the Board did not approve the nominated Overseers.

On January 13, 2022, the Board approved the 2022 Bylaws, which added Sections 7.07(c) and 7.08(e). Section 7.07(c) provides that if there are fewer than three Overseers, the Board shall assume the roles and responsibilities of the Overseers. This is consistent with the Board's historical authority to investigate and discipline, if warranted, "all reported concerns or complaints regarding corporate accounting practices, internal controls, or auditing." Bylaws § 17.02(d). Thereby fully empowered to act by the Bylaws, on January 13 the Board voted to initiate an investigation and to retain Nelson Mullins to conduct it and to report its findings to the Board. This report comprises the findings of our investigation.

Our investigation was performed according to biblical principles. Pursuant to the Board's directive, this investigation was designed and intended to reveal and report the truth of what has transpired at Celebration under the Weemses' leadership.

## II. <u>FINDINGS OF FACT</u>

### A. Summary

Stovall Weems engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the Church. Weems failed to present these transactions to the Board for its review and approval, which he was required to do pursuant to Florida law and the Church's governing documents. When three Trustees sought to question these transactions, Weems retaliated by attempting to remove them. Although Weems has a duty to cooperate with this investigation, he has refused to do so.

Since at least 2019, the Weemses' leadership of the Church has been inconsistent and unbiblical. Stovall Weems failed to effectively define and communicate the Church's purpose, failed to properly administer the organization, nominate Overseers, oversee Church staff, and ensure the Board's directives were met effectively and efficiently. Instead, Weems has acted erratically, creating a culture of confusion and disarray that has hindered the Church from effectively carrying out its mission. Worse, Weems' leadership was marked by rampant spiritual and emotional abuse, including manipulation, a profound sense of self-importance and selfishness, superiority and entitlement,

overbearing and unreasonable demands on employees' time, a lack of accountability or humility, demands of absolute loyalty and compliance, public shaming and humiliation of employees, coercion, shunning, gaslighting, and the creation of a culture of fear and intimidation in which it was not safe to disagree with Weems.

Each of the above actions constitutes a separate and independent basis justifying the discipline of the Senior Pastor, up to and including ratifying the removal of his leadership position and termination of his employment.

## B. Overview of the Weemses' Leadership of Celebration

Stovall and Kerri Weems, among others, founded Celebration in 1998. Since then, the Church has experienced great success and growth. Celebration currently has 3,745 active members across five campuses. Celebration's early years were marked by the development of a small, tight-knit group of people who helped grow and lead the Church in the following years. Many of Celebration's current senior leadership team and employees have been with the Church since the early 2000s. Their knowledge and understanding of the Church, and their first-hand witness of its—and the Weemses'—transformation, provide a valuable resource that was extremely helpful in our investigation. The Church's deep bench of longtime volunteers, employees, leaders, and pastors is among its greatest assets and a key reason for the Church's growth and success.

Stovall Weems, as the Church's longtime Senior Pastor, was responsible for the management of the Church's day-to-day operations and the spiritual leadership of the Church. Witnesses described troubling details regarding the Weemses' dysfunctional leadership style. Many of these issues were detailed in a Baseline Report prepared in November 2020 by Network King, a firm hand-picked and commissioned by the Weemses.

The Network King report identified six key ways in which the Church required improvement: leadership challenges, poor communication, limited planning and forecasting, lack of professional development, ineffective governance, and lack of focus on performance. The Network King report found that the root cause of most of these issues was a failure of executive leadership. The report summarized its observations of the Church's executive leadership as including:

- Unclear vision, mission, and values
- Unclear leader intent
- Lack of developed strategy
- Inconsistent guidance
- Centralized decision-making
- Rampant hasty decision-making
- Lack of delegation
- Micromanagement
- General lack of order
- Poor expectation management

- Lack of accountability
- Lack of effective change management
- Lack of mentorship
- No leadership development program
- Personal activities impacting professional operations

The Network King report stands as a scathing indictment of the Weemses' failed leadership at Celebration. We understand that another, even more critical report specifically addresses the Weemses, but we have been unable to obtain a copy of it.

The single word used most frequently to describe Stovall Weems was: *narcissist*. When asked to describe Weems, nearly every witness we interviewed used that specific word. Many witnesses detailed, often through tears, instances when Weems personally belittled and humiliated them for minor mistakes or misunderstanding Weems' inconsistent and confusing directives. Worse, Weems created and fostered an environment in which he was not subject to accountability. Many witnesses explained that the first rule to survive at the Church was "We don't say no to Pastor." In this way, he was able to impose his will on others to force their compliance with his demands. Neither Stovall nor Kerri Weems served anyone at the Church. Instead, they demanded others to serve them – the antithesis of Christ-like personal sacrifice and service to others.

