# Exhibit E

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

CHARLES STOVALL WEEMS, IV
and KERRI WEEMS,

       Case No.: 2022-CA-1047

     Plaintiffs,

       Division:  CV-F

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., KEVIN
CORMIER, MARCUS ROWE,
ANGELA CANNON,
JACOB WILLIAM, and
LEE WEDEKIND, III,

     Defendants.

_____/

## MOTION OF DEFENDANT LEE WEDEKIND, III, TO
## DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

**GUNSTER, YOAKLEY & STEWART, P.A.**
David M. Wells, Esq.
Florida Bar No. 309291
Timothy J. McGinn, Esq.
Florida Bar No. 1000377
1 Independent Drive, Suite 2300
Jacksonville, FL 32202
Telephone:  (904) 354-1980
Facsimile:   (904) 354-2170
dwells@gunster.com
tmcginn@gunster.com

*Attorneys for Defendant Lee Wedekind, III*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 2

ARGUMENT ........................................................................................................ 9

I.    THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS THE PASTORS'
      DEFAMATION CLAIMS. ............................................................................ 12

      A.    The Court Has Already Held The Ecclesiastical Abstention Doctrine Bars
            The Pastors' Defamation Claims Because They Would Require The Court
            To Engage In An Impermissible Inquiry Concerning The Church's Internal
            Affairs. ........................................................................................... 13

      B.    The Ecclesiastical Abstention Doctrine Bars The Pastors' Defamation
            Claims Because They Would Require The Court To Engage In An
            Impermissible Inquiry Concerning The Church's Employment And
            Disciplinary Decisions. ..................................................................... 19

II.   THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS PASTOR
      KERRI'S PRIVACY AND EMOTIONAL DISTRESS CLAIMS. ............... 22

CONCLUSION ..................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Archdiocese of Miami, Inc. v. Minagorri,*
    954 So. 2d 640 (Fla. 3d DCA 2007) ..........................................................................11, 24

*Crowder v. S. Baptist Convention,*
    828 F.2d 718 (11th Cir. 1987) ...........................................................................................9

*Diocese of Palm Beach, Inc. v. Gallagher,*
    249 So. 3d 657 (Fla. 4th DCA 2018) ...............................................................19, 20, 21

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.,*
    321 So. 3d 245 (Fla. 4th DCA 2021) ..............................................................................22

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.,*
    824 F. App'x 680 (11th Cir. 2020) ...................................................................................9

*Flynn v. Estevez,*
    221 So. 3d 1241 (Fla. 1st DCA 2017) ..................................................................*passim*

*From v. Tallahassee Democrat, Inc.,*
    400 So. 2d 52 (Fla. 1st DCA 1981) ..................................................................................2

*Goodman v. Temple Shir Ami, Inc.,*
    712 So. 2d 775 (Fla. 3d DCA 1998) ...............................................................20, 21, 22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,*
    565 U.S. 171 (2012) ........................................................................................10, 11, 12

*Hutchison v. Thomas,*
    789 F.2d 392 (6th Cir. 1986) ..........................................................................................10

*Kedroff v. St. Nicholas Cathedral,*
    344 U.S. 94 (1952) ...........................................................................................................10

*Larson v. Valente,*
    456 U.S. 228 (1982) ........................................................................................................10

*Malicki v. Doe,*
    814 So. 2d 347 (Fla. 2002) .............................................................................................10

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972) ..........................................................................................11

*Napolitano v. St. Joseph Catholic Church,*
    308 So. 3d 274 (Fla. 5th DCA 2020) ...............................................................10, 12, 22

*NLRB v. Catholic Bishop of Chi.*,
    440 U.S. 490 (1979)...............................................................................................22

*Readon v. WPLG, LLC*,
    317 So. 3d 1229 (Fla. 3d DCA 2021) ...........................................................18, 19

*Se. Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis*,
    862 So. 2d 842 (Fla. 4th DCA 2003) ...................................................11, 20, 24

*Seminole Tribe of Fla. v. McCor*,
    903 So. 2d 353 (Fla. 2d DCA 2005) ...............................................................8

*Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*,
    426 U.S. 696 (1976)...............................................................................................9

*Simpson v. Wells Lamont Corp.*,
    494 F.2d 490 (5th Cir. 1974) ...........................................................................10

*Smith v. Cuban Am. Nat'l Found.*,
    731 So. 2d 702 (Fla. 3d DCA 1999) ...............................................................2

*Springhill Missionary Baptist Church, Inc. v. Mobley*,
    251 So. 3d 281 (Fla. 1st DCA 2018) ......................................................1, 9, 19

*Weems v. Celebration Church of Jacksonville, Inc.*,
    No. 2022-CA-1047 (Fla. Cir. Ct. Duval Cty. Sept. 28, 2022) ................................. *passim*

## Statutes & Rules

Fla. R. Civ. P. 1.140(b)(1) .................................................................................1

## Biblical Authorities

Matthew 7:15–20 ..................................................................................................7

1 Peter 5:1–3 ........................................................................................................7

1 Timothy 3:1–5 ...................................................................................................7

Titus 1:6–9 ...........................................................................................................7

Defendant Lee Wedekind, III, moves pursuant to Rule 1.140(b)(1) of the Florida Rules of Civil Procedure to dismiss this action with prejudice on the ground that the ecclesiastical abstention doctrine bars this Court from exercising subject-matter jurisdiction over the parties' dispute.

**<u>INTRODUCTION</u>**

No secular court may intrude upon a church's autonomous management of its internal affairs. *Flynn v. Estevez*, 221 So. 3d 1241, 1246 (Fla. 1st DCA 2017). Indeed, this Court dismissed the Second Amended Complaint of Plaintiffs Charles Stovall Weems, IV, and Kerri Weems (together, the "Pastors") because their claims would have "require[d] th[e] Court to impermissibly examine the inner workings of Celebration Church, including the [C]hurch's internal financial policies and bylaws, as well as the duties and actions of Pastor Weems." *Weems v. Celebration Church of Jacksonville, Inc.*, No. 2022-CA-1047, slip op. at 8 (Fla. Cir. Ct. Duval Cty. Sept. 28, 2022) ("Dismissal Order").

