# Exhibit G

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

CELEBRATION CHURCH OF
JACKSONVILLE, INC.,                          Case No.: 16-2023-CA-000740

     Plaintiff,                             Division:  CV-F

v.

CHARLES S. ("STOVALL") WEEMS, IV,
*et al.*,

     Defendants.
_____/

CHARLES S. WEEMS, IV, *et al.*,

     Counter-Plaintiffs,

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., *et al.*,

     Counter-Defendants.
_____/

## MOTION OF COUNTER-DEFENDANT LEE WEDEKIND, III, TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

     **GUNSTER, YOAKLEY & STEWART, P.A.**
David M. Wells, Esq.
Florida Bar No. 309291
Timothy J. McGinn, Esq.
Florida Bar No. 1000377
1 Independent Drive, Suite 2300
Jacksonville, FL 32202
Telephone: (904) 354-1980
Facsimile:  (904) 354-2170
dwells@gunster.com
tmcginn@gunster.com

*Attorneys for Counter-Defendant Lee Wedekind, III*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

    A.    The Pastors Resign From The Church Amid An Investigation That Ultimately Concludes They Engaged In Pastoral Misconduct And Unbiblical Leadership. ............................................................................. 2

    B.    The Pastors Sue The Church, Certain Trustees, And Mr. Wedekind For Defamation, Invasion Of Privacy, And Intentional Infliction Of Emotional Distress—And This Court Dismisses All Claims Because They Are Barred By The Ecclesiastical Abstention Doctrine. ..................................................... 8

    C.    The Pastors Refuse To Vacate The Church's Property After Resigning, The Church Commences This Eviction Action, And The Pastors Assert Counterclaims Incorporating The Same Allegations This Court Previously Held It Could Not Examine Under The Ecclesiastical Abstention Doctrine. ......... 9

ARGUMENT ............................................................................................................ 10

I.    THE COURT HAS ALREADY HELD THE PASTORS' ALLEGATIONS WOULD REQUIRE IT TO ENGAGE IN IMPERMISSIBLE INQUIRIES CONCERNING THE CHURCH'S INTERNAL AFFAIRS. ........................................... 14

II.    THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS THE PASTORS' CLAIMS BECAUSE THEY WOULD REQUIRE THE COURT TO ENGAGE IN IMPERMISSIBLE INQUIRIES CONCERNING THE CHURCH'S EMPLOYMENT AND DISCIPLINARY DECISIONS. ............................................... 18

CONCLUSION ......................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Archdiocese of Miami, Inc. v. Minagorri*,
    954 So. 2d 640 (Fla. 3d DCA 2007) ...............................................................13

*Coogler v. Rhodes*,
    21 So. 109 (Fla. 1897)......................................................................................17

*Cox v. CSX Intermodal, Inc.*,
    732 So. 2d 1092 (Fla. 1st DCA 1999) .............................................................16

*Crowder v. S. Baptist Convention*,
    828 F.2d 718 (11th Cir. 1987) .........................................................................11

*Diocese of Palm Beach, Inc. v. Gallagher*,
    249 So. 3d 657 (Fla. 4th DCA 2018) ...............................................................18

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.*,
    321 So. 3d 245 (Fla. 4th DCA 2021) ...............................................................15

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*,
    824 F. App'x 680 (11th Cir. 2020) ..................................................................11

*Flynn v. Estevez*,
    221 So. 3d 1241 (Fla. 1st DCA 2017) ...................................................... *passim*

*Franzen v. Poulos*,
    604 So. 2d 1260 (Fla. 3d DCA 1992) ..............................................................20

*Goodman v. Temple Shir Ami, Inc.*,
    712 So. 2d 775 (Fla. 3d DCA 1998).................................................15, 18, 19, 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012).....................................................................................12, 13

*Howard v. Murray*,
    184 So. 3d 1155 (Fla. 1st DCA 2015) .............................................................15

*Hutchison v. Thomas*,
    789 F.2d 392 (6th Cir. 1986) ...........................................................................12

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952)...........................................................................................11

*Larson v. Valente*,
    456 U.S. 228 (1982).........................................................................................11

iii

*Malicki v. Doe*,
    814 So. 2d 347 (Fla. 2002)..............................................................12

*McClure v. Salvation Army*,
    460 F.2d 553 (5th Cir. 1972) ..........................................................13

*McCurdy v. Collis*,
    508 So. 2d 380 (Fla. 1st DCA 1987) ................................................17

*Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*,
    396 U.S. 367 (1970)........................................................................11

*Napolitano v. St. Joseph Cath. Church*,
    308 So. 3d 274 (Fla. 5th DCA 2020) ...........................................11, 12, 14, 15

*NLRB v. Cath. Bishop of Chi.*,
    440 U.S. 490 (1979)........................................................................15

*Rekas v. Polish Nat'l Cath. Church*,
    102 So. 2d 705 (Fla. 1958)..............................................................20

*Se. Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis*,
    862 So. 2d 842 (Fla. 4th DCA 2003) ..........................................13, 19

*Seminole Tribe of Fla. v. McCor*,
    903 So. 2d 353 (Fla. 2d DCA 2005) ..................................................2

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
    426 U.S. 696 (1976)...................................................................11, 20

*Simpson v. Wells Lamont Corp.*,
    494 F.2d 490 (5th Cir. 1974) .....................................................12, 20

*Springhill Missionary Baptist Church, Inc. v. Mobley*,
    251 So. 3d 281 (Fla. 1st DCA 2018) ..........................................11, 18

*Weems v. Celebration Church of Jacksonville, Inc.*,
    No. 2022-CA-1047 (Fla. Cir. Ct. Duval Cty. Sept. 28, 2022) ................... *passim*

## Statutes & Rules

Fla. R. Civ. P. 1.140(b)(1) ..................................................................1

## Biblical Authorities

Matthew 7:15–20 ..............................................................................7

1 Peter 5:1–3 ....................................................................................7

1 Timothy 3:1–5 .................................................................................................................7

Titus 1:6–9 .......................................................................................................................7

Counter-Defendant Lee Wedekind, III, moves pursuant to Rule 1.140(b)(1) of the Florida Rules of Civil Procedure to dismiss the counter-plaintiffs' amended counterclaims with prejudice on the ground that the ecclesiastical abstention doctrine bars this Court from exercising subject-matter jurisdiction over those claims.

