UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV, an
individual, KERRI WEEMS, an
individual, and CELEBRATION
GLOBAL, INC., a Florida not for profit
corporation, HONEY LAKE FARMS,
INC., a Florida not for profit corporation,
NORTHSTREAM MANAGEMENT
GROUP, LLC, a Florida limited liability
company, and WEEMS GROUP, LLC, a
Florida limited liability company,

      Plaintiffs,

v.                                                              Case No.: 3:23-cv-00811-MMH-LLL

ASSOCIATION OF RELATED
CHURCHES, a Texas not-for-profit
corporation, CHRIS HODGES,
individually, and DINO RIZZO,
individually,

      Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION
OR, ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM**

      Defendants Association of Related Churches ("ARC"), Chris Hodges ("Pastor

Hodges"), and Dino Rizzo ("Pastor Rizzo") move under Federal Rule of Civil

Procedure 12(b)(1) to dismiss Plaintiffs' First Amended Complaint & Demand for Jury

Trial (ECF No. 49) for lack of subject-matter jurisdiction because the ecclesiastical

abstention doctrine bars this lawsuit. Alternatively, Defendants move under Federal

Rule of Civil Procedure 12(b)(6) to dismiss Counts X through XV and Counts XIX

and XX for failure to state a claim.

## INTRODUCTION

The ecclesiastical abstention doctrine bars civil courts from considering this dispute. At the center of each of the First Amended Complaint's twenty counts is a farfetched—and fictional—conspiracy theory involving an elaborate plot to seize control of Celebration Church and oust Pastor Stovall Weems. *See, e.g.*, 1st Am. Compl. ¶¶ 57, 84, 96. According to Plaintiffs' allegations—which are baseless—Defendants conspired to "legitimiz[e] the takeover of Celebration Church" by a rival faction by engineering a "sham 'investigation'" of Pastor Weems on behalf of the church. *Id.* ¶¶ 81, 96. Though Celebration Church is not a party to this lawsuit, each of Plaintiffs' claims rests on a challenge to the legitimacy of the church's internal investigation of Pastor Weems and the end of his role as a pastor in the church.

In its order striking the original Complaint as a shotgun pleading, the Court observed that "[f]or some events and business relationships" alleged in the Complaint, Defendants' ecclesiastical abstention arguments "likely are well-taken." ECF No. 39 at 6. But because that Complaint lumped together claims involving six Plaintiffs and four Defendants, the Court was "unable to determine which relationships, acts, or omissions form[ed] the basis of" each claim. *Id.*

The First Amended Complaint removes any doubt. Plaintiffs' amended pleading breaks their claims down into twenty separate counts, each of which expressly incorporates and, critically, depends on Plaintiffs' allegations regarding the church's "sham 'investigation'" and the end of Pastor Weems's ministry. *See* 1st Am.

2

Compl. ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199; *see also* ¶¶ 57-58, 63-65, 81-87, 91, 95-96. Each claim thus demands an impermissible intrusion into core ecclesiastical matters.

Both the United States and Florida Constitutions forbid such an intrusion. Under the ecclesiastical abstention doctrine, civil courts may not "enter[] into a religious controversy and put[] the enforcement power of the state behind a particular religious faction." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987). Because civil courts "may not adjudicate ecclesiastical disputes," the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction. *Id.* at 718.

Alternatively, the counts asserted by NorthStream Management Group, LLC ("NorthStream") and Weems Group, LLC ("Weems Group") fail to allege well-pleaded facts sufficient to support claims for tortious interference or conspiracy. Those counts should be dismissed for failure to state a claim.

## BACKGROUND

### A.    Allegations of the First Amended Complaint

Plaintiffs' allegations, though false in all but the most mundane details, will be treated as true for the purposes of this motion.[1] The substantive allegations are presented under the heading "COMMON FACTUAL ALLEGATIONS TO ALL COUNTS" and are incorporated into each count. *See* 1st Am. Compl. ¶¶ 23-101; *see also id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167,

---

[1]    This motion presents a facial, rather than factual, attack on the Court's jurisdiction. *See Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021).

171, 178, 185, 192, 199.

According to those allegations, Plaintiffs Stovall Weems and Kerri Weems founded Celebration Church in 1998. *Id.* ¶ 23. Until April 2022, Pastor Weems served as Celebration Church's Senior Pastor. *Id.* ¶ 93.