The Weemses' demands blurred the line between employees' personal and professional lives to such an extent there was no apparent difference between them. Total responsibility to serve the Weemses in all ways at all times was required to appease them. Witnesses described many examples of overbearing demands. One witness reported that she had to beg for one hour per day in which she was not required to immediately respond to text messages. Another reported that Weems instructed an employee to drive to a liquor store late at night and deliver a bottle of bourbon to his house because he did not want to be seen purchasing liquor. Another recounted that an employee was instructed to purchase a car for Weems and deliver it to his house. After the employee delivered the car as demanded, Weems told him to find his own ride home. Many witnesses described intense personal anguish and pain caused by working for the Weemses. One witness expressed an inability to return to church—any church—due to crippling anxiety and panic attacks.

Weems considered himself a visionary and frequently presented big ideas in conceptual form. These ideas were often simultaneously complex and unfinished, and Weems suffered an inability to fully explain his plans or how they should be implemented. Weems constantly wanted to execute on these plans during their conceptual phase without further analysis or refinement. When employees presented feasibility issues that would limit or prevent these ideas from being successful, they were ridiculed as "dreamkillers." Employees who raised questions or challenged ideas were quickly removed from the decision-making process. Many witnesses described knowing whether they were "in" or "out" of Weems' circle of trust by whether Weems would communicate—or not—with that person. Shunning, isolating, and discarding were common tactics used to punish anyone who expressed a disagreement or concern with an idea presented by Weems.

As the Church became more successful, the lavishness of the Weemses' lifestyle also increased. Private charter flights to exotic vacations, a full "house staff" to assist in maintaining their mansions, and personal assistants required to attend to the Weemses' every demand all became trappings of their life. The Weemses' compensation, staff, travel and expense accounts comprised approximately 10% of the Church's total revenue. Despite these privileges, the Weemses treated people who attended to them as inferior. In 2020, Weems drafted a document that instructed the Weemses' assistants on how they were to keep each of the three residences so the Weemses would not be bothered during their transitions between homes. This was so the Weemses could focus on their "spiritual acuity" at all times.

The Weemses also posted schedules of their required food and beverage service so that their employees would know how to serve them food and drinks. These instructions included specifications on the times of day the items were to be provided, exact requirements for each item, and a description of how the items were to be presented to the Weemses (on "real dishes" presented on a "serving tray"). These instructions—similar to over-the-top green room riders required by celebrities—reflected the Weemses' immense entitlement and self-importance.

Since Tim Timberlake was brought into Celebration in 2019, the Weemses were seldom seen at the church. Many witnesses could not remember the last time that the Weemses worshipped at Celebration.

### C. The Encounter

The Encounter was a pivotal moment in Celebration's history. At a Seder service on Passover in 2018, Stovall Weems claimed he had a personal encounter with Jesus Christ. Guest pastor Paul Wilbur, a messianic Jew, came to explain and reenact the ancient Hebrew/Judaic Passover Supper at Celebration. At the event, Weems became transfixed on a piece of bread he was holding. Weems stared blankly at the bread for a long time and then appeared bewildered, stunned, and speechless as his attention turned back to the events on the stage.

A video of the service at which the Encounter took place can be viewed here: https://youtu.be/swkJMbGuKa4?list=PLCIFIIMQrbfC1yXgmCMaZP0xMEbbwEHKv&t=6566

Afterward, Weems described that he had seen Jesus on the stage and been transported to the Last Supper the night before Jesus' crucifixion. Weems claims that he was physically with Jesus Christ and that Jesus spoke with him, directing his attention to the future and what Christ wanted for the Weemses to accomplish on Earth. Weems described Jesus as having dark hair, a white robe, and speaking in Hebrew.

This report takes no position on whether the Encounter was real. There is no way to confirm or deny—legally or factually—what was going on inside Weems' mind during that time. There is evidence that the Weemses were under a tremendous amount of personal stress during this time that may have impacted Weems' mindset that evening.

Regardless, after the Encounter things changed dramatically. Most witnesses recall that event was the catalyst for dramatically changed behaviors and actions by the Weemses in the following years.

Witnesses to the events at the Weems residence in the days following the Encounter describe Weems as visibly shaking and sobbing. They also confirmed that Kerri Weems was distraught and overwhelmed by her husband's behavior. Kerri Weems has a history of clinical depression, a topic which she openly discussed. People close with Kerri Weems stated that she expressed being suicidal as a result of the Encounter and Weems' behavior following it. Despite repeated requests by many, the Weemses refused to take any meaningful time off after the Encounter to process the event.