The Court must dismiss the Pastors' Third Amended Complaint for the same reason. Although the Pastors now omit many of the Second Amended Complaint's allegations concerning the parties' struggle for control of Celebration Church of Jacksonville, Inc. (the "Church"), there is no way to separate the statements on which the Pastors sue from the context in which Defendants made those statements: a report detailing the Church-led investigation of the Pastors' misconduct and a letter to "Celebration Church Family and Staff" explaining why the Church's board of trustees had suspended the Pastors from their positions within the Church and then accepted their resignations. *See, e.g.*, *Springhill Missionary Baptist Church, Inc. v. Mobley*, 251 So. 3d 281, 283 (Fla. 1st DCA 2018) (amended complaint "omitted references to heresy and described the church's actions in more general terms"; letter in which allegedly defamatory statements were made

1

established court would need to "intrude into church doctrine in violation of the ecclesiastical abstention doctrine"); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) ("To determine whether a statement is defamatory, it must be considered in the context of the publication."); *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) (citation omitted) ("[D]etermining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality and the context in which it was uttered or published. . . . [T]he court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.").

Any judicial inquiry into the investigation report and the board's accompanying explanation of both its actions and the Pastors' departure would therefore require the same impermissible examinations of the Church's "inner workings" and the Pastors' "duties and actions" that compelled the Court to dismiss the Pastors' Second Amended Complaint. Consistent with its prior order, the Court should dismiss the Third Amended Complaint for lack of subject-matter jurisdiction—this time, with prejudice.

## FACTUAL BACKGROUND

The Pastors founded the Church in 1998. (Doc. D56 Ex. A (Weems Decl.) ¶ 2.) Pastor Stovall was the Church's senior pastor, president, and chair of the board of trustees. (*Id.*) Pastor Kerri "pastor[ed] [the Church] alongside her husband," "serve[d] on the Senior Executive Team at [the Church,] and provide[d] leadership oversight to several areas including staff development, strategic ministry development, and Celebration Sisterhood." (Doc. D51 (McGinn Decl.) Ex. A (Pastors' Facebook Page) at 1.)

In January 2022, the Church's board of trustees suspended the Pastors from their positions within the Church, placed them in "not good standing" under the Church's bylaws, and retained the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") to investigate allegations concerning their stewardship of the Church and its assets. (Report at 3.) The Pastors resisted the investigation and the board's exercise of its authority over them and the Church. Pastor Stovall attempted to remove trustee Kevin Cormier from the Church's board amidst Mr. Cormier's calls (with other Church leaders) for an investigation into the Pastors' potential misconduct (*see* Doc. D46 Ex. D), and the Pastors sought an injunction that would have lifted their suspensions, returned them to "their pre-suspension positions at the Church," restored "their base salary and benefits arrangements and back pay," and halted the board-authorized investigation. (*See* Compl. ¶¶ 93–101.) On their social media platforms and in statements to the press, the Pastors repeatedly criticized the investigation and disparaged the Church and the board of trustees. (Report at 3.)

No injunction was granted, and Nelson Mullins—through Mr. Wedekind and others— conducted and completed its investigation of the Pastors on behalf of the Church. Mr. Wedekind and Nelson Mullins performed their investigation according to biblical principles. (Report at 6.) Over the course of several months, the firm reviewed thousands of pages of documents and conducted more than 20 interviews with current and former Church leaders, staff, trustees, advisors, and consultants—but not the Pastors, who refused to be interviewed. (Report at 3.)

On April 15, 2022, shortly before Nelson Mullins issued its investigation report to the board of trustees, Pastor Stovall resigned as senior pastor, president, chief executive officer, chair, trustee, and registered agent of the Church. (Weems Decl. ¶ 18 & Ex. A.) Pastor Stovall's resignation letter asserted that "[t]he Trustees' actions leave me and my family with no choice but to legally separate from [the Church] and continue our ministry elsewhere, placing ourselves under

the proper accountability and oversight of a council of apostolic pastors and elders . . . that understand and model biblical governance." (*Id.* Ex. A.) Pastor Stovall further asserted: "I shall not and cannot be legally connected to any church in which the leadership abandons the clear biblical principles and scriptural qualifications for spiritual covering, spiritual authority, and ecclesiastical governance and oversight." (*Id.*) The Pastors posted Pastor Stovall's resignation letter on Instagram, and numerous media outlets reported both Pastor Stovall's resignation and his claim that the Church had abandoned "biblical principles and spiritual qualifications . . . for ecclesiastical governance and oversight."[1]

Shortly thereafter, Nelson Mullins provided its report to the board of trustees "to assist the Board in fulfilling its biblical and legal obligations." (Report at 4.) The firm concluded that, "[s]ince at least 2019, the [Pastors'] leadership of the Church ha[d] been inconsistent and unbiblical." (*Id.* at 6.) The report said Pastor Stovall had "acted erratically, creating a culture of confusion and disarray that ha[d] hindered the Church from effectively carrying out its mission." (*Id.*) It also said Pastor Stovall's "leadership was marked by rampant spiritual and emotional abuse, including manipulation, a profound sense of self-importance and selfishness, superiority and entitlement and unreasonable demands on employees' time, a lack of accountability or humility, demands of absolute loyalty and compliance, public shaming and humiliation of employees, coercion, shunning, gaslighting, and the creation of a culture of fear and intimidation in which it was not safe to disagree with" him. (*Id.* at 6–7.)

---

[1] *See, e.g.*, Steve Patterson, *Celebration Church founder Stovall Weems quits; vows to 'continue our ministry elsewhere'*, FLORIDA TIMES-UNION (April 19, 2022, 12:37 PM), https://www.jacksonville.com/story/news/local/2022/04/19/stovall-weems-quits-celebration-church-jacksonville-lawsuit-not-done/7365312001/ (McGinn Decl. Ex. A); Stacey Readout, *Celebration Church founding pastor steps down amid legal battle*, NEWS4JAX (April 19, 2022, 4:37 AM), https://www.news4jax.com/news/local/2022/04/19/celebration-church-founding-pastor-steps-down-amid-legal-battle/ (McGinn Decl. Ex. B).