## INTRODUCTION

No secular court may intrude upon a church's autonomous management of its internal affairs and property. *Flynn v. Estevez*, 221 So. 3d 1241, 1246 (Fla. 1st DCA 2017).  Indeed, this Court dismissed the Second Amended Complaint of Plaintiffs Charles Stovall Weems, IV, and Kerri Weems (together, the "Pastors") in a related action because their claims "invite[d] th[e] Court's entanglement into Celebration Church's internal matters" and would have "require[d] th[e] Court to impermissibly examine the inner workings of Celebration Church, including the church's internal financial policies and bylaws, as well as the duties and actions of Pastor Weems."  *Weems v. Celebration Church of Jacksonville, Inc.*, No. 2022-CA-1047, slip op. at 7, 8 (Fla. Cir. Ct. Duval Cty. Sept. 28, 2022) ("Dismissal Order").  In dismissing the Pastors' Second Amended Complaint, the Court specifically held it could not make factual findings about "whether the trustees approved a Parsonage and Compensation Agreement for Pastor Weems" and "the history between the Church and the [Pastors]."  *Id.* at 8.

Like their barred claims in the related action, the Pastors' Amended Counterclaims in this action are founded on and incorporate allegations concerning the parties' struggle for control of Celebration Church of Jacksonville, Inc. (the "Church") and a supposed conspiracy and coup against the Pastors.  Any judicial inquiry into the Amended Counterclaims—including the Pastors' assertion of a parsonage agreement with the Church, the Church's investigation and discipline of the Pastors, and the Pastors' separation from the Church—would therefore require the same

impermissible examinations of the Church's "inner workings" and the Pastors' "duties and actions" that compelled the Court to dismiss the Pastors' Second Amended Complaint in the related action.  Consistent with its earlier Dismissal Order, the Court should dismiss the Amended Counterclaims for lack of subject-matter jurisdiction on the ground they are barred by the ecclesiastical abstention doctrine—this time, with prejudice.

## FACTUAL BACKGROUND

### A.    The Pastors Resign From The Church Amid An Investigation That Ultimately Concludes They Engaged In Pastoral Misconduct And Unbiblical Leadership.

The Pastors founded the Church in 1998.  (Am. Counterclaims ¶ 21.)  Pastor Stovall was the Church's senior pastor, president, and chair of the board of trustees.  (*Id.* ¶¶ 23, 24.)  Pastor Kerri "pastor[ed] [the Church] alongside her husband," "serve[d] on the Senior Executive Team at [the Church,] and provide[d] leadership oversight to several areas including staff development, strategic ministry development, and Celebration Sisterhood."  (McGinn Decl. Ex. A (Pastors' Facebook Page) at 1.)[1]

In January 2022, the Church's board of trustees suspended the Pastors from their positions within the Church, placed them in "not good standing" under the Church's bylaws, and retained the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") to investigate allegations concerning their stewardship of the Church and its assets.  (McGinn Decl. Ex. B (Report) at 3.)  The Pastors resisted the investigation and the board's exercise of its authority over them and the Church.  Pastor Stovall attempted to remove trustee Kevin Cormier from the Church's board amidst Mr. Cormier's calls (with other Church leaders) for an investigation into the Pastors'

---

[1] "In considering a motion to dismiss challenging subject matter jurisdiction, a trial court may properly go beyond the four corners of the complaint and consider affidavits." *Seminole Tribe of Fla. v. McCor*, 903 So. 2d 353, 357 (Fla. 2d DCA 2005) (citation omitted) (Canady, J.).

potential misconduct.  (McGinn Decl. Ex. C.)  Those efforts having failed, the Pastors sued the

Church[2], seeking an injunction that would have lifted their suspensions, returned them to "their

pre-suspension positions at the Church," restored "their base salary and benefits arrangements and

back pay," and halted the board-authorized investigation.  (McGinn Decl. Ex. D ¶¶ 93–101.)  On

their social media platforms and in statements to the press, the Pastors repeatedly criticized the

investigation and disparaged the Church and the board of trustees.  (Report at 3.)

No injunction was granted, and Nelson Mullins—through Mr. Wedekind and others—

conducted and completed its investigation of the Pastors on behalf of the Church.  Mr. Wedekind

and Nelson Mullins performed their investigation according to biblical principles.  (Report at 6.)

Over the course of several months, the firm reviewed thousands of pages of documents and

conducted more than 20 interviews with current and former Church leaders, staff, trustees,

advisors, and consultants—but not the Pastors, who refused to be interviewed.  (Report at 3.)

On April 15, 2022, shortly before Nelson Mullins issued its investigation report to the

board of trustees, Pastor Stovall resigned as senior pastor, president, chief executive officer, chair,

trustee, and registered agent of the Church.  (McGinn Decl. Ex. E (Weems Decl.) ¶ 18 & Ex. A.)