Defendant ARC is "one of the largest church planting organizations in North America and has planted more than a thousand churches since 2000." *Id.* ¶ 33. Pastor Hodges is a co-founder of ARC and a founder and Senior Pastor of the Church of the Highlands in Birmingham, Alabama. *Id.* ¶ 39. Pastor Rizzo is "the Executive Director of ARC and an Associate Pastor at Church of the Highlands." *Id.* ¶ 45. Pastor Rizzo also served as an "Overseer at Celebration Church until September 2021." *Id.* ¶ 46.

In 2018, Pastor Weems rejected what the First Amended Complaint characterizes as "the modern church growth system," which prioritizes efforts to "grow attendance and generate more and more revenue" for a church. *Id.* ¶¶ 25-26. Pastor Weems instead embraced a competing vision in which the goal of increasing church attendance would be subordinated to "helping the poor, missionary work, equality, and simplifying the church by creating alternative revenue streams that would make the church less donation dependent." *Id.* ¶ 25. Pastor Weems conceived what Plaintiffs call the "Missions Plan," which was intended, somehow, to move Celebration Church toward Pastor Weems's new vision by creating several new corporate entities to handle various church functions. *Id.* ¶¶ 27-28.

To that end, the Weemses formed the four corporate Plaintiffs: Celebration Global, Inc. ("Celebration Global"), Honey Lake Farms, Inc. ("Honey Lake Farms"),

NorthStream, and Weems Group. *Id.* ¶¶ 28-29. Celebration Global was formed "to operate as the umbrella organization under which [the Weemses'] missionary work would be housed." *Id.* ¶ 28. Honey Lake Farms was formed "to create, develop, and operate a retreat and outpatient facility for pastoral care." *Id.* NorthStream was formed to "provide centralized and shared management services to Celebration Church" and to "help initially operate and develop . . . Honey Lake Farms" and other so-called "Restorative Community Developments." *Id.* ¶¶ 27-28. Weems Group was formed "as a vehicle for [the Weemses] and family members to invest in the Missions Plan." *Id.* ¶ 29. Another corporation, nonparty AWKNG, Inc., was formed to "serve[] as the hub for the restorative/ministry programing [sic] used at Honey Lake Farms." *Id.* ¶ 28.

According to Plaintiffs, Weems Group invested $450,000 in NorthStream. *Id.* ¶ 29. Although the First Amended Complaint does not describe the nature of that investment, it says the money "was used to help fund and start the operations of Honey Lake Farms and AWKNG." *Id.* The First Amended Complaint also alleges that the Weemses "invested $350,000 of their own money in Honey Lake Farms." *Id.*

According to Plaintiffs, Defendants have "business and financial interests" in the church growth model that Pastor Weems had come to reject in 2018. *Id.* ¶ 51. Plaintiffs allege that ARC receives ongoing payments of 2 percent of tithes from the churches it seeds. *Id.* ¶ 34. It also alleges that Pastor Hodges "controls" and "benefits financially" from entities that "provid[e] fee-based mentoring, coaching, training, and consulting services and related resources focused on promoting and advancing the

5

modern church growth system to churches and their leadership." *Id.* ¶¶ 40-41. The nature of Pastor Rizzo's purported financial interests is not described in any detail.

According to the First Amended Complaint, Defendants sought to protect these financial interests by engineering a "takeover of Celebration Church" to ensure the failure of Pastor Weems's missionary-focused vision and the continued dominance of their preferred church growth model. *E.g.*, *id.* ¶¶ 57, 96. To achieve that "takeover," Defendants allegedly "plant[ed] an ARC agent Defendants knew they could control and who would continue to advance their interests, Tim Timberlake . . . , to replace S. Weems as Senior Pastor of Celebration Church." *Id.* ¶¶ 57-58.

At the center of the alleged scheme to "oust Pastor Weems" was an internal church investigation purportedly "engineered" by Defendants. *Id.* ¶¶ 63, 81. According to the First Amended Complaint, Defendants, through Celebration Church trustee Kevin Cormier and financial officer Lisa Stewart, "manufacture[d] evidence of supposed financial crimes and mismanagement that could be used to frame S. Weems and justify his removal from Celebration Church." *Id.* ¶ 64. The result was a "sham 'investigation'" of Pastor Weems's "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor." *Id.* ¶ 81. The purpose of the investigation was to "frame S. Weems and K. Weems for embezzling" from Celebration Church, "thereby legitimizing the takeover of Celebration Church, ensuring the failure of the Missions Plan, and simultaneously publicly destroying S. Weems and K. Weems so that they no longer posed any threat to Hodge's [sic], Rizzo's . . . , and ARC's personal, business, and financial interests." *Id.* ¶ 96.