Over time, Weems used the Encounter and subsequent messages flowing from the Encounter to justify his authority and maintain control of the Church. If questioned, Weems would respond by saying that this direction was given to him by God through the Encounter. As a result, staff were not permitted to challenge Weems for fear of being accused of disobeying God's will. Because only Weems experienced the Encounter, only he had the ability to interpret its meaning and direction. When employees would ask questions or express confusion over Weems' directions, he would tell them that he had only disclosed part of the vision God deposited in him through the Encounter. In that way, Weems exercised control by claiming a secret divine revelation.[2]

One of the results of the Encounter was Weems' decision to "give away" the Church to Pastor Tim Timberlake – without first telling Kerri Weems, the board, senior leadership team, or the staff. The absence of any communication or coordination surrounding this handoff was the genesis for an extremely disorganized and disruptive transition, which ultimately culminated in this investigation.

### D. Post-Encounter Leadership of the Church

For months following the Encounter, Weems struggled to form words or communicate effectively. He was disengaged in business meetings with staff and cried frequently. The Encounter magnified his demand for control and his defiance to authority or accountability. Anyone—trustees, pastors, senior leaders, employees—who did not serve the needs of the Weemses was replaced. Anyone who challenged Weems' judgment or control of the Church was removed. He and Kerri Weems frequently repeated that the Board reported to them, not the other way around. Weems said that while he may have needed Overseers during his younger years, he no longer felt he did.

Most staff members described 2019 as a very confusing time. Weems struggled to process the Encounter and every decision was based on a disjointed understanding of its meaning. Weems would make decisions and demand they be carried out immediately, only to later reverse himself. Communications were sporadic and no clear chain of command was established. Weems often shuffled employees between positions

---

[2] The concept that a special knowledge of God is made available only to a select few is a tenet of Gnosticism condemned for centuries as heretical.

depending on who was in his inner circle. Because employees had poorly-described job functions and were constantly being reassigned, many employees did not know who was in charge of the Church's operations. Weems also began making strange comments about sweeping changes he intended for the Church's ministry. At one point he suggested the Church needed to learn how to function without any buildings.

During this time, Weems also appeared physically and mentally unwell. Members of the senior leadership team were so concerned that they convened a meeting to confront him about his mental health and the impact it was having on the Church's ability to function effectively. Although the meeting seemed to have gone well initially, it ultimately had no lasting impact and Weems continued to spiral.

In 2020, COVID-19 led to a complete disruption of the Church's operations. This disruption was further complicated by a plan developed by Weems to "separate the business from the Church" by spinning off several ministries as stand-alone corporate entities. In September 2020, the Board was comprised of Erik Sharpe, Jonathan MacArthur, Todd Gicalone, and Fitz Powell, all of whom were experienced Trustees who had served since at least 2014. At the September 2020 Board meeting, Weems presented his vision for a massive restructuring plan that included a request to seek a new $14 million credit line to fund proposed real estate transactions and capital improvements. The proposed reorganization was a confusing and poorly-conceived plan. Weems never fully grasped the complexities involved, continually changed direction, and failed to adequately explain his concepts to the board, senior leaders, and staff. Recognizing major issues with this reorganization, the board required that Weems provide it with business plans for each entity to be spun off. Some business plans were provided at the October 2020 Board meeting, but the Board later concluded they were of limited value.

Friction between Weems and the Board grew. At the December 2020 Board meeting, the Trustees came prepared to engage in an extensive conversation about Weems' reorganization plan. While the Church's revenues were 15% short of projections, Weems advocated for the Board to approve $14 million in new debt. When the Trustees questioned him about the details of his plan, and specifically how the Church would service the new debt, Weems responded with frustration and indignance. Instead of providing a business case to support his plan, Weems demanded that the Trustees either immediately approve the plan without further questions or end the meeting. When the Trustees asked for a 5-minute break to ease the tension, the Weemses walked out.[3]

---

[3] The debt proposal was approved in the Weemses' absence, but the property purchase ultimately fell through because of a title defect that Weems had failed to identify. This is another example of problems that arose as a result of Weems' rushed decision-making and failure to adequately analyze issues before demanding execution (and God's grace in saving the Church from critical mistakes).