According to the report, the Pastors' behavior had "dramatically changed" after a Seder service on Passover in 2018, during which Pastor Stovall claims he had a personal encounter with Jesus (the "Encounter"). (*Id.* at 9–10.) Pastor Stovall told others that he had been transported to the Last Supper and that Jesus had "direct[ed] his attention to the future and what Christ wanted for the [Pastors] to accomplish on Earth." (*Id.* at 9.) Witnesses Nelson Mullins interviewed said that Pastor Stovall visibly shook and sobbed in the days after the Encounter and that Pastor Kerri, who had "openly discussed" her history of clinical depression, had "expressed being suicidal as a result of the Encounter and [Pastor Stovall's] behavior following it." (*Id.* at 10.) Pastor Stovall came to use the Encounter "to justify his authority and maintain control of the Church," rejecting criticism on the grounds that "direction was given to him by God through the Encounter" and that "he had only disclosed part of the vision God deposited in him through the Encounter." (*Id.*) The Encounter "magnified [Pastor Stovall's] demand for control and his defiance to authority or accountability," and he replaced "[a]nyone" who questioned his judgment or did not serve the Pastors' needs accordingly. (*Id.*)

Additionally, the report identified a series of improper financial transactions Pastor Stovall had carried out at the expense of the Church and without the approval of its board of trustees. (*Id.* at 6.) Specifically:

- Pastor Stovall purchased a property (the "Shellcracker property") for $855,000 through a single-member limited liability company, then re-sold the property to the Church for $1.3 million four months later, having made no improvements to it. (*Id.* at 14–15.) Pastor Stovall did not disclose the Church's purchase of the Shellcracker property to the Church's board of trustees. (*Id.* at 14.) He unilaterally increased the Church's debt by $1.3 million, signed the transaction closing documents on behalf of both his LLC and the Church, and pocketed the more-

than $430,000 difference between the price he and his LLC paid for the Shellcracker property and the price for which he then sold the property to the Church. (*Id.*)

- Pastor Stovall directed the Church to spend $1.1 million in Paycheck Protection Program ("PPP") loan proceeds in violation of PPP rules without notice to or authorization by the Church's board of trustees. (*Id.* at 16–17.)

- Pastor Stovall invested $500,000 in Church debt in TurnCoin, an illiquid digital security, without the board of trustees' knowledge or approval. (*Id.* at 17.) He directed that the Church's books and records identify the $100,000 the Church invested directly in TurnCoin as a liquid asset, which it is not. (*Id.* at 18.) And Pastor Stovall gave $400,000 in Church debt (namely, PPP loan proceeds) to entities he controlled and "people with whom he had a personal relationship" so they could invest in TurnCoin and Pastor Stovall could qualify as a TurnCoin "legacy investor" who would be "entitled to be paid back before other investors" and "10% interest on [his] investment." (*Id.* at 17, 18.) The report concluded that "high-risk investments" like TurnCoin "are inconsistent with the Church's investment risk profile and its duty to serve as a faithful steward of sacrificially-donated funds." (*Id.* at 18.)

- Despite the Church's uncertain financial position, and without board authorization, Pastor Stovall wrote off a loan of $1.3 million the Church had made to Honey Lake Farms, an entity he controls, to strengthen Honey Lake Farms' financial position and increase its chances of obtaining a loan. (*Id.* at 18–19.)

- At Pastor Stovall's direction, his AWKNG organization solicited $29,486.75 in mission funds from Church members. (*Id.* at 19.) After AWKNG shut down and the Church assumed responsibility for those missions, AWKNG refused to transfer or account for the mission funds. (*Id.*)

- Pastor Stovall unilaterally moved the Church's operating funds out of the bank that provided the Church a $2 million line of credit. (*Id.*) When Pastor Stovall's AWKNG organization missed a credit card payment, the bank examined all related accounts, including the Church's accounts, and reduced the Church's credit limit from $2 million to $200,000—approximately half the $400,000 per month the Church averaged in credit card expenses. (*Id.*) The bank then revoked the Church's credit line in its entirety. (*Id.* at 20.) Pastor Stovall's actions therefore significantly compromised the Church's operations. (*Id.*)

A senior pastor of the Church may be disciplined for "immoral conduct" or "improper financial practices" (Bylaws Art. 7.07(a)), and Nelson Mullins opined that each of its findings regarding Pastor Stovall's leadership "constitute[d] a separate and independent basis justifying the discipline of [Pastor Stovall], up to and including ratifying the removal of his leadership position and termination of his employment." (Report at 7.) The firm concluded that, "[s]piritually, the [Pastors] have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture[.]" (Report at 20–21 (quoting Matthew 7:15–20; 1 Peter 5:1–3; 1 Timothy 3:1–5; Titus 1:6–9).)

The report explained that the Pastors had "fall[en] short" of the "biblical standards for leadership" by not modifying their behavior when others attempted to address their shortcomings, being unrepentant, attacking and undermining the investigation of their misconduct instead of accepting it with humility, and, in Pastor Stovall's case, disparaging the Church's leaders and "refus[ing] to accept any responsibility for the trauma and profound hurt he and Kerri Weems have caused to many." (*Id.* at 21.) The report concluded that, "[t]hrough their actions, Stovall and Kerri Weems have disqualified themselves from pastoral leadership." (*Id.*)

The board of trustees accepted Nelson Mullins's findings and its recommendations. (*See generally* Doc. D51 (McGinn Decl.) Ex. B (Celebration Website Excerpt).[2]) It then informed the Church's congregation of "the difficult decisions" it had made concerning the investigation of Pastor Stovall, including the decision to place him in "'not good standing' . . . pending an investigation into instances of pastoral misconduct." (*Id.*) The board recited the basic facts of Nelson Mullins's investigation and said that "[p]astoral misconduct was found to be present based on facts and corresponding documentation." (*Id.*) The board told the congregation that it had accepted each of Nelson Mullins's recommendations, including the recommendations that the board accept the Pastors' resignation and that the Church engage in the Christian Conciliation Process outlined in the Church's bylaws. (*Id.*) The investigation report was attached to the board of trustees' message to the congregation "[t]o ensure the transparency of this process and promote healing and restoration[.]" (*Id.*)

Pastor Stovall asserts claims against Mr. Wedekind for defamation (Count III) and conspiracy to defame (Count VII). Pastor Kerri asserts claims against Mr. Wedekind for defamation (Count VI), conspiracy to defame (Count VIII), invasion of privacy (Count IX), public disclosure of private facts (Count X), intentional infliction of emotional distress (Count XI), and conspiracy to invade privacy (Count XII). All claims are founded upon Nelson Mullins's investigation—at the direction of the Church's board of trustees—of the Pastors' leadership of the Church, the firm's investigation report, which informed the trustees' actions, and the trustees' explanation of the Pastors' suspension and departure to Church members and employees.