Pastor Stovall's resignation letter asserted that "[t]he Trustees' actions leave me and my family

with no choice but to legally separate from [the Church] and continue our ministry elsewhere,

placing ourselves under the proper accountability and oversight of a council of apostolic pastors

and elders . . . that understand and model biblical governance."  (*Id.* Ex. A.)  Pastor Stovall further

asserted: "I shall not and cannot be legally connected to any church in which the leadership

abandons the clear biblical principles and scriptural qualifications for spiritual covering, spiritual

---

[2] *Charles Stovall Weems, IV, et al. v. Celebration Church of Jacksonville, Inc., et al.*, Case No.
2022-CA-1047 (Fla. Cir. Ct. Duval Cty.).

authority, and ecclesiastical governance and oversight." (*Id.*)  The Pastors posted Pastor Stovall's resignation letter on Instagram, and numerous media outlets reported both Pastor Stovall's resignation and his claim that the Church had abandoned "biblical principles and spiritual qualifications . . . for ecclesiastical governance and oversight."[3]

Shortly thereafter, Nelson Mullins provided its report to the board of trustees "to assist the Board in fulfilling its biblical and legal obligations."  (Report at 4.)  The firm concluded that, "[s]ince at least 2019, the [Pastors'] leadership of the Church ha[d] been inconsistent and unbiblical." (*Id.* at 6.)  The report found that Pastor Stovall had "acted erratically, creating a culture of confusion and disarray that ha[d] hindered the Church from effectively carrying out its mission." (*Id.*)  It also said Pastor Stovall's "leadership was marked by rampant spiritual and emotional abuse, including manipulation, a profound sense of self-importance and selfishness, superiority and entitlement and unreasonable demands' on employees' time, a lack of accountability or humility, demands of absolute loyalty and compliance, public shaming and humiliation of employees, coercion, shunning, gaslighting, and the creation of a culture of fear and intimidation in which it was not safe to disagree with" him.  (*Id.* at 6–7.)

According to the report, the Pastors' behavior had "dramatically changed" after a Seder service on Passover in 2018, during which Pastor Stovall claims he had a personal encounter with Jesus (the "Encounter").  (*Id.* at 9–10.)  Pastor Stovall told others that he had been transported to the Last Supper and that Jesus had "direct[ed] his attention to the future and what Christ wanted

---

[3] *See, e.g.*, Steve Patterson, *Celebration Church founder Stovall Weems quits; vows to 'continue our ministry elsewhere'*, Florida Times-Union (April 19, 2022, 12:37 PM), https://www.jacksonville.com/story/news/local/2022/04/19/stovall-weems-quits-celebration-church-jacksonville-lawsuit-not-done/7365312001/ (McGinn Decl. Ex. F); Stacey Readout, *Celebration Church founding pastor steps down amid legal battle*, NEWS4JAX (April 19, 2022, 4:37 AM), https://www.news4jax.com/news/local/2022/04/19/celebration-church-founding-pastor-steps-down-amid-legal-battle/ (McGinn Decl. Ex. G).

for the [Pastors] to accomplish on Earth." (*Id.* at 9.)  Witnesses Nelson Mullins interviewed said that Pastor Stovall visibly shook and sobbed in the days after the Encounter and that Pastor Kerri, who had "openly discussed" her history of clinical depression, had "expressed being suicidal as a result of the Encounter and [Pastor Stovall's] behavior following it." (*Id.* at 10.)  Pastor Stovall came to use the Encounter "to justify his authority and maintain control of the Church," rejecting criticism on the grounds that "direction was given to him by God through the Encounter" and that "he had only disclosed part of the vision God deposited in him through the Encounter." (*Id.*)  The Encounter "magnified [Pastor Stovall's] demand for control and his defiance to authority or accountability," and he replaced "[a]nyone" who questioned his judgment or did not serve the Pastors' needs accordingly. (*Id.*)

Additionally, the report identified a series of improper financial transactions Pastor Stovall had carried out at the expense of the Church and without the approval of its board of trustees. (*Id.* at 6.)  Specifically:

- Pastor Stovall purchased a property (the "Shellcracker property") for $855,000 through a single-member limited liability company, then re-sold the property to the Church for $1.3 million four months later, having made no improvements to it. (*Id.* at 14–15.)  Pastor Stovall did not disclose the Church's purchase of the Shellcracker property to the Church's board of trustees. (*Id.* at 14.)  He unilaterally increased the Church's debt by $1.3 million, signed the transaction closing documents on behalf of both his LLC and the Church, and pocketed the more-than-$430,000 difference between the price he and his LLC paid for the Shellcracker property and the price for which he then sold the property to the Church. (*Id.*)

- Pastor Stovall directed the Church to spend $1.1 million in Paycheck Protection Program ("PPP") loan proceeds in violation of PPP rules without notice to or authorization by the Church's board of trustees. (*Id.* at 16–17.)

- Pastor Stovall invested $500,000 in Church debt in TurnCoin, an illiquid digital security, without the board of trustees' knowledge or approval. (*Id.* at 17.) He directed that the Church's books and records identify the $100,000 the Church invested directly in TurnCoin as a liquid asset, which it is not. (*Id.* at 18.) And Pastor Stovall gave $400,000 in Church debt (namely, PPP loan proceeds) to entities he controlled and "people with whom he had a personal relationship" so they could invest in TurnCoin and Pastor Stovall could qualify as a TurnCoin "legacy investor" who would be "entitled to be paid back before other investors" and "10% interest on [his] investment." (*Id.* at 17, 18.) The report concluded that "high-risk investments" like TurnCoin "are inconsistent with the Church's investment risk profile and its duty to serve as a faithful steward of sacrificially-donated funds." (*Id.* at 18.)