While the church's internal investigation was ongoing, Defendants, according to the First Amended Complaint, "convinc[ed] Celebration Church . . . to amend Celebration Church Bylaws to give its Trustees absolute, unchecked power to unlawfully oust S. Weems from the church." *Id.* ¶ 84; *see also id.* ¶ 91.

The church's investigation of Pastor Weems ultimately resulted in an April 24, 2022 "Report of Investigation to Celebration Church of Jacksonville, Inc." (the "Report") prepared by the church's attorneys. *Id.* ¶ 95; ECF No. 1-1.[2] The Report announced that it was "provided to assist [Celebration Church's] Board [of Trustees] in fulfilling its biblical and legal obligations" and was "performed according to biblical principles." ECF No. 1-1 at 4, 6. In addition to detailing Pastor Weems's financial misconduct, *id.* at 13-20, the Report found that the Weemses' discipline and removal were independently justified by "unbiblical" leadership of the church, including "spiritual" abuse. *Id.* at 6-7. Pastor Weems's behavior, the Report found, reflected "the antithesis of Christ-like personal sacrifice and service to others." *Id.* at 7-8. And after extensively quoting scripture, the Report found the Weemses had shown "the antithesis of biblical leadership." *Id.* at 20. It recommended immediate acceptance of their resignations without further pay or benefits. *Id.* at 22.

---

[2]    The Report was attached to the original Complaint as an exhibit and is explicitly referenced in the First Amended Complaint. 1st Am. Compl. ¶ 95 (citing ECF No. 1-1). The investigation and the Report are relied on extensively throughout the First Amended Complaint. *See id.* ¶¶ 78, 81-83, 85-87, 95-100. A document may be treated as incorporated by reference into a complaint if "(1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (per curiam)). All three elements are met with respect to the Report.

On April 15, 2022, Pastor Weems "tendered his resignation." *Id.* ¶ 93. Thus, Defendants, according to the First Amended Complaint, "successfully completed their plan to take over control of Celebration Church." *Id.* ¶ 91. Based on that purported "takeover" of the church, Plaintiffs assert claims for tortious interference and conspiracy in twenty counts. *See id.* ¶¶ 102-205.

## B.    Related State-Court Litigation

This is not the Weemses' first lawsuit challenging the church's investigation and their resulting "ouster." On February 23, 2022, the Weemses filed suit in the Circuit Court for the Fourth Judicial Circuit, in and for Duval County, Florida (*Weems v. Celebration Church of Jacksonville, Inc. et al.*, Case No. 2022-CA-001047).[3] The original complaint in that lawsuit sought injunctive relief against Celebration Church. ECF No. 28-1 ¶ 100. It requested, among other things, an order "[r]estoring Pastor Stovall and Kerri to their pre-suspension positions at the Church" and "[d]etermining that the purported January 2022 amendment to the Bylaws is invalid." *Id.*

Subsequent complaints in that state-court lawsuit also asserted claims for damages against individual defendants, including Celebration Church trustees and one of the church's attorneys. ECF No. 28-2; ECF No. 28-4. Those claims are based on the same internal investigation of the Weemses' "possible misconduct in their pastoral

---

[3]    The Court may take judicial notice of filings in related state-court proceedings. *See Sporea v. Regions Bank, N.A.*, No. 20-11812, 2021 WL 2935365, at *2 (11th Cir. July 13, 2021) (per curiam) ("[T]he district court did not abuse its discretion by taking judicial notice of documents related to Sporea's state court action."); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage.").

roles" that Plaintiffs rely on here. *See* ECF No. 37-1 at 2.

On October 6, 2023, the state court entered an order dismissing that lawsuit with prejudice. *Id.* at 5. The court concluded that adjudicating the Weemses' claims "would require [the court] to impermissibly engage in a doctrinal squabble involving the Church's biblical standards, administration, financial policies, and disciplinary practices." *Id.* at 3. The state court reasoned that it could not lawfully "determine the proper scope of the Pastors' spending powers (including whether these transactions required board approval)." *Id.* at 4. More fundamentally, the court could not "second-guess the church's decision to remove the Pastors or its reasoning for doing so." *Id.* at 5.