At the end of 2020, the Church's longstanding CFO Lisa Stewart left to become the CEO of Honey Lake Clinic. In the interim, Devan Schanding served as interim CFO. Stewart's permanent replacement, Tojy Thomas, joined in January 2021 but left by May because of extremely poor treatment by Weems. Thomas came from an accounting background with substantial nonprofit experience at the University of Chicago and Woodman Valley Chapel in Colorado Springs. One of Thomas's primary tasks was to implement the separation of these ministries (AWKNG, Honey Lake Farms) from the Church. To accomplish this, Thomas needed to understand what these entities were designed to do, what purpose they historically served, what assets and liabilities "belonged" to each entity, and who each entity would employ going forward.

Thomas learned that Weems had a poor understanding of the Church's organizational structure and financial position, including its revenues and expenses. As things progressed, Thomas became increasingly concerned about the Church's cash burn rate and how it was depleting the Church's cash balance. The Church's financial statements reflect that its cash balance dropped from $9 million in October 2020 to $6 million in December 2020, then to $2 million in March/April 2021. Weems never had a grasp of where the money went and would oscillate between negligent attention to financial details and aggressive demands for voluminous information. He could never keep all of the parts straight in his head, and he blamed this confusion on the providers of the information (Stewart, Thomas, Cormier).

After Thomas left, Weems did not fill the position of CFO but instead relied on the HR director to assume some of the responsibilities of that position. The turmoil of the reorganization combined with the turnover of accounting and financial professionals resulted in a highly disorganized and dysfunctional enterprise in early-to-mid 2021.

Part of this confusion was caused by Weems' failure to recognize and treat the different entities as distinct. Although Weems was a full-time employee of the Church, paid by the Church and responsible for raising funds on behalf of the Church, he would obtain donations and then direct them to be deposited into other entities' accounts. This was problematic because it was never clear that any entity was capable of financial success independent of the Church. This has been proven out by AWKNG's demise. When AWKNG was spun off and Weems was responsible for its management outside of the Church's control, it immediately failed. In January 2022, AWKNG fired all but a handful of its staff – 40 employees were let go. Demonstrating a lack of empathy and obliviousness to the workers who had just lost their jobs, Weems asked the fired employees to pray for Kerri Weems because of how hard it had been on her. Kerri Weems did not attend the meeting at which the employees were laid off.

### E.  Lack of Oversight from December 2020 to June 2021

In the aftermath of the December 2020 board meeting, Trustees Sharpe, MacArthur, and Gicalone determined that they could no longer continue to serve on the Board if the Senior Pastor refused to accept any accountability or governance. In February 2021, Mr. Sharpe, Mr. MacArthur, and Mr. Gicalone resigned as Trustees. In their resignation letter, they outlined a series of concerns they had with the direction of the Church, including its over-accumulation of debt, financial commitments made without board authorization, conflicts of interest between organizations, the absence of the minimum number of required Overseers, an organizational complexity that made transparency and oversight difficult, and poor staff reviews and accountability. These concerns mirrored those set forth in the Network King report issued a few months prior. The letter restated the Board's policy requiring Board approval of any expenditure over $5,000 not previously included in an approved budget. Their resignation left Mr. Powell and Mr. Rowe as the Trustees.

The Church's annual report filed in March 2021 lists the current Trustees as directors, but despite the near-complete turnover of the Board and the serious management concerns raised by Network King and the outgoing Trustees, Weems did not call a meeting of the Board from December 10, 2020 to June 3, 2021—nearly six months. During this period, Weems acted without any accountability or oversight by the Board or the Overseers. This was also the period during which the CFO role transitioned three times, from Stewart to Schanding to Thomas. Uncoincidentally, it was during this period when all of the improper financial transactions occurred. Weems eliminated or ignored all oversight, accountability, and compliance mechanisms that acted to limit his discretion and acted unilaterally.

### F.  Improper Financial Transactions

#### 1.  The Parsonage at 16073 Shellcracker Road

In January 2020, at the request of the Weemses, the Church agreed to purchase a parsonage for the Weemses to use as their personal residence. The property, located at 4504 Hunterston Lane in Glen Kernan Golf and Country Club, was purchased on January 14, 2020 for $1,295,000. The Board approved the purchase and executed a resolution authorizing Lisa Stewart to execute the necessary documents to close on the purchase. In connection with the Church's purchase, Celebration and the Weemses entered into a Parsonage Use License Agreement setting forth the rights of the parties with respect to the use of the parsonage. The Agreement related only to the Hunterston property, and would terminate on the date the Weemses abandoned the parsonage as their primary residence.

At some point thereafter, the Weemses decided they wanted to relocate. In connection with the Church's sale of the Hunterston parsonage, Weems asked if he could keep the proceeds from the sale. He was told by Tojy Thomas that because the Church owned the property, he was not entitled to the sale proceeds. The Hunterston parsonage

was sold on June 4, 2021 for $1,475,000. Weems never presented the potential sale of the Hunterston parsonage to the Board. Celebration kept the sale proceeds.