---

[2] "In considering a motion to dismiss challenging subject matter jurisdiction, a trial court may properly go beyond the four corners of the complaint and consider affidavits." *Seminole Tribe of Fla. v. McCor*, 903 So. 2d 353, 357 (Fla. 2d DCA 2005) (citation omitted) (Canady, J.).

## ARGUMENT

The ecclesiastical abstention doctrine bars this Court from examining the inner workings of the Church, the Pastors' conduct as leaders and stewards of the Church, and the Pastors' compliance with the Church's bylaws and other internal policies. Dismissal Order at 8. The Pastors' Second Amended Complaint asked this Court to examine these ecclesiastical matters, and the Court rightly dismissed it for lack of subject-matter jurisdiction. Now, having been granted leave to amend, the Pastors ask this Court to examine the very same ecclesiastical matters the Court previously declared off-limits. The Court should dismiss the Pastors' Third Amended Complaint for lack of subject-matter jurisdiction—with prejudice—accordingly.

"[R]eligious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). "By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987). Therefore, a civil court must "refrain from adjudicating matters involving 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (citation omitted); *see also Springhill Missionary Baptist Church, Inc.*, 251 So. 3d at 283 (same); *Flynn*, 221 So. 3d at 1245 (same). This ecclesiastical abstention doctrine "provides 'a spirit of freedom for religious organizations, [and] an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those

of faith and doctrine.'"[3] *Napolitano v. St. Joseph Catholic Church*, 308 So. 3d 274, 277 (Fla. 5th

DCA 2020) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)).

　　To determine whether the ecclesiastical abstention doctrine deprives it of subject-matter

jurisdiction over this action, the Court "must determine whether the dispute is an ecclesiastical one

about discipline, faith, internal organization, or ecclesiastical rule, custom, or law, or whether it is

a case in which it should hold religious organizations liable in civil courts for purely secular

disputes between third parties and a particular defendant, albeit a religiously affiliated

organization."  Dismissal Order at 3 (cleaned up) (quoting *Malicki v. Doe*, 814 So. 2d 347, 355

(Fla. 2002).  If "the dispute requires 'inquiry into or resolution of an ecclesiastical matter,' the

ecclesiastical abstention doctrine acts as a jurisdictional bar and requires the claim to be

dismissed."[4]  *Id.* (quoting *Flynn*, 221 So. 3d at 1247); *see also Napolitano*, 308 So. 3d at 279

(citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196

(2012)) (if "dispute is one of discipline, faith, internal organization, or ecclesiastical rule, custom

---

[3] As the Court held in dismissing the Pastors' Second Amended Complaint, the ecclesiastical
abstention doctrine provides this independence from secular control and power to decide matters
of church government free from state interference to hierarchical and congregational churches
alike.  Dismissal Order at 4–6; *see also Larson v. Valente*, 456 U.S. 228, 246 (1982) ("Since
*Everson v. Board of Education*, this Court has adhered to the principle, clearly manifested in the
history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion'
or that 'prefer one religion over another.'").

[4] The neutral principles of law test, which the Pastors advanced previously, does not apply to any
dispute requiring inquiry into or resolution of an ecclesiastical matter.  *See* Dismissal Order at 3–
4 (citing *Napolitano*, 308 So. 3d at 278); *see also Hutchison v. Thomas*, 789 F.2d 392, 396 (6th
Cir. 1986) ("The 'neutral principles' doctrine has never been extended to religious controversies
in the areas of church government, order and discipline, nor should it be."); *Simpson v. Wells
Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) (ecclesiastical abstention doctrine applied to
dispute over pastor's firing—in which church asserted it fired pastor for "inefficiency" and pastor
asserted church fired him for his views on race and because of his wife's race—notwithstanding
absence of differences over religious doctrine).

or law . . . secular courts lack the authority to resolve the dispute and there is no need for judicial balancing tests—the First Amendment has already struck that balance.").

The First District Court of Appeal has explained that the ecclesiastical abstention doctrine "has its core application in cases where a court [would] intrude[] on a church's autonomous management of its own internal affairs and property, thereby either burdening or inhibiting the exercise of religious freedom (free exercise clause) or fostering an excessive government entanglement with religion (establishment clause)." *Flynn*, 221 So. 3d at 1246. Thus, the doctrine bars a secular court from exercising jurisdiction over internal matters like employment and disciplinary disputes between churches and their leaders. *See, e.g.*, *Se. Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis*, 862 So. 2d 842, 844 (Fla. 4th DCA 2003) (citations omitted); *Archdiocese of Miami, Inc. v. Minagorri*, 954 So. 2d 640, 641 (Fla. 3d DCA 2007) (citations omitted) (ecclesiastical abstention doctrine "precludes courts from exercising jurisdiction where an employment decision concerns a member of the clergy or an employee in a ministerial position").[5]

The doctrine's jurisdictional prohibition of judicial interference with a church's autonomous management of its internal affairs is closely related to the "ministerial exception" to certain generally applicable employment laws. *Flynn*, 221 So. 3d at 1246. Both protect "a religious body's right to self-governance," its "ability to select, and to be selective about, those who will serve as the very 'embodiment of its message' and 'its voice to the faithful,'" and "its

---

[5] *See also Hosanna-Tabor*, 565 U.S. at 188–89 ("According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."); *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972) ("The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.").

freedom to speak in its own voice, both to its own members and to the outside world." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) (discussing ministerial exception).