- Despite the Church's uncertain financial position, and without board authorization, Pastor Stovall wrote off a loan of $1.3 million the Church had made to Honey Lake Farms, an entity he controls, to strengthen Honey Lake Farms' financial position and increase its chances of obtaining a loan. (*Id.* at 18–19.)

- At Pastor Stovall's direction, his AWKNG organization solicited $29,486.75 in mission funds from Church members. (*Id.* at 19.) After AWKNG shut down and the Church assumed responsibility for those missions, AWKNG refused to transfer or account for the mission funds. (*Id.*)

- Pastor Stovall unilaterally moved the Church's operating funds out of the bank that provided the Church a $2 million line of credit. (*Id.*) When Pastor Stovall's AWKNG organization

missed a credit card payment, the bank examined all related accounts, including the Church's accounts, and reduced the Church's credit limit from $2 million to $200,000—approximately half the $400,000 per month the Church averaged in credit card expenses. (*Id.*) The bank then revoked the Church's credit line in its entirety. (*Id.* at 20.) Pastor Stovall's actions therefore significantly compromised the Church's operations. (*Id.*)

A senior pastor of the Church may be disciplined for "immoral conduct" or "improper financial practices" (McGinn Decl. Ex. H (Bylaws) Art. 7.07(a)), and Nelson Mullins opined that each of its findings regarding Pastor Stovall's leadership "constitute[d] a separate and independent basis justifying the discipline of [Pastor Stovall], up to and including ratifying the removal of his leadership position and termination of his employment." (Report at 7.) The report concluded that, "[s]piritually, the [Pastors] have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture[.]" (Report at 20–21 (quoting Matthew 7:15–20; 1 Peter 5:1–3; 1 Timothy 3:1–5; Titus 1:6–9).)

The report explained that the Pastors had "fall[en] short" of the "biblical standards for leadership" by not modifying their behavior when others attempted to address their shortcomings, being unrepentant, attacking and undermining the investigation of their misconduct instead of accepting it with humility, and, in Pastor Stovall's case, disparaging the Church's leaders and "refus[ing] to accept any responsibility for the trauma and profound hurt he and Kerri Weems have caused to many." (*Id.* at 21.) The report concluded that, "[t]hrough their actions, Stovall and Kerri Weems have disqualified themselves from pastoral leadership." (*Id.*)

The board of trustees accepted the investigation report's findings and its recommendations. (*See generally* McGinn Decl. Ex. I (Celebration Website Excerpt).) It then informed the Church's

congregation of "the difficult decisions" it had made concerning the investigation of Pastor Stovall, including the decision to place him in "'not good standing' . . . pending an investigation into instances of pastoral misconduct." (*Id.*) The board recited the basic facts of Nelson Mullins' investigation and said that "[p]astoral misconduct was found to be present based on facts and corresponding documentation." (*Id.*) The board told the congregation that it had accepted each of Nelson Mullins' recommendations, including the recommendations that the board accept the Pastors' resignation and that the Church engage in the Christian Conciliation Process outlined in the Church's bylaws. (*Id.*)

**B.    The Pastors Sue The Church, Certain Trustees, And Mr. Wedekind For Defamation, Invasion Of Privacy, And Intentional Infliction Of Emotional Distress—And This Court Dismisses All Claims Because They Are Barred By The Ecclesiastical Abstention Doctrine.**

Having resigned their positions with the Church, the Pastors twice amended their complaint for injunctive relief against the Church in *Weems v. Celebration Church of Jacksonville, Inc.*, to assert claims for defamation, invasion of privacy, and intentional infliction of emotional distress against not only the Church but certain of its trustees and Mr. Wedekind. (*See generally* McGinn Decl. Ex. J (2d Am. Compl.).) The Pastors' Second Amended Complaint alleged the defendants had "staged a 'nefarious coup' to 'banish [the Pastors] from the church they founded over two decades ago'" and were "seditionists . . . in control of Celebration Church.'" Dismissal Order at 7 (quoting 2d Am. Compl. at 1–2). The Pastors incorporated these and similar allegations into each of their 12 causes of action. *Id.* The defendants moved to dismiss on the ground that the ecclesiastical abstention doctrine barred a secular court from exercising jurisdiction over the Pastors' claims.

On September 28, 2022, the Court granted the defendants' motion to dismiss. The Court explained that the Pastors' claims "invite[d] th[e] Court's entanglement into Celebration Church's

internal matters" and "would require th[e] Court to impermissibly examine the inner workings of
Celebration Church, including the church's internal financial policies and bylaws, as well as the
duties and actions of Pastor [Stovall]." *Id.* at 7–8.  The Court held it could not make factual
findings regarding, among other things, "whether the trustees approved a Parsonage and
Compensation Agreement for Pastor Weems on December 10, 2019," and "the history between
the Church and the [Pastors]." *Id.* at 8.

      The Pastors subsequently filed a Third Amended Complaint, which the defendants have
moved to dismiss on ecclesiastical abstention grounds.  The Court has not yet heard argument on
those motions.

      **C.**    **The Pastors Refuse To Vacate The Church's Property After Resigning, The
Church Commences This Eviction Action, And The Pastors Assert
Counterclaims Incorporating The Same Allegations This Court Previously
Held It Could Not Examine Under The Ecclesiastical Abstention Doctrine.**

      Although Pastor Stovall resigned from his positions with the Church on April 15, 2022, the
Pastors refused to vacate the Church's Shellcracker property, ignoring the Church's repeated
demands that they do so.  (*See* Compl.)  On June 1, 2022, the Church commenced this action in
county court to obtain judicial enforcement of its property rights.  (*Id.*)  The Pastors initially
answered and asserted affirmative defenses but made no counterclaims of their own.