## ARGUMENT

### I.     This lawsuit is barred by the ecclesiastical abstention doctrine.

#### A.     The Ecclesiastical Abstention Doctrine

"Among the separation of church and state principles required by the establishment and free exercise clauses of the first amendment is that courts may not adjudicate ecclesiastical disputes." *Crowder*, 828 F.2d at 718. This "limitation on secular judicial power" to interfere with "religious affairs" is similarly embedded in Florida's Constitution. *Napolitano v. St. Joseph Cath. Church*, 308 So. 3d 274, 275, 277 (Fla. 5th DCA 2020). This "ecclesiastical abstention doctrine" is well-established: "Civil courts lack jurisdiction to entertain disputes involving church doctrine and polity." *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021) (per curiam); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719

F. App'x 926, 928 (11th Cir. 2018) (per curiam) (same); *see also Napolitano*, 308 So. 3d at 277. Nor may a court "enter[] into a religious controversy and put[] the enforcement power of the state behind a particular religious faction." *Crowder*, 828 F.2d at 721.

A "narrow exception to this doctrine" permits judicial review of a church-related dispute if it can be decided based on neutral legal principles—but only if the dispute does not involve religious doctrinal matters, *see Rutland*, 857 F. App'x at 628, or issues of internal church procedures or governance, *see Myhre*, 719 F. App'x at 928-29; *see also Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (declining to apply the "'neutral principles' doctrine" to a dispute involving the plaintiff's "status and employment as a minister of the church"). Courts lack jurisdiction if a claim implicates or is "part and parcel of ecclesiastical concerns." *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (per curiam). The core areas courts must avoid include "issues connected to 'theological controversy, church discipline, ecclesiastical government, or conformity of members of the church to the standard of morals required of them.'" *Myhre*, 719 F. App'x at 928 (quoting *Crowder*, 828 F.2d at 722); *see also Eglise Baptiste*, 824 F. App'x at 683.

Further, the ecclesiastical abstention doctrine is not limited to claims against religious bodies; it is also properly invoked by individuals. *See, e.g.*, *Rutland*, 857 F. App'x at 627 (affirming the dismissal of a complaint against the president of a church); *Eglise Baptiste*, 824 F. App'x at 681 (affirming the dismissal of claims against an individual defendant). And as the Court observed in its order striking the original

Complaint, the doctrine may apply even where the parties are not members of the same church or religious institution. *See* ECF No. 39 at 6 n.7; *see also Mammon v. SCI Funeral Servs. of Fla. Inc.*, 193 So. 3d 980, 985 (Fla. 4th DCA 2016).

Nor is the doctrine limited to disputes involving hierarchical, as opposed to congregational, churches. *See Crowder*, 828 F.2d at 726 n.20. Instead, as the Eleventh Circuit has recognized, "[t]he distinction . . . between the types of congregational and hierarchical church polities [is] relevant only to determining the ecclesiastical body to which the civil court must defer in determining rights to use of property." *Id.*

"The relationship between an organized church and its ministers is its lifeblood." *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). "Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 559. Consequently, a church's selecting or removing its ministers is a core ecclesiastical matter into which civil courts may not intrude. *See Myhre*, 719 F. App'x at 928 (concluding that the district court lacked jurisdiction over an action challenging "purely ecclesiastical decisions . . . regarding [the plaintiff's] fitness to serve in the clergy or to remain a member of the denomination"); *see also Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) ("[T]he decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts."); *Se. Conf. Ass'n of Seventh-Day Adventists, Inc. v. Dennis*, 862 So. 2d 842, 843-44 (Fla. 4th DCA 2003) (holding that the court lacked jurisdiction over a pastor's claims that a church

11

negligently suspended him and failed to follow its internal procedures in dealing with allegations against him because "[w]hether an individual is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that particular faith"; "[t]he interaction between a church and its pastor is an essential part of church government"; and "civil courts must abstain from deciding ministerial employment disputes").

Nor can a plaintiff overcome the autonomy that protects such decisions merely by alleging that such a decision flowed from illegitimate or nonreligious motives. A civil court "lacks jurisdiction over an action if the inquiry it would have to undertake to resolve the issues before it requires analysis of the religious organization's decision making process or excessive entanglement in the organization's religious affairs." *Farley v. Wis. Evangelical Lutheran Synod*, 821 F. Supp. 1286, 1289 (D. Minn. 1993). Thus, evaluating the motives behind a church's selection or removal of its ministers is an improper intrusion into ecclesiastical matters. *See Bell*, 126 F.3d at 332 ("While it is possible that the Presbyterian Church may have harbored hostility against Bell personally, it is also possible that [it] may have been acting in good faith to fulfill its discernment of the divine will for its ministry. Resolution of such an accusation would interpose the judiciary into the Presbyterian Church's decisions . . . relating to how and by whom they spread their message and specifically their decision to select their outreach ministry . . . ."); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. 3d DCA 1998) ("Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."); *see also Young v.*

*N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994) ("[C]ivil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." (emphasis in original)).