Meanwhile, on February 9, 2021 Weems Group, LLC—of which Weems is the sole member and its manager—purchased a single-family residence at 16073 Shellcracker Road on the Nassau River. The property was listed for sale at $875,000 but Weems Group bought it for $855,000. The appraisal obtained by Weems Group in connection with financing its purchase of the property valued it at $890,000 as of December 23, 2020.

Four months after Weems Group purchased the Shellcracker property, Weems Group sold it to the Church for $1,286,863.30—an increase of $431,386, more than 50% more than Weems Group had just paid. The Church's purchase of the Shellcracker property was not disclosed to or approved by the Board. The closing documents were signed by Weems on behalf of both Weems Group and the Church. The Church financed the purchase of the property by drawing on its line of credit from its primary lender, Wesleyan Investment Foundation ("WIF"). Weems executed a Mortgage Modification and Spreading Agreement encumbering the Shellcracker parsonage and increasing the Church's debt by $1,300,000.

To induce WIF to advance funds to the Church under its line of credit, Weems represented to WIF that the Board had approved the purchase of the Shellcracker property when it hadn't. What Weems claimed as authorization was the Board's prior approval of the purchase of the Hunterston parsonage, not the Shellcracker property. The failure to provide that important information was a material misrepresentation, an Event of Default under the Church's Promissory Note to WIF, and a breach of the Church's Business Loan Agreement with WIF.

Weems did not commission an appraisal of the property on behalf of Celebration when his company sold it to the Church, and the Duval County Property Appraiser has determined that the sale is not a "qualified" sale under the Florida Administrative Code (meaning it was determined not to be an arm's length transaction). An email sent by Sarah Mannion, the attorney that closed the sale, indicates that the Weems Group kept the $430,000 profit it made on the sale of the property.

The purchase of the Hunterston parsonage and the purchase of the Shellcracker property were fundamentally different in several ways:

- The Board was presented with the purchase of the Hunterston property and authorized the transaction via formal board action evidenced by a written resolution but was never presented with or authorized the purchase of the Shellcracker property.
- Lisa Stewart was authorized to execute the documents necessary to close on the Hunterston property purchase, but Weems was never similarly authorized to purchase the Shellcracker property.
- The Church and the Weemses entered into a license agreement for the use of the Hunterston property, but not the Shellcracker property.

- The Hunterston property was brought from and sold to unrelated third parties, while the Shellcracker property was bought from a company owned by Weems (and through which he obtained a huge financial windfall).

The Weemses have claimed that the Shellcracker purchase was merely a "transfer" of the parsonage from one location to another. But the resolution authorizing the Hunterston acquisition and the license use agreement both make clear that they specifically related only to that particular property and were not a blank check for the Weemses to buy and sell properties as they saw fit.

The Weemses have attempted to justify keeping the profit the Weems Group realized by flipping the Shellcracker property because the money was needed for "improvements." The Weemses' claim that these funds were used to improve the property appears to be entirely false. There is no evidence that any improvements have been made to the property, and certainly not improvements worth $430,000. First, the Building Department's records do not show that any permit applications have been filed for work to be performed at the Shellcracker property, and no notices of commencement have been recorded in the Duval County official records. Second, and more damning, when asked by the Weemses' realtor whether any renovations would be made to the property after closing for the purpose of obtaining homeowner's insurance, Weems sent an email stating: "No renovations after closing."

But even if that justification were true, it ignores the Weemses' direct and undisclosed conflict of interest in the transaction, the material misrepresentation made by Weems to WIF, and the absence of authority to purchase and mortgage property on behalf of the Church without notice to or approval by the Board. Standing alone, the improprieties and misrepresentations surrounding this transaction are sufficient grounds to disqualify the Weemses from serving as pastors and constitute a valid basis for their immediate termination.

2.  The Second PPP Loan

In 2020, the Church applied for and was granted a loan under the federal Paycheck Protection Program ("PPP"). The first PPP loan was in the amount of $2.2 million and was used by the Church to pay staff salaries. Weems at different times asked if the Church could use the loan proceeds for general operating expenses or for other ministries. In response, it was explained that the loan could only be used for specific purposes, because the loan rules required that the funds be used only for very specific purposes. Ultimately, the loan was used for its required purposes, each expenditure was documented, and the Church sought, and was granted, forgiveness of the loan. Lisa Stewart, the Church's then-CFO, managed the process.