The Pastors' Third Amended Complaint omits many of the Second Amended Complaint's allegations about the power struggle between the Church and its former leaders, but it cannot hide that the Pastors are ultimately asking the Court to intrude upon the Church's management of its internal affairs and to adjudicate disputes between the Church and the Pastors over the allocation of power within the Church during the Pastors' tenure, the Pastors' conduct as leaders of the Church, the board's investigation of the Pastors and the measures it took after concluding the Pastors had engaged in conduct antithetical to pastoral leadership, and the board's communications with the Church's members regarding the Pastors' misconduct. This Court has no jurisdiction to hear such disputes. *See Flynn*, 221 So. 3d at 1246; *Napolitano*, 308 So. 3d at 279.

## I. THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS THE PASTORS' DEFAMATION CLAIMS.

The Third Amended Complaint alleges Defendants defamed the Pastors in statements in the investigation report concerning Pastor Stovall's unauthorized financial transactions and Pastor Kerri's response to the Encounter and Pastor Stovall's subsequent behavior. But the Court has already held that the ecclesiastical abstention doctrine bars the Pastors from asserting claims based on these subjects. Dismissal Order at 8. Even if the Court had not already held the Pastors' claims barred, the ecclesiastical abstention doctrine would divest the Court of subject-matter jurisdiction over the Pastors' defamation claims because they are founded on protected statements the Church made in connection with employment and disciplinary decisions. The Pastors' amended defamation claims should be dismissed with prejudice accordingly.

A.    **The Court Has Already Held The Ecclesiastical Abstention Doctrine Bars The Pastors' Defamation Claims Because They Would Require The Court To Engage In An Impermissible Inquiry Concerning The Church's Internal Affairs.**

In dismissing the Pastors' Second Amended Complaint, the Court held that the ecclesiastical abstention doctrine bars the Pastors from asserting claims based on the portions of the investigation report concerning Pastor Stovall's unauthorized financial transactions and the Pastors' "history" with the Church. Dismissal Order at 7–8. The Court explained that such "claims would require th[e] Court to impermissibly examine the inner workings of Celebration Church, including the [C]hurch's internal financial policies and bylaws," and "look to the time Pastor [Stovall] was employed by the Church to see whether he did or did not partake in the actions as alleged by the Church and whether those actions were forbidden by the Church's bylaws and other internal policies." *Id.* at 8. Ignoring the guidance the Court provided in its Dismissal Order, Counts III, VI, VII, and VIII of the Pastors' Third Amended Complaint assert defamation and conspiracy to defame claims founded on nine statements in the investigation report concerning Pastor Stovall's unauthorized financial transactions and Pastor Kerri's history with the Church— the very same subjects the Court previously held would require an impermissible inquiry into the Church's internal affairs. The Court should dismiss Counts III, VI, VII, and VIII accordingly.[6]

First, the Pastors allege the investigation report "falsely states that Stovall Weems 'engaged in a series of improper and unauthorized financial transactions through which he personally benefitted, either directly or indirectly, at the expense of the [C]hurch." (Third Am. Compl. ¶¶ 58(a), 73(a), 88(a), 103(a), 118(a), 133(a) (emphases added).) The Court cannot determine whether the transactions at issue were proper or improper, authorized or unauthorized, without

---

[6] Counts I, II, IV, and V—which are asserted against the Church and certain members of its board of trustees—should be dismissed for the same reasons.

examining the Church's "inner workings," its "internal financial policies," and its allocation of spending power between Pastor Stovall and the board of trustees. The Court has already held the ecclesiastical abstention doctrine bars any such examinations. Dismissal Order at 8.

      <u>Second</u>, the Pastors allege the investigation report "falsely states that the [Pastors] made 'material misrepresentations' to Wesleyan Investment Foundation ('WIF') and 'embezzled profit' from the sale of" the Shellcracker property. (Third Am. Compl. ¶¶ 58(b), 73(b), 88(b), 103(b), 118(b), 133(b).) The portion of the investigation report to which the Pastors are referring explains (i) Pastor Stovall bought the Shellcracker property through an LLC for $855,000, then re-sold it to the Church months later for $1.29 million, having made no improvements to the property, (ii) Pastor Stovall executed the transaction closing documents for his LLC and the Church, (iii) the board of trustees did not authorize, or receive notice of, the Church's purchase of the Shellcracker property from Pastor Stovall's LLC at a $431,386 markup (or any price), and (iv) Pastor Stovall told WIF that the board of trustees had approved the transaction when it had not. (Report at 14–15.) The Court cannot determine whether Pastor Stovall misrepresented his authority to WIF or embezzled from the Church through his unauthorized, self-interested sale of the Shellcracker property to the Church without impermissibly examining the Church's inner workings—including whether the Shellcracker property transaction required the board of trustees' approval under the Church's internal financial policies and bylaws and whether the board gave its approval. *See* Dismissal Order at 8.

      <u>Third</u>, the Pastors allege the investigation report "falsely states" that Pastor Stovall misused the Church's PPP loan proceeds, including by purchasing TurnCoin; was deceptive about the TurnCoin investments; deceptively identified the TurnCoin investments on the Church's books and records; and benefited personally from the TurnCoin investments. (Third Am. Compl.

¶¶ 58(c), 73(c), 88(c), 103(c), 118(c), 133(c).)  The section of the investigation report the Pastors cite explains (i) the Church's internal policies required that the board of trustees approve any expenditure over $5,000; (ii) under the Church's bylaws, the board must approve or disapprove any transfer of Church assets to another tax-exempt organization; (iii) in violation of the Church's articles of incorporation, bylaws, and expenditure policies, Pastor Stovall distributed more than $1 million in PPP loan proceeds without notice to or authorization by the board, including more than $850,000 in unapproved transfers to other tax-exempt organizations and $500,000 that funded TurnCoin purchases; (iv) Pastor Stovall directed that the illiquid TurnCoin investment be falsely recorded as cash currency on the Church's books and records; (v) Pastor Stovall stands to benefit personally from the TurnCoin investments he funded with the Church's PPP loan proceeds; and (vi) TurnCoin investments are too risky for the Church.  (Report at 15–18.)