      But on January 19, 2023—after this Court dismissed the Pastors' Second Amended
Complaint in the related action for lack of subject-matter jurisdiction and the defendants moved to
dismiss the Pastors' Third Amended Complaint—the Pastors amended their answer and asserted
counterclaims against the Church, its pastors, its former chief financial officer, its trustees, and
Mr. Wedekind.  (*See generally* Am. Counterclaims.)  The Pastors allege that before the trustees
placed them in "not good standing" and began investigating them, and before they resigned their
positions at the Church, the Church agreed to buy a parsonage for them to occupy, to pay for a

house manager to do their bidding, to pay Pastor Stovall $100,000 per year, and to pay the Pastors'

corporate arm 10 percent of the Church's annual revenues for 15 years.  (*See, e.g.*, Am.

Counterclaims ¶ 125.)  The Pastors allege the Church breached this supposed agreement and that

the other counter-defendants tortiously interfered.

The Amended Counterclaims' factual allegations are substantially—and, in significant

part, word-for-word—identical to the factual allegations of the dismissed Second Amended

Complaint.  (*Compare* Am. Counterclaims ¶¶ 21–31, 37–46, 49–62, 64–69, 73, 76–77, 80–81, 88–

92, 94–112, 114 *with* 2d Am. Compl. ¶¶ 23–33, 35–37, 45–70, 72–75, 80–95, 99–105,108–113,

122.)  Despite the Court's prior ruling that it could not "examine the inner workings of Celebration

Church," the Pastors again allege a "clandestine plot" against them, culminating in a sham

investigation "end[ing] in the predetermined outcome necessary to complete the coup."  (*See, e.g.*,

Am. Counterclaims ¶¶ 76, 97.)  The Pastors allege the counter-defendants carried out this "coup"

in order "to prevent [them] from receiving the benefits Celebration Church had already agreed to

provide."  (*Id.* ¶ 98.)

## ARGUMENT

The ecclesiastical abstention doctrine bars this Court from examining the inner workings

of the Church, the Pastors' conduct as leaders and stewards of the Church, the Pastors' compliance

with the Church's bylaws and other internal policies, whether the trustees approved a parsonage

and compensation agreement for Pastor Stovall, and the history between the Church and the

Pastors.  Dismissal Order at 8.  The Pastors' Second Amended Complaint in the related action

asked this Court to examine these ecclesiastical matters, and the Court rightly dismissed it for lack

of subject-matter jurisdiction.  Now, despite the Dismissal Order, the Pastors again ask this Court

to examine the ecclesiastical matters the Court previously declared off-limits.  The Court should

dismiss the Pastors' Amended Counterclaims for lack of subject-matter jurisdiction—with prejudice—accordingly.

"[R]eligious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). "By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987). Therefore, a civil court must "refrain from adjudicating matters involving 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (citation omitted); *see also Springhill Missionary Baptist Church, Inc. v. Mobley*, 251 So. 3d 281, 283 (Fla. 1st DCA 2018) (same); *Flynn*, 221 So. 3d at 1245 (same). This ecclesiastical abstention doctrine "provides 'a spirit of freedom for religious organizations, [and] an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"[4] *Napolitano v. St. Joseph Cath. Church*, 308 So. 3d 274, 277 (Fla. 5th DCA 2020) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)).

---

[4] As the Court held in dismissing the Pastors' Second Amended Complaint in the related action, the ecclesiastical abstention doctrine provides this independence from secular control and power to decide matters of church government free from state interference to hierarchical and congregational churches alike. Dismissal Order at 4–6; *see also Larson v. Valente*, 456 U.S. 228, 246 (1982) ("Since *Everson v. Board of Education*, this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'"); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring) (cleaned up) (secular court may "enforce the property decisions made within a church of congregational polity by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government").

To determine whether the ecclesiastical abstention doctrine deprives it of subject-matter jurisdiction, the Court "must determine whether the dispute is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom, or law, or whether it is a case in which it should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." Dismissal Order at 3 (cleaned up) (quoting *Malicki v. Doe*, 814 So. 2d 347, 355 (Fla. 2002)). If "the dispute requires 'inquiry into or resolution of an ecclesiastical matter,' the ecclesiastical abstention doctrine acts as a jurisdictional bar and requires the claim to be dismissed."[5] *Id.* (quoting *Flynn*, 221 So. 3d at 1247); *see also Napolitano*, 308 So. 3d at 279 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196 (2012)) (if "dispute is one of discipline, faith, internal organization, or ecclesiastical rule, custom or law . . . secular courts lack the authority to resolve the dispute and there is no need for judicial balancing tests—the First Amendment has already struck that balance.").