### B. This lawsuit presents an ecclesiastical dispute that civil courts may not lawfully adjudicate.

Here, the First Amended Complaint presents "manifestly ecclesiastical" questions that "would require [the Court] to inquire into church rules, policies, and decision-making and questions of church governance" and excessively entangle it "'in questions of ecclesiastical doctrine or belief'—the very types of questions [courts] are commanded to avoid." *Eglise Baptiste*, 824 F. App'x at 683 (quoting *Crowder*, 828 F.2d at 722). Like the lawsuit dismissed by the state court, Plaintiffs' claims in this action would require the Court to "second-guess the church's decision to remove [Pastor Weems] or its reasoning for doing so." ECF No. 37-1 at 5. The Court, therefore, lacks jurisdiction.

All of Plaintiffs' claims depend on the contention that Celebration Church's investigation and "ouster" of the Weemses were illegitimate. 1st Am. Compl. ¶ 82. If Pastor Weems's ministry ended for legitimate religious reasons—for example, because of doubts among the church's trustees about his spiritual leadership or sincere disagreement with his vision for the church—then Plaintiffs cannot show that Defendants caused their alleged damages. Plaintiffs' allegations regarding the investigation and the supposed takeover plot are incorporated into—and are

indispensable to—every count of the First Amended Complaint. *See, e.g.*, *id.* ¶¶ 57-58, 63-65, 81-87, 91, 95-96; *see also id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199. Thus, although the church itself is not a defendant in this action, this lawsuit is nevertheless another improper attempt by the Weemses to challenge Celebration Church's "decisions . . . about the appointment and removal of ministers." *Bell*, 126 F.3d at 331.

The Weemses' essential complaint "s that Defendants instigated a sham internal church investigation as part of a scheme to "oust" Pastor Weems from Celebration Church so that Defendants' vision for the church could prevail, with various negative financial consequences for the Weemses, including the loss of a financial package. *See, e.g.*, 1st Am. Compl. ¶¶ 57, 63-64, 79, 104, 109, 114. The Weemses also complain about "the public dissemination of the Report" resulting from the investigation, which was purportedly intended to "legitimiz[e] the takeover of Celebration Church." *Id.* ¶ 96. These matters—a church's investigation of its pastor and its decision-making process regarding his removal—are "of prime ecclesiastical concern" and lie outside civil courts' legitimate sphere of concern. *McClure*, 460 F.2d at 559.

Further, any alleged harm to the corporate Plaintiffs—which the Weemses formed to carry out Pastor Weems's vision for Celebration Church, *see* 1st Am. Compl. ¶¶ 28-29—flowed from the church's investigation and alleged ouster of Pastor Weems. The First Amended Complaint alleges that the Weemses and Celebration Church agreed on a "financial package" (the "Founding Pastor Agreements") that included, among other things, "continued and ongoing financial support for [the Weemses']

missions through funding Celebration Global, which would in turn help fund the operations of Honey Lake Farm[s], NorthStream, and AWKNG." *Id.* ¶ 53.

After its investigation, Celebration Church "repudiate[d] the Founding Pastor Agreements and its commitment to provide millions of dollars in funding to Celebration Global to carry out the Missions Plan." *Id.* ¶ 79. In turn, when Celebration Global's funding from Celebration Church—on which all the other corporate Plaintiffs depended—dried up, the effect was to "destroy[]" the other corporate Plaintiffs. *Id.* ¶ 86. Plaintiffs also allege that the findings from the church's investigation dissuaded potential investors in Honey Lake Farms. *Id.* ¶ 98. Those are the only harms alleged to support each count of the First Amended Complaint. *See id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199.

To prevail on the causation and damages elements of their claims, Plaintiffs must prove that Defendants caused those harms. *See, e.g.*, *Realauction.com, LLC v. Grant Street Grp., Inc.*, 82 So. 3d 1056, 1059 (Fla. 4th DCA 2011) (observing that a tortious interference claim requires proof that "defendant's interference caused the cessation of the business relationship"). In other words, Plaintiffs must prove that it was Defendants' conduct—not Pastor Weems's own conduct or, for that matter, sincere concerns about his spiritual leadership or vision for the church—that brought about the church's investigation and Weems's departure.