In April 2021, the Church applied for a second PPP Loan. Tojy Thomas was the Church's CFO when the second PPP loan application was submitted, which included the following certification:

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; *I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*

Thomas had resigned by the time the loan was approved and $1,106,400 in loan proceeds were received by the Church. Freed from the financial and accounting professionals that ensured Weems complied with the law, the Church's financial records indicate that *none* of the loan proceeds from the second PPP loan were used for permitted expenditures. Instead, Weems directed that the funds be spent on the following:

- $100,000 to invest in TurnCoin on behalf of the Church,[4] a digital security with which fans can "invest" in "talented people in all passions of life; sport, esports, music, art, entertainment and more."

- $856,033.33 was transferred to Honey Lake Farms's First Citizens Missions Account,[5] of which $150,000 was used to buy TurnCoin on behalf of Honey Lake Farms and $150,000 was used to buy TurnCoin on behalf of AWKNG.

- $100,000 was transferred to the Church's Missions account to cover a transfer of $100,000 to an unrelated church ministry in Nevada.[6]

In total, $500,000 of PPP loan proceeds were used to purchase TurnCoin. All of these transactions were directed by Weems without notice to or authorization by the Board, which has sole authority to "to approve or disapprove the transfer of church assets to other tax-exempt organizations" pursuant to Bylaws § 8.01. Weems knew, based on his experience with the first PPP loan, that these expenses were not permitted under the PPP loan program and would result in the Church's inability to seek forgiveness of the loan. The result of these transfers was an increase of the Church's debt by more than $1 million.

---

[4] TurnCoin is discussed in greater detail in Section II(B)(3).

[5] Weems is the President of Honey Lake Farms, Inc. and therefore transferred these funds as an "advance" on giving based on inflated revenue projections that would not be hit, resulting in a significant overpayment.

[6] The transferred funds were used to purchase TurnCoin at Weems' direction, as discussed in Section II(B)(3) below.

Weems also derived a direct financial benefit from these transactions. As discussed in greater detail below, Weems bundled these funds with others so that he could qualify as a "legacy investor" in TurnCoin. Legacy investors were entitled to be paid back before other investors and were entitled to 10% interest on their investment.

### 3.  TurnCoin

TurnCoin is a digital security designed by TheXchange Pte. Ltd, a Singapore private company. TurnCoin would be used by fans to buy or sell "non-fungible cryptographic tokens" known as VirtualStax Cards that depict public figures such as athletes, movie stars, musicians, and other celebrities. By selling VirtualStax Cards, celebrities would be able "to monetize their social media following."

A private placement memorandum issued by the company in March 2021 includes the following disclaimer:

> THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS WHO CAN BEAR THE ECONOMIC RISK FOR AN INDEFINITE PERIOD OF TIME AND WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. FURTHERMORE, INVESTORS MUST UNDERSTAND THAT THIS INVESTMENT IS ILLIQUID AND IS EXPECTED TO CONTINUE TO BE ILLIQUID FOR AN INDEFINITE PERIOD OF TIME. NO PUBLIC MARKET EXISTS FOR THE SECURITIES, AND NO PUBLIC MARKET IS EXPECTED TO DEVELOP FOLLOWING THIS OFFERING. SEE "RISK FACTORS."

Celebration's cash reserves in mid-2021, when Weems decided to invest in TurnCoin, were substantially diminished and the Church could not afford to bear such a high risk for an indefinite period. Moreover, as mentioned above, the Board—not Weems—had authority to approve these decisions. Nevertheless, Weems acted unilaterally without presenting these proposed expenditures to the Board for its review and approval. As stated in the private placement memorandum, these funds are illiquid and cannot currently be accessed or utilized by the Church or entities.

Weems was also deceptive about the TurnCoin investments. When he first approached another pastor and friend about investing in TurnCoin, The pastor declined. Needing to bundle investors to qualify as a legacy investor, Weems decided to fund the pastor's investment through Celebration. Weems directed the Church's accounting staff to transfer $100,000 to the pastor's ministry account from the Church's Heart for the House Pentecost Offering. Heart for the House is a giving campaign in which Celebration's members are encouraged to make sacrificial, meaningful offerings to fund initiatives to transform lives through Jesus Christ. Weems told Celebration staff that the funds were to be used for a revival. Later, the pastor told the Church that Weems had directed him to invest the funds in TurnCoin as part of Weems' legacy investment group, which he did. To date, the funds have not been used for a revival.

Weems was also deceptive in how he showed these investments on Celebration's financial statements. In an email dated May 5, 2021, Weems instructed the Church's Human Resources Director that the TurnCoin investment be shown "as a cash currency on the books just like Bitcoin would.". But TurnCoin is a digital security, not a cryptocurrency. TurnCoin is currently illiquid and cannot be sold on a market – it is not a "cash currency." Identifying TurnCoin as a currency on Celebration's balance sheets is a fundamental mischaracterization of the asset.