The Court cannot determine whether Pastor Stovall misused the Church's PPP loan proceeds and deceived the Church regarding the use of its debt to fund TurnCoin investments without examining the Church's "internal financial policies and bylaws" and "look[ing] to the time Pastor [Stovall] was employed by the Church to see whether he did or did not partake in the actions as alleged by the Church and whether those actions were forbidden by the Church's bylaws and other internal policies."  *See* Dismissal Order at 8.  Again, the Court has already held the ecclesiastical abstention doctrine bars these inquiries.  *See id.*

Fourth, the Pastors allege the investigation report "falsely states" that Pastor Stovall fraudulently mischaracterized the debt Honey Lake Farms owed the Church and then forgave the debt without authorization.  (Third Am. Compl. ¶¶ 58(d), 73(d), 88(d), 103(d), 118(d), 133(d).) Any determination of how Pastor Stovall should have characterized the debt Honey Lake Farms owed the Church and whether he had the authority to forgive the debt without the board of trustees'

approval would require the Court to review the Church's inner workings, bylaws, and internal
financial policies in violation of the ecclesiastical abstention doctrine.  Dismissal Order at 8.

Fifth, the Pastors allege the investigation report "falsely states" that the Pastors
misappropriated mission funds donated to AWKNG.  (Third Am. Compl. ¶¶ 58(e), 73(e), 88(e),
103(e), 118(e), 133(e).)  The investigation report explains Church members donated $29,486.75
to AWKNG for missions, AWKNG shut down, the Church assumed responsibility for the
AWKNG missions, and AWKNG refused to transfer or account for the mission funds.  (Report at
19.)  The Court cannot determine whether the Pastors misappropriated the mission funds without
examining Pastor Stovall's "duties and actions" and whether the Church's internal financial
policies and bylaws required the Pastors to account for the donated funds.  Dismissal Order at 8.
As the Court has recognized, the ecclesiastical abstention doctrine bars this examination.  *See id*.

Sixth, the Pastors allege the investigation report "falsely states" that Pastor Stovall
"'unilaterally' changed banks in early 2021, causing the revocation of the [C]hurch's credit line"
and the depletion of its cash reserves.  (Third Am. Compl. ¶¶ 58(f), 73(f), 88(f), 103(f), 118(f),
133(f) (emphasis added).)  To determine whether Pastor Stovall unilaterally moved the Church's
operating funds from its primary bank and lender to another bank, the Court must examine the
Church's inner workings—including who decided to move the Church's operating funds, whether
Pastor Stovall had the authority to transfer the funds himself, whether the Church's internal
financial policies and bylaws required the board of trustees to approve the relocation of the
Church's funds, and whether the board authorized Pastor Stovall to act.  The Court has held these
inquiries are barred by the ecclesiastical abstention doctrine.  *See* Dismissal Order at 8.

Seventh, the Pastors allege the investigation report "falsely states" that Pastor Stovall
"'violated the law by breaching his fiduciary duties to Celebration, committing fraud, unjustly

enriching himself at the expense of the Church, and failing to meet the fiduciary duties and standards of care required of his office' and 'brought Celebration to the brink of insolvency.'" (Third Am. Compl. ¶¶ 58(g), 73(g), 88(g), 103(g), 118(g), 133(g).)  As explained above, the Court cannot inquire into whether Pastor Stovall committed fraud, enriched himself at the expense of the Church, or mismanaged the Church's finances without engaging in an impermissible inquiry.  *See* Dismissal Order at 8; *supra* at 13–16.  Nor, as the Court held previously, can it examine the "duties and actions of" Pastor Stovall or whether "he did or did not partake in the actions as alleged by the Church and whether those actions were forbidden by the Church's bylaws and other internal policies"—which would preclude any adjudication of whether he breached his fiduciary duties or failed to meet the standards of his office.  *See* Dismissal Order at 8, 9.

Eighth, the Pastors allege the investigation report "falsely states" the Pastors should be required to account for misappropriated Church funds and reported to criminal authorities.  (Third Am. Compl. ¶¶ 58(h), 73(h), 88(h), 103(h), 118(h), 133(h).)  Again, the Court cannot examine these claims—whether Pastor Stovall improperly benefitted from his sale of the Shellcracker property to the Church at a tremendous, unexplained markup; whether he misspent the Church's PPP loan proceeds without obtaining required approvals from the board of trustees; whether he improperly wrote off the Honey Lake Farms debt without authorization—without engaging in inquiries the Court has already held are barred by the ecclesiastical abstention doctrine.  *See* Dismissal Order at 8; *supra* at 13–16.

Ninth, Pastor Kerri alleges the investigation report falsely states she was "'distraught and overwhelmed by her husband's behavior' and 'suicidal as a result of the Encounter and [Pastor Stovall's behavior following it.'" (Third Am. Compl. ¶¶ 103(a)[sic], 118(i), 133(i).)  But the Court has already rejected Pastor Kerri's invitation "to look into the history between the Church and the

[Pastors]" and "examine the inner workings" of the Church—including Pastor Stovall's Encounter with Jesus and the Pastors' response to it.  Dismissal Order at 8.  There is no way to adjudicate Pastor Kerri's claim without pursuing this impermissible inquiry.

Furthermore, although the Pastors attempt to slice the investigation report as thinly as possible to avoid the application of the ecclesiastical abstention doctrine, there is no separating the statements that are the subject of the Third Amended Complaint's defamation counts from the remainder of the investigation report and the circumstances in which it was prepared for at least two reasons.

To begin with, in the actual malice section of the Third Amended Complaint, the Pastors allege Defendants had "personal and economic" reasons for ignoring facts disproving or casting doubt on the report's findings and that "[e]ven a cursory review of the facts surrounding the events described in the [investigation report] revealed the falsity of the charges made against [the Pastors]."  (3d Am. Compl. ¶¶ 47, 54.)  "The facts surrounding the events described" in the report necessarily include the Pastors' battle with Defendants for control of the Church, and any adjudication of Defendants' reasons for publishing the report would require an impermissible inquiry into that battle and the sufficiency of Defendants' reasons for removing the Pastors from their posts.  The ecclesiastical abstention doctrine bars these inquiries.  *See* Dismissal Order at 8–10; *infra* at 19–22.