The First District Court of Appeal has explained that the ecclesiastical abstention doctrine "has its core application in cases where a court [would] intrude[] on a church's autonomous management of its own internal affairs and property, thereby either burdening or inhibiting the exercise of religious freedom (free exercise clause) or fostering an excessive government entanglement with religion (establishment clause)." *Flynn*, 221 So. 3d at 1246. Thus, the doctrine

---

[5] The neutral principles of law test, which the Pastors advanced in the related action, cannot apply to any dispute requiring inquiry into or resolution of an ecclesiastical matter. *See* Dismissal Order at 3–4 (citing *Napolitano*, 308 So. 3d at 278); *see also Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) ("The 'neutral principles' doctrine has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be."); *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) (ecclesiastical abstention doctrine applied to dispute over pastor's firing—in which church asserted it fired pastor for "inefficiency" and pastor asserted church fired him for his views on race and because of his wife's race—notwithstanding absence of differences over religious doctrine).

bars a secular court from exercising jurisdiction over internal matters like employment and disciplinary disputes between churches and their leaders. *See, e.g.*, *Se. Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis*, 862 So. 2d 842, 844 (Fla. 4th DCA 2003) (citations omitted); *Archdiocese of Miami, Inc. v. Minagorri*, 954 So. 2d 640, 641 (Fla. 3d DCA 2007) (citations omitted) (ecclesiastical abstention doctrine "precludes courts from exercising jurisdiction where an employment decision concerns a member of the clergy or an employee in a ministerial position").[6]

The doctrine's jurisdictional prohibition of judicial interference with a church's autonomous management of its internal affairs is closely related to the "ministerial exception" to certain generally applicable employment laws. *Flynn*, 221 So. 3d at 1246. Both protect "a religious body's right to self-governance," its "ability to select, and to be selective about, those who will serve as the very 'embodiment of its message' and 'its voice to the faithful,'" and "its freedom to speak in its own voice, both to its own members and to the outside world." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) (discussing ministerial exception).

In their Amended Counterclaims, the Pastors repeat most of their Second Amended Complaint's allegations about the power struggle between themselves and the Church. In so doing, the Pastors make no effort to hide that they are ultimately asking the Court to make a series of impermissible inquiries—to intrude upon the Church's management of its internal affairs and property and to adjudicate disputes between the Church and the Pastors over the allocation of

---

[6] *See also Hosanna-Tabor*, 565 U.S. at 188–89 ("According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."); *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972) ("The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.").

power within the Church during the Pastors' tenure, the Pastors' conduct as leaders of the Church, the trustees' and Mr. Wedekind's investigation of the Pastors, the measures the trustees took after concluding the Pastors had engaged in conduct antithetical to pastoral leadership, and whether the trustees approved the agreement that is the subject of the Pastors' counterclaims.

This Court has no jurisdiction to adjudicate these disputes.  *See Flynn*, 221 So. 3d at 1246; *Napolitano*, 308 So. 3d at 279.  The Court said as much in holding the ecclesiastical abstention doctrine bars the Pastors from asserting defamation and other claims founded on the same intra-Church disputes as the Amended Counterclaims.  *See* Dismissal Order at 8.  Even if the Court had not already so held, the ecclesiastical abstention doctrine would divest the Court of subject-matter jurisdiction over the Pastors' tortious interference and conspiracy claims because they are founded on an employment and disciplinary decision the Court may not examine.  The Pastors' amended tortious interference and conspiracy claims against Mr. Wedekind—the only claims asserted against him—should be dismissed with prejudice accordingly.

I.    **THE COURT HAS ALREADY HELD THE PASTORS' ALLEGATIONS WOULD REQUIRE IT TO ENGAGE IN IMPERMISSIBLE INQUIRIES CONCERNING THE CHURCH'S INTERNAL AFFAIRS.**

The Pastors' Amended Counterclaims would impermissibly entangle this Court in the Church's internal matters—just like the claims the Pastors asserted in their Second Amended Complaint in the related action, and which the Court held were barred by the ecclesiastical abstention doctrine, would have.  In dismissing the Pastors' Second Amended Complaint, the Court held that the ecclesiastical abstention doctrine specifically foreclosed any inquiry into, among other things, the inner workings of the Church, the Church's internal financial policies and bylaws, whether Pastor Stovall "did or did not partake in the actions" alleged in Nelson Mullins' investigation report, whether those actions violated Church bylaws and other internal policies, and whether the trustees approved a parsonage and compensation agreement for Pastor Weems.

14

Dismissal Order at 7–8.  Any adjudication of the Pastors' tortious interference and conspiracy counterclaims against Mr. Wedekind would require the Court to engage in one or more of these barred inquiries.  The Court should dismiss Counts IX and X of the Amended Counterclaims accordingly.

First, the Pastors allege they had—and Mr. Wedekind interfered with—an agreement with the Church under which they would occupy the Shellcracker property as a parsonage, the Church would pay Pastor Stovall $100,000 a year, and the Church would fund the Pastors' lifestyle and mission organization.  (Am. Counterclaims ¶¶ 162, 168.)  The Court expressly held, in dismissing the Second Amended Complaint in the related action, that the ecclesiastical abstention doctrine bars it from determining whether the trustees made such an agreement with the Pastors on the Church's behalf.  *See* Dismissal Order at 8.[7]

Second, the Pastors allege Mr. Wedekind "*unjustifiably* interfered with [the Pastors'] rights flowing from their relationship and agreements with" the Church.  (Am. Counterclaims ¶ 164 (emphasis added).)  But, in the context of a claim for tortious interference, "any determination whether a defendant acted without justification is [] highly fact dependent and requires an examination of the defendant's conduct, its motive, and the interests it sought to advance." *Howard v. Murray*, 184 So. 3d 1155, 1167 (Fla. 1st DCA 2015) (citation and internal quotation