The causation and damages elements of Plaintiffs' claims thus cannot be resolved without answering the following questions, among others equally inappropriate for a civil court: Was the investigation of Pastor Weems undertaken by

Celebration Church in good faith, based on reasonable concerns about his leadership, or solely because of Defendants' machinations? Was Pastor Weems's "ouster" the result of scheming by Defendants, or was it Pastor Weems's failure to live up to "biblical standards for leadership in the church" that led to the investigation and the end of his ministry? ECF No. 1-1 at 21. Did Pastor Weems exhibit "the antithesis of biblical leadership as described in scripture," or was he just set up? *Id.* at 20.

Resolving the causation and damages issues would require the Court not only to determine how and why Celebration Church began its investigation of Pastor Weems but also to weigh *the degree to which* the Report affected the church trustees' decision-making as opposed to the influence of other religious disagreements or conflicting visions for the church that may have contributed to the end of Pastor Weems's ministry. In other words, even if Plaintiffs could somehow show that the church's investigation was initiated because of a conspiracy by Defendants—and they cannot—the Court would still have to determine whether the rupture between Pastor Weems and the church was ultimately caused by Defendants' alleged scheming or, instead, sincere religious disagreement, or a disagreement about whether Pastor Weems's conduct complied with the church's policies. And it would still be necessary to evaluate any dispute about doctrinal matters and to examine the church's financial policies and bylaws to determine whether the financial misconduct alleged in the Report was genuinely improper.

Judicial entanglement in such religious matters is impermissible. *See, e.g.*, *Myhre*, 719 F. App'x at 928; *see also Rutland v. Nelson*, No. 3:20-CV-1272-J-32JRK, 2021 WL

16

118984, at *1 (M.D. Fla. Jan. 13, 2021) ("[T]he First Amendment prevents this Court from ruling on any matters of internal governance of churches, including the [church's] decision to disfellow [the plaintiff], and any subsequent action relating to his role in the Church. No amendment of the Complaint can cure this problem."), *aff'd*, 857 F. App'x 627 (11th Cir. 2021); *Goodman*, 712 So. 2d at 777 ("In order for the trial court to have resolved these disputes, it would have had to immerse itself in religious doctrines and concepts and 'determine' whether the religious disagreements were a 'valid' basis for the termination of [a rabbi's] services. The allegedly defamatory report and tortious interference occurred as part of this religious dispute and would require the trial court to weigh their effect on the board members as compared to the effects of the other considerations which clearly are religious disagreements. Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."). But such entanglement is unavoidable if this action is allowed to proceed.

The problem is not that Plaintiffs' position on the merits of these issues is wrong (although it is). What matters is that the Court cannot even inquire into, much less resolve, Plaintiffs' claims without impermissibly intervening in these sorts of ecclesiastical matters. *See Young*, 21 F.3d at 187 ("[C]ivil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." (emphasis in original)); *Diocese of Palm Beach, Inc. v. Gallagher*, 249 So. 3d 657, 663 (Fla. 4th DCA 2018) (holding that abstention was

17

required with respect to claims that would have required determining whether the "reasons for not making [the plaintiff] a pastor, and reassigning him to another church, were valid religious reasons concerning [his] fitness for the job"); *Goodman*, 712 So. 2d at 777 ("Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."). Accordingly, the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction.

## II.   Counts X through XV and Counts XIX and XX fail to state a claim.

Alternatively, the counts that purport to assert tortious interference and conspiracy claims on behalf of NorthStream (Counts X, XI, XII, and XIX) and Weems Group (Counts XIII, XIV, XV, and XX) should be dismissed for failure to state a claim.

To state a claim for tortious interference, a complaint must allege "(1) the existence of a business relationship . . . [;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (first alteration in original) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985) (per curiam)).

Further, although "[a] protected business relationship need not be evidenced by an enforceable contract," "'the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.'" *Id.* (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)). "As a general rule, an action for tortious

interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 184 (Fla. 1998) (per curiam) (quoting *Ethan Allen, Inc.*, 647 So. 2d at 815).

To state a conspiracy claim, a complaint must allege:

> (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.

*Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015).