In total, $500,000 in Church debt was invested in TurnCoin, but only $100,000 was invested in the Church's name. The remaining $400,000 was given away to other entities that Weems controlled (Honey Lake Farms, AWKNG) or people with whom he had a personal relationship.

None of these transactions were presented to or authorized by the Board, as required by the Church's articles of incorporation, bylaws, and Board policies regarding expenditures.[7] Furthermore, high-risk investments such as these are inconsistent with the Church's investment risk profile and its duty to serve as a faithful steward of sacrificially-donated funds.

### 4. Fraudulent mischaracterization and cancellation of Honey Lake Farms debt

Over the years, the Church made intercompany loans for the development and operation of Honey Lake Farms. These loans included a loan of $1,366,471.43 for the construction of a lodge building at the Farms. For years, this amount had been reflected as an asset of the Church (Accounts Receivable) and a liability of the Farms (Accounts Payable).

In January 2021, Weems inquired as to whether this loan should be forgiven by the Church. When it was explained to him that a consequence of the loan's forgiveness would be a negative impact to the Church's financial position, he determined that was not in the Church's best interest and dropped the matter.

In August 2021, Weems applied for a loan from First Citizens Bank on behalf of Honey Lake Farms, Inc. In connection with the application, HLF submitted financial statements to support its loan application. These statements, consistent with their historical characterizations, showed this as a liability of HLF. However, in order to improve HLF's financial statement to increase the likelihood of the loan's approval, Weems unilaterally determined to recharacterize this as an asset of the Farms, not a liability. He first told First Citizens that Honey Lake Clinic actually owed this money to the Farms. When the bank attempted to clarify this with the Clinic, the Clinic declined to recognize it as a legitimate receivable (because it wasn't).

---

[7] In 2020, the Board imposed a limit of $5,000 on expenditures that did not require Board authorization. Any expenses over this amount were required to be approved by the Board. The Board imposed this policy to prevent situations like this.

When the bank officer questioned the legitimacy of this entry (describing it as improper accounting), Weems expressed exasperation that the bank would attempt to confirm the information on the financial statements submitted by HLF ("I can't believe she asked [redacted] to do that."). The officer and Celebration's bookkeeping staff had a call in which the officer informed Celebration that the manipulation of financial statements in connection with a loan application was extremely serious and improper. To "resolve" the issue, Weems directed the Church's accountants to write off the $1.3 million debt on the Church's books so that it could be deleted as a liability on HLF's books. At Weems' direction, HLF's financial statements were revised to reflect this $1.3 million improvement in its financial position. All of this was done without board authorization at a time when the Church's financial position had eroded significantly.

The fraudulent manipulation of HLF's financial statements and unauthorized debt forgiveness in connection with a loan application violates Florida and federal law.

### 5.  Misappropriation of Designated Funds

At Weems' direction, AWKNG solicited members of the Church to donate funds that AWKNG was to use for missions trips. Ultimately, AWKNG received donations in the amount of $29,486.75 that were solicited and designated for missions trips. After AWKNG was shut down in January 2021, Celebration was required to assume responsibility for conducting those mission trips. Despite Celebration's repeated requests, AWKNG has refused to transfer these designated funds to the Church or to account for their whereabouts. It therefore appears that AWKNG used these designated funds for an improper and unauthorized purpose.

### 6.  BBVA/PNC Bank Termination of access to credit lines

For years, the Church used BBVA Compass (now PNC Bank) as its primary bank and lender. In 2019, BBVA issued Celebration a credit line of $2 million that was linked to 75 credit cards that church staff used for operational expenses across the Church's many locations. This credit line was contingent on Celebration maintaining a balance of $2 million in deposits at the bank. Credit cards were also issued to AWKNG and Honey Lake Farms, Inc. Those entities' cards were not linked to the Church's operating accounts.

In January 2021, Weems directed new CFO Tojy Thomas to switch banks from BBVA to First Citizens Bank. This decision was unilaterally made without regard to the impact that this move could have on the Church's credit line. After the banking change, a minimal amount of money remained with BBVA but the church still depended on the credit cards to fund operational expenses and manage its cash balance.