Additionally, there is no separating the nine statements at issue from the broader context of the report in which they were made as a matter of defamation law.  Under Florida's substantial truth doctrine, "a statement does not have to be perfectly accurate if the gist or the sting of the statement is true."  *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234 (Fla. 3d DCA 2021) (cleaned

up). "The key distinction is whether the incorrectly reported material would 'have had a different

effect on the mind of the [reader]' by affecting 'the gist of the story.'" *Id.* at 1235.

There is no way to assess whether the nine statements at issue would have had a different

effect on the mind of the reader by affecting the gist of the investigation report *without*

*consideration of the report in its entirety*.  But, as the Court's order dismissing the Second

Amended Complaint makes clear, any examination of the investigation report in its entirety is

barred by the ecclesiastical abstention doctrine.  Because the Court cannot determine whether the

nine statements at issue are false and defamatory without making an impermissible inquiry into

whether the investigation report is substantially true, each of the Third Amended Complaint's

defamation counts is barred by the ecclesiastical abstention doctrine.

> **B.** **The Ecclesiastical Abstention Doctrine Bars The Pastors' Defamation Claims Because They Would Require The Court To Engage In An Impermissible Inquiry Concerning The Church's Employment And Disciplinary Decisions.**

Because the ecclesiastical abstention doctrine "has its core application in cases where a

court [would] intrude[] on a church's autonomous management of its own internal affairs," *Flynn*,

221 So. 3d at 1246, it is unsurprising that Florida courts have repeatedly held the ecclesiastical

abstention doctrine divests civil courts of subject-matter jurisdiction over defamation claims

founded on statements made in connection with a church's employment or disciplinary decisions.

*See, e.g.*, *Diocese of Palm Beach, Inc. v. Gallagher*, 249 So. 3d 657 (Fla. 4th DCA 2018)

(ecclesiastical abstention doctrine barred defamation claim requiring inquiry into why priest was

not promoted, was reassigned, was hired, retained, or disciplined, and whether diocese's reasons

were valid religious reasons or retaliation for priest's whistleblowing); *Springhill Missionary*

*Baptist Church*, 251 So. 3d at 283 (granting petition for writ of prohibition and holding

ecclesiastical abstention doctrine deprived circuit court of subject-matter jurisdiction over

deacon's defamation claims against pastor and deacon-board chairman founded on statements

made in connection with deacon's termination); *Se. Conference Ass'n of Seventh-Day Adventists, Inc.*, 862 So. 2d at 843–44 (granting petition for writ of prohibition and holding ecclesiastical abstention doctrine deprived circuit court of subject-matter jurisdiction over pastor's claim church did not follow its internal procedures in disciplining him following congregant's allegation of unwelcome sexual overtures); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775 (Fla. 3d DCA 1998) (where rabbi had been dismissed for doctrinal differences and alleged prior assault of senior rabbi, court held "[i]nquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court").  *Gallagher* and *Goodman*—the two authorities on which the Court principally relied in dismissing the Pastors' Second Amended Complaint—are instructive.

In *Gallagher*, the plaintiff priest reported another priest who had shown child pornography to a boy.  *Gallagher*, 249 So. 3d at 659.  After the diocese transferred the plaintiff priest to another church—and did not promote him—the plaintiff accused the diocese of covering up his colleague's misconduct and punishing him for not participating in the cover up.  *Id.* at 659–60.  The diocese told parishioners in letters read during mass, *posted on its website*, and *said to the media* that the plaintiff was a liar, unfit to be a priest, and in need of professional help.  *Id.* at 660.  Despite the diocese's publication of its allegedly defamatory comments to non-church members on its website and through the media, the Fourth District Court of Appeal held the ecclesiastical abstention doctrine barred secular courts from exercising subject matter jurisdiction.  *Id.* at 661–65.

Here, likewise, the Church's explanation of its suspension and separation from the Pastors on its website—following the Pastors' publication of Pastor Stovall's resignation letter, blasting the Church's supposed abandonment of "clear biblical principles and scriptural qualifications for . . . ecclesiastical governance and oversight," on social media—is, in substance, no different from

the diocese's internet posts and responsive statements to the media in *Gallagher*. The ecclesiastical abstention doctrine therefore applies, notwithstanding the Pastors' prior contention that the Church could have communicated with its congregation through less-public channels. *See id.* at 660 (ecclesiastical abstention doctrine barred defamation claims based on contents of "letters to parishioners which were read at masses" *and* "newspaper articles, . . . press statements posted on the diocese webpage, . . . and postings on diocese personnel's social media"). Indeed, the Pastors' invitation to second guess *the medium* the Church chose to disseminate the news that the board had suspended the Pastors and accepted their resignation—their claim that the board should have emailed the news to congregants instead of using the Church's website—highlights the peril to which a religious organization would be exposed if a narrowly drawn ecclesiastical abstention doctrine allowed secular courts to micromanage ecclesiastical communications regarding protected matters of church governance.

*Goodman* likewise compels the application of the ecclesiastical abstention doctrine to the Pastors' claims. In that case, a rabbi sued a temple (his former employer) for defamation and breach of contract and a member of the temple's board of directors for defamation and tortious interference. 712 So. 2d at 776. Certain temple members had opposed the rabbi's continued service, based, in part, on their "disagreement over religious concepts." *Id.* The defendant director also claimed the rabbi previously had struck a senior rabbi at another temple and had been fired as a result. *Id.* After the defendant director made this claim, the rabbi's contract with the temple was not renewed, and temple members "were advised of" both the non-renewal and the temple director's allegation of assault against the rabbi. *Id.* at 777. Although the alleged assault did not concern any doctrinal matter, the Third District Court of Appeal held the ecclesiastical abstention doctrine barred the rabbi's tortious interference and defamation claims because the statements on

21

which the rabbi sued were made in the context of a religious dispute, and the court could not

inquire into whether the rabbi was terminated for doctrinal reasons or because of his alleged prior

assault on other rabbi. *Id.*

The Pastors were likewise disciplined for both their financial misconduct (which violated

both secular law and the Church's biblical principles) *and* their unbiblical leadership. Any one of

the failings Nelson Mullins identified "constitute[d] a separate and independent basis justifying

the discipline of [Pastor Stovall], up to and including ratifying the removal of his leadership

position and termination of his employment." (Report at 7.)  As in *Goodman,* the Court may not

now inquire into, and attempt to disentangle, the board of trustees' reasons for suspending the

Pastors and accepting their resignation. The ecclesiastical abstention doctrine forbids it, and the

Pastors' defamation counts must be dismissed accordingly.[7]

## II.    THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS PASTOR KERRI'S PRIVACY AND EMOTIONAL DISTRESS CLAIMS.

The Third Amended Complaint alleges Defendants invaded Pastor Kerri's privacy and

intentionally inflicted emotional distress on her by disclosing her private medical information and

interactions and conversations that took place within her home, including her discussions about

her history of clinical depression and her suicidal feelings in response to the Encounter and Pastor

Stovall's subsequent behavior. (3d Am. Compl. ¶¶ 159–199.)  But the Court has already held that

---

[7] The ecclesiastical abstention doctrine bars any inquiry into the Church's internal affairs and employment and disciplinary decisions, irrespective of whom the claim requiring the inquiry is asserted against.  *See Napolitano*, 308 So. 3d at 279 (citing *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979)); *see also Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.*, 321 So. 3d 245, 246–47 (Fla. 4th DCA 2021) (ecclesiastical abstention doctrine barred claims by faction asserting control of church that banks negligently transferred control of church bank accounts to rival faction because resolution of dispute would require determination of which faction was entitled to control of church); *Goodman*, 712 So. 2d at 775 (barring claims against temple and director).  The doctrine's jurisdictional bar applies with equal force to the claims asserted against each Defendant, including Mr. Wedekind.

the ecclesiastical abstention doctrine bars Pastor Kerri from asserting claims based on these subjects. Dismissal Order at 8. And even if the Court had not already held these claims barred, the ecclesiastical abstention doctrine would divest the Court of subject-matter jurisdiction over Pastor Kerri's claims because they are founded on protected statements the Church made in connection with employment and disciplinary decisions. Pastor Kerri's privacy and emotional distress claims (Counts IX–XII) should be dismissed with prejudice accordingly.

First, the Court has already held that the ecclesiastical abstention doctrine bars Pastor Kerri from asserting her claims because they would "require this Court to impermissibly examine the inner workings of [the Church]." Dismissal Order at 8. In dismissing the Pastors' Second Amended Complaint, the Court specifically rejected Pastor Kerri's privacy and emotional distress claims because they would require the Court "to look into the history between the Church and the [Pastors]." *Id.* Pastor Kerri's amended claims are no different. They would require the Court to examine, among other things, the Encounter; the Pastors' response to it; to whom, within the Church, Pastor Kerri talked about her feelings regarding the Encounter; whether the information Pastor Kerri shared was to be treated as private or confidential under the Church's bylaws and other internal policies; and who was entitled to access this information under the Church's bylaws and internal policies. As the Court has already held, the ecclesiastical abstention doctrine forbids these inquiries. Dismissal Order at 8.

Likewise, as the Pastors allege Defendants defamed them with actual malice, Pastor Kerri alleges Defendants disclosed her personal information "for their own economic gain and self-interests," "in an unprivileged manner calculated to financially capitalize therefrom," and with actual malice. (*See, e.g.*, 3d Am. Compl. ¶¶ 160, 166, 167.) These allegations necessarily include the Pastors' battle with Defendants for control of the Church and Defendants' motivations, so any

adjudication of Pastor Kerri's privacy and emotional distress claims would require an impermissible inquiry into the parties' power struggle and Defendants' reasons for removing the Pastors from their posts. The ecclesiastical abstention doctrine bars these inquiries. *See* Dismissal Order at 8–10; *supra* at 18.

Second, as explained above, the ecclesiastical abstention doctrine divests civil courts of subject-matter jurisdiction over claims founded on statements made in connection with a church's employment or disciplinary decisions. *See supra* at 19–22; *Se. Conference Ass'n of Seventh-Day Adventists, Inc.*, 862 So. 2d at 844; *Minagorri*, 954 So. 2d at 641. There is no dispute that the Church issued the investigation report in connection with employment or disciplinary decisions— the board's suspension of the Pastors, investigation of them, and acceptance of their resignation. The ecclesiastical abstention doctrine bars Pastor Kerri's claims accordingly. The Court should dismiss them with prejudice.

## **CONCLUSION**

Neither this Court nor any other secular court has subject-matter jurisdiction over the parties' ecclesiastical dispute. The ecclesiastical abstention doctrine requires that the Court dismiss Plaintiffs' Third Amended Complaint with prejudice accordingly.

DATED:  November 17, 2022

Respectfully submitted,

*/s/ Timothy J. McGinn*
**GUNSTER, YOAKLEY & STEWART, P.A.**
David M. Wells, Esq.
Florida Bar No. 309291
Timothy J. McGinn, Esq.
Florida Bar No. 1000377
1 Independent Drive, Suite 2300
Jacksonville, FL 32202
Telephone:(904) 354-1980
Facsimile: (904) 354-2170
dwells@gunster.com
tmcginn@gunster.com

*Attorneys for Defendant Lee Wedekind, III*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 17, 2022, I electronically filed the foregoing

document with the Clerk of the Court through the Florida Courts E-Filing Portal and thereby

furnished copies to the following by email:

Shane B. Vogt
David A. Hayes
Kenneth G. Turkel
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
svogt@tcb-law.com
dhayes@tcb-law.com
kturkel@tcb-law.com
garnold@tcb-law.com
service@tcb-law.com

Lee D. Wedekind, III
NELSON MULLINS RILEY & SCARBOROUGH LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
lee.wedekind@nelsonmullins.com
allison.abbott@nelsonmullins.com

Kristin M. Ahr
NELSON MULLINS RILEY & SCARBOROUGH LLP
360 S. Rosemary Avenue, Suite 1410
West Palm Beach, FL 33401
kristin.ahr@nelsonmullins.com
brooke.werner@nelsonmullins.com

/s/ *Timothy J. McGinn*
Timothy J. McGinn