---

[7] The ecclesiastical abstention doctrine bars any inquiry into the Church's internal affairs and employment and disciplinary decisions, irrespective of whom the claim requiring the inquiry is asserted against.  *See Napolitano*, 308 So. 3d at 279 (citing *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979)); *see also Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.*, 321 So. 3d 245, 246–47 (Fla. 4th DCA 2021) (ecclesiastical abstention doctrine barred claims by faction asserting control of church that banks negligently transferred control of church bank accounts to rival faction because resolution of dispute would require determination of which faction was entitled to control of church); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775 (Fla. 3d DCA 1998) (barring claims against temple and director).  The doctrine's jurisdictional bar applies with equal force to the claims asserted against each Counter-Defendant, including Mr. Wedekind.

marks omitted).  Any determination of whether Mr. Wedekind acted without justification and any examination of Mr. Wedekind's conduct, his motive, and the interests he sought to advance—whether he acted to protect the Church from the Pastors' misconduct (which he did) or in furtherance of a so-called "coup" to usurp the Pastors' authority (which he did not)—would require the Court to delve into the inner workings of the Church, its internal financial policies, its bylaws, and its history with the Pastors and to determine whether Pastor Stovall "did or did not partake in the actions" alleged in Nelson Mullins' investigation report and whether those actions violated Church bylaws and other internal policies.  As this Court previously held, the ecclesiastical abstention doctrine bars these inquiries.  *See* Dismissal Order at 7–8.

Third, the Pastors allege Mr. Wedekind "acted solely with ulterior purposes and without an honest belief that [his] actions would benefit" the Church.  (Am. Counterclaims ¶ 166.)  "[A] tortious interference claim will generally not lie against employees and representatives of contracting entities." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999) (citations omitted), *reh'g denied* (Apr. 19, 1999)*.*  But "where an employee acts solely with ulterior purposes and without an honest belief that her actions would benefit her employer, individual liability for unlawful interference with the employer's contract with a third party may be imposed on the employee." *Id*. (citation omitted).

Thus, the tortious interference and conspiracy claims against Mr. Wedekind, the Church's representative, will fail as a matter of law unless he acted solely with ulterior purposes and without an honest belief that his actions would benefit the Church.  *See id.*  Any examination of whether Mr. Wedekind acted solely with ulterior purposes and without an honest belief that his actions would benefit the Church—i.e., only in furtherance of an alleged coup, not to protect the Church—would require the Court to inquire into the inner workings of the Church, its internal financial

policies, its bylaws, and its history with the Pastors and to determine whether Pastor Stovall "did or did not partake in the actions" alleged in Nelson Mullins' investigation report and whether those actions violated Church bylaws and other internal policies. As this Court held in the related action, the ecclesiastical abstention doctrine bars these inquiries. *See* Dismissal Order at 7–8.

Fourth, Mr. Wedekind enjoyed a qualified privilege to share the results of his investigation with the Church, and the Pastors cannot overcome that qualified privilege without an impermissible inquiry into the bases for Mr. Wedekind's conduct. "'Where a person is so situated that it becomes right, in the interests of society, that he should tell to a third person certain facts, then, if he bona fide, and without malice, does tell them, it is a privileged communication.'" *McCurdy v. Collis*, 508 So. 2d 380, 382 (Fla. 1st DCA 1987) (quoting *Coogler v. Rhodes*, 21 So. 109, 112 (Fla. 1897)). "It is only when malice is the *sole* basis for interference that it will be actionable." *Id.* at 383 (citation omitted).

Therefore, the tortious interference and conspiracy claims against Mr. Wedekind, the Church's agent and one of the attorneys conducting the trustees' investigation on the Church's behalf, will fail as a matter of law unless he conducted himself in bad faith and interfered solely for the purpose of gratifying his malice toward the Pastors. *See id.* at 382–83. The Amended Counterclaims do not allege Mr. Wedekind harbors any malice toward the Pastors. But even if they did, the Court could not determine whether Mr. Wedekind acted in bad faith and solely out of malice without inquiring into whether Mr. Wedekind acted to protect the Church from the Pastors' misconduct or in service of the trustees' supposed coup, the inner workings of the Church, its internal financial policies, its bylaws, its history with the Pastors, whether Pastor Stovall "did or did not partake in the actions" alleged in Nelson Mullins' investigation report, and whether

17

those actions violated Church bylaws and other internal policies.  Again, the Court has held the ecclesiastical abstention doctrine bars these inquiries.  *See* Dismissal Order at 7–8.

In sum, the Court cannot determine whether the Pastors and the Church had the agreement Mr. Wedekind supposedly interfered with or whether Mr. Wedekind acted without justification, solely with ulterior purposes, without an honest belief that his actions would benefit the Church, in bad faith, and solely out of malice without entangling itself in the Church's internal matters and engaging in inquiries the ecclesiastical abstention doctrine forbids.  The Court should dismiss the Amended Counterclaims against Mr. Wedekind accordingly.

## II.    THE ECCLESIASTICAL ABSTENTION DOCTRINE BARS THE PASTORS' CLAIMS BECAUSE THEY WOULD REQUIRE THE COURT TO ENGAGE IN IMPERMISSIBLE INQUIRIES CONCERNING THE CHURCH'S EMPLOYMENT AND DISCIPLINARY DECISIONS.

Because the ecclesiastical abstention doctrine "has its core application in cases where a court [would] intrude[] on a church's autonomous management of its own internal affairs and property," *Flynn*, 221 So. 3d at 1246, it is unsurprising that Florida courts have repeatedly held the ecclesiastical abstention doctrine divests civil courts of subject-matter jurisdiction over claims founded on statements made in connection with a church's employment or disciplinary decisions. *See, e.g.*, *Goodman*, 712 So. 2d at 775–77 (where rabbi had been dismissed for doctrinal differences and alleged prior assault of senior rabbi, court held "[i]nquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court" and dismissed defamation and tortious interference claims under ecclesiastical abstention doctrine).[8]

---

[8] *See also Diocese of Palm Beach, Inc. v. Gallagher*, 249 So. 3d 657 (Fla. 4th DCA 2018) (ecclesiastical abstention doctrine barred defamation claim requiring inquiry into why priest was not promoted, was reassigned, was hired, retained, or disciplined, and whether diocese's reasons were valid religious reasons or retaliation for priest's whistleblowing); *Springhill Missionary Baptist Church*, 251 So. 3d at 283 (granting petition for writ of prohibition and holding

*Goodman*—one of the authorities on which the Court principally relied in dismissing the
Pastors' Second Amended Complaint in the related action—compels the application of the
ecclesiastical abstention doctrine to the Pastors' Amended Counterclaims.  In that case, a rabbi
sued a temple (his former employer) for defamation and breach of contract and a member of the
temple's board of directors for defamation and tortious interference.  712 So. 2d at 776.  Certain
temple members had opposed the rabbi's continued service, based, in part, on their "disagreement
over religious concepts."  *Id.*  The defendant director also claimed the rabbi previously had struck
a senior rabbi at another temple and had been fired as a result.  *Id.*  After the defendant director
made this claim, the rabbi's contract with the temple was not renewed, and temple members "were
advised of" both the non-renewal and the temple director's allegation of assault against the rabbi.
*Id.* at 777.  Although the alleged assault did not concern any doctrinal matter, the Third District
Court of Appeal held the ecclesiastical abstention doctrine barred the rabbi's tortious interference
and defamation claims because the statements on which the rabbi sued were made in the context
of a religious dispute, and the court could not inquire into whether the rabbi was terminated for
doctrinal reasons or because of his alleged prior assault on other rabbi.  *Id.*

The Pastors were likewise disciplined for both their financial misconduct (which violated
both secular law and the Church's biblical principles) *and* their unbiblical leadership.  Any one of
the failings Nelson Mullins identified "constitute[d] a separate and independent basis justifying
the discipline of [Pastor Weems], up to and including ratifying the removal of his leadership

---

ecclesiastical abstention doctrine deprived circuit court of subject-matter jurisdiction over
deacon's defamation claims against pastor and deacon-board chairman founded on statements
made in connection with deacon's termination); *Se. Conference Ass'n of Seventh-Day Adventists,
Inc.*, 862 So. 2d at 843–44 (granting petition for writ of prohibition and holding ecclesiastical
abstention doctrine deprived circuit court of subject-matter jurisdiction over pastor's claim church
did not follow its internal procedures in disciplining him following congregant's allegation of
unwelcome sexual overtures).

position and termination of his employment." (Report at 7.) As in *Goodman,* the Court may not now inquire into, and attempt to disentangle, the board of trustees' reasons for suspending the Pastors and their resignation. The ecclesiastical abstention doctrine forbids it, and the Pastors' Amended Counterclaims against Mr. Wedekind must be dismissed accordingly.[9]

## **CONCLUSION**

Neither this Court nor any other secular court has subject-matter jurisdiction over the Pastors' Amended Counterclaims against Mr. Wedekind. The ecclesiastical abstention doctrine requires that the Court dismiss the Amended Counterclaims with prejudice accordingly.

DATED: March 28, 2023                              Respectfully submitted,

                                                   /s/ Timothy J. McGinn
                                                   **GUNSTER, YOAKLEY & STEWART, P.A.**
                                                   David M. Wells, Esq.
                                                   Florida Bar No. 309291
                                                   Timothy J. McGinn, Esq.
                                                   Florida Bar No. 1000377
                                                   1 Independent Drive, Suite 2300
                                                   Jacksonville, FL 32202
                                                   Telephone: (904) 354-1980
                                                   Facsimile:  (904) 354-2170
                                                   dwells@gunster.com
                                                   tmcginn@gunster.com

                                                   *Attorneys for Counter-Defendant Lee Wedekind, III*

---

[9] The ecclesiastical abstention doctrine does not bar the Church's eviction claim against the Pastors, however. A church may invoke the authority of a civil court to enforce the decisions of its highest ecclesiastical authority and regain control over its physical property. *See, e.g.*, *Franzen v. Poulos*, 604 So. 2d 1260, 1263 (Fla. 3d DCA 1992) (citing *Rekas v. Polish Nat'l Cath. Church*, 102 So. 2d 705 (Fla. 1958)); *cf. Simpson*, 494 F.2d at 494–95 (public officials "duty bound" to execute eviction order once church filed affidavit of eviction against ousted pastor). Indeed, the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Milivojevich*, 426 U.S. at 710. Here, it is undisputed that the Church owns the Shellcracker property. Thus, the First Amendment commands that the Court enforce the Church's undisputed right of ownership of the Shellcracker property without resolving the disputed issues the Pastors raise.

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 28, 2023, I electronically filed the foregoing document with the Clerk of the Court through the Florida Courts E-Filing Portal and thereby furnished copies to the following by email:

Shane B. Vogt
David A. Hayes
Kenneth G. Turkel
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
svogt@tcb-law.com
dhayes@tcb-law.com
kturkel@tcb-law.com
garnold@tcb-law.com
service@tcb-law.com

Lee D. Wedekind, III
John P. McDermott, Jr.
NELSON MULLINS RILEY & SCARBOROUGH LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
lee.wedekind@nelsonmullins.com
john.mcdermott@nelsonmullins.com
allison.abbott@nelsonmullins.com

/s/ *Timothy J. McGinn*
Timothy J. McGinn

21