Significantly, "[t]he gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 909 (Fla. 3d DCA 2015) (quoting *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 950 (Fla. 3d DCA 1984)). A conspiracy claim, therefore, requires an underlying tort. *See id.* ("The independent civil wrong on which the civil conspiracy is dependent must be alleged in the complaint. If a particular wrong is not pled as the underlying basis for the conspiracy, then the complainant must be 'precluded from recovery' on the basis of any conspiracy to commit that wrong." (citation omitted)); *see also CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-cv-186-J-34JRK, 2018 WL 905752, at *13 (M.D. Fla. Feb. 15, 2018) ("[A] claim for civil conspiracy will not lie unless the plaintiff alleges an underlying civil wrong, done

19

pursuant to the conspiracy, which results in damage to the plaintiff.").

**A.    The First Amended Complaint fails to state a claim on behalf of NorthStream.**

**1.    The First Amended Complaint fails to allege advantageous contractual or business relationships enjoyed by NorthStream.**

NorthStream asserts that Defendants interfered with its "advantageous contractual and business relationships with Celebration Church and Honey Lake Farms, Honey Lake Clinic, and AWKNG." 1st Am. Compl. ¶¶ 147, 152, 157. But the First Amended Complaint alleges no such relationships.

On the contrary, there was no direct business or contractual relationship between NorthStream and Celebration Church. Instead, NorthStream hoped to benefit indirectly from another entity's alleged relationship with Celebration Church. According to the First Amended Complaint, Celebration Church agreed to provide "financial support for [the Weemses'] missions through funding Celebration Global, which would in turn help fund the operations of Honey Lake Farm[s], NorthStream, and AWKNG." *Id.* ¶ 53. NorthStream's hope for an indirect benefit does not amount to "an actual and identifiable understanding or agreement" with Celebration Church, "which in all probability would have been completed if the defendant[s] had not interfered." *Gossard*, 723 So. 2d at 184.

Nor does the First Amended Complaint allege a sufficient contractual or business relationship between NorthStream and Honey Lake Farms, Honey Lake Clinic, or AWKNG. NorthStream, Honey Lake Farms, and AWKNG have in common that the Weemses formed them. 1st Am. Compl. ¶ 28. But nothing in the

First Amended Complaint suggests NorthStream had an "actual and identifiable understanding or agreement" with any of them "which in all probability would have been completed if the defendant[s] had not interfered." *Gossard*, 723 So. 2d at 184.

Plaintiffs speculate that if Defendants had not interfered with the Weemses' plans, anticipated investments in Honey Lake Farms by nonparties "would have benefitted NorthStream through management services agreements with Honey Lake Farms, Honey Lake Clinic, and AWKNG, pursuant to which NorthStream would have been paid management fees to provide management services for the operations at Honey Lake Farms and management services associated with launching [restorative community developments]." 1st Am. Compl. ¶ 76. But Plaintiffs do not allege that such "management services agreements" had actually been executed. Nor do they describe the anticipated contracts in any detail or allege well-pleaded facts supporting the conjecture that they would have been executed but for Defendants' conduct.

### 2. The First Amended Complaint fails to allege interference with, or damages resulting from a breach of, any business relationship purportedly enjoyed by NorthStream.

The First Amended Complaint also fails to allege any intentional interference with, or damages resulting from a breach of, NorthStream's purported relationships with Celebration Church, Honey Lake Farms, Honey Lake Clinic, or AWKNG. For example, the First Amended Complaint does not suggest that Defendants induced Celebration Church, Honey Lake Farms, Honey Lake Clinic, or AWKNG to breach management services agreements with NorthStream. Indeed, such a breach would be surprising, if not impossible, given the Weemses' control over at least three of those

21

entities. *See* 1st Am. Compl. ¶¶ 6, 28. It is hard to imagine how Defendants could have in effect interfered with Pastor Weems's relationship with himself. The First Amended Complaint thus fails to state claims for tortious interference on behalf of NorthStream. *See Ethan Allen, Inc.*, 647 So. 2d at 814; *see also Gerber v. Keyes Co.*, 443 So. 2d 199, 201 (Fla. 3d DCA 1983) ("There is no cause of action for tortious interference with a business relationship in the absence of a breach.").

Further, because the First Amended Complaint fails to allege an underlying tort against NorthStream, Count XIX fails to state a conspiracy claim. *See Marriott Int'l, Inc.*, 193 So. 3d at 909. Counts X, XI, XII, and XIX should therefore be dismissed.

## B. The First Amended Complaint fails to state a claim on behalf of Weems Group.

In Counts XIII, XIV, and XV, Weems Group asserts tortious-interference claims against ARC, Pastor Hodges, and Pastor Rizzo, respectively. The First Amended Complaint fails, however, to allege the existence of a business relationship or interference with that relationship and resulting damage to Weems Group.

Each of Weems Group's claims rests on the assertion that Defendants interfered with Weems Group's relationship with NorthStream—an entity that, like Weems Group, is wholly owned by the Weemses. 1st Am. Compl. ¶¶ 6-7, 160-61, 164-65, 168-69. Apart from introductory paragraphs that reveal the two companies' common ownership, only a single sentence of the First Amended Complaint is devoted to characterizing their relationship: "Weems Group invested approximately $450,000 in NorthStream, which was used to help fund and start the operations of Honey Lake

Farms and AWKNG . . . ." *Id.* ¶¶ 6-7, 29.

The nature of that "invest[ment]" is left to the imagination. It appears not to have been an equity investment since NorthStream's "sole members" are Stovall and Kerri Weems, not Weems Group. *Id.* ¶ 6. But if the $450,000 investment was a loan, the First Amended Complaint does not say so. Nor does it say whether Weems Group and NorthStream entered into a contract. To support a tortious-interference claim, again, a relationship "must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc.*, 647 So. 2d at 814 (quoting *Register*, 530 So. 2d at 993). No such rights can be discerned from the First Amended Complaint.

Whatever the nature of the purported relationship, the First Amended Complaint does not allege well-pleaded facts showing that Defendants interfered with it. It is puzzling, to say the least, how any Defendant could possibly have interfered with a relationship between two entities wholly owned by the same married couple. The First Amended Complaint does nothing to dispel that puzzlement; for all it says, any relationship between Weems Group and NorthStream is still wholly intact, just as their common ownership would lead one to expect. For these reasons, Counts XIII, XIV, and XV fail to state claims for tortious interference with that relationship. *See Gerber*, 443 So. 2d at 201 ("There is no cause of action for tortious interference with a business relationship in the absence of a breach.").

Although Counts XIII and IV refer only to NorthStream, Count XV, perhaps inadvertently, asserts that Pastor Rizzo interfered with Weems Group's relationship with Celebration Church as well. 1st Am. Compl. ¶ 169. The First Amended

23

Complaint does not assert, however, that Pastor Rizzo knew of any such relationship. *See* 1st Am. Compl. ¶ 168. Nor does it allege any well-pleaded facts showing that such a relationship existed, much less that Pastor Rizzo, or any other Defendant, interfered with it and thereby harmed Weems Group. Count XV, therefore, falls along with Counts XIII and XIV.

Finally, without an underlying tort, Weems Group's conspiracy claim—Count XX—must also be dismissed. *See Marriott Int'l, Inc.*, 193 So. 3d at 909.

## CONCLUSION

The ecclesiastical abstention doctrine prevents the Court from exercising jurisdiction over this dispute. Therefore, the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction. Alternatively, all counts asserted by NorthStream or Weems Group should be dismissed for failure to state a claim.

## LOCAL RULE 3.01(g) CERTIFICATION

Under Local Rule 3.01(g), the undersigned certifies that counsel for Defendants have conferred by email with counsel for Plaintiffs in good faith regarding the subject matter of this Motion. Plaintiffs oppose the requested relief.

Respectfully submitted this 22nd day of April 2024.

MURPHY & ANDERSON, P.A.

s/Sarah Jeck Hulsberg
Niels P. Murphy
Florida Bar No. 0065552
Sarah Jeck Hulsberg
Florida Bar No. 0106027
1501 San Marco Blvd
Jacksonville, Florida 32207
904-598-9282 (Telephone)
nmurphy@murphyandersonlaw.com
shulsberg@murphyandersonlaw.com
*Attorneys for Defendant Association of Related Churches*

THE LILES FIRM, P.A.

s/Robert B. George
Robert B. George
Florida Bar No. 108995
John A. Carlisle
Florida Bar No. 626716
50 North Laura Street, Suite 1200
Jacksonville, Florida 32202
904-634-1100 (Telephone)
904-634-1234 (Facsimile)
rgeorge@thelilesfirm.com
jcarlisle@thelilesfirm.com
*Attorneys for Defendant Chris Hodges*

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE, P.A.

s/Michael E. Lockamy
Michael E. Lockamy
Florida Bar No. 69626
John G. Woodlee
Florida Bar No. 0100990
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
904-353-0211 (Telephone)
904-353-9307 (Facsimile)
mel@bedellfirm.com
jgw@bedellfirm.com
*Attorneys for Defendant Dino Rizzo*