On November 8, 2021, PNC notified the church that AWKNG (operated by Weems) had missed a payment. This default triggered the bank to evaluate all related accounts. PNC's evaluation led to a reduction in Celebration's commercial credit card limit from $2 million to $200,000 because Celebration had moved its operating account. Because the Church averaged $400,000 per month in credit card expenses, the reduction in this credit line significantly limited the Church's ability to fund operations and almost wiped out all

its cash reserves. The Church attempted to acquire new commercial credit cards with First Citizens but they were only willing to offer a $70,000 limit given the significant financial losses the church had suffered to date. On April 8, 2022, PNC announced that it was revoking Celebration's credit line in its entirety, leaving the Church in a cash-only position.

The loss of the Church's access to short-term credit has resulted in a significant impact to its operations. This was caused by Weems' depletion of the Church's cash reserves through the above unauthorized transactions and his hasty and poor decision-making.

## III.    <u>CONCLUSIONS</u>

Through the actions described above, Stovall Weems violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required by his office. He has brought Celebration to the brink of insolvency. The current amount of Accounts Receivable that remain outstanding and unpaid is $3,389,835 (excluding the embezzled profit from the Shellcracker sale). But for the steadying leadership of Pastor Tim Timberlake and the actions of Celebration's Board, Celebration would have likely already failed as an institution.

Spiritually, the Weemses have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture:

Watch out for false prophets. They come to you in sheep's clothing, but inwardly they are ferocious wolves. By their fruit you will recognize them. Do people pick grapes from thornbushes, or figs from thistles? Likewise, every good tree bears good fruit, but a bad tree bears bad fruit. A good tree cannot bear bad fruit, and a bad tree cannot bear good fruit. Every tree that does not bear good fruit is cut down and thrown into the fire. Thus, by their fruit you will recognize them.

Matthew 7:15-20.

To the elders among you, I appeal as a fellow elder and a witness of Christ's sufferings who also will share in the glory to be revealed: Be shepherds of God's flock that is under your care, watching over them—not because you must, but because you are willing, as God wants you to be; not pursuing dishonest gain, but eager to serve; not lording it over those entrusted to you, but being examples to the flock.

1 Peter 5:1-3.

Whoever aspires to be an overseer desires a noble task. Now the overseer is to be above reproach, faithful to his wife, temperate, self-controlled, respectable, hospitable, able to teach, not given to drunkenness, not violent but gentle, not quarrelsome, not a lover of money. He must manage his own family well and see that his children obey him, and he must do so in a manner worthy of full[a] respect. (If anyone does not know how to manage his own family, how can he take care of God's church?)

1 Timothy 3:1-5.

An elder must be blameless, faithful to his wife, a man whose children believe and are not open to the charge of being wild and disobedient.  Since an overseer manages God's household, he must be blameless—not overbearing, not quick-tempered, not given to drunkenness, not violent, not pursuing dishonest gain. Rather, he must be hospitable, one who loves what is good, who is self-controlled, upright, holy and disciplined. He must hold firmly to the trustworthy message as it has been taught, so that he can encourage others by sound doctrine and refute those who oppose it.

Titus 1:6-9.

The biblical standards for leadership in the church are high, and Stovall and Kerri Weems have demonstrated a longstanding pattern of falling short of this measure. Pastors, employees, trustees, friends, co-workers, and independent consultants have attempted to address these failings without success. Worse, the Weemses are completely unrepentant. Instead of accepting this investigation with humility, they have sought to attack and undermine it, by making statements to the news media and on their social media accounts and by attempting to seize control of the Church through the court system. Stovall Weems has repeatedly disparaged the Church's leaders and has refused to accept any responsibility for the trauma and profound hurt that he and Kerri Weems have caused to many. Through their actions, Stovall and Kerri Weems have disqualified themselves from pastoral leadership.

1 Timothy 5:19-20 lays out a process by which the Weemses are to be rebuked, and the Church's bylaws provide for a process of conciliation that Celebration should follow. Additionally, the Church should consider taking the following recommended actions.

## IV.    <u>RECOMMENDATIONS</u>

1.    Accept the resignation of Stovall Weems and Kerri Weems as employees of Celebration effective April 15, 2022 without further compensation or benefits.

2.    Pursue the permanent removal of Stovall Weems and Kerri Weems from any positions of authority relating to the Church, Honey Lake Farms, Honey Lake Clinic, and AWKNG.

3.    Require Stovall Weems and Kerri Weems to account for and return to the Church all funds misappropriated by them.

4.    Remove Stovall Weems and Kerri Weems from the parsonage and sell the property.

5.    Require Northstream Management, Habitat for Wholeness, Honey Lake Farms and AWKNG to repay all receivables and loans made by the Church to those entities.

6.    Report these findings to the appropriate authorities to determine whether criminal charges should be brought.

7.    Engage in the Christian Conciliation Process outlined in Celebration's bylaws.

4883-0877